Michael Rubin (SBN 80618)
Andrew Kushner (SBN 316035)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone:    (415) 421-7151
Facsimile:    (415) 362-8064
Email:    mrubin@altber.com
          akushner@altber.com

Cliff Palefsky (SBN 77683)
Keith Ehrman (SBN 106985)
MCGUINN, HILLSMAN & PALEFSKY
535 Pacific Avenue
San Francisco, CA 94133
Telephone:    (415) 421-9292
Facsimile:    (415) 403-0202
Email:    cp@mhpsf.com
          keith@mhpsf.com

William B. Reilly (SBN 177550)
LAW OFFICE OF WILLIAM REILLY
86 Molino Avenue
Mill Valley, CA 94941
Telephone:    (415) 225-6215
Facsimile:    (415) 634-2897
Email:    bill@williambreilly.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| ROBIN BERMAN, BO KANG, KHASHAYAR MIRFAKHRAEI, THANG VAN VU, DONNA VIERA-CASTILLO, GIRISH RAMESH, PATRICK HANLEY, ILANA SHTERNSHAIN and MANDY SCHWARZ,<br><br>Plaintiffs,<br><br>v.<br><br>MICROCHIP TECHNOLOGY INCORPORATED, a corporation; ATMEL CORPORATION, a corporation; and ATMEL CORPORATION U.S. SEVERANCE GUARANTEE BENEFIT PROGRAM, an employee benefit plan,<br><br>Defendants | Case No. 4:17-CV-1864-HSG<br><br>**EXHIBIT A (PART II, SECTION 1) TO DECLARATION OF CLIFF PALEFSKY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:  October __, 2021<br>Time:  2:00 p.m.<br>Courtroom.:  2, Floor 4<br>Judge:  Hon. Haywood S. Gilliam, Jr.<br><br>Action Filed:  April 4, 2017<br>Trial Date:  Not yet set |

# ADMINISTRATIVE RECORD PART II

**Bates Stamp ATMEL PLAN/BERMAN 0001-4119**

JOHN A. McGUINN
JOHN R. HILLSMAN
CLIFF PALEFSKY
DEREK B. JACOBSON
KEITH A. EHRMAN
ABRAHAM FEINSTEIN-HILLSMAN
SCOTT M. STILLMAN
JEANNETTE A. VACCARO

LAW OFFICES OF
## McGUINN, HILLSMAN & PALEFSKY
A PROFESSIONAL CORPORATION
535 PACIFIC AVENUE, SUITE 100
SAN FRANCISCO, CALIFORNIA 94133
TELEPHONE (415) 421-9292

FAX (415) 403-0202

February 3, 2017

### VIA FAX: (503-669-6055) & FEDERAL EXPRESS

Ms. Carly Petrovic
Plan Administrator for
Atmel Corporation's U.S. Severance Guarantee Benefit Program
c/o Microchip Technology Corporation
2355 West Chandler Blvd.
Chandler, AZ  85224-6199

Re:    *ERISA Appeals for Peter Schuman, William Coplin, Robin Berman, Bo Kang,*
*Khashayar Mirfakhraei, Thang Van Vu, Donna Viera-Castillo, Girish Ramesh,*
*Patrick Hanley, Ilana Shternshain and Mandy Schwarz*

Dear Plan Administrator:

As you know, this office represents Peter Schuman, William Coplin, Robin Berman, Bo Kang, Khashayar Mirfakhraei, Thang Van Vu, Donna Viera-Castillo, Girish Ramesh, Patrick Hanley, Ilana Shternshain and Mandy Schwarz (collectively referred to as our "Clients") in connection with their claims for severance benefits under the Atmel Corporation's U.S. Severance Guarantee Benefit Program (the "Plan"), which is governed by ERISA. This letter is submitted on behalf of our Clients in response to your January 23, 2017 letter, and in support of our Clients' appeals of your denials of their claims for severance benefits under the Plan. Please place a copy of this letter in each of our Clients' claim files.

On January 23, 2017, you responded to our demand for the entire administrative record relating to the denial of our Clients' claims, and to our repeated demands for the documents we listed in our Clients' original demand letters, by producing a set of documents bearing Bates Stamp Nos. BSC 1—2756. The documents produced by the Plan Administrator on January 23, 2017 consist entirely of the documents that our Clients submitted to the Plan Administrator in support of their claims in the first place; the Plan Administrator's correspondence to our Clients in response to their original demand letters; and the Plan documents themselves. Under applicable ERISA law and regulations (ERISA § 104(b) and/or 29 CFR 2560.503-1(h)(2)(iii)), and as indicated by the Plan Administrator itself in the January 23, 2017 letter, the documents produced as BSC 1—2756 thus constitute all of the documents that the Plan Administrator "considered or generated in the course of making the benefit determination" and "relied upon in

**ATMEL PLAN/BERMAN000001**

Ms. Carly Petrovic
Plan Administrator for
Atmel Corporation's U.S. Severance Guarantee Benefit Program
February 3, 2017
Page 2

making the benefit determination", and constitute all of the documents that purportedly demonstrate the Plan Administrator's "compliance with the [required] administrative process and safeguards." If this is incorrect, please advise me as soon as possible.

The documents comprising BSC 1—2756 contain very few of the documents which our Clients demanded in their original demand letters and which our Clients highlighted to the Plan Administrator as being relevant and necessary to a proper determination of their claims. In its January 23, 2017 letter, the Plan Administrator took the position that it "continues to dispute that any of these Document Demands are proper." We strongly disagree with your contention that the documents demanded by our Clients are "not relevant" and that "the vast majority of [our Clients'] Document Demands were improper, enormously broad and burdensome, and raise issues related to interests associated with production, accessibility, and relevance to the claimants' claims for benefits." The documents previously demanded by our Clients are highly relevant to the factual basis underlying our Clients' assertions in their demands for benefits; are relevant and necessary to a good faith determination of their claims for benefits; and should have been considered as part of a proper claim investigation in order to fulfil the Plan Administrator's fiduciary obligations under ERISA. In addition, by failing to produce to our Clients the documents they demanded, you have interfered with, and failed to provide our Clients with, their opportunity to submit to the Plan Administrator evidence and information relating to their claims for benefits, and so have denied our Clients the "full and fair review" of their claims required under ERISA.

Furthermore, the Plan Administrator's assertion in its January 23, 2017 letter that, because "the claimants did not complain with respect to the sufficiency of the documents provided," the Plan Administrator met its duty to investigate and to obtain available information is misplaced, as is the Plan Administrator's request that we contact you "in writing citing additional provisions with respect to which [we] believe the Severance Plan is required to produce documents." The Plan Administrator may not shirk its duty to investigate and to obtain available information for any reason, nor may it attempt to foist that duty onto Plan beneficiaries.

If any additional evidence or analysis is obtained to support a decision to uphold the denial on appeal, or if any additional documents are "considered" or "generated" or "relied upon" during the appeal determination process, we demand that the Plan Administrator provide us with such documents and evidence and analysis, and with the opportunity to review, comment on and/or submit contradictory evidence or analysis, *before* a decision on appeal is issued. If the Plan Administrator does not provide us with this opportunity, our Clients will be denied the "full and fair review" of their claims required under ERISA.

Finally, in the letters to our Clients in which the Plan Administrator gave itself an "extension of time" to issue its claim decisions, the Plan Administrator made the repeated assertion that it was "in the process of obtaining all appropriate documentation relating to your

**ATMEL PLAN/BERMAN000002**

Ms. Carly Petrovic
Plan Administrator for
Atmel Corporation's U.S. Severance Guarantee Benefit Program
February 3, 2017
Page 3

claim" and that special circumstances warranted extending the time to decide the claim. As the Administrative Record reflected in BSC 1—2756 establishes that the Plan Administrator did not obtain or consider any additional documentation, it is clear that there were no 'special circumstances' that warranted extending the time to decide the claims. Rather, the Plan Administrator merely extended the time in bad faith and in breach of its fiduciary duties for the purpose of delaying the resolution of our Clients' claims and to allow Microchip further opportunity to wrongfully obtain releases from Plan beneficiaries who were being terminated.

Do not hesitate to contact me if you have any questions.

Very truly yours,

Keith Ehrman

cc: Michael Rubin, Esq.
Kim van Herk, Esq. (via email)

Robin Berman

EXHIBIT A-2

<u>DECLARATION OF ROBIN BERMAN</u>

I, Robin Berman, declare as follows:

In 2015, I was employed by Atmel as a Creative Director. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan documents that I received in July 2015 is attached hereto as Exhibit A. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

In September 2015, I learned that Atmel had entered into an agreement with a company called Dialog Semiconductor pursuant to which Dialog would acquire Atmel. In December 2015, I heard that another company had made an offer to purchase Atmel and that a decision would be made in January. The rumor among employees was that the new company was Microchip. I and many other employees thought this would be bad for Atmel and for the future of many Atmel employees.

In mid-January 2016, I learned that Microchip had made a superior offer to that of Dialog. My superior, Sander Arts (the Vice President of Corporate Marketing), assured me and other employees that we should not look elsewhere for a job outside of Atmel, since the Severance Plan was in place and so we had financial protection in the event that Microchip terminated us.

On approximately January 20, 2016, Steve Laub (the Chief Executive Officer of Atmel) held an informal all hands meeting. During this meeting, Laub discussed the Microchip offer, and indicated to the employees that the Severance Plan was still in place.

In February 2016, I discussed with Sander Arts the fact that I and others had not started looking for new jobs in light of the Severance Plan. Arts again assured me that the Severance Plan was intact and so I would have financial protection for many months if Microchip terminated me. I had an almost identical discussion with Arts again in March 2016.

On approximately April 6, 2016, I and many other Atmel employees received a letter informing us that we were being terminated effective immediately. These letters indicated that Microchip would only pay 5 weeks of salary as severance. A copy of the April 6, 2016 termination letter I received is attached hereto as Exhibit B. As I was being escorted out of the lobby on April 6th, I had a discussion with Ravi Ball (a Manager of Human Resources). Ball made it clear that he was shocked that Microchip was not honoring the Severance Plan, and he also indicated that it was a complete surprise to the remaining Atmel Human Resources team that Microchip was not paying the severance.

On approximately April 11, 2016, I and the other Atmel employees who were terminated received a new letter, which indicated that Microchip would pay us 50% of the severance benefits due under the Severance Plan. A copy of the April 11, 2016 letter I received is attached hereto as Exhibit C.

Based on my discussions with other Atmel employees prior to the closing of the acquisition in April 2016, it was my understanding that Atmel had made Microchip aware of the existence of the Severance Plan prior to April 2016, and that Atmel had also made Microchip aware of the fact that Atmel believed that the Severance Plan was still in place following Microchip's agreement to purchase

1

Atmel in January 2016 and that the Severance Plan would require Microchip to pay severance benefits if Microchip acquired Atmel and then terminated Atmel employees. Based on my discussions with other Atmel employees prior to the closing of the acquisition in April 2016, Microchip had knowledge of, and had been involved in the drafting of, the language of the February 2016 "Frequently Asked Questions" that were published for Atmel employees to address questions regarding the Microchip acquisition.

On approximately May 11, 2016, I had a conversation with Sander Arts, in which Arts confirmed that prior to the Microchip acquisition, he had conveyed to his whole team that the Severance Plan was intact even with Microchip becoming the purchaser. Arts also confirmed that, prior to the April acquisition by Microchip, Laub had told all of his direct reports (including Arts) that the Severance Plan was still intact.

I relied on the Severance Plan and the assurances I had received from Atmel managers in deciding to stay with Atmel through the Microchip acquisition. I would have left Atmel and found another job long before the Microchip acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 18, 2016 at Palo Alto, California.

Robin S. Berman

Robin Berman

2

EXHIBIT A to A-2

ATMEL PLAN/BERMAN000007



July 9, 2015

Robin Berman
Re: Severance Guarantee

Dear Robin,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and ·
- **COBRA Benefits:** Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Robin, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Sander Arts
Robin Berman

*STRICTLY CONFIDENTIAL*

ADDENDUM TO
U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A. A Change of Control actually occurs; and
B. Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000009**

**Payments:** All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

**Additional Matters.** Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

**ATMEL PLAN/BERMAN000010**

| EXHIBIT B to A-2 |
|---|

ATMEL PLAN/BERMAN000011

| TO:   | Robin Berman                     |
|-------|----------------------------------|
| DATE: | April 6, 2016                    |
| FROM: | Atmel, LLC.                      |
| RE:   | Severance Agreement and Release  |

In connection with the termination of your employment from Atmel, LLC. effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Atmel, LLC., and its affiliates, parent corporation and subsidiaries (collectively the "Company"), on the terms stated below.

### Atmel, LLC Commitments to You

- In consideration for entering into this Agreement, Atmel, LLC. will pay you a lump sum total of $12,538.17 ("Severance"), which is approximately equal to 5 weeks of your current base pay.

- The Severance will be paid to you in one lump sum within 30 business days after the Effective Date of this Agreement, less all legally-required taxes and withholdings, including any advanced PTO pay.

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel, LLC. Human Resources department, Atmel, LLC. shall use its best efforts to provide only your last position and dates of employment.

### Your Commitments to the Company

- You agree to release the Company and its current and former officers, directors, employees, shareholders, affiliates, benefit plans, administrators, insurers, trustees, divisions, and subsidiaries, and predecessor and successor corporations and assigns (including, but not limited to, Atmel, LLC.) (collectively, the "Releasees") and promise never to assert any and all actions,

**ATMEL PLAN/BERMAN000012**

causes of action, grievances, obligations, damages, losses and claims of every kind based on any act, omission, event up to the date you sign this Agreement, including, but not limited to, any claims relating to or arising out of your employment and/or termination of your employment with Atmel, LLC. In particular, you release the Releasees from liability for all claims of any nature that you ever had or may have at this time, whether you know about them or not. This release specifically includes, but is not limited to, any claims under federal or state law, such as Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act, as well as any contract claim or other claim under statutory or common law, to the fullest extent the law permits a release of claims. You agree that the waiver and release of claims in this paragraph is on behalf of yourself and your heirs, administrators, representatives, executors, successors and assigns, and all such persons are bound by this waiver and release. You agree that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement. This release does not release claims that cannot be released as a matter of law, including, but not limited to, your right to file a charge with or participate in a charge by the Equal Employment Opportunity Commission, or any other local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, against the Company (with the understanding that any such filing or participation does not give you the right to recover any monetary damages against the Company and your release of claims herein bars you from recovering such monetary relief from the Company). This release does not extend to any right you may have to unemployment compensation benefits or workers' compensation benefits. You acknowledge that you have made no assignment or transfer of any claim or other matter waived or released by this Agreement.

- You agree that this release constitutes a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads:

  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

- You acknowledge that you are waiving and releasing rights you may have under ADEA, and that this waiver and release is knowing and voluntary. You and the Company agree that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Effective Date of this Agreement. You acknowledge that the consideration given for this waiver and release is in addition to anything of value to which you were already entitled. You acknowledge further that you have been advised by this writing that: (a) you should consult with an attorney prior to executing this Agreement; (b) you have forty-five (45) days within which to consider this Agreement; (c) as set forth in Exhibits A, B and C herein, you have been advised in writing by the Company of the class, unit, or group of individuals covered by the reduction in force, the eligibility factors for the reduction in force, and the job titles and ages of all individuals who were and were not selected; (d) you have seven (7) days following the execution of this Agreement to revoke this Agreement; (e) this Agreement shall not be effective until after

2

the revocation period has expired; and (f) nothing in this Agreement prevents or precludes you from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law. You and the Atmel, LLC. agree that changes, whether material or immaterial, do not restart the running of the 45-day period.

- This Agreement will become effective and irrevocable on the eighth (8th) day after both parties execute it (the "Effective Date"). In the event you sign this Agreement and returns it to the Company in less than the forty-five (45) day period identified above, you hereby acknowledge that you have voluntarily chosen to waive the full time period allotted for considering this Agreement. You acknowledge and understand that revocation must be accomplished by a written notification to Geri Shaw, Human Resources, Atmel, LLC., that is received prior to the Effective Date.

- To the extent Employee is in the possession of any Atmel property, including personal computers (PCs), laptops, fax machines scanners, copiers cellular phones, Atmel credit cards, and any Atmel documents, correspondence and related corporate materials on all media, Employee will return all property to Atmel on or before the Termination Date. In addition, computers must be returned with all Company data intact.

- You acknowledge and represent that, other than the consideration set forth in this Agreement, the Company has paid or provided all salary, wages, bonuses, accrued vacation/paid time off, premiums, leaves, housing allowances, relocation costs, interest, severance, outplacement costs, fees, reimbursable expenses, commissions, stock, stock options, vesting, and any and all other benefits and compensation due to you.

### General Understandings and Acknowledgements

- You hereby reaffirm and agree to observe and abide by the terms of the [Confidential Information and Invention Assignment] (the "Proprietary Information Agreement") between you and Atmel, LLC., specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information. You represent that you have returned all documents and other items provided to you by the Company, developed or obtained by you in connection with your employment with the Company, or otherwise belonging to the Company.

- This Agreement and the Proprietary Information Agreement states your and the Company's complete understandings regarding the subject matter of this Agreement and your rights and the Company's obligations relating in any way to, or arising out of, your employment with Atmel, LLC. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 23, 2016 to consider whether you want to accept the offer Atmel, LLC is making in this Agreement, although you do not need to wait until that time to

3

accept this offer and obtain the Severance. To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in this bullet point. As noted above, you will not receive the Severance until after you deliver this signed Agreement to Geri Shaw and the seven (7) day revocation period ends and you have not revoked this Agreement.

o  By signing this Agreement, you will be acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given a reasonable period of time to consider it, and that you are signing it knowingly and voluntarily.

In WITNESS WHEROF, the parties have executed this Agreement on the respective dates set forth below.

_____          _____
Date                                      Robin Berman



_____          _____
Date                                      Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

4

# EXHIBIT A

## DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1. **Decisional Unit.** The decisional unit for this reduction in force is Marcom Group

2. **Eligibility.** All persons included in the Marcom Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3. **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to the Company. The offer of severance benefits contained in this Agreement will expire on the date stated on page 3 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4. **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

5

Data Sheet by Age
4/6/2016

EXHIBIT B

Job Titles of Individuals <u>Not Selected</u> from the Decisional Unit for this Reduction in Force and Not Offered Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

6

ATMEL PLAN/BERMAN000017

**EXHIBIT C**

Job Titles of Individuals <u>Selected</u> from the Decisional Unit for this Reduction in Force and Offered Severance Benefits for Signing this Separation Agreement and Release

| <u>Title</u> | <u>Age</u> |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**ATMEL PLAN/BERMAN000018**

EXHIBIT C to A-2

ATMEL PLAN/BERMAN000019

| TO: | Robin Berman |
| DATE: | April 11, 2016 |
| FROM: | Atmel Corporation |
| RE: | Severance Agreement and Release |

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip, Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

<u>Company Commitments to You</u>

- In consideration for entering into this Agreement, Atmel will pay you a lump sum total of (i) $26,079.40 representing, a lump sum cash payment in cash equal to 0.20 times the your Base Pay, and (ii) $1,052.05 representing, a lump sum payment in cash equal to 50% of the your 2015 Bonus, prorated to the date of your Involuntary Termination.

- In addition, if you timely elect to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to two (2) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence, you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- The benefits described in the two bullets above are the "Severance Benefits."

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

- The Company will not contest any claim for unemployment benefits that you may file.

**ATMEL PLAN/BERMAN000020**

## Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads "*a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.*"

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

## General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 27, 2016 to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until the next administratively practicable payroll after the eighth calendar day after you delivered this signed unrevoked Agreement to Geri Shaw. If you decide to accept this offer and you deliver a signed Agreement to Geri Shaw, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Geri Shaw within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 45 days to consider it, and that you are signing it knowingly and voluntarily.

2

**ATMEL PLAN/BERMAN000021**

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time that you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____
Date

_____
Robin Berman

_____
Date

_____
Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

3

ATMEL PLAN/BERMAN000022

## EXHIBIT A

### DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1.  **Decisional Unit.** The decisional unit for this reduction in force is Marcom Group

2.  **Eligibility.** All persons included in the Marcom Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.  **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to Geri Shaw at Atmel. The offer of severance benefits contained in this Agreement will expire on the date stated on page 2 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.  **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

**ATMEL PLAN/BERMAN000023**

Data Sheet by Age
4/6/2016

EXHIBIT B

Job Titles of Individuals <u>Not Selected</u> from the Decisional Unit for this Reduction In Force and Not Offered
Severance Benefits

| <u>Job Title(s)</u> | <u>Age(s)</u> |
|---|---|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

5

ATMEL PLAN/BERMAN000024

**Data Sheet by Age**
**4/6/2016**

**EXHIBIT C**

Job Titles of Individuals <u>Selected</u> from the Decisional Unit for this Reduction in Force and Offered Severance Benefits for Signing this Separation Agreement and Release

| <u>Title</u> | <u>Age</u> |
|---|---|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

ATMEL PLAN/BERMAN000025

*Bo Kang*

EXHIBIT A-3

**ATMEL PLAN/BERMAN000026**

# DECLARATION OF BO KANG

I, Bo Kang, declare as follows:

In 2015, I was employed by Atmel as a Senior Applications Manager. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan documents that I received in July 2015 is attached hereto as Exhibit A. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

During 2015, I learned that Atmel had entered into an agreement with a company called Dialog pursuant to which Dialog would acquire Atmel. In approximately December 2015, I heard that Dialog might not be the buyer and that Microchip might be the potential purchaser. Around this time period, I had several conversations with my manager, Steve Pancoast (the Vice President of Software, Tools and Applications) about the ongoing validity of the severance. Pancoast communicated to me his understanding and belief that the severance remained in place.

In approximately early February 2016, I read the Frequently Asked Questions ("FAQ's") that had been published for Atmel employees regarding the potential Microchip acquisition of Atmel. A copy of the FAQ's is attached as Exhibit B. The FAQ's appeared to confirm that Microchip would be honoring the Severance Plan if it acquired Atmel, consistent with what Pancoast had expressed to me.

In early March 2016, I spoke with Pancoast about my possible future if Microchip acquired Atmel, and how my position might not be safe. Pancoast discussed with me that both of us would have some financial protection for a transition period because of the severance package, as assured by the FAQ's.

In early April 2016, I was on a pre-arranged vacation overseas, and my paid time off was scheduled to last through April 11, 2016. I returned to work at Atmel on April 12, 2016 and learned that many employees had received a letter on April 6, 2016 terminating them and offering six weeks of severance. Because I had been on vacation, I did not receive such a letter. However, when I returned to the office on April 12, 2016, I was informed by Human Resources that my employment was being terminated effective April 12, 2016. I then received a letter which was dated April 11, 2016. That letter indicated that Microchip would pay me 50% of the severance benefits due under the Severance Plan. A copy of the April 11, 2016 letter which I received is attached hereto as Exhibit C.

In all of my discussions with other Atmel employees prior to April 2016, there was no doubt in anyone's mind that the Severance Plan was valid and intact for the upcoming Microchip acquisition, based on assurances they had received from Atmel management. I and other employees were shocked when the Severance Plan was not honored by Microchip after our termination in April 2016.

1

**ATMEL PLAN/BERMAN000027**

I relied on receiving severance benefits under the Severance Plan in making the decision to saty at Atmel through the time of the Microchip acquisition, and I would have left and looked for another job outside Atmel long before April 2016 if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration

was executed on May _18_, 2016 at ____Pleasanton____,
____California____.

_____
Bo Kang

EXHIBIT A to A-3

ATMEL PLAN/BERMAN000029



July 9, 2015

Bo Kang
Re: Severance Guarantee

Dear Bo,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- COBRA Benefits: Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Bo, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Steven Pancoast
Steven Pancoast

*STRICTLY CONFIDENTIAL*

ADDENDUM TO
U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

    A.    A Change of Control actually occurs; and

    B.    Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000031**

Payments: All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

Additional Matters. Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

**ATMEL PLAN/BERMAN000032**

EXHIBIT B to A-3

ATMEL PLAN/BERMAN000033

**Subject:** Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger
**Date:** Wednesday, February 3, 2016 at 5:57:34 PM Pacific Standard Time
**From:** Human Resources

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our intranet, **Atmel Connect**, at http://connect.atmel.com/index.html and are focused on answering questions related to compensation and benefits.

As we have additional information, we will provide further updates and FAQs.

Warm regards,

Suzy
**Suzanne Zoumaras** | Senior Vice President, Global Human Resources
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com | www.atmel.com

ATMEL PLAN/BERMAN000034



# FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
## Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

RSUs & PRSUs. At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

Stock Options. All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

ATMEL PLAN/BERMAN000035



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

Purchase Rights under the Employee Stock Purchase Plan (ESPP). Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010841/11600178_8k.htm

When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

Confidential *** Not for Distribution

ATMEL PLAN/BERMAN000036

# Atmel

## Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the *"SEC"*) a Registration Statement on Form S-4 (the *"Registration Statement"*) containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the *"Proxy Statement/Prospectus"*). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the *"Investors"* section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

## Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the *"Investors"* section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

## Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

ATMEL PLAN/BERMAN000037

or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential success to be derived from strategic partnerships, the potential impact of capacity constraints, the effect of financial performance on share price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip; (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 9, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000038

# Atmel

only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

###

Confidential *** Not for Distribution

ATMEL PLAN/BERMAN000039

EXHIBIT C to A-3

ATMEL PLAN/BERMAN000040

| TO: | Bo Kang |
|---|---|
| DATE: | April 11, 2016 |
| FROM: | Atmel Corporation |
| RE: | Severance Agreement and Release |

---

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip, Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

<u>Company Commitments to You</u>

- In consideration for entering into this Agreement, Atmel will pay you a lump sum total of (i) $32,000.00 representing, a lump sum cash payment in cash equal to 0.20 times your Base Pay, and (ii) $3,024.66 representing, a lump sum payment in cash equal to 50% of your 2015 Bonus, prorated to the date of your Involuntary Termination.

- In addition, if you timely elect to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to two (2) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence, you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- <u>The benefits described in the two bullets above are the "Severance Benefits."</u>

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

  - The Company will not contest any claim for unemployment benefits that you may file.

**ATMEL PLAN/BERMAN000041**

## Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads *"a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."*

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

## General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 27, 2016 to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until the next administratively practicable payroll after the eighth calendar day after you delivered this signed unrevoked Agreement to Geri Shaw. If you decide to accept this offer and you deliver a signed Agreement to Geri Shaw, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Geri Shaw within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 45 days to consider it, and that you are signing it knowingly and voluntarily.

2

**ATMEL PLAN/BERMAN000042**

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time that you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____          _____
Date                                     Bo Kang


_____          _____
Date                                     Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

3

ATMEL PLAN/BERMAN000043

## EXHIBIT A

### DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel:

1.    **Decisional Unit.** The decisional unit for this reduction in force is MCU Apps Engineering Group

2.    **Eligibility.** All persons included in the MCU Apps Engineering Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.    **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to Geri Shaw at Atmel. The offer of Severance Benefits contained in this Agreement will expire on the date stated on page 3 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.    **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

4

**ATMEL PLAN/BERMAN000044**

**Data Sheet by Age**
4/6/2016

**EXHIBIT B**

Job Titles of Individuals Not Selected from the Decisional Unit for this Reduction in Force and Not Offered Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

5

ATMEL PLAN/BERMAN000045

EXHIBIT B -Atmel MCU Apps - (4/6/16)

| Title | Age(s) |
|---|---|
| Sr. Applications / Systems Engineer | 32 |
| Senior Applications Engineer | 32 |
| Staff Applications Engineer | 38 |
| Manager, Systems Applications | 49 |
| Sr. Applications Manager | 50 |
| Sr. RF Applications Engineer | 57 |
| Staff Applications Engineer | 61 |
| Sr. Applications Engineer | 65 |

**ATMEL PLAN/BERMAN000046**

Data Sheet by Age
4/6/2016

## EXHIBIT C

Job Titles of Individuals <u>Selected</u> from the Decisional Unit for this Reduction in Force and Offered
Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
| --- | --- |
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**ATMEL PLAN/BERMAN000047**

EXHIBIT C - Atmel MCU Apps (4/6/16)

| Job Title | Age(s) |
|---|---|
| Senior Manager, Applications Engineering | 50 |

ATMEL PLAN/BERMAN000048

Mary Van Va

EXHIBIT A-4

## DECLARATION OF THONG VAN VU

I, Thong Van Vu, declare as follows:

In 2015, I was employed by Atmel as a Digital Marketing and Online Acquisition Manager. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan documents that I received in July 2015 is attached hereto as Exhibit A. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

During 2015, I learned that Atmel had entered into an agreement with a company called Dialog pursuant to which Dialog would acquire Atmel. In approximately late December 2015 or early January 2016, I heard that Dialog might not be the buyer and that another potential purchaser had emerged. In early January 2016, I heard that it was Microchip that was the new emerging buyer. During this time period, I was assured by various Atmel employees (including Sanders Arts, the Vice President of Marketing) that the Severance Plan was in place and that I should not go look for another job outside Atmel, since if I wound up losing my job through the acquisition that I was protected by the Severance Plan and so would have time available to find another job, with my severance payout acting as a financial bridge.

In February 2016, after it had become clear that Microchip was the entity that was going to purchase Atmel, I was assured by Shantanu Dhavale (Director) that the Severance Plan was in place and that I should not go look for a job outside Atmel (as I was inclined to do). Mr. Dhavale assured me that if I wound up losing my job through the Microchip acquisition, that I and the other team members would still be protected by the Severance Plan and so would have time available to find another job. We also discussed that the Severance Plan would offer a bridge to our next transition and allow us to find out more about the integration plans from the merger with Microchip. Mr. Dhavale encouraged me to believe that, because of the severance package, I would have time to find another job and that I should stay at Atmel and see what was going to happen with the company.

In February 2016, I read a memo entitled Frequently Asked Questions ("FAQ's") that had been published for Atmel employees regarding the potential Microchip acquisition of Atmel. A copy of the FAQ's is attached as Exhibit B. As I read the FAQ's, they confirmed that Microchip would be honoring the Severance Plan if it acquired Atmel.

In March 2016, I was assured by Laura Roselli (Director) that I should not look for another job outside Atmel (as I was inclined to do), and assured me that if I wound up losing my job through the Microchip acquisition that I would be protected by the Severance Plan. Ms. Roselli encouraged me to believe that, because of the financial security of the severance package, combined with my unique digital marketing role, I should stay at Atmel and see whether I would be part of the team following the merger.

1

**ATMEL PLAN/BERMAN000050**

On approximately April 6, 2016, I and many other Atmel employees received a letter informing us that we were being terminated effective immediately. These letters indicated that Microchip would only pay 4 weeks of salary as severance. A copy of the April 6, 2016 termination letter I received is attached hereto as Exhibit C. On that same day, I had a discussion with Ravi Bali (a Director of Human Resources). Bali expressed that he was shocked that Microchip was not honoring the Severance Plan. Bali told me that it was a complete surprise to the Atmel Finance team, Investor Relations team and Human Resources team that Microchip was not paying the severance.

On approximately April 11, 2016, I and the other Atmel employees who were terminated received a new letter, which indicated that Microchip would pay us 50% of the severance benefits due under the Severance Plan. A copy of the April 11, 2016 letter I received is attached hereto as Exhibit D.

I relied on the Severance Plan and the assurances I had received from numerous Atmel managers in deciding to stay with Atmel through the Microchip acquisition. I would have left Atmel and found another job long before the Microchip acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan. In fact, I and many other employees considered Microchip an undesirable purchaser for Atmel, and I was very concerned about the future of Atmel and my own job security when I learned that Microchip was attempting to acquire Atmel.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May _18_, 2016 at _San Jose_, _California_.

_____
Thong Van Vu

2

EXHIBIT A to A-4

ATMEL PLAN/BERMAN000052

Thong Van Vu
Re: Severance Guarantee

Dear Thong Van,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- **COBRA Benefits:** Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Thong Van, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Sander Arts
Sander Arts

ADDENDUM TO
U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A. A Change of Control actually occurs; and
B. Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000054**

Payments: All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

Additional Matters. Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000055

EXHIBIT B to A-4

ATMEL PLAN/BERMAN000056

**Subject:** Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger
**Date:** Wednesday, February 3, 2016 at 5:57:34 PM Pacific Standard Time
**From:** Human Resources

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our intranet, Atmel Connect, at http://connect.atmel.com/index.html and are focused on answering questions related to compensation and benefits.

As we have additional information, we will provide further updates and FAQs.

Warm regards,

Suzy
**Suzanne Zoumaras** | Senior Vice President, Global Human Resources
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com | www.atmel.com

ATMEL PLAN/BERMAN000057



## FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
## Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

<u>RSUs & PRSUs</u>. At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

<u>Stock Options</u>. All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

**ATMEL PLAN/BERMAN000058**



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

<u>Purchase Rights under the Employee Stock Purchase Plan (ESPP)</u>. Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

**How much will I receive for my shares of Atmel stock?**

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010841/t1600178_8k.htm

**When is the transaction expected to close?**

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

**Will there be salary adjustments in 2016?**

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

**Who should I contact if I have questions about the transaction?**

If you have any questions, please contact Atmel's HR department.

**ATMEL PLAN/BERMAN000059**

# Atmel

## Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-4 (the *"Registration Statement"*) containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the *"Proxy Statement/Prospectus"*). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the *"Investors"* section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

## Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the *"Investors"* section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

## Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

ATMEL PLAN/BERMAN000060

Atmel

or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential success to be derived from strategic partnerships, the potential impact of capacity constraints, the effect of financial performance on share price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations, (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip, (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip; (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner, (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000061

**Atmel**

only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

\*\*\*

Confidential \*\*\* Not for Distribution

ATMEL PLAN/BERMAN000062

EXHIBIT C to A-4

ATMEL PLAN/BERMAN000063

TO: Thong Van Vu

DATE: April 6, 2016

FROM: Atmel, LLC.

RE: Severance Agreement and Release

---

In connection with the termination of your employment from Atmel, LLC. effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Atmel, LLC., and its affiliates, parent corporation and subsidiaries (collectively the "Company"), on the terms stated below.

### Atmel, LLC Commitments to You

- In consideration for entering into this Agreement, Atmel, LLC. will pay you a lump sum total of $11,365.38 ("Severance"), which is approximately equal to 4 weeks of your current base pay.

- The Severance will be paid to you in one lump sum within 30 business days after the Effective Date of this Agreement, less all legally-required taxes and withholdings, including any advanced PTO pay.

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel, LLC. Human Resources department, Atmel, LLC. shall use its best efforts to provide only your last position and dates of employment.

### Your Commitments to the Company

- You agree to release the Company and its current and former officers, directors, employees, shareholders, affiliates, benefit plans, administrators, insurers, trustees, divisions, and subsidiaries, and predecessor and successor corporations and assigns (including, but not limited to, Atmel, LLC.) (collectively, the "Releasees") and promise never to assert any and all actions,

ATMEL PLAN/BERMAN000064

causes of action, grievances, obligations, damages, losses and claims of every kind based on any act, omission, event up to the date you sign this Agreement, including, but not limited to, any claims relating to or arising out of your employment and/or termination of your employment with Atmel, LLC. In particular, you release the Releasees from liability for all claims of any nature that you ever had or may have at this time, whether you know about them or not. This release specifically includes, but is not limited to, any claims under federal or state law, such as Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act, as well as any contract claim or other claim under statutory or common law, to the fullest extent the law permits a release of claims. You agree that the waiver and release of claims in this paragraph is on behalf of yourself and your heirs, administrators, representatives, executors, successors and assigns, and all such persons are bound by this waiver and release. You agree that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement. This release does not release claims that cannot be released as a matter of law, including, but not limited to, your right to file a charge with or participate in a charge by the Equal Employment Opportunity Commission, or any other local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, against the Company (with the understanding that any such filing or participation does not give you the right to recover any monetary damages against the Company and your release of claims herein bars you from recovering such monetary relief from the Company). This release does not extend to any right you may have to unemployment compensation benefits or workers' compensation benefits. You acknowledge that you have made no assignment or transfer of any claim or other matter waived or released by this Agreement.

- You agree that this release constitutes a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads:

  > A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

- You acknowledge that you are waiving and releasing rights you may have under ADEA, and that this waiver and release is knowing and voluntary. You and the Company agree that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Effective Date of this Agreement. You acknowledge that the consideration given for this waiver and release is in addition to anything of value to which you were already entitled. You acknowledge further that you have been advised by this writing that: (a) you should consult with an attorney prior to executing this Agreement; (b) you have forty-five (45) days within which to consider this Agreement; (c) as set forth in Exhibits A, B and C herein, you have been advised in writing by the Company of the class, unit, or group of individuals covered by the reduction in force, the eligibility factors for the reduction in force, and the job titles and ages of all individuals who were and were not selected; (d) you have seven (7) days following the execution of this Agreement to revoke this Agreement; (e) this Agreement shall not be effective until after

2

**ATMEL PLAN/BERMAN000065**

the revocation period has expired; and (f) nothing in this Agreement prevents or precludes you from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law. You and the Atmel, LLC. agree that changes, whether material or immaterial, do not restart the running of the 45-day period.

- This Agreement will become effective and irrevocable on the eighth (8th) day after both parties execute it (the "Effective Date"). In the event you sign this Agreement and return it to the Company in less than the forty-five (45) day period identified above, you hereby acknowledge that you have voluntarily chosen to waive the full time period allotted for considering this Agreement. You acknowledge and understand that revocation must be accomplished by a written notification to Geri Shaw, Human Resources, Atmel, LLC., that is received prior to the Effective Date.

- To the extent Employee is in the possession of any Atmel property, including personal computers (PCs), laptops, fax machines scanners, copiers cellular phones, Atmel credit cards, and any Atmel documents, correspondence and related corporate materials on all media, Employee will return all property to Atmel on or before the Termination Date. In addition, computers must be returned with all Company data intact.

- You acknowledge and represent that, other than the consideration set forth in this Agreement, the Company has paid or provided all salary, wages, bonuses, accrued vacation/paid time off, premiums, leaves, housing allowances, relocation costs, interest, severance, outplacement costs, fees, reimbursable expenses, commissions, stock, stock options, vesting, and any and all other benefits and compensation due to you.

## General Understandings and Acknowledgements

- You hereby reaffirm and agree to observe and abide by the terms of the [Confidential Information and Invention Assignment] (the "Proprietary Information Agreement") between you and Atmel, LLC., specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information. You represent that you have returned all documents and other items provided to you by the Company, developed or obtained by you in connection with your employment with the Company, or otherwise belonging to the Company.

- This Agreement and the Proprietary Information Agreement states your and the Company's complete understandings regarding the subject matter of this Agreement and your rights and the Company's obligations relating in any way to, or arising out of, your employment with Atmel, LLC. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 23, 2016 to consider whether you want to accept the offer Atmel, LLC is making in this Agreement, although you do not need to wait until that time to

3

accept this offer and obtain the Severance. To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in this bullet point. As noted above, you will not receive the Severance until after you deliver this signed Agreement to Geri Shaw and the seven (7) day revocation period ends and you have not revoked this Agreement.

- By signing this Agreement, you will be acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given a reasonable period of time to consider it, and that you are signing it knowingly and voluntarily.

In WITNESS WHEROF, the parties have executed this Agreement on the respective dates set forth below.


_____          _____
Date                               Thong Van Vu



_____          _____
Date                               Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____. _____

4

**ATMEL PLAN/BERMAN000067**

## EXHIBIT A

## DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1. **Decisional Unit.** The decisional unit for this reduction in force is Marcom Group

2. **Eligibility.** All persons included in the Marcom Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3. **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to the Company. The offer of severance benefits contained in this Agreement will expire on the date stated on page 3 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4. **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

5

ATMEL PLAN/BERMAN000068

**Data Sheet by Age**
4/6/2016

**EXHIBIT B**

Job Titles of Individuals <u>Not Selected</u> from the Decisional Unit for this Reduction in Force and Not Offered Severance Benefits

| <u>Job Title(s)</u> | <u>Age(s)</u> |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

6

**ATMEL PLAN/BERMAN000069**

**EXHIBIT C**

Job Titles of Individuals Selected from the Decisional Unit for this Reduction in Force and Offered Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**ATMEL PLAN/BERMAN000070**

EXHIBIT D to A-4

ATMEL PLAN/BERMAN000071

| | |
|---|---|
| TO: | Thong Van Vu |
| DATE: | April 11, 2016 |
| FROM: | Atmel Corporation |
| RE: | Severance Agreement and Release |

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip, Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

### Company Commitments to You

- In consideration for entering into this Agreement, Atmel,, LLC. will pay you a lump sum total of (i) $29,550.00 representing, a lump sum cash payment in cash equal to 0.20 times the your Base Pay, and (ii) $1,446.58 representing, a lump sum payment in cash equal to 50% of your 2015 Bonus, prorated to the date of the your Involuntary Termination.

- In addition, if you timely elect to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to two (2) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence, you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- The benefits described in the two bullets above are the "Severance Benefits."

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

- The Company will not contest any claim for unemployment benefits that you may file.

**ATMEL PLAN/BERMAN000072**

## Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. It includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and related on views and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads "a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

## General Understandings and Acknowledgments

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligation relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is in writing and signed by a representative of the Company and you. If any provision in this Agreement is found to be unenforceable, it will be considered severable and will not affect the enforceability of the rest of this Agreement.

- You have until 5:00 p.m. on May 27, 2016 to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept the offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of this Agreement to Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until the next administratively practicable payroll after the expiration date. See after you delivered this signed unrevoked Agreement to Geri Shaw. If you decide to agree with this offer and you deliver a signed Agreement to Geri Shaw, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Geri Shaw within seven (7) calendar days after signing this Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 45 days to consider it, and that you are signing it knowingly and voluntarily.

2

ATMEL PLAN/BERMAN000073

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time that you have been given to consider it

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT

Date                                    Thong Van Vu


Date                                    Company Witness/Title

Internal use:

Date received: _____ _____

7-day revocation period ends: _____

ATMEL PLAN/BERMAN000074

## EXHIBIT A

### DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1.    **Decisional Unit.** The decisional unit for this reduction in force is Marcom Group

2.    **Eligibility.** All persons included in the Marcom Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.    **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to Geri Shaw at Atmel. The offer of severance benefits contained in this Agreement will expire on the date stated on page 2 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.    **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

4

**ATMEL PLAN/BERMAN000075**

Varna Castillo

EXHIBIT A-5

ATMEL PLAN/BERMAN000076

## DECLARATION OF DONNA VIERA-CASTILLO

I, Donna Viera-Castillo, declare as follows:

In 2015, I was employed by Atmel as an Event Marketing Manager. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). I cannot locate the actual Severance Plan document that I received in July 2015. However, attached hereto as Exhibit A is a copy of the Severance Plan document that Bo Kang received in July 2015, and the Severance Plan document I received in July 2015 was identical to Exhibit A, except that my name was on the letter rather than Mr. Kang's. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

During 2015, I learned that Atmel had entered into an agreement with a company called Dialog pursuant to which Dialog would acquire Atmel. In the last half of January 2016, I learned that Dialog seemed to be on the way out as a purchaser, and that Microchip Technology looked like it would be the new purchaser. My boss, Sanders Arts (Vice President of Corporate Marketing), assured me and others that we were still covered by the Severance Plan and would get severance benefits, and that we should stay focused on our jobs and not worry about the potential acquisition by Microchip.

In approximately late January 2016, I learned about a January 14, 2016 letter that was sent by Atmel to director-level employees. That January 14, 2016 letter specifically confirmed that the Severance Plan was still intact and that the severance benefits under the Severance Plan would be paid if Microchip completed the acquisition and terminated Atmel employees. A copy of the January 14, 2016 letter is attached as Exhibit B.

In early February 2016, I read the Frequently Asked Questions ("FAQ's") that had been published for Atmel employees regarding the potential Microchip acquisition of Atmel. A copy of the FAQ's is attached as Exhibit C. Reading the FAQ's confirmed again to me that Microchip would be honoring the Severance Plan if it acquired Atmel. At staff meetings during this time period, it was noted multiple times that employees who were terminated by Microchip would be receiving the severance benefits of the Severance Plan.

During the time period between Microchip signing its agreement with Atmel in January 2016 and the closing of the acquisition in early April 2016, I had a conversation with Steve Laub (Atmel's Chief Executive Officer) about the Severance Plan. During this conversation, Laub told me that the Severance Plan was still in effect. Bob Martin, another Atmel employee, was present during that conversation.

On approximately April 6, 2016, I and many other Atmel employees received a letter informing us that we were being terminated effective immediately. These letters indicated that Microchip would only pay 6 weeks of salary as severance. A copy of the April 6, 2016 termination letter I received is attached hereto as Exhibit D.

On approximately April 11, 2016, I and the other Atmel employees who were terminated received a new letter, which indicated that Microchip would pay us 50% of the severance benefits due under the Severance Plan. A copy of the April 11, 2016 letter I received is attached hereto as Exhibit E.

1

**ATMEL PLAN/BERMAN000077**

After the April 6th termination of me and other Atmel employees, Sanders Arts expressed to me his shock that Microchip did not pay the severance benefits due under Severance Plan.

Between April 6 and April 11, 2016, I had lunch with Steve Laub and discussed Microchip's refusal to pay the severance benefits due under the Severance Plan. Laub told me that the July 2015 Severance Plan was in effect; that he was surprised that Microchip was not honoring the Severance Plan; and that Microchip knew about the Severance Plan.

I relied on receiving severance benefits under the Severance Plan in making the decision to stay at Atmel through the time of the Microchip acquisition. I certainly would have left Atmel and found another job long before Microchip's April 2016 acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 18, 2016 at _____ San Jose _____, _____ California _____

_Donna M Castllo_

Donna Viera-Castillo

EXHIBIT A to A-5

ATMEL PLAN/BERMAN000079



July 9, 2015

Bo Kang
Re: Severance Guarantee

Dear Bo,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- Cash Severance: 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- Target Incentive: If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- COBRA Benefits: Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Bo, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Steven Pancoast
Steven Pancoast

ADDENDUM TO
U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A. A Change of Control actually occurs; and
B. Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000081**

Payments: All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

Additional Matters. Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000082

EXHIBIT B to A-5

ATMEL PLAN/BERMAN000083

Atmel

January 14, 2016

Dear

We recognize that there continues to be significant speculation regarding the acquisition of the company and understand that this can be distracting and unsettling. As a result, we believe it is important to remind you of the benefits for which you may be eligible in the event that your employment is involuntarily terminated without Cause in connection with a Change of Control of the company, including an acquisition by Dialog or Microchip.

In July 2015, we provided you a letter (the "July Severance Benefits Letter") describing the U.S. Severance Guarantee Benefits for which you are eligible. This U.S. Severance Guarantee Program continues to remain in place. In addition, in September 2015, we informed you that the company's Compensation Committee approved acceleration of unvested non-performance restricted stock units ("RSUs") for our U.S. based Director-level employees under certain conditions. Under that program you will be eligible for 100% acceleration of your unvested RSUs if there is a Change of Control and your employment is involuntarily terminated without Cause during the period beginning three (3) months prior to the Change of Control and ending twelve (12) months following the Change of Control.

The benefits under the U.S. Severance Guarantee Program and the U.S Director-level equity acceleration programs are subject to the terms and conditions of each as approved by the company's Compensation Committee. To receive these benefits you will be required to sign a form of separation and release agreement reasonably acceptable to the company (or its successor). Capitalized terms that are not defined in this letter shall have the meanings set forth in the July Severance Benefits Letter.

Nothing in this letter or the July Severance Benefits Letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the company (or its successor) of the benefits provided by this letter and the July Severance Benefits Letter. You shall remain an at-will employee for all purposes, meaning that you or the company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Andy, we hope these benefits provide reassurance and reflect our appreciation for your contributions to Atmel. And, thank you for your continued focus during these unusual times.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

EXHIBIT C to A-5

**ATMEL PLAN/BERMAN000085**

**Subject:** Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger

**Date:** Wednesday, February 3, 2016 at 5:57:34 PM Pacific Standard Time

**From:** Human Resources

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our intranet, **Atmel Connect**, at http://connect.atmel.com/index.html and are focused on answering questions related to compensation and benefits.

As we have additional information, we will provide further updates and FAQs.

Warm regards,

Suzy
**Suzanne Zoumaras** | Senior Vice President, Global Human Resources
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com  |  www.atmel.com

ATMEL PLAN/BERMAN000086



# FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
### Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

RSUs & PRSUs. At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

Stock Options. All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

Confidential *** Not for Distribution

**ATMEL PLAN/BERMAN000087**

# Atmel

If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

Purchase Rights under the Employee Stock Purchase Plan (ESPP). Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010843/t1600178_8k.htm

When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

**ATMEL PLAN/BERMAN000088**

# Atmel

### Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-4 (the "Registration Statement") containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the "Proxy Statement/Prospectus"). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the "Investors" section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

### Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the "Investors" section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

### Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

ATMEL PLAN/BERMAN000089

# Atmel

or Atmel's plans, objectives, expectations and intentions and the expected timing of completion of the transaction. (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future savings and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of these opportunities, the potential success to be derived from logic partnerships, the potential impact of currently constraints, the effect of financial performance on stock price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. These factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip; (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000090

# Atmel

only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

Confidential *** Not for Distribution

ATMEL PLAN/BERMAN000091

EXHIBIT D to A-5

ATMEL PLAN/BERMAN000092

TO:      Donna Castillo

DATE:    April 6, 2016

FROM:   Atmel, LLC.

RE:      Severance Agreement and Release

---

In connection with the termination of your employment from Atmel, LLC. effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Atmel, LLC., and its affiliates, parent corporation and subsidiaries (collectively the "Company"), on the terms stated below.

## Atmel, LLC Commitments to You

- In consideration for entering into this Agreement, Atmel, LLC. will pay you a lump sum total of $16,961.54 ("Severance"), which is approximately equal to 6 weeks of your current base pay.

- The Severance will be paid to you in one lump sum within 30 business days after the Effective Date of this Agreement, less all legally-required taxes and withholdings, including any advanced PTO pay.

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel, LLC. Human Resources department, Atmel, LLC. shall use its best efforts to provide only your last position and dates of employment.

## Your Commitments to the Company

- You agree to release the Company and its current and former officers, directors, employees, shareholders, affiliates, benefit plans, administrators, insurers, trustees, divisions, and subsidiaries, and predecessor and successor corporations and assigns (including, but not limited to, Atmel, LLC.) (collectively, the "Releasees") and promise never to assert any and all actions,

**ATMEL PLAN/BERMAN000093**

causes of action, grievances, obligations, damages, losses and claims of every kind based on any act, omission, event up to the date you sign this Agreement, including, but not limited to, any claims relating to or arising out of your employment and/or termination of your employment with Atmel, LLC. In particular, you release the Releasees from liability for all claims of any nature that you ever had or may have at this time, whether you know about them or not. This release specifically includes, but is not limited to, any claims under federal or state law, such as Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act, as well as any contract claim or other claim under statutory or common law, to the fullest extent the law permits a release of claims. You agree that the waiver and release of claims in this paragraph is on behalf of yourself and your heirs, administrators, representatives, executors, successors and assigns, and all such persons are bound by this waiver and release. You agree that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement. This release does not release claims that cannot be released as a matter of law, including, but not limited to, your right to file a charge with or participate in a charge by the Equal Employment Opportunity Commission, or any other local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, against the Company (with the understanding that any such filing or participation does not give you the right to recover any monetary damages against the Company and your release of claims herein bars you from recovering such monetary relief from the Company). This release does not extend to any right you may have to unemployment compensation benefits or workers' compensation benefits. You acknowledge that you have made no assignment or transfer of any claim or other matter waived or released by this Agreement.

- You agree that this release constitutes a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads:

  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

- You acknowledge that you are waiving and releasing rights you may have under ADEA, and that this waiver and release is knowing and voluntary. You and the Company agree that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Effective Date of this Agreement. You acknowledge that the consideration given for this waiver and release is in addition to anything of value to which you were already entitled. You acknowledge further that you have been advised by this writing that: (a) you should consult with an attorney prior to executing this Agreement; (b) you have forty-five (45) days within which to consider this Agreement; (c) as set forth in Exhibits A, B and C herein, you have been advised in writing by the Company of the class, unit, or group of individuals covered by the reduction in force, the eligibility factors for the reduction in force, and the job titles and ages of all individuals who were and were not selected; (d) you have seven (7) days following the execution of this Agreement to revoke this Agreement; (e) this Agreement shall not be effective until after

2

ATMEL PLAN/BERMAN000094

the revocation period has expired; and (f) nothing in this Agreement prevents or precludes you from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law. You and the Atmel, LLC. agree that changes, whether material or immaterial, do not restart the running of the 45-day period.

- This Agreement will become effective and irrevocable on the eighth (8th) day after both parties execute it (the "Effective Date"). In the event you sign this Agreement and returns it to the Company in less than the forty-five (45) day period identified above, you hereby acknowledge that you have voluntarily chosen to waive the full time period allotted for considering this Agreement. You acknowledge and understand that revocation must be accomplished by a written notification to Geri Shaw, Human Resources, Atmel, LLC. that is received prior to the Effective Date.

- To the extent Employee is in the possession of any Atmel property, including personal computers (PCs), laptops, fax machines scanners, copiers cellular phones, Atmel credit cards, and any Atmel documents, correspondence and related corporate materials on all media, Employee will return all property to Atmel on or before the Termination Date. In addition, computers must be returned with all Company data intact.

- You acknowledge and represent that, other than the consideration set forth in this Agreement, the Company has paid or provided all salary, wages, bonuses, accrued vacation/paid time off, premiums, leaves, housing allowances, relocation costs, interest, severance, outplacement costs, fees, reimbursable expenses, commissions, stock, stock options, vesting, and any and all other benefits and compensation due to you.

## General Understandings and Acknowledgements

- You hereby reaffirm and agree to observe and abide by the terms of the [Confidential Information and Invention Assignment] (the "Proprietary Information Agreement") between you and Atmel, LLC, specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information. You represent that you have returned all documents and other items provided to you by the Company, developed or obtained by you in connection with your employment with the Company, or otherwise belonging to the Company.

- This Agreement and the Proprietary Information Agreement states your and the Company's complete understandings regarding the subject matter of this Agreement and your rights and the Company's obligations relating in any way to, or arising out of, your employment with Atmel, LLC. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 23, 2016 to consider whether you want to accept the offer Atmel, LLC is making in this Agreement, although you do not need to wait until that time to

3

ATMEL PLAN/BERMAN000095

accept this offer and obtain the Severance. To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in this bullet point. As noted above, you will not receive the Severance until after you deliver this signed Agreement to Geri Shaw and the seven (7) day revocation period ends and you have not revoked this Agreement.

○ By signing this Agreement, you will be acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given a reasonable period of time to consider it, and that you are signing it knowingly and voluntarily.

In WITNESS WHEROF, the parties have executed this Agreement on the respective dates set forth below.

_____          _____
Date                             Donna Castillo


_____          _____
Date                             Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

4

ATMEL PLAN/BERMAN000096

# EXHIBIT A

## DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1.  **Decisional Unit.** The decisional unit for this reduction in force is Marcom Group

2.  **Eligibility.** All persons included in the Marcom Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.  **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to the Company. The offer of severance benefits contained in this Agreement will expire on the date stated on page 3 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.  **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

5

**ATMEL PLAN/BERMAN000097**

**Data Sheet by Age**
4/6/2016

**EXHIBIT B**

Job Titles of Individuals <u>Not Selected</u> from the Decisional Unit for this Reduction in Force and Not Offered Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

6

**ATMEL PLAN/BERMAN000098**

## EXHIBIT C

Job Titles of Individuals Selected from the Decisional Unit for this Reduction in Force and Offered Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

ATMEL PLAN/BERMAN000099

EXHIBIT E to A-5

ATMEL PLAN/BERMAN000100

| | |
|---|---|
| TO: | Donna Castillo |
| DATE: | April 11, 2016 |
| FROM: | Atmel Corporation |
| RE: | Severance Agreement and Release |

---

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip, Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

<u>Company Commitments to You</u>

- In consideration for entering into this Agreement, Atmel will pay you a lump sum total of (i) $29,400.00 representing, a lump sum cash payment in cash equal to 0.20 times the your Base Pay, and (ii) $1,972.60 representing, a lump sum payment in cash equal to 50% of the your 2015 Bonus, prorated to the date of the your Involuntary Termination.

- In addition, if you timely elects to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to two (2) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence, you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- The benefits described in the two bullets above are the "Severance Benefits."

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

- The Company will not contest any claim for unemployment benefits that you may file.

TO: Donna Castillo

DATE: April 11, 2016

FROM: Atmel Corporation

RE: Severance Agreement and Release

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip, Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

## Company Commitments to You

- In consideration for entering into this Agreement, Atmel will pay you a lump sum total of (i) $29,400.00 representing, a lump sum cash payment in cash equal to 0.20 times the your Base Pay, and (ii) $1,972.60 representing, a lump sum payment in cash equal to 50% of the your 2015 Bonus, prorated to the date of the your involuntary Termination.

- In addition, if you timely elects to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to two (2) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence, you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- The benefits described in the two bullets above are the "Severance Benefits."

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

- The Company will not contest any claim for unemployment benefits that you may file.

## Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads *"a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."*

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

- 

## General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 27, 2016 to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until the next administratively practicable payroll after the eighth calendar day after you delivered this signed unrevoked Agreement to Geri Shaw. If you decide to accept this offer and you deliver a signed Agreement to Geri Shaw, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Geri Shaw within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 45 days to consider it, and that you are signing it knowingly and voluntarily.

2

ATMEL PLAN/BERMAN000103

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time that you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____          _____
Date                                     Donna Castillo


_____          _____
Date                                     Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

3

ATMEL PLAN/BERMAN000104

Khashayar Nirjahari

EXHIBIT A-6

## DECLARATION OF KHASHAYAR MIRFAKHRAEI

I, Khashayar Mirfakhraei, declare as follows:

In 2015, I was employed by Atmel as a Senior Staff DSP Architect. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan documents that I received in July 2015 is attached hereto as Exhibit A. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

During 2015, I learned that Atmel had entered into an agreement with a company called Dialog pursuant to which Dialog would acquire Atmel. In approximately December 2015 or January 2016, after I learned that Dialog might not increase its offer and that Microchip Technology ("Microchip) might become the acquirer, the Vice President of MCU Engineering (Rafi Fried) was asked by the R & D engineers in his reporting structure about the ongoing validity of the severance package. Dr. Fried subsequently held a meeting with these engineers at Atmel's San Jose headquarters. I was told by several engineers who attended this meeting that, at the meeting, Dr. Fried told the engineers that he had specifically spoken with Atmel Human Resources about this severance issue and assured them that their severance package was still valid with Microchip as the purchaser.

In February 2016, I read a memo entitled Frequently Asked Questions ("FAQ's") that had been published for Atmel employees regarding the potential Microchip acquisition of Atmel. A copy of the FAQ's is attached as Exhibit B. The FAQ's seemed to confirm that Microchip would be honoring the Severance Plan if it acquired Atmel. In early February 2016, after the FAQ's came out, I asked my direct supervisor Gaute Myklebuste (Vice President of Research and Development) about the Severance Plan staying intact under the new acquiring entity (Microchip). Dr. Myklebuste referred me to the FAQ's published by Atmel Human Resources, implying that the Severance Plan would remain intact.

All of the Atmel employees I am familiar with in San Jose believed and understood that the Severance Plan remained intact despite Microchip replacing Dialog as the purchaser of Atmel, and all of the employees I am familiar with had uniformly received such assurances from their superiors.

On approximately April 6, 2016, I and many other Atmel employees received a letter informing us that we were being terminated effective immediately. These letters indicated that Microchip would only pay 5 weeks of salary as severance. A copy of the April 6, 2016 termination letter I received is attached hereto as Exhibit C.

On approximately April 11, 2016, I and the other Atmel employees who were terminated received a new letter, which indicated that Microchip would pay us 50% of the severance benefits due under the Severance Plan. A copy of the April 11, 2016 letter I received is attached hereto as Exhibit D.

1

ATMEL PLAN/BERMAN000106

I relied on the Severance Plan and the assurances I had received from Atmel managers in deciding to stay employed with Atmel through the Microchip acquisition. I would have left Atmel and found another job well before the Microchip acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 18, 2016 at Los Altos, California.

Khashayar Mirfakhraei

ATMEL PLAN/BERMAN000107

EXHIBIT A to A-6

ATMEL PLAN/BERMAN000108



July 9, 2015

Khashayar Mirfakhraei
Re: Severance Guarantee

Dear Khashayar,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- COBRA Benefits: Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Khashayar, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Gaute Myklebust
Gaute Myklebust

*STRICTLY CONFIDENTIAL*

## ADDENDUM TO
## U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

    A.    A Change of Control actually occurs; and
    B.    Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

ATMEL PLAN/BERMAN000110

**Payments:** All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

**Additional Matters.** Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

**ATMEL PLAN/BERMAN000111**

EXHIBIT B to A-6

**ATMEL PLAN/BERMAN000112**

**Subject:** Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger
**Date:** Wednesday, February 3, 2016 at 5:57:34 PM Pacific Standard Time
**From:** Human Resources

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our intranet, Atmel Connect, at http://connect.atmel.com/index.html and are focused on answering questions related to compensation and benefits.

As we have additional information, we will provide further updates and FAQs.

Warm regards,

Suzy
**Suzanne Zoumaras | Senior Vice President, Global Human Resources**
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com  |  www.atmel.com

ATMEL PLAN/BERMAN000113



# FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
## Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

_RSUs & PRSUs._ At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

_Stock Options._ All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

Confidential *** Not for Distribution

ATMEL PLAN/BERMAN000114



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

<u>Purchase Rights under the Employee Stock Purchase Plan (ESPP).</u> Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010841/t1600178_8k.htm

When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

Confidential *** Not for Distribution

ATMEL PLAN/BERMAN000115

# Atmel

## Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the "*SEC*") a Registration Statement on Form S-4 (the "*Registration Statement*") containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the "*Proxy Statement/Prospectus*"). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the "*Investors*" section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

## Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the "*Investors*" section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

## Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

ATMEL PLAN/BERMAN000116

# Atmel

or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential success to be derived from strategic partnerships, the extent and impact of capacity constraints, the effect of financial performance on share price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip; (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

Confidential *** Not for Distribution

ATMEL PLAN/BERMAN000117

# Atmel

only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

*\*\**

Confidential *\*\** Not for Distribution

ATMEL PLAN/BERMAN000118

EXHIBIT C to A-6

ATMEL PLAN/BERMAN000119

| TO: | Khashayar Mirfakhraei |
|------|------------------------|
| DATE: | April 6, 2016 |
| FROM: | Atmel, LLC. |
| RE: | Severance Agreement and Release |

In connection with the termination of your employment from Atmel, LLC. effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Atmel, LLC., and its affiliates, parent corporation and subsidiaries (collectively the "Company"), on the terms stated below.

## Atmel, LLC Commitments to You

- In consideration for entering into this Agreement, Atmel, LLC. will pay you a lump sum total of $17,358.37 ("Severance"), which is approximately equal to 5 weeks of your current base pay.

- The Severance will be paid to you in one lump sum within 30 business days after the Effective Date of this Agreement, less all legally-required taxes and withholdings, including any advanced PTO pay.

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel, LLC. Human Resources department, Atmel, LLC. shall use its best efforts to provide only your last position and dates of employment.

## Your Commitments to the Company

- You agree to release the Company and its current and former officers, directors, employees, shareholders, affiliates, benefit plans, administrators, insurers, trustees, divisions, and subsidiaries, and predecessor and successor corporations and assigns (including, but not limited to, Atmel, LLC.) (collectively, the "Releasees") and promise never to assert any and all actions,

ATMEL PLAN/BERMAN000120

causes of action, grievances, obligations, damages, losses and claims of every kind based on any act, omission, event up to the date you sign this Agreement, including, but not limited to, any claims relating to or arising out of your employment and/or termination of your employment with Atmel, LLC. In particular, you release the Releasees from liability for all claims of any nature that you ever had or may have at this time, whether you know about them or not. This release specifically includes, but is not limited to, any claims under federal or state law, such as Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act, as well as any contract claim or other claim under statutory or common law, to the fullest extent the law permits a release of claims. You agree that the waiver and release of claims in this paragraph is on behalf of yourself and your heirs, administrators, representatives, executors, successors and assigns, and all such persons are bound by this waiver and release. You agree that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement. This release does not release claims that cannot be released as a matter of law, including, but not limited to, your right to file a charge with or participate in a charge by the Equal Employment Opportunity Commission, or any other local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, against the Company (with the understanding that any such filing or participation does not give you the right to recover any monetary damages against the Company and your release of claims herein bars you from recovering such monetary relief from the Company). This release does not extend to any right you may have to unemployment compensation benefits or workers' compensation benefits. You acknowledge that you have made no assignment or transfer of any claim or other matter waived or released by this Agreement.

o   You agree that this release constitutes a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

o   You acknowledge that you are waiving and releasing rights you may have under ADEA, and that this waiver and release is knowing and voluntary. You and the Company agree that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Effective Date of this Agreement. You acknowledge that the consideration given for this waiver and release is in addition to anything of value to which you were already entitled. You acknowledge further that you have been advised by this writing that: (a) you should consult with an attorney prior to executing this Agreement; (b) you have forty-five (45) days within which to consider this Agreement; (c) as set forth in Exhibits A, B and C herein, you have been advised in writing by the Company of the class, unit, or group of individuals covered by the reduction in force, the eligibility factors for the reduction in force, and the job titles and ages of all individuals who were and were not selected; (d) you have seven (7) days following the execution of this Agreement to revoke this Agreement; (e) this Agreement shall not be effective until after

2

ATMEL PLAN/BERMAN000121

the revocation period has expired; and (f) nothing in this Agreement prevents or precludes you from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law. You and the Atmel, LLC. agree that changes, whether material or immaterial, do not restart the running of the 45-day period.

- This Agreement will become effective and irrevocable on the eighth (8th) day after both parties execute it (the "Effective Date"). In the event you sign this Agreement and returns it to the Company in less than the forty-five (45) day period identified above, you hereby acknowledge that you have voluntarily chosen to waive the full time period allotted for considering this Agreement. You acknowledge and understand that revocation must be accomplished by a written notification to Geri Shaw, Human Resources, Atmel, LLC., that is received prior to the Effective Date.

- To the extent Employee is in the possession of any Atmel property, including personal computers (PCs), laptops, fax machines scanners, copiers cellular phones, Atmel credit cards, and any Atmel documents, correspondence and related corporate materials on all media, Employee will return all property to Atmel on or before the Termination Date. In addition, computers must be returned with all Company data intact.

- You acknowledge and represent that, other than the consideration set forth in this Agreement, the Company has paid or provided all salary, wages, bonuses, accrued vacation/paid time off, premiums, leaves, housing allowances, relocation costs, interest, severance, outplacement costs, fees, reimbursable expenses, commissions, stock, stock options, vesting, and any and all other benefits and compensation due to you.

## General Understandings and Acknowledgements

- You hereby reaffirm and agree to observe and abide by the terms of the [Confidential Information and Invention Assignment] (the "Proprietary Information Agreement") between you and Atmel, LLC., specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information. You represent that you have returned all documents and other items provided to you by the Company, developed or obtained by you in connection with your employment with the Company, or otherwise belonging to the Company.

- This Agreement and the Proprietary Information Agreement states your and the Company's complete understandings regarding the subject matter of this Agreement and your rights and the Company's obligations relating in any way to, or arising out of, your employment with Atmel, LLC. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 23, 2016 to consider whether you want to accept the offer Atmel, LLC is making in this Agreement, although you do not need to wait until that time to

3

ATMEL PLAN/BERMAN000122

accept this offer and obtain the Severance. To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in this bullet point. As noted above, you will not receive the Severance until after you deliver this signed Agreement to Geri Shaw and the seven (7) day revocation period ends and you have not revoked this Agreement.

- By signing this Agreement, you will be acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given a reasonable period of time to consider it, and that you are signing it knowingly and voluntarily.

In WITNESS WHEROF, the parties have executed this Agreement on the respective dates set forth below.

_____     _____
Date                                 Khashayar Mirfakhraei


_____     _____
Date                                 Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

4

ATMEL PLAN/BERMAN000123

# EXHIBIT A

## DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1.　**Decisional Unit.** The decisional unit for this reduction in force is CTO Organization

2.　**Eligibility.** All persons included in the CTO Organization are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.　**How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to the Company. The offer of severance benefits contained in this Agreement will expire on the date stated on page 3 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.　**Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

5

ATMEL PLAN/BERMAN000124

**Data Sheet by Age**
4/6/2016

**EXHIBIT B**

Job Titles of Individuals <u>Not Selected</u> from the Decisional Unit for this Reduction in Force and Not
Offered Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

6

ATMEL PLAN/BERMAN000125

## EXHIBIT C

Job Titles of Individuals <u>Selected</u> from the Decisional Unit for this Reduction in Force and Offered Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

EXHIBIT D to A-6

**ATMEL PLAN/BERMAN000127**

| TO: | Khashayar Mirfakhraei |
|---|---|
| DATE: | April 11, 2016 |
| FROM: | Atmel Corporation |
| RE: | Severance Agreement and Release |

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip, Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

## Company Commitments to You

- In consideration for entering into this Agreement, Atmel will pay you a lump sum total of (i) $36,105.40 representing, a lump sum cash payment in cash equal to 0.20 times the your Base Pay, and (ii) $2,564.38 representing, a lump sum payment in cash equal to 50% of the your 2015 Bonus, prorated to the date of the your Involuntary Termination.

- In addition, if you timely elect to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to two (2) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- The benefits described in the two bullets above are the "Severance Benefits."

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

- The Company will not contest any claim for unemployment benefits that you may file.

**ATMEL PLAN/BERMAN000128**

## Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads "*a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.*"

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

## General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 27, 2016 to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until the next administratively practicable payroll after the eighth calendar day after you delivered this signed unrevoked Agreement to Geri Shaw. If you decide to accept this offer and you deliver a signed Agreement to Geri Shaw, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Geri Shaw within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 45 days to consider it, and that you are signing it knowingly and voluntarily.

2

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time that you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____          _____
Date                                     Khashayar Mirfakhraei


_____          _____
Date                                     Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

3

ATMEL PLAN/BERMAN000130

## EXHIBIT A

## DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1.  **Decisional Unit.** The decisional unit for this reduction in force is CTO Organization

2.  **Eligibility.** All persons included in the CTO Organization are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.  **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to Geri Shaw at Atmel. The offer of severance benefits contained in this Agreement will expire on the date stated on page 2 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.  **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

4

**Data Sheet by Age**
**4/6/2016**

**EXHIBIT B**

Job Titles of Individuals <u>Not Selected</u> from the Decisional Unit for this Reduction in Force and Not Offered
Severance Benefits

| <u>Job Title(s)</u> | <u>Age(s)</u> |
|---|---|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

5

ATMEL PLAN/BERMAN000132

**Data Sheet by Age**
4/6/2016

**EXHIBIT C**

Job Titles of Individuals <u>Selected</u> from the Decisional Unit for this Reduction in Force and Offered
Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
|---|---|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

ATMEL PLAN/BERMAN000133

_Quinn Barrett_

EXHIBIT A-7

## DECLARATION OF GIRISH RAMESH

I, Girish Ramesh, declare as follows:

In 2015, I was employed by Atmel as a Senior Marketing Manager. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). Attached hereto as **Exhibit A** is a copy of the Severance Plan document that I received in July 2015. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

In approximately September 2015, I learned that Atmel had entered into an agreement with a company called Dialog Semiconductor ("Dialog") pursuant to which Dialog would acquire Atmel. In approximately December 2015, I heard that Atmel had received another acquisition offer from a different company. There was speculation among employees at Atmel that the "other" company looking to acquire Atmel was Microchip Technology, Inc. ("Microchip"). In approximately the last half of December 2015, I made an appointment to speak with Suzy Zoumaras, Atmel's Senior Vice President of Human Resources, in order to ask her for confirmation that the Severance Plan would be valid and in effect even if a company other than Dialog wound up acquiring Atmel. During our meeting, Ms. Zoumaras assured me that the Severance Plan had been triggered when Atmel had entered into the agreement with Dialog, and that the Severance Plan was valid and in effect regardless of which company wound up acquiring Atmel. Ms. Zoumaras also indicated that I did not need to worry about looking for other employment outside of Atmel, since I would be protected with severance payments under the Severance Plan if a company acquired Atmel and I was terminated as a result. Ms. Zoumaras also encouraged me to disseminate this message about the Severance Plan to other Atmel employees who might have similar concerns or questions.

In early February 2016, I read the Frequently Asked Questions ("FAQ's") that had been published for Atmel employees regarding the potential Microchip acquisition of Atmel. A copy of the FAQ's is attached as **Exhibit B**. Reading the FAQ's confirmed again to me that Microchip would be honoring the Severance Plan if it acquired Atmel.

On multiple occasions between approximately January 2016 and March 2016, I had discussions with my immediate manager, Tushar Dhayagude (Atmel's Director of Marketing for the MCU Business Unit) about the issue of severance. Mr. Dhayagude told me multiple times that if Microchip acquired Atmel and then terminated my employment, that I would have a financial cushion because of the severance pay I would receive under the Severance Plan. Mr. Dhayagude also told me that he had been in meetings with Steve Laub (the Chief Executive Officer of Atmel) after Microchip had become the likely acquirer of Atmel, in which Mr. Laub gave assurances that the Atmel employees would receive their severance payments under the Severance Plan if they were terminated following an acquisition. Many other employees at Atmel told me that they also had been assured by their managers that the Severance Plan was valid and in effect and that Microchip would need to pay this severance if it terminated Atmel employees following the acquisition.

1

On approximately April 4, 2016, the acquisition between Atmel and Microchip closed. On approximately April 6, 2016, I learned that some Atmel employees received a letter informing them that they were being terminated effective immediately. I was told that these termination letters indicated that Microchip would only pay a small number of weeks of salary as severance. Approximately one week later, I learned that many Atmel employees who had been terminated had subsequently received a new letter, which indicated that Microchip would pay them only 50% of the severance benefits due under the Severance Plan.

On approximately April 13, 2016, I received a letter from Atmel which proposed a "new" severance agreement for me. A copy of this April 13, 2016 letter is attached as **Exhibit C**. Under this "new" severance proposal, I would only receive 50% of the severance benefits which were due to me under the Severance Plan if I were subsequently terminated by Microchip. I refused to sign this April 13, 2016 letter proposal.

On approximately May 20, 2016, I was informed that I was being terminated effective immediately. A copy of the "Notice To Employee As To Change In Relationship" that I received on May 201, 2016, informing me that I was being laid off as of May 20, 2016, is attached hereto as **Exhibit D**. I was terminated without "cause". However, Microchip has failed and refused to pay me any of the severance benefits due to me under the Severance Plan.

I relied on receiving severance benefits under the Severance Plan in making the decision to stay at Atmel through the time of the Microchip acquisition. I certainly would have left Atmel and found another job long before Microchip's April 2016 acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 10, 2016 at ___CAMPBELL___, ___CA___.

_____
Girish Ramesh

2

EXHIBIT A to A-7

ATMEL PLAN/BERMAN000137



**STRICTLY PERSONAL AND CONFIDENTIAL**

July 9, 2015

Girish Ramesh
Re: Severance Guarantee

Dear Girish,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- **COBRA Benefits:** Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Girish, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Tushar Dhayagude
Patrick Sullivan

**ATMEL PLAN/BERMAN000138**

ADDENDUM TO
U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

- A. A Change of Control actually occurs; and
- B. Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000139**

**Payments:** All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

**Additional Matters.** Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000140

EXHIBIT B to A-7

ATMEL PLAN/BERMAN000141

**Subject:** Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger

**Date:** Wednesday, February 3, 2016 at 5:57:34 PM Pacific Standard Time

**From:** Human Resources

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our intranet, **Atmel Connect**, at http://connect.atmel.com/index.html and are focused on answering questions related to compensation and benefits.

As we have additional information, we will provide further updates and FAQs.

Warm regards,

Suzy
**Suzanne Zoumaras | Senior Vice President, Global Human Resources**
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com | www.atmel.com

ATMEL PLAN/BERMAN000142

# *Atmel*

## FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
## Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

<u>RSUs & PRSUs.</u> At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

<u>Stock Options.</u> All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

**ATMEL PLAN/BERMAN000143**



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

Purchase Rights under the Employee Stock Purchase Plan (ESPP). Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010841/t1600178_8k.htm

When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

ATMEL PLAN/BERMAN000144

# Atmel

## Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-4 (the "Registration Statement") containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the "Proxy Statement/Prospectus"). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the "Investors" section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful, prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

## Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015; and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the "Investors" section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

## Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

ATMEL PLAN/BERMAN000145

# Atmel

or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential success to be derived from strategic partnerships, the potential impact of capacity constraints, the effect of financial performance on share price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip; (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000146

# Atmel

only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

***

ATMEL PLAN/BERMAN000147

EXHIBIT C to A-7

ATMEL PLAN/BERMAN000148

April 13, 2016

Girish Ramesh

Re: Severance Benefits

Dear Girish,

I am pleased to offer you a severance agreement on the terms and conditions set forth below.

As you know, Atmel Corporation (the "Company") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). The Company and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by the Company, and in part to provide you with the security of certain benefits in the event your relationship is terminated involuntarily without Cause (as defined in Appendix A) by the Company, Microchip or any U.S. subsidiary or affiliate of the Company or Microchip (the "Microchip Group"), and other than due to your death or disability, on or prior to April 4, 2017 ("Qualifying Termination").

These benefits (collectively, the "Severance Benefits") are:
- **Cash Severance:** A lump sum payment equal to 20% of your annual base salary, less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");
- **Target Incentive:** A lump sum payment equal to 50% of the annual performance bonus (MIP) that you received from the Company for 2015, then annualized, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date[1]; and
- **COBRA Benefits:** Two months of COBRA benefits paid for by Microchip.

Your receipt of the Severance Benefits will be subject to you signing and not revoking a release of any and all claims, in a form prescribed by Microchip and substantially the same as that attached at Appendix B (the "Release"). Upon the Release becoming effective, the Cash Severance and Target Incentive will be payable in a lump sum without interest as soon as administratively practicable, and all other amounts will be payable in accordance with the payment schedule applicable to each payment or benefit.

Nothing in this agreement is intended to, or shall, contradict, modify or alter the terms of your at-will employment. You shall remain an at-will employee of the Company and the Microchip Group for all purposes, meaning that you, the Company or the member of the Microchip Group employing you may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice. Moreover, the at-will status of your relationship cannot be changed except in a written document, signed by Microchip's Chief Executive Officer and you, and which expressly modifies your at will status. This agreement constitutes the complete, final, and exclusive embodiment of the entire agreement between you and the

---

[1] For example, if your performance bonus for working the entire year of 2015 was $10,000, less applicable withholdings, and you are employed for a total of 180 days after January 1, 2016, then you will be eligible for a Target Incentive of (($10,000 x .5) x (180/365))= $2,465.75, less applicable withholdings. However, if you were hired by the Company sometime after January 1, 2015, then your 2015 bonus number will be annualized accordingly. For example, if you were hired April 1, 2015 and received a performance bonus for 2015 of $7,500, and you are employed for a total of 180 days after January 1, 2016, then you will be eligible for a Target Incentive of ((($7,500 x 365/275) x .5) x (180/365)) = $2,454.55.

1

**ATMEL PLAN/BERMAN000149**

Microchip Group with regard to its subject matter and supersedes any other actual or perceived promises, warranties, or representations with regard to its subject matter made by the Company or any other member of the Microchip Group, including, for the avoidance of doubt, any programs, policies, or agreements with respect to severance or equity acceleration benefits made prior to April 4, 2016.

In the event that a portion of the Microchip Group is sold to an unrelated party and your employment is transferred to that party, Microchip and the Company will ensure that the new employer assumes responsibility for this agreement.

If a Qualifying Termination does not occur on or prior to April 4, 2017, this agreement will expire and you will not be eligible to receive the Severance Benefits described here.

To accept this offer, counter-sign in the space provided below and return it to your HR business partner no later than April 20, 2016.

Thank you for your continued contributions to our success.

Sincerely,

*Lauren a. Carr*

Lauren Carr
Vice President, Global Human Resources

AGREED AND ACKNOWLEDGED:                          MICROCHIP TECHNOLOGY INC.

_____                          _____
Signature (Girish Ramesh)     .                          HR Business Partner

_____                          _____
Date                                                              Date

2

ADDITIONAL TERMS TO SEVERANCE AGREEMENT

Unless otherwise defined below, capitalized terms used herein will have the meanings set forth in the agreement.

1. <u>Cause</u>. "Cause" is defined as (i) your willful and continued failure to perform the duties and responsibilities of your position after there has been delivered to you a written demand for performance from Microchip's Vice President, Worldwide Human Resources which describes the basis for her belief that you have not substantially performed your duties and you have not corrected such failure within 30 days of such written demand; (ii) any act of dishonesty by you in connection with your responsibilities as an employee of the Company with the intention or reasonable expectation that such action may result in your substantial personal enrichment; (iii) your conviction of, or plea of nolo contendere to, a felony that Microchip's Vice President, Worldwide Human Resources reasonably believes has had or will have a material detrimental effect on the reputation or business or any member of the Microchip Group; (iv) a breach of any fiduciary duty owed to the Company or the Microchip Group by you that has a material detrimental effect on the reputation or business of any member of the Microchip Group; (v) you being found liable in any Securities and Exchange Commission or other civil or criminal securities law action or entering any cease and desist order with respect to such action (regardless of whether or not you admit or deny liability); (vi) you (A) obstructing or impeding; (B) endeavoring to obstruct, impede or improperly influence, or (C) failing to materially cooperate with, any investigation authorized by the Board or any governmental or self-regulatory authority (an "Investigation"); however, your waiver of attorney-client privilege relating to communications with your own attorney in connection with an Investigation will not constitute "Cause"; or (vii) your disqualification or bar by any governmental or self-regulatory authority from serving in the capacity contemplated by your position or your loss of any governmental or self-regulatory license that is reasonably necessary for you to perform your responsibilities to the Company or any member of the Microchip Group, if (A) the disqualification, bar or loss continues for more than 30 days; and (B) during that period the Company or any member of the Microchip Group uses its good faith efforts to cause the disqualification or bar to be lifted or the license replaced, it being understood that while any disqualification, bar or loss continues during your employment, you will serve in the capacity contemplated by your position to whatever extent legally permissible and, if your service in the capacity contemplated by your position is not permissible, you will be placed on leave (which will be paid to the extent legally permissible).

**ATMEL PLAN/BERMAN000151**

| TO: | [NAME] |
|-----|--------|
| FROM: | Microchip Technology Incorporated |
| DATE: | [XXXX] |
| RE: | Employment Separation, Severance and Release ("Agreement") |

As you know, the Company[2] has decided to end your employment without cause (as defined in the Severance Agreement that you signed in April 2016). Under the terms of the Severance Agreement, you are entitled to the Severance Benefits listed below provided you sign, return and do not revoke this Agreement.

### The Company's Commitments to You

- The Company will give you:

  - **Cash Severance:** A lump sum payment equal to 20% of your annual base salary, less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");
  - **Target Incentive:** A lump sum payment equal to 50% of the annual performance bonus (MIP) that you received from the Company for 2015, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date; and
  - **COBRA Benefits:** Two months of COBRA benefits paid for by Microchip.

- The Company will not contest any claim for unemployment benefits that you may file.

### Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads *"a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."*

---

[2]  In this document, unless otherwise noted, "Company" means Microchip Technology Incorporated, Atmel Corporation and any of their affiliated entities.

1

ATMEL PLAN/BERMAN000152

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

### General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on XXXXX (XX days after your Separation Date), to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Lauren Carr in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until seven (7) business days after you deliver it to Lauren Carr. If you decide to accept this offer and you deliver a signed Agreement to Lauren Carr, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Lauren Carr within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 21 days [or 45 days if you are not the only employee separated from the Company at the same time] to consider it, and that you are signing it knowingly and voluntarily.

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____         _____

Date                                    [XXXX EMPLOYEE NAME]

ATMEL PLAN/BERMAN000153

EXHIBIT D to A-7

**ATMEL PLAN/BERMAN000154**

# Atmel

**NOTICE TO EMPLOYEE AS TO CHANGE IN RELATIONSHIP**
(Issued pursuant to provisions of Section 1089
of the California Unemployment Insurance Code)

Employee Name: Girish Ramesh

Social Security Number: last 4 digits 0008

You were ☑ laid off / ☐ discharged on 05/20/2016

OR

You resigned your employment voluntarily with an effective date of

**ATMEL CORPORATION**

BY: _____
Signature

Jayme Valdoz
Printed Name

## NOTICE ACKNOWLEDGMENT

I received a copy of this notice.

Signed: _____

Date: _____

Rev 10 October 2015

Peter Shuman

EXHIBIT A-8

ATMEL PLAN/BERMAN000156

## DECLARATION OF PETER SCHUMAN

I, Peter Schuman, declare as follows:

In 2015, I was employed by Atmel Corp. ("Atmel") as a Senior Director of Investor Relations. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan I received in July 2015 is attached as Exhibit A. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

In September 2015, I learned that Atmel had entered into an agreement with a company called Dialog Semiconductor ("Dialog") pursuant to which Dialog would acquire Atmel. In December 2015, I heard that Dialog might not be the buyer and that another potential purchaser had emerged. In January 2016, I learned that Microchip Technology, Inc. ("Microchip") was the new potential buyer and that Microchip had made a purchase offer superior to Dialog's. On approximately January 14, 2016, I received a letter from Suzanne Zoumaras, Atmel's Senior Vice President of Global Human Resources. A copy of the January 14, 2016 letter I received from Ms. Zoumaras is attached as Exhibit B. In that letter, Ms. Zoumaras stated that I would be eligible for the severance benefits provided in the July 2015 Severance Plan if I were to be involuntarily terminated following a change in control, regardless of whether the acquisition of Atmel was done by Dialog or Microchip. The January 14, 2016 letter also emphasized that the Severance Plan continued to remain in place.

After Dialog failed to increase its purchase offer, I learned in the last half of January 2016 that Microchip had entered into an agreement with Atmel pursuant to which Microchip would acquire Atmel.

On the morning of February 29, 2016, three senior members of Microchip's finance team visited Atmel's corporate headquarters in San Jose, California, in order to discuss the upcoming acquisition/merger between Atmel and Microchip. These three Microchip individuals were Eric Bjornholt (Microchip's Chief Financial Officer), Nawaz Sharif (Microchip's Vice President of European Finance) and Phil Kagel (Microchip's Director of Finance). At approximately 10:30 a.m., these three Microchip executives met with the senior members of Atmel's Finance Team (Director level and above) in the "training room", which was the large meeting room on the ground floor of Atmel's headquarters. There were approximately 12 to 15 Atmel employees at this meeting, including me. During this meeting, which included a question and answer session regarding the upcoming merger between Atmel and Microchip, one of the Atmel employees asked for confirmation that Microchip would be honoring the severance agreements and programs which the Atmel employees had received the previous year. In response, Mr. Bjornholt assured the Atmel employees that, if Microchip acquired Atmel and then terminated Atmel employees, that Microchip would honor the severance agreements which the Atmel employees had received.

ATMEL PLAN/BERMAN000157

Later on that same morning of February 29, 2016, Mr. Bjornholt, Mr. Sharif and Mr. Kagel held a second meeting with a larger group of Atmel finance employees in the same "training room" at Atmel's headquarters in San Jose. This meeting was attended by all (or almost all) members of the San Jose Atmel finance team, including me. There were approximately 40 to 60 Atmel employees in attendance at this meeting. During this second meeting, which again focused on the upcoming merger between Microchip and Atmel, Mr. Bjornholt again reiterated to the Atmel employees that Microchip would honor the Atmel severance agreements and programs that the Atmel employees had received, if Microchip terminated Atmel employees following the acquisition by Microchip.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June _7__, 2016 at _____Burlingame, California_____.

Peter Schuman

2

**ATMEL PLAN/BERMAN000158**

EXHIBIT A to A-8

ATMEL PLAN/BERMAN000159

July 9, 2015

Peter Schuman
Re: Severance Guarantee

Dear Peter,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 50% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** A prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- **COBRA Benefits:** Six (6) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Peter, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Stephen Skaggs
Stephen Skaggs

*STRICTLY CONFIDENTIAL*

ADDENDUM TO
U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A.   A Change of Control actually occurs; and
B.   Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000161**

Payments: All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

Additional Matters. Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000162

EXHIBIT B to A-8

ATMEL PLAN/BERMAN000163

January 14, 2016

Peter Schuman

Dear Peter,

We recognize that there continues to be significant speculation regarding the acquisition of the company and understand that this can be distracting and unsettling. As a result, we believe it is important to remind you of the benefits for which you may be eligible in the event that your employment is involuntarily terminated without Cause in connection with a Change of Control of the company, including an acquisition by Dialog or Microchip.

In July 2015, we provided you a letter (the "July Severance Benefits Letter") describing the U.S. Severance Guarantee Benefits for which you are eligible. This U.S. Severance Guarantee Program continues to remain in place. In addition, in September 2015, we informed you that the company's Compensation Committee approved acceleration of unvested non-performance restricted stock units ("RSUs") for our U.S. based Director-level employees under certain conditions. Under that program you will be eligible for 100% acceleration of your unvested RSUs if there is a Change of Control and your employment is involuntarily terminated without Cause during the period beginning three (3) months prior to the Change of Control and ending twelve (12) months following the Change of Control

The benefits under the U.S. Severance Guarantee Program and the U.S Director-level equity acceleration programs are subject to the terms and conditions of each as approved by the company's Compensation Committee. To receive these benefits you will be required to sign a form of separation and release agreement reasonably acceptable to the company (or its successor). Capitalized terms that are not defined in this letter shall have the meanings set forth in the July Severance Benefits Letter

Nothing in this letter or the July Severance Benefits Letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the company (or its successor) of the benefits provided by this letter and the July Severance Benefits Letter. You shall remain an at-will employee for all purposes, meaning that you or the company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Peter, we hope these benefits provide reassurance and reflect our appreciation for your contributions to Atmel And, thank you for your continued focus during these unusual times.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

JOHN A. McGUINN
JOHN R. HILLSMAN
CLIFF PALEFSKY
DEREK B. JACOBSON
KEITH A. EHRMAN
ABRAHAM FEINSTEIN-HILLSMAN
SCOTT M. STILLMAN
JEANNETTE A. VACCARO

**LAW OFFICES OF**
# McGUINN, HILLSMAN & PALEFSKY
A PROFESSIONAL CORPORATION
535 PACIFIC AVENUE, SUITE 100
SAN FRANCISCO, CALIFORNIA 94133
TELEPHONE (415) 421-9292

FAX (415)403-0202

January 19, 2017

Ms. Carly Petrovic
Plan Administrator for
    Atmel Corporation's U.S. Severance Guarantee Benefit Program
c/o Microchip Technology Corporation
2355 West Chandler Blvd.
Chandler, AZ 85224-6199

Re:     ***Robin Berman v. Atmel Corporation/Microchip Technology Incorporated***
        ***Appeal of Denial of Benefits***

Dear Plan Administrator:

        This office represents Robin Berman. By this letter, Ms. Berman appeals your November 29, 2016 denial of her claim for benefits under the Atmel Corporation "U.S. Severance Guarantee Benefit Program" (hereafter "Severance Plan").

## I.    SUMMARY OF CLAIM AND DENIAL

        On May 20, 2016, Ms. Berman submitted a claim for benefits under the Severance Plan to the Plan Administrator ("the May 20th Claim Letter"). On June 9, 2016, Ms. Berman provided supplemental evidence to the Plan Administrator which was to be considered as part of her claim ("the June 9th Supplemental Letter"). On November 29, 2016, the Plan Administrator sent Ms. Berman a letter in which she denied Ms. Berman's claim for benefits ("the Denial Letter"). A copy of the Denial Letter is attached hereto as **Exhibit B.**

        The stated reason for denying Ms. Berman's claim was that, "You are not eligible for benefits under the Atmel Severance Plan." See, **Exhibit B.** The explanation given by the Plan Administrator for this decision was that the agreement which Atmel entered into with Dialog Semiconductor prior to November 1, 2015 was not the 'same agreement' that resulted in the eventual Change in Control in April 2016. Thus, the Denial Letter stated: "The agreement with respect to Dialog Semiconductor PLC...did not result in a 'Change in Control'. Thus, you are not eligible for benefits under the Atmel Severance Plan with respect to the agreement with respect to Dialog Semiconductor PLC". *Id.* The Denial Letter further asserted that that the Severance Plan had "expired" on November 1, 2015 with respect to any entity other than Dialog. *Id.*

In essence, the Plan Administrator asserted that Ms. Berman could not be eligible for benefits under the Severance Plan unless the 2015 agreement between Atmel and Dialog eventually resulted in the Change of Control itself. Apparently, the Plan Administrator is claiming that: 1) only a Change of Control involving Atmel and *Dialog* could qualify Atmel employees for benefits under the Severance Plan, and 2) since Microchip did not enter into any agreements with Atmel before November 1, 2015, a Change of Control involving Atmel and Microchip could not result in any Atmel employees being eligible for benefits.

For the reasons set forth below, and based upon the evidence and arguments submitted by Ms. Berman in connection with her claim, the Plan Administrator's denial of Ms. Berman's claim is completely indefensible. Indeed, the Plan Administrator's denial of Ms. Berman's claim contravenes the terms of the Severance Plan; is arbitrary and capricious; was clearly done in bad faith; and constitutes a breach of the Plan Administrator's fiduciary duties which she owes to the beneficiaries of the Severance Plan.

As part of her appeal, Ms. Berman hereby incorporates all of the material she previously submitted to the Plan Administrator in connection with her claim for benefits, including all of the arguments and evidence submitted in the May 20th Claim Letter and in the June 9th Supplemental Letter. As part of her appeal, Ms. Berman also hereby incorporates all of the documents which Ms. Berman requested from the Plan Administrator in her May 20th Letter, in her June 9th Supplemental Letter, and in the December 22, 2016 letter which this law office sent to the Plan Administrator on behalf of Ms. Berman and ten other Atmel claimants ("the December 22nd Letter"). A copy of the December 22nd Letter is attached hereto as **Exhibit C**. Ms. Berman contends that these requested documents are relevant to her claim and must be reviewed and considered by the Plan Administrator as part of Ms. Berman's claim and appeal determination. Because Ms. Berman is incorporating her previously submitted materials, Ms. Berman is not attaching to this appeal letter Exhibits A through I from her May 20th Claim Letter, nor is she attaching to this appeal letter the material attached to her June 9th Supplemental Letter. Instead, Ms. Berman will refer to that evidence where appropriate in this appeal letter.

## II. THE REASON GIVEN FOR THE DENIAL OF MS. BERMAN'S CLAIM CONTRAVENES THE SEVERANCE PLAN, IS ARBITRARY AND CAPRICIOUS, DEMONSTRATES BAD FAITH, AND CONSTITUTES A BREACH OF FIDUCIARY DUTY

As demonstrated by the facts and evidence submitted by Ms. Berman, much of which is set forth in Part III below, the Plan Administrator's denial of Ms. Berman's claim contravenes the terms of the Severance Plan and is completely baseless.

**First**, in her November 29, 2016 denial letter, the Plan Administrator has arbitrarily added a "condition" to Ms. Berman's eligibility for benefits which *does not exist* in the

**ATMEL PLAN/BERMAN000166**

Severance Plan. The Plan Administrator added this fictitious "condition" for the specific purpose of depriving Ms. Berman of benefits. The Plan Administrator has required that, as a condition of being eligible for benefits under the Severance Plan, the entity which entered into the "Definitive Agreement" with Atmel prior to November 1, 2015 (Dialog) was required to be the *same* entity which eventually became a party to the Change in Control. *There is no such "condition" in the Severance Plan.* Indeed, as described in more detail below, Atmel never intended this to be a "condition" of eligibility under the Severance Plan. To the contrary, Atmel (as the drafter and creator of the Severance Plan) intended, and repeatedly and expressly emphasized to its employees and to Microchip, that exactly the *opposite* was true: that because the September 2015 Atmel-Dialog agreement was drafted to result in a change of control, that agreement would extend the term of the Severance Plan by 18 months (until March 2017), *even if* Dialog was replaced by another suitor who whom Atmel reached another agreement; that even though Microchip was going to replace Dialog as the acquiring company for purposes of the Change in Control, the Severance Plan had *not* expired; that the Severance Plan was still fully in effect; and that Atmel employees who were terminated without cause by Microchip following a Change in Control involving Microchip *were* eligible for benefits under the Severance Plan.

**Second**, prior to the April 4, 2016 Change in Control, Atmel had *already* decided the Severance Plan "eligibility" issue with respect to the pending Microchip acquisition; had already interpreted the Severance Plan to mean that Atmel employees remained eligible for benefits under the Severance Plan regardless of whether Microchip or Dialog was the acquiring company; and had already communicated that decision and interpretation to its employees. Under the express terms of the Severance Plan, once Atmel had made this decision and interpretation and taken this action prior to the Change in Control, Microchip had no power to subsequently contravene or reject that decision/interpretation/action. Thus, the Severance Plan expressly states:

"The [U.S. Severance Guarantee Benefit] Program will be administered and interpreted by the Company. Any decision made or action taken by the Company *prior* to a Change in Control with respect to the Program, and any interpretation by the Company *prior* to a Change in Control of any term or condition of the Program, or any related document, will be *conclusive and binding on all persons* and will be given the maximum possible deference allowed by law." (emphasis added). See, **Exhibit A-3,** Declaration of Bo Kang (page 2 of "Addendum to U.S. Severance Guarantee Program Letter, July 9, 2015", attached as Exhibit A to Kang Declaration).

Prior to the April 4, 2016 "Change in Control", Atmel had "made a decision or taken action" with respect to the Severance Plan, and had made an "interpretation…of a term or condition" of the Severance Plan with respect to the issue of whether Atmel employees remained eligible for benefits under the Severance Plan if Microchip were to become the acquiring company rather than Dialog. Indeed, Atmel senior management repeatedly and definitively communicated to its employees prior to the Change in Control (both orally and in writing) that, regardless of the fact that Microchip was likely to be the acquiring company rather than Dialog,

Atmel employees who were terminated without cause by Microchip following the Change in Control remained eligible for benefits under the Severance Plan, and that the Severance Plan remained intact and was unaffected by the fact that Microchip might be the acquiring company. Since Atmel made this interpretation and decision regarding the Severance Plan, and took this action to communicate its decision and interpretation to its employee, prior to the Change in Control, this was "conclusive and binding on all persons". Therefore, under the express terms of the Severance Plan, Microchip had no authority or power *following* the Change in Control to contravene Atmel's previous interpretation, decision and action.

The explanation given in the Denial Letter for denying Ms. Berman's claim directly contradicts and contravenes Atmel's pre-Change in Control interpretation, decision and action. However, the Severance Plan flatly prohibited Microchip from ignoring what Atmel had already decided concerning the eligibility of its employees for benefits under the Severance Plan. Thus, any effort by the Plan Administrator to disregard and contravene the express terms of the Severance Plan in this respect in order to avoid paying benefits was arbitrary, capricious, bad faith and an abuse of discretion.

**Third,** even if the Severance Plan had *not* expressly prohibited Microchip from adopting an interpretation of the Severance Plan which had already been decided by Atmel prior to the Change in Control, Microchip's only possible argument would be that the Severance Plan is purportedly "ambiguous" on the issue of whether the agreement that constitutes the "Definitive Agreement/Initial Triggering Event" has to be the same agreement that results in the actual "Change of Control". However, there is nothing in the Severance Plan which states or even suggests that the Definitive Agreement entered into prior to November 1, 2015 needs to be the same agreement that governs the later Change of Control, nor is there anything in the Severance Plan which states or suggests that the entity which enters into the original Definitive Agreement needs to be the same entity which ultimately acquires Atmel.[1]

---

[1] Indeed, there is no logical basis to support Microchip's contention in its November 29th Denial Letter that the "agreement" entered into prior to November 1, 2015 needs to be the same "agreement" that results in the Change in Control. Merger and acquisition agreements are routinely subject to re-negotiation of the terms. Under Microchip's theory, if Atmel and Dialog entered into an agreement in September 2015 for a purchase price of $50,000,000, but in December 2015 they re-negotiated the terms and signed a new agreement for $49,000,000, the Atmel employees would no longer be eligible for benefits under the Severance Plan, as the Severance Plan would have "expired". Similarly, there is no logical basis for Microchip's argument that the Severance Plan "expired" on November 1, 2015 unless Atmel entered into a Change in Control agreement with the same company that was a party to the original "Initial Triggering Event" agreement. In mergers and acquisitions, the potential parties change frequently. This is precisely why Atmel intended and drafted the Severance Plan to remain in effect even if a merger partner with whom Atmel reached a definitive agreement before November 1, 2015 was replaced after that date with a new merger partner; and why Atmel did

**ATMEL PLAN/BERMAN000168**

Microchip was not involved in the drafting or creation of the Severance Plan. Even if the Microchip Plan Administrator now claims that there is some "ambiguity" in the Severance Plan language and that Microchip's purported interpretation is "possible", the Plan Administrator was well aware prior to November 29, 2016 that Atmel—which had *drafted and created the Severance Plan*—had intended its Severance Plan to be interpreted and administered in a manner that was completely contrary to the Plan Administrator's position. Thus, even assuming that the Plan Administrator could conjure an interpretation consistent with her Denial Letter, the Plan Administrator was fully aware that Atmel *never intended for such an interpretation to be given* and that Atmel had repeatedly and clearly announced that the correct interpretation of its Severance Plan (that Atmel employees remained eligible for benefits under the Severance Plan even if Microchip was the acquiring company) was the *opposite* of the one proposed by the Plan Administrator in the Denial Letter.

In light of these facts, it was completely arbitrary and capricious and an abuse of discretion for the Plan Administrator to *disregard and contravene* the interpretation of the Severance Plan given by the entity that drafted and created the Severance Plan, when determining Ms. Berman's claim for benefits. Indeed, Atmel's interpretation had been repeatedly and consistently expressed by Atmel to its employees (and to Microchip) for many months prior to the Change in Control, and this point was made very clearly in Ms. Berman's claim for benefits. Microchip deliberately disregarded Atmel's interpretation for the specific purpose of depriving Ms. Berman and other Atmel employees of Severance Plan benefits. Such conduct constitutes an abuse of discretion and a breach of the Plan Administrator's fiduciary duties.

## III. FACTUAL BACKGROUND AND EVIDENCE SUPPORTING MS. BERMAN'S CLAIM AND APPEAL

As noted above, Ms. Berman incorporates by reference all of the evidence and arguments she previously submitted to the Plan Administrator. However, Ms. Berman will again summarize the factual background supporting her claim and appeal.

On July 9, 2015, Atmel Corporation ("Atmel") delivered to Ms. Berman and other employees a letter setting forth its "U.S. Severance Guarantee Benefit Program," along with an Addendum to the letter providing additional details (hereafter collectively "Severance Plan"). Examples of these July 9, 2015 documents are attached hereto as part of **Exhibits A-1** through **A-11** (Declarations of William Coplin, Robin Berman, Bo Kang, Thong Van Vu, Donna Viera-Castillo, Khashayar Mirfakhraei, Girish Ramesh, Patrick Hanley, Ilana Shternshain, Peter

---

not draft the Severance Plan with any language suggesting that the parties to the two agreements had to be the same.

Schuman and Mandy Schwarz). The Severance Plan constitutes an ERISA plan created by Atmel for the benefit of its employees.

The terms of the Severance Plan were clearly spelled out: if an "Initial Triggering Event" occurred prior to November 1, 2015, the Severance Plan would remain in effect for 18 months following that triggering event. An Initial Triggering Event occurred if Atmel entered into a definitive agreement (before November 1, 2015) "that will result in a Change of Control of the Company." If a change of control of Atmel subsequently occurred and an employee was terminated without "cause" within 18 months of the Initial Triggering Event, the employee would become entitled to benefits under the Severance Plan.

On September 19, 2015, an Initial Triggering Event occurred when Atmel entered into a definitive agreement with Dialog Semiconductor PLC ("Dialog"), pursuant to which Dialog would acquire Atmel for stock and cash worth approximately $4.6 billion. Not only did Dialog and Atmel enter into a formal "Agreement and Plan of Merger" ("Merger Agreement"), but the Merger Agreement was announced publicly in press releases; the Merger Agreement was the subject of a Form 8-K filing with the SEC in September 2015; and the Merger Agreement was the subject of a Form 425 filing with the SEC in September 2015. Excerpts from these documents are attached hereto as **Exhibits B, C** and **D** to the May 20th Claim Letter. The Merger Agreement with Dialog constituted a "definitive agreement that will result in a change of control of [Atmel]" within the meaning of the Severance Plan. Therefore, an Initial Triggering Event within the meaning of the Severance Plan occurred prior to November 1, 2015, thereby extending the Severance Plan for 18 months.

In creating the Severance Plan, Atmel recognized and contemplated the common and foreseeable possibility that, after Atmel entered into an agreement constituting the Initial Triggering Event, a second company might seek to acquire Atmel before the merger with the first suitor had closed. Atmel drafted the Severance Plan to reflect its intent that Atmel employees would be provided with the benefits under the Severance Plan even in the event that the merger was eventually consummated with a *different* merger partner than the one with whom Atmel had initially reached an agreement constituting the Initial Triggering Event. Thus, Atmel drafted the Severance Plan so that the agreement constituting the Initial Triggering Event was not required to be the same agreement under which a Change of Control eventually occurred. For the same reason, the Severance Plan does not state, imply or in any way require that the Initial Triggering Event and the Change of Control must relate to the same company.

Several months after Atmel entered into its Merger Agreement with Dialog (but before the transaction had closed), Microchip Technology Corporation ("Microchip") approached Atmel and made a more lucrative purchase offer. When Dialog declined to increase its offer, Atmel elected to back out of its Merger Agreement with Dialog in January 2016. Atmel then entered into a new merger agreement with Microchip on January 19, 2016, pursuant to which Microchip would purchase Atmel. See, **Exhibit E** to the May 20th Claim Letter. The parties

**ATMEL PLAN/BERMAN000170**

contemplated that the merger transaction would close (thereby constituting a "Change of Control" under the Severance Plan) in the spring of 2016.

Consistent with Atmel's intent when drafting the Severance Plan, beginning in approximately January 2016, numerous members of Atmel management (including Atmel Chief Executive Officer Steve Laub and Atmel Senior Vice President of Human Resources Suzanne Zoumaras) repeatedly informed the Atmel employees--both orally and in writing--that their eligibility for benefits under the Severance Plan remained intact and were unaffected by the fact that Microchip might be replacing Dialog as the acquiring company. See **Exhibits A-1** through **A-11**. For example, after it became apparent that Microchip might replace Dialog as the acquiring company, Atmel senior management wrote a letter to Atmel employees on January 14, 2016, in which senior management stated:

> "We recognize that there continues to be significant speculation regarding the acquisition of the company and understand that this can be distracting and unsettling. As a result, we believe it is important to remind you of the benefits for which you may be eligible in the event that your employment is involuntarily terminated without Cause in connection with a Change of Control of the company, including an acquisition by Dialog or Microchip. In July 2015, we provided you a letter (the "July Severance Benefits Letter") describing the U.S. Severance Guarantee Benefits for which you are eligible. The U.S. Severance Guarantee Program continues to be in place....To receive these benefits you will be required to sign a form of separation and release agreement...Nothing in this letter or the July Severance Benefits Letter is intended to...modify...the terms of your at-will employment, other than the provision by the company (or its successor) of the benefits provided by this letter and the July Severance Benefits Letter. "

An example of this January 14, 2016 letter is attached as **Exhibit F** to the May 20th Claim Letter. See also **Exhibit A-1** (Declaration of William Coplin) and **Exhibit A-10** (Declaration of Peter Schuman).

Microchip was aware of the Severance Plan; was aware of Atmel's interpretation of the Severance Plan; and was aware of its obligation under the Severance Plan to pay the benefits provided therein in the event Atmel employees were terminated following an acquisition by Microchip. Furthermore, Atmel employees were informed that Microchip was well aware of its severance obligations. See **Exhibit A-2** (Declaration of Berman). For example, on approximately February 3, 2016, several weeks after Atmel had withdrawn from its merger agreement with Dialog and had entered into a new merger agreement with Microchip, Atmel

**ATMEL PLAN/BERMAN000171**

management published for its employees a "Frequently Asked Questions" memorandum regarding the Microchip transaction. That FAQ began with the question, **"What happens to my employment and compensatory arrangements with Atmel after the closing?"** The FAQ that answers that question stated: "Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect prior to the closing of the transaction." See **Exhibit G** to the May 20th Claim Letter. Microchip senior management reviewed and approved the FAQs before they were made available to Atmel employees, and Microchip also participated in drafting the language of the FAQs. See **Exhibit A-10** (Declaration of Schuman), **Exhibit A-1** (Declaration of Coplin) and **Exhibit A-2** (Declaration of Berman). Microchip knew that Atmel employees reading this FAQ would believe that Microchip was aware of the Severance Plan and had agreed to pay the severance benefits set forth in the Severance Plan to Atmel employees who were terminated without cause following Microchip's acquisition of Atmel.

Similarly, the Proxy Statement filed with the Securities and Exchange Commission in February 2016, which contained the Merger Agreement between Atmel and Microchip, specifically stated: "Microchip has agreed, as of the Effective Time, to honor and perform all employment or compensatory contracts between Atmel or any of its subsidiaries, on the one hand, and any Atmel employees, on the other (including all...severance,...change in control and termination contracts disclosed to Microchip and the assumed Atmel equity awards)." See **Exhibit H** to the May 20th Claim Letter. Microchip helped draft, and then reviewed and approved, the Proxy Statement prior to its filing with the SEC. Microchip knew that the Proxy Statement would lead Atmel employees to believe that Microchip would pay the severance benefits set forth in the Severance Plan to Atmel employees who were terminated following Microchip's acquisition of Atmel.

Furthermore, during meetings between Microchip senior management and Atmel employees in February 2016, Microchip senior management (including Microchip's Chief Financial Officer) explicitly acknowledged to the Atmel employees on multiple occasions that Microchip was aware of the severance agreements and programs that were in place at Atmel, and Microchip senior management explicitly assured the Atmel employees that, if Microchip acquired Atmel and then terminated Atmel employees, that Microchip would honor those severance agreements. See, **Exhibit A-10** (Declaration of Schuman).

In sum, the Atmel employees were assured both orally and in writing that both Atmel and Microchip understood that the Severance Plan was still in effect and that the Atmel employees would receive the benefits of the Severance Plan if they were terminated by Microchip following the acquisition. As intended by Atmel senior management and by Microchip, the Atmel employees relied on these repeated assurances and remained at Atmel from July 2015 through the Microchip acquisition in April 2016. See **Exhibit A-1** through **A-11**. If these assurances had

not been given to Atmel employees, those employees would have looked for other jobs and left Atmel long before Microchip's acquisition of Atmel. *Id.*

In the months prior to the April 4, 2016 merger closing, as the negotiations between Atmel and Microchip continued, Atmel provided relevant company documents to Microchip showing Microchip's potential obligations and liabilities. Atmel discussed with and communicated to Microchip the severance obligations that would be owed to Atmel employees if Microchip terminated their employment following a merger, including providing Microchip with summaries of the dollar severance amounts that would be due to terminated Atmel employees pursuant to the Severance Plan. In the months prior to the April 4, 2016 merger closing, Microchip was also aware that Atmel—*as the drafter and creator of the Severance Plan*— believed and intended that the Severance Plan was in effect and that Microchip would be legally obligated to pay Atmel employees the severance benefits set forth in the Severance Plan if Microchip terminated Atmel employees without cause following the acquisition. Microchip was also aware that Atmel had communicated this position to Atmel employees.

Prior to and up until the April 4, 2016 merger closing, Microchip was fully aware that Atmel management, including the senior management of Atmel, had determined that the Severance Plan was in effect and that Atmel employees would be eligible to receive benefits under the Severance Plan even if Microchip replaced Dialog as the acquiring company. Prior to and up until the April 4, 2016 merger closing, Microchip was also fully aware that not only had Atmel interpreted the Severance Plan in this manner, but that Atmel management, including senior management, had communicated to Atmel employees that they remained eligible for benefits under the Severance Plan even if Microchip replaced Dialog as the acquiring company, and that Atmel employees would receive benefits under the Severance Plan if Microchip acquired Atmel and then terminated Atmel employees without cause. Despite being aware of these things, Microchip never suggested or indicated to Atmel prior to the closing of the April 4, 2016 merger that Microchip had any understanding or interpretation of the Severance Plan that was different than Atmel's. Prior to the closing of the April 4, 2016 merger, Microchip never suggested or indicated that the Severance Plan had 'expired' or was otherwise not in effect, nor did Microchip ever suggest or indicate to Atmel that Microchip believed that Atmel employees would have no right to any severance benefits under the Severance Plan if Microchip terminated their employment following the merger.[2]

---

[2] Indeed, prior to the April 4, 2016 merger, Microchip knew and believed that the Severance Plan *was* in effect; knew that Microchip had a legal obligation to pay the severance benefits set forth in the Severance Plan to Atmel employees who were terminated without cause following the merger; knew that Microchip had agreed to honor the severance obligations under the Severance Plan; and knew that Microchip had led Atmel management and employees to believe that Microchip *would* pay the severance benefits set forth in the Severance Plan to Atmel employees who were terminated without cause following the merger.

ATMEL PLAN/BERMAN000173

On April 4, 2016, Microchip's acquisition of Atmel closed and Atmel became a wholly owned subsidiary of Microchip. This merger transaction constituted a "Change in Control" within the meaning of the Severance Plan. Microchip promptly terminated many Atmel employees in the days immediately following the change of control.

On April 6, 2016, Ms. Berman's employment was involuntarily terminated without "cause." See **Exhibit A-3**. Since all three conditions under the Atmel Severance Plan had now occurred--the Initial Triggering Event prior to November 1, 2015; a change of control; and a termination without cause—Ms. Berman was entitled to the benefits provided by the Severance Plan. Thus, Ms. Berman was entitled to 40% of her base salary, a prorated portion of 100% of her annual incentive bonus, and four months of paid COBRA benefits. However, on April 6, 2016, Ms. Berman and other terminated Atmel employees received a letter from Microchip which indicated that Microchip would only pay either 5 or 6 weeks of salary as severance. See, **Exhibits A-2** through **A-6**.

In the days and weeks immediately following the April 4, 2016 merger, Atmel employees were falsely told by Microchip that Atmel employees who were terminated were not entitled to any benefits under the Severance Plan; were falsely told that the Severance Plan had 'expired' and that Atmel employees were therefore not eligible for benefits; and were falsely told that Microchip has no knowledge of the Severance Plan prior to the merger. Atmel employees were also falsely told by Microchip that the Severance Plan only applied if Dialog had been the entity which acquired Atmel and that it did not apply to Microchip's purchase of Atmel. See, **Exhibits A-11** (Declaration of Schwarz), **A-10** (Declaration of Schuman) and **A-1** (Declaration of Coplin). Microchip also told Atmel employees that if they wanted to challenge Microchip's refusal to pay the severance benefits under the Severance Plan, they would have to fight Microchip in court. *Id.* Microchip also told Atmel employees that Microchip might offer them severance benefits equal to 50% of the benefits they were due under the Severance Plan, if the employee signed an agreement to take only 50% and if the employee then signed a release of all claims following the employee's termination.

On April 11, 2016, Ms. Berman and other Atmel employees were sent another letter from Microchip ("the April 11th Letter") which indicated that Microchip would only pay them 50% of the severance benefits due to them under the Severance Plan. See **Exhibits A-1** through **A-11**.

Prior to Microchip sending the April 11th Letter to Ms. Berman and other Atmel employees, Microchip's Chief Executive Officer gave an interview to an electronics industry publication in which he acknowledged that Microchip was aware that Atmel had represented in writing to its employees in January 2016 that the Atmel employees would be eligible for the severance benefits contained in the Severance Plan in connection with an acquisition by Microchip and that the Severance Plan remained in place, and that this had been confirmed again to the Atmel employees in the February 2016 FAQs regarding the potential Microchip transaction. See **Exhibit I** to the May 20th Claim Letter. Prior to Microchip sending Ms.

Berman and other Atmel employees the April 11th Letter, Microchip's Chief Executive Officer was also aware that Microchip's own executives had explicitly assured Atmel employees that Microchip would honor the severance agreements of the Atmel employees if they were terminated following an acquisition by Microchip. See, **Exhibit A-10** (Declaration of Schuman). Thus, despite knowing that Atmel had made a decision and interpretation prior to the Change in Control that the Severance Plan was in effect and that Atmel employees remained eligible for benefits under the Severance Plan if they were terminated without cause by Microchip; despite knowing prior to April 11, 2016 that these representations and assurances had been made to the Atmel employees by both Atmel and Microchip; and despite knowing and believing that the Severance Plan *was* in effect, Microchip nevertheless tried to coerce and intimidate Ms. Berman and other employees into accepting only 50% of the severance benefits due to them under the Severance Plan.

Furthermore, following the Change in Control, Microchip never informed Atmel employees that they had the right, under ERISA, to submit a claim for benefits under the Severance Plan and to ask for a determination as to whether they were, in fact, entitled to benefits under the Severance Plan. To the contrary, Microchip falsely told Atmel employees after the Change in Control that the Severance Plan had "expired" and no longer existed. In doing these acts and omissions, Microchip acted in bad faith and breached its fiduciary duties under ERISA as a Plan Administrator.

## IV. DEMAND FOR BENEFITS AND DOCUMENTS

By this letter, Ms. Berman is appealing the Plan Administrator's November 29, 2016 denial of her benefits, and Ms. Berman demands that Microchip honor its obligations and pay her 100% of the severance benefits due to her under the Severance Plan, i.e., 40% of her base salary, a pro-rated portion of 100% of her annual incentive bonus, and four months of paid COBRA benefits. As contemplated by the Severance Plan, Ms. Berman is prepared to sign an appropriate separation and release agreement upon confirmation that Microchip intends to pay Ms. Berman her *full* severance benefits.

We demand that Microchip inform us in writing no later than **March 21, 2017** whether or not Microchip will pay Ms. Berman all of her Severance Plan benefits. If Microchip's stated position in response to this demand is that Microchip will *not* pay Ms. Berman all of her Severance Plan benefits, Microchip must provide us with an explanation for its position and any documents supporting this position. If any of these requested documents are withheld, we demand that the Plan Administrator provide us with a list of each document being withheld together with a complete explanation of the basis upon which each document is being withheld.

In Ms. Berman's original May 20th Claim Letter, Ms. Berman included a request for 23 categories of documents relating to her claim. In addition, in the December 22nd Letter, Ms. Berman's attorneys: 1) demanded that the Plan Administrator immediately provide us with a

complete copy of the administrative record on which you based your denial of Ms. Berman's claim, and 2) reiterated Ms. Berman's prior demand for documents, i.e., the request for documents that was included in Ms. Berman's May 20th Claim Letter. As of January 18, 2016, the Plan Administrator has failed to provide us with a copy of the administrative record on which you based your denial of Ms. Berman's claim. The Plan Administrator has also failed to provide us with the other documents we requested in Ms. Berman's May 20th Claim Letter and in the December 22nd Letter. Because the Plan Administrator has failed to provide us with these documents, the Plan Administrator has intentionally hindered Ms. Berman's appeal and prevented her from obtaining a full and fair review of her claim as is required by ERISA. Therefore, Ms. Berman reserves the right to submit a response to any further documents that are provided to her by the Plan Administrator in the future, prior to the Plan Administrator rendering any decision regarding Ms. Berman's appeal.

As noted above, Ms. Berman's appeal incorporates all previous letters, arguments, documents and evidence which Ms. Berman has previously submitted to the Plan Administrator in support of her claim for benefits. Thus, when considering Ms. Berman's appeal, the Plan Administrator is expected and required to consider, review and evaluate all prior letters, arguments, documents and evidence which Ms. Berman submitted, including all materials accompanying the May 20th Claim Letter and the June 9th Supplemental Letter. In addition, Ms. Berman also expects and demands that the Plan Administrator review and consider all of the documents which Ms. Berman has previously requested from the Plan Administrator (regardless of whether the Plan Administrator has produced them to Ms. Berman), including the documents requested in the May 20th Claim Letter, the June 9th Supplemental Letter and the December 22nd Letter, since these documents are relevant to Ms. Berman's claim for benefits.

Very truly yours,

Keith Ehrman

Enclosures

cc: Michael Rubin, Esq. (w/Enclosures)

EXHIBIT A-1

ATMEL PLAN/BERMAN000177

## DECLARATION OF WILLIAM COPLIN

I, William Coplin, declare as follows:

In 2015, I was employed by Atmel Corporation (hereinafter "Atmel" or "Company") as a Director of Human Resources. In July 2015, I and all other U.S. Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan I received in July 2015 is attached as **Exhibit A**. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated without cause. Under the terms of the Severance Plan, my severance benefits included cash payments representing 50% of my base salary, a pro-rated amount of my annual bonus target, and six months of COBRA insurance to be paid for by the Company.

In early September 2015, Steve Laub ("Laub"), Atmel's Chief Executive Officer, held a meeting with Atmel U.S. employees who were at the Director level or above. At this meeting, which I attended, Mr. Laub informed us that Atmel's Board of Directors had approved an additional severance benefit for all Director level and above U.S. Atmel employees. Mr. Laub explained that, in the event that Atmel was acquired and such employees were subsequently terminated without cause, they would be entitled to accelerated vesting of any unvested equity awards they held, such as Restricted Stock Units ("RSUs"), in addition to the cash payments previously set forth in the Severance Plan.

In September 2015, I learned that Atmel had entered into a definitive agreement with a company called Dialog Semiconductor ("Dialog"), pursuant to which Dialog would acquire Atmel. In December 2015, I heard that Dialog might not be the buyer, since another potential purchaser had emerged and had made an offer that might be superior to Dialog's. In January 2016, I learned that Microchip Technology, Inc. ("Microchip") was the new potential buyer.

On or around January 13, 2016, I attended a meeting which Mr. Laub held with Atmel employees who were at the Director level or above. After explaining that Microchip had made a superior offer to purchase Atmel, and that Atmel was going to give Dialog four days in which to make a counter-offer, Mr. Laub reiterated that all of the severance benefits previously presented to the Atmel employees in the Severance Plan remained in effect, regardless of whether the ultimate purchaser was Microchip or Dialog.

On or around January 14, 2016, I received a letter from Suzanne Zoumaras, Atmel's Senior Vice President of Global Human Resources ("the January 14, 2016 Letter"). A copy of the January 14, 2016 Letter that I received is attached as **Exhibit B**. Ms. Zoumaras was my immediate supervisor. In the January 14, 2016 Letter, Ms. Zoumaras stated that I would be eligible for the severance benefits provided in the July 2015 Severance Plan if I were to be involuntarily terminated without cause following a change in control, regardless of whether the acquisition of Atmel was done by Dialog or Microchip. The January 14, 2016 Letter also emphasized that the Severance Plan continued to remain in place. The January 14, 2016 Letter also specifically referenced the September 2015 communication which had informed the Atmel employees at the Director level or above that they would be entitled to accelerated

1

EXHIBIT A to A-1

ATMEL PLAN/BERMAN000179

I relied on the Severance Plan and the assurances I had received from Atmel executive management, including Mr. Laub and Ms. Zoumaras, and I relied on the assurances contained in the documents described above, including the January 14, 2016 Letter and the FAQs and Proxy Statement which had been reviewed and approved by Microchip, in deciding to stay employed with Atmel through the Microchip acquisition period. I would have looked for a job outside of Atmel well before the Microchip acquisition had I known that Microchip was not going to honor the Severance Plan benefits.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on September 28, 2016 at _____ San Jose _____, CA _____.

William Coplin

ATMEL PLAN/BERMAN000180

employees signed an agreement accepting this 50% proposal, and if they later signed a release of claims. Mr. Sanghi repeated multiple times that Atmel employees were not eligible for the benefits under the Severance Plan and that Atmel employees would have to fight him in court if they wanted to challenge him on their entitlement to benefits under the Severance Plan. As a senior HR manager, I made an effort to gauge how the Atmel employees were responding to Mr. Sanghi and Microchip's conduct and threats during the first half of April 2016. Based on my own communications with Atmel employees as well as the feedback I received from other HR managers who were in contact with employees, many Atmel employees felt fearful and intimidated by Microchip's conduct and threats, and they believed that they would not receive any severance benefits whatsoever if they did not sign the 50% agreement. Many employees also feared that they would be promptly terminated by Microchip if they did not sign the 50% agreement.

On approximately April 13, 2016, I received a letter "severance agreement" from Microchip ("the April 13 Agreement") which offered to pay me 50% of the Severance Plan benefits if I signed the April 13 Agreement and was subsequently terminated, provided that I also signed a release of claims following my termination. A copy of the April 13 Agreement is attached hereto as Exhibit D. Based on Microchip's and Mr. Sanghi's statements, I believed that if I did not sign the April 13 Agreement, Microchip would refuse to pay me any of the severance benefits I was due under the Severance Plan and would not accelerate the vesting of any of my RSUs. I also felt that Microchip might immediately terminate my employment if I did not sign the April 13 Agreement. I also believed that I could not afford to challenge Microchip in court regarding my Severance Plan. For these reasons, I felt compelled to sign the April 13 Agreement in order to receive some portion of the severance benefits I was due. On April 18, 2016, I signed the April 13 Agreement.

On June 10, 2016, my employment was terminated by Microchip without cause. On or about June 10, 2016, I received from Microchip a Severance Agreement and Release (the "June 10 Agreement and Release"). A copy of the June 10 Agreement and Release is attached hereto as Exhibit E. The June 10 Agreement and Release provided that Microchip would pay me 50% of the severance benefits to which I was entitled under the Severance Plan, and would accelerate the vesting of my RSUs, if I released Microchip from all claims and liabilities. I believed that if I did not sign the June 10 Agreement and Release, Microchip would refuse to pay me any of the severance benefits I was due under the Severance Plan and would not accelerate the vesting of any of my RSUs. I also believed that I could not afford to challenge Microchip in court. I felt compelled to sign the June 10 Agreement and Release in order to receive some portion of the severance benefits I was due, and so I signed the June 10 Agreement and Release on the day I received it.

3

vesting of their unvested RSUs in the event of a termination following a change of control. The January 14, 2016 Letter emphasized that this accelerated vesting benefit also remained in place.

After Dialog failed to increase its purchase offer in January 2016, I learned on approximately January 20, 2016 that Microchip had entered into an agreement with Atmel pursuant to which Microchip would acquire Atmel.

On approximately February 3, 2016, Ms. Zoumaras sent an e-mail to Atmel employees entitled "Compensation Benefits Relating to the Microchip Merger", which had links to a series of Frequently Asked Questions ("FAQs") that had been published for Atmel employees regarding the potential Microchip acquisition. A copy of the FAQs is attached as Exhibit C. These FAQs had been reviewed by the HR team, and had been sent to Microchip for Microchip's review and approval, prior to their release to the Atmel employees. Ms. Zoumaras confirmed to our HR team that these FAQs had been reviewed and approved by Microchip and that Microchip would honor the Severance Plan if it acquired Atmel. Ms. Zoumaras also explained that Microchip insisted that no communications of this sort (including the FAQs) could be released by Atmel without specific approval by Microchip. Following Microchip's approval, the FAQs were released to Atmel employees and were posted on Atmel's intranet site. The FAQs remained on the Atmel intranet site and were available for review by Atmel employees through at least the date of the acquisition closing in April 2016.

As part of the HR team, I attended multiple meetings throughout the acquisition process which Ms. Zoumaras held with her direct HR reports. These meetings were generally held weekly, but more often when required. In these meetings, the HR team reviewed the progress of the acquisition and specifically reviewed Exhibits A, B and C. During these HR meetings, we addressed employee questions and concerns regarding the pending acquisition. One of the issues we discussed was whether the terms of the Severance Plan remained in effect under the Microchip acquisition. During the period from January through March 2016, Ms. Zoumaras emphatically confirmed that she had discussed this point with Atmel's executive team and with others, and that the terms of the Severance Plan would apply to the Microchip acquisition. Ms. Zoumaras assured me and the HR management team multiple times that if Atmel employees were terminated without cause following the acquisition by Microchip, they would receive the severance benefits provided in the Severance Plan. To reassure me and the entire HR team further, and to provide information for the HR team to disseminate to concerned employees, Ms. Zoumaras also referred us to the Proxy Statement which Atmel and Microchip had filed in February 2016 with the Securities and Exchange Commission ("Proxy Statement"). The Proxy Statement contained language specifically confirming that Microchip had agreed to honor any severance contracts of the Atmel employees which had been disclosed to Microchip.

On April 4, 2016, Microchip's acquisition of Atmel closed. On approximately April 5 and 6, 2016, Microchip communicated to the Atmel employees that the Atmel employees were not entitled to the benefits set forth in the Severance Plan and that Microchip would not pay those severance benefits. Microchip also claimed that it purportedly had been unaware of the Severance Plan/severance packages that had been provided to Atmel employees prior to the acquisition closing. Within a few days of these communications, Steve Sanghi, the Chairman and Chief Executive Officer of Microchip held a general meeting with Atmel employees. During this meeting, Mr. Sanghi informed Atmel employees that they were not entitled to any benefits under the Severance Plan, but that Microchip was nevertheless willing to offer terminated Atmel employees 50% of the benefits provided by the Severance Plan if Atmel

2

ATMEL PLAN/BERMAN000182



January 14, 2016

William Coplin

Dear William,

We recognize that there continues to be significant speculation regarding the acquisition of the company and understand that this can be distracting and unsettling. As a result, we believe it is important to remind you of the benefits for which you may be eligible in the event that your employment is involuntarily terminated without Cause in connection with a Change of Control of the company, including an acquisition by Dialog or Microchip.

In July 2015, we provided you a letter (the "July Severance Benefits Letter") describing the U.S. Severance Guarantee Benefits for which you are eligible. This U.S. Severance Guarantee Program continues to remain in place. In addition, in September 2015, we informed you that the company's Compensation Committee approved acceleration of unvested non-performance restricted stock units ("RSUs") for our U.S. based Director-level employees under certain conditions. Under that program you will be eligible for 100% acceleration of your unvested RSUs if there is a Change of Control and your employment is involuntarily terminated without Cause during the period beginning three (3) months prior to the Change of Control and ending twelve (12) months following the Change of Control.

The benefits under the U.S. Severance Guarantee Program and the U.S Director-level equity acceleration programs are subject to the terms and conditions of each as approved by the company's Compensation Committee. To receive these benefits you will be required to sign a form of separation and release agreement reasonably acceptable to the company (or its successor). Capitalized terms that are not defined in this letter shall have the meanings set forth in the July Severance Benefits Letter.

Nothing in this letter or the July Severance Benefits Letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the company (or its successor) of the benefits provided by this letter and the July Severance Benefits Letter. You shall remain an at-will employee for all purposes, meaning that you or the company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

William, we hope these benefits provide reassurance and reflect our appreciation for your contributions to Atmel. And, thank you for your continued focus during these unusual times.

Sincerely,

Suzanne P. Zoumaras
Suzanne Zoumaras
Senior Vice President, Global Human Resources

ATMEL PLAN/BERMAN000183

**EXHIBIT C to A-1**

ATMEL PLAN/BERMAN000184

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our intranet, **Atmel Connect,** at http://connect.atmel.com/index.html and are focused on answering questions related to compensation and benefits.

As we have additional information, we will provide further updates and FAQs.

**Warm regards,**

Suzy

**Suzanne Zoumaras** | Senior Vice President, Global Human Resources
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com | www.atmel.com

**ATMEL PLAN/BERMAN000185**



## FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
## Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

RSUs & PRSUs. At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

Stock Options. All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

**ATMEL PLAN/BERMAN000186**



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

<u>Purchase Rights under the Employee Stock Purchase Plan (ESPP)</u>. Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

### How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010841/t1600178_8k.htm

### When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

### Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

### Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

ATMEL PLAN/BERMAN000187



***

Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the *"SEC"*) a Registration Statement on Form S-4 (the *"Registration Statement"*) containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the *"Proxy Statement/Prospectus"*). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the *"Investors"* section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the *"Investors"* section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

**ATMEL PLAN/BERMAN000188**

# Atmel

or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential success to be derived from strategic partnerships, the potential impact of capacity constraints, the effect of financial performance on share price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip; (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000189



only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

***

Confidential *** Not for Distribution

ATMEL PLAN/BERMAN000190

EXHIBIT B to A-1

ATMEL PLAN/BERMAN000191

**Payments:** All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

**Additional Matters.** Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000192

**STRICTLY CONFIDENTIAL**

## ADDENDUM TO
## U.S. SEVERANCE GUARANTEE PROGRAM LETTER
### July 8, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effect ive from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will rema in in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Contr ol is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become availab le to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or b efore November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not en tered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Ad dendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U. S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A.  A Change of Control actually occurs; and
B.  Their employment is terminated without "Cause" by the Company (or its successor) at any time w ithin 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" an d "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are e ntitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 8, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial ·Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Gua rantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your exe cu ting a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Rel ease"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that po rtion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Ben efits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000193**



July 9, 2015

William Coplin
Re: Severance Guarantee

Dear William,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 50% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** A prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- **COBRA Benefits:** Six (6) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

William, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Tim Mueller
Tim Mueller

EXHIBIT D to A-1

ATMEL PLAN/BERMAN000195



April 13, 2016

William Coplin

Re: Severance Benefits

Dear William,

I am pleased to offer you a severance agreement on the terms and conditions set forth below.

As you know, Atmel Corporation (the "Company") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). The Company and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by the Company, and in part to provide you with the security of certain benefits in the event your relationship is terminated involuntarily without Cause (as defined in Appendix A) by the Company, Microchip or any U.S. subsidiary or affiliate of the Company or Microchip (the "Microchip Group"), and other than due to your death or disability, on or prior to April 4, 2017 ("Qualifying Termination").

These benefits (collectively, the "Severance Benefits") are:

- **Cash Severance:** A lump sum payment equal to 25% of your annual base salary, less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");
- **Target Incentive:** A lump sum payment equal to 50% of the annual performance bonus (MIP) that you received from the Company for 2015, then annualized, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date[1];
- **Equity Acceleration:** 100% vesting acceleration of your restricted stock units that were assumed by Microchip in connection with the Merger; and
- **COBRA Benefits:** Three months of COBRA benefits paid for by Microchip.

Your receipt of the Severance Benefits will be subject to you signing and not revoking a release of any and all claims, in a form prescribed by Microchip and substantially the same as that attached at Appendix B (the "Release"). Upon the Release becoming effective, the Cash Severance, Target Incentive, and Equity Acceleration benefits will be payable in a lump sum without interest as soon as administratively practicable, and all other amounts will be payable in accordance with the payment schedule applicable to each payment or benefit.

Nothing in this agreement is intended to, or shall, contradict, modify or alter the terms of your at-will employment. You shall remain an at-will employee of the Company and the Microchip Group for all purposes,

---

[1] For example, if your performance bonus for working the entire year of 2015 was $10,000, less applicable withholdings, and you are employed for a total of 180 days after January 1, 2016, then you will be eligible for a Target Incentive of (($10,000 x .5) x (180/365))= $2,465.75, less applicable withholdings. However, if you were hired by the Company sometime after January 1, 2015, then your 2015 bonus number will be annualized accordingly. For example, if you were hired April 1, 2015 and received a performance bonus for 2015 of $7,500, and you are employed for a total of 180 days after January 1, 2016, then you will be eligible for a Target Incentive of (($7,500 x 365/275) x .5) x (180/365)) = $2,454.55.

1



meaning that you, the Company or the member of the Microchip Group employing you may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice. Moreover, the at-will status of your relationship cannot be changed except in a written document, signed by Microchip's Chief Executive Officer and you, and which expressly modifies your at-will status. This agreement constitutes the complete, final, and exclusive embodiment of the entire agreement between you and the Microchip Group with regard to its subject matter and supersedes any other actual or perceived promises, warranties, or representations with regard to its subject matter made by the Company or any other member of the Microchip Group, including, for the avoidance of doubt, any programs, policies, or agreements with respect to severance or equity acceleration benefits made prior to April 4, 2016.

In the event that a portion of the Microchip Group is sold to an unrelated party and your employment is transferred to that party, Microchip and the Company will ensure that the new employer assumes responsibility for this agreement.

If a Qualifying Termination does not occur on or prior to April 4, 2017, this agreement will expire and you will not be eligible to receive the Severance Benefits described here.

To accept this offer, counter-sign in the space provided below and return it to your HR Business Partner no later than April 20, 2016.

Thank you for your continued contributions to our success.

Sincerely,

*Lauren a. Carr*

Lauren Carr
Vice President, Global Human Resources

AGREED AND ACKNOWLEDGED:

*Wm Coplin*

Signature (William Coplin)

4|18|2016

Date

MICROCHIP TECHNOLOGY INC.

HR Business Partner

4|18|2016

Date

2

**ATMEL PLAN/BERMAN000197**



**MICROCHIP**

### APPENDIX A

### ADDITIONAL TERMS TO SEVERANCE AGREEMENT

Unless otherwise defined below, capitalized terms used herein will have the meanings set forth in the agreement.

1. <u>Cause.</u> "Cause" is defined as (i) your willful and continued failure to perform the duties and responsibilities of your position after there has been delivered to you a written demand for performance from Microchip's Vice President, Worldwide Human Resources which describes the basis for her belief that you have not substantially performed your duties and you have not corrected such failure within 30 days of such written demand; (ii) any act of dishonesty by you in connection with your responsibilities as an employee of the Company with the intention or reasonable expectation that such action may result in your substantial personal enrichment; (iii) your conviction of, or plea of nolo contendere to, a felony that Microchip's Vice President, Worldwide Human Resources reasonably believes has had or will have a material detrimental effect on the reputation or business or any member of the Microchip Group; (iv) a breach of any fiduciary duty owed to the Company or the Microchip Group by you that has a material detrimental effect on the reputation or business of any member of the Microchip Group; (v) you being found liable in any Securities and Exchange Commission or other civil or criminal securities law action or entering any cease and desist order with respect to such action (regardless of whether or not you admit or deny liability); (vi) you (A) obstructing or impeding; (B) endeavoring to obstruct, impede or improperly influence, or (C) failing to materially cooperate with, any investigation authorized by the Board or any governmental or self-regulatory authority (an "Investigation"); however, your waiver of attorney-client privilege relating to communications with your own attorney in connection with an Investigation will not constitute "Cause"; or (vii) your disqualification or bar by any governmental or self-regulatory authority from serving in the capacity contemplated by your position or your loss of any governmental or self-regulatory license that is reasonably necessary for you to perform your responsibilities to the Company or any member of the Microchip Group, if (A) the disqualification, bar or loss continues for more than 30 days, and (B) during that period the Company or any member of the Microchip Group uses its good faith efforts to cause the disqualification or bar to be lifted or the license replaced, it being understood that while any disqualification, bar or loss continues during your employment, you will serve in the capacity contemplated by your position to whatever extent legally permissible and, if your service in the capacity contemplated by your position is not permissible, you will be placed on leave (which will be paid to the extent legally permissible).

1

**ATMEL PLAN/BERMAN000198**



**MICROCHIP**

### APPENDIX B

| TO: | [NAME] |
|-----|--------|
| FROM: | Microchip Technology Incorporated |
| DATE: | [XXXX] |
| RE: | Employment Separation, Severance and Release ("Agreement") |

As you know, the Company[2] has decided to end your employment without cause (as defined in the Severance Agreement that you signed in April 2016). Under the terms of the Severance Agreement, you are entitled to the Severance Benefits listed below provided you sign, return and do not revoke this Agreement.

#### The Company's Commitments to You

- The Company will give you:

  ○ **Cash Severance:** A lump sum payment equal to 25% of your annual base salary, less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");

  ○ **Target Incentive:** A lump sum payment equal to 50% of the annual performance bonus (MIP) that you received from the Company for 2015, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date;

  ○ **Equity Acceleration:** 100% vesting acceleration of your restricted stock units that were assumed by Microchip in connection with the April 4, 2016 Merger between Atmel Corporation and Microchip Technology Incorporated; and

  ○ **COBRA Benefits:** Three months of COBRA benefits paid for by Microchip.

- The Company will not contest any claim for unemployment benefits that you may file.

#### Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act.

---

[2] In this document, unless otherwise noted, "Company" means Microchip Technology Incorporated, Atmel Corporation and any of their affiliated entities.

1

**ATMEL PLAN/BERMAN000199**



This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads *"a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."*

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

### General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on XXXXX (XX days after your Separation Date), to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Lauren Carr in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until seven (7) business days after you deliver it to Lauren Carr. If you decide to accept this offer and you deliver a signed Agreement to Lauren Carr, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Lauren Carr within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 21 days [or 45 days if you are not the only employee separated from the Company at the same time] to consider it, and that you are signing it knowingly and voluntarily.

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

2

**ATMEL PLAN/BERMAN000200**



**MICROCHIP**

---

**Date**

[XXXX EMPLOYEE NAME]

3

**ATMEL PLAN/BERMAN000201**

EXHIBIT E to A-1

ATMEL PLAN/BERMAN000202



**MICROCHIP**

## APPENDIX B

| TO: | William Coplin |
| --- | --- |
| FROM: | Microchip Technology Incorporated |
| DATE: | June 10, 2016 |
| RE: | Employment Separation, Severance and Release ("Agreement") |

As you know, the Company[1] has decided to end your employment without cause (as defined in the Severance Agreement that you signed in April 2016). Under the terms of the Severance Agreement, you are entitled to the Severance Benefits listed below provided you sign, return and do not revoke this Agreement.

### The Company's Commitments to You

- The Company will give you:

  - **Cash Severance:** A lump sum payment equal to 25% of your annual base salary ($48,255.99), less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");
  - **Incentive Bonus:** A lump sum payment equal to 50% of the annual performance bonus (MIP) ($7,745.90) that you received from the Company for 2015, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date;
  - **Equity Acceleration:** 100% vesting acceleration of your restricted stock units that were assumed by Microchip in connection with the April 4, 2016 Merger between Atmel Corporation and Microchip Technology Incorporated; and
  - **COBRA Benefits:** Three months of COBRA benefits paid for by Microchip.

- The Company will not contest any claim for unemployment benefits that you may file.

### Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act.

---

[1] In this document, unless otherwise noted, "Company" means Microchip Technology Incorporated, Atmel Corporation and any of their affiliated entities.

1

**ATMEL PLAN/BERMAN000203**



This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads "*a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.*"

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

### General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on July 25, 2016 (45 days after your Separation Date), to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Lauren Carr in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until seven (7) business days after you deliver it to Lauren Carr. If you decide to accept this offer and you deliver a signed Agreement to Lauren Carr, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Lauren Carr within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 21 days [or 45 days if you are not the only employee separated from the Company at the same time] to consider it, and that you are signing it knowingly and voluntarily.

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

2

**ATMEL PLAN/BERMAN000204**



**MICROCHIP**

_____          _____
Date                               William Coplin

3

**ATMEL PLAN/BERMAN000205**

## EXHIBIT A

### DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Microchip:

1.  **Decisional Unit.** The decisional unit for this reduction in force is Human Resources

2.  **Eligibility.** All persons included in the Human Resources are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.  **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to the Company. The offer of severance benefits contained in this Agreement will expire on the date stated on page 2 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.  **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

**EXHIBIT B -Atmel - HR  (6/10/16)**
**Group Not Selected**

| Title | Age(s) |
|---|---|
| HR Business Partner | 36 |
| Benefits Analyst | 41 |
| Sr. Payroll Specialist | 42 |
| Senior Manager, Global HRMS | 43 |
| Sr. Global Payroll Manager | 53 |
| Sr. Compensation Analyst | 55 |
| Sr. HR Business Partner | 56 |
| Manager, Benefits | 60 |

ATMEL PLAN/BERMAN000207

**EXHIBIT C - Atmel - HR (6/10/2016)**
**Group Selected**

| Job Title | Age(s) |
|-----------|--------|
| Compensation Analyst | 25 |
| Senior Manager, Global Compensation | 55 |
| Director, Human Resources | 57 |

**EXHIBIT A-2**

<u>DECLARATION OF ROBIN BERMAN</u>

I, Robin Berman, declare as follows:

In 2015, I was employed by Atmel as a Creative Director. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan documents that I received in July 2015 is attached hereto as Exhibit A. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

In September 2015, I learned that Atmel had entered into an agreement with a company called Dialog Semiconductor pursuant to which Dialog would acquire Atmel. In December 2015, I heard that another company had made an offer to purchase Atmel and that a decision would be made in January. The rumor among employees was that the new company was Microchip. I and many other employees thought this would be bad for Atmel and for the future of many Atmel employees.

In mid-January 2016, I learned that Microchip had made a superior offer to that of Dialog. My superior, Sander Arts (the Vice President of Corporate Marketing), assured me and other employees that we should not look elsewhere for a job outside of Atmel, since the Severance Plan was in place and so we had financial protection in the event that Microchip terminated us.

On approximately January 20, 2016, Steve Laub (the Chief Executive Officer of Atmel) held an informal all hands meeting. During this meeting, Laub discussed the Microchip offer, and indicated to the employees that the Severance Plan was still in place.

In February 2016, I discussed with Sander Arts the fact that I and others had not started looking for new jobs in light of the Severance Plan. Arts again assured me that the Severance Plan was intact and so I would have financial protection for many months if Microchip terminated me. I had an almost identical discussion with Arts again in March 2016.

On approximately April 6, 2016, I and many other Atmel employees received a letter informing us that we were being terminated effective immediately. These letters indicated that Microchip would only pay 5 weeks of salary as severance. A copy of the April 6, 2016 termination letter I received is attached hereto as Exhibit B. As I was being escorted out of the lobby on April 6th, I had a discussion with Ravi Bali (a Manager of Human Resources). Bali made it clear that he was shocked that Microchip was not honoring the Severance Plan, and he also indicated that it was a complete surprise to the remaining Atmel Human Resources team that Microchip was not paying the severance.

On approximately April 11, 2016, I and the other Atmel employees who were terminated received a new letter, which indicated that Microchip would pay us 50% of the severance benefits due under the Severance Plan. A copy of the April 11, 2016 letter I received is attached hereto as Exhibit C.

Based on my discussions with other Atmel employees prior to the closing of the acquisition in April 2016, it was my understanding that Atmel had made Microchip aware of the existence of the Severance Plan prior to April 2016, and that Atmel had also made Microchip aware of the fact that Atmel believed that the Severance Plan was still in place following Microchip's agreement to purchase

1

Atmel in January 2016 and that the Severance Plan would require Microchip to pay severance benefits if Microchip acquired Atmel and then terminated Atmel employees. Based on my discussions with other Atmel employees prior to the closing of the acquisition in April 2016, Microchip had knowledge of, and had been involved in the drafting of, the language of the February 2016 "Frequently Asked Questions" that were published for Atmel employees to address questions regarding the Microchip acquisition.

On approximately May 11, 2016, I had a conversation with Sander Arts, in which Arts confirmed that prior to the Microchip acquisition, he had conveyed to his whole team that the Severance Plan was intact even with Microchip becoming the purchaser. Arts also confirmed that, prior to the April acquisition by Microchip, Laub had told all of his direct reports (including Arts) that the Severance Plan was still intact.

I relied on the Severance Plan and the assurances I had received from Atmel managers in deciding to stay with Atmel through the Microchip acquisition. I would have left Atmel and found another job long before the Microchip acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 18, 2016 at Palo Alto, California.

Robin S. Berman

Robin Berman

**ATMEL PLAN/BERMAN000211**

EXHIBIT A to A-2

ATMEL PLAN/BERMAN000212



July 9, 2015

Robin Berman
Re: Severance Guarantee

Dear Robin,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- **COBRA Benefits:** Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Robin, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Sander Arts
Robin Berman

**ATMEL PLAN/BERMAN000213**

STRICTLY CONFIDENTIAL

## ADDENDUM TO
## U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A. A Change of Control actually occurs; and
B. Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000214**

**Payments:** All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

**Additional Matters.** Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000215

EXHIBIT B to A-2

ATMEL PLAN/BERMAN000216

| TO: | Robin Berman |
| DATE: | April 6, 2016 |
| FROM: | Atmel, LLC. |
| RE: | Severance Agreement and Release |

In connection with the termination of your employment from Atmel, LLC. effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Atmel, LLC., and its affiliates, parent corporation and subsidiaries (collectively the "Company"), on the terms stated below.

## Atmel, LLC Commitments to You

- In consideration for entering into this Agreement, Atmel, LLC. will pay you a lump sum total of $12,538.17 ("Severance"), which is approximately equal to 5 weeks of your current base pay.

- The Severance will be paid to you in one lump sum within 30 business days after the Effective Date of this Agreement, less all legally-required taxes and withholdings, including any advanced PTO pay.

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel, LLC. Human Resources department, Atmel, LLC. shall use its best efforts to provide only your last position and dates of employment.

## Your Commitments to the Company

- You agree to release the Company and its current and former officers, directors, employees, shareholders, affiliates, benefit plans, administrators, insurers, trustees, divisions, and subsidiaries, and predecessor and successor corporations and assigns (including, but not limited to, Atmel, LLC.) (collectively, the "Releasees") and promise never to assert any and all actions,

ATMEL PLAN/BERMAN000217

causes of action, grievances, obligations, damages, losses and claims of every kind based on any act, omission, event up to the date you sign this Agreement, including, but not limited to, any claims relating to or arising out of your employment and/or termination of your employment with Atmel, LLC. In particular, you release the Releasees from liability for all claims of any nature that you ever had or may have at this time, whether you know about them or not. This release specifically includes, but is not limited to, any claims under federal or state law, such as Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act, as well as any contract claim or other claim under statutory or common law, to the fullest extent the law permits a release of claims. You agree that the waiver and release of claims in this paragraph is on behalf of yourself and your heirs, administrators, representatives, executors, successors and assigns, and all such persons are bound by this waiver and release. You agree that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement. This release does not release claims that cannot be released as a matter of law, including, but not limited to, your right to file a charge with or participate in a charge by the Equal Employment Opportunity Commission, or any other local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, against the Company (with the understanding that any such filing or participation does not give you the right to recover any monetary damages against the Company and your release of claims herein bars you from recovering such monetary relief from the Company). This release does not extend to any right you may have to unemployment compensation benefits or workers' compensation benefits. You acknowledge that you have made no assignment or transfer of any claim or other matter waived or released by this Agreement.

- You agree that this release constitutes a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads:

    A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

- You acknowledge that you are waiving and releasing rights you may have under ADEA, and that this waiver and release is knowing and voluntary. You and the Company agree that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Effective Date of this Agreement. You acknowledge that the consideration given for this waiver and release is in addition to anything of value to which you were already entitled. You acknowledge further that you have been advised by this writing that: (a) you should consult with an attorney prior to executing this Agreement; (b) you have forty-five (45) days within which to consider this Agreement; (c) as set forth in Exhibits A, B and C herein, you have been advised in writing by the Company of the class, unit, or group of individuals covered by the reduction in force, the eligibility factors for the reduction in force, and the job titles and ages of all individuals who were and were not selected; (d) you have seven (7) days following the execution of this Agreement to revoke this Agreement; (e) this Agreement shall not be effective until after

2

the revocation period has expired; and (f) nothing in this Agreement prevents or precludes you from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law. You and the Atmel, LLC. agree that changes, whether material or immaterial, do not restart the running of the 45-day period.

- This Agreement will become effective and irrevocable on the eighth (8th) day after both parties execute it (the "Effective Date"). In the event you sign this Agreement and returns it to the Company in less than the forty-five (45) day period identified above, you hereby acknowledge that you have voluntarily chosen to waive the full time period allotted for considering this Agreement. You acknowledge and understand that revocation must be accomplished by a written notification to Geri Shaw, Human Resources, Atmel, LLC., that is received prior to the Effective Date.

- To the extent Employee is in the possession of any Atmel property, including personal computers (PCs), laptops, fax machines scanners, copiers cellular phones, Atmel credit cards, and any Atmel documents, correspondence and related corporate materials on all media, Employee will return all property to Atmel on or before the Termination Date. In addition, computers must be returned with all Company data intact.

- You acknowledge and represent that, other than the consideration set forth in this Agreement, the Company has paid or provided all salary, wages, bonuses, accrued vacation/paid time off, premiums, leaves, housing allowances, relocation costs, interest, severance, outplacement costs, fees, reimbursable expenses, commissions, stock, stock options, vesting, and any and all other benefits and compensation due to you.

## General Understandings and Acknowledgements

- You hereby reaffirm and agree to observe and abide by the terms of the [Confidential Information and Invention Assignment] (the "Proprietary Information Agreement") between you and Atmel, LLC., specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information. You represent that you have returned all documents and other items provided to you by the Company, developed or obtained by you in connection with your employment with the Company, or otherwise belonging to the Company.

- This Agreement and the Proprietary Information Agreement states your and the Company's complete understandings regarding the subject matter of this Agreement and your rights and the Company's obligations relating in any way to, or arising out of, your employment with Atmel, LLC. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 23, 2016 to consider whether you want to accept the offer Atmel, LLC is making in this Agreement, although you do not need to wait until that time to

3

ATMEL PLAN/BERMAN000219

accept this offer and obtain the Severance. To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in this bullet point. As noted above, you will not receive the Severance until after you deliver this signed Agreement to Geri Shaw and the seven (7) day revocation period ends and you have not revoked this Agreement.

- By signing this Agreement, you will be acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given a reasonable period of time to consider it, and that you are signing it knowingly and voluntarily.

In WITNESS WHEROF, the parties have executed this Agreement on the respective dates set forth below.

_____        _____
Date                                    Robin Berman



_____        _____
Date                                    Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

4

## EXHIBIT A

## DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1. **Decisional Unit.** The decisional unit for this reduction in force is Marcom Group

2. **Eligibility.** All persons included in the Marcom Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3. **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to the Company. The offer of severance benefits contained in this Agreement will expire on the date stated on page 3 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4. **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

5

**ATMEL PLAN/BERMAN000221**

**Data Sheet by Age**
4/6/2016

**EXHIBIT B**

Job Titles of Individuals Not Selected from the Decisional Unit for this Reduction in Force and Not
Offered Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

ATMEL PLAN/BERMAN000222

**Data Sheet by Age**
4/6/2016

**EXHIBIT C**

Job Titles of Individuals <u>Selected</u> from the Decisional Unit for this Reduction in Force and
Offered Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

ATMEL PLAN/BERMAN000223

**EXHIBIT C to A-2**

ATMEL PLAN/BERMAN000224

TO: **Robin Berman**

DATE: **April 11, 2016**

FROM: **Atmel Corporation**

RE: **Severance Agreement and Release**

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip, Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

## Company Commitments to You

- In consideration for entering into this Agreement, Atmel will pay you a lump sum total of (i) $26,079.40 representing, a lump sum cash payment in cash equal to 0.20 times the your Base Pay, and (ii) $1,052.05 representing, a lump sum payment in cash equal to 50% of the your 2015 Bonus, prorated to the date of your Involuntary Termination.

- In addition, if you timely elect to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to two (2) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence, you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- The benefits described in the two bullets above are the "Severance Benefits." – – – – –

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

- The Company will not contest any claim for unemployment benefits that you may file.

**ATMEL PLAN/BERMAN000225**

## Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads "*a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.*"

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

## General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 27, 2016 to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until the next administratively practicable payroll after the eighth calendar day after you delivered this signed unrevoked Agreement to Geri Shaw. If you decide to accept this offer and you deliver a signed Agreement to Geri Shaw, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Geri Shaw within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 45 days to consider it, and that you are signing it knowingly and voluntarily.

2

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time that you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____          _____
**Date**                                 **Robin Berman**


_____          _____
**Date**                                 **Company Witness/Title**

**Internal use:**

**Date received:** _____

**7-day revocation period ends:** _____

3

ATMEL PLAN/BERMAN000227

## EXHIBIT A

## DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1. **Decisional Unit.** The decisional unit for this reduction in force is Marcom Group

2. **Eligibility.** All persons included in the Marcom Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3. **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to Geri Shaw at Atmel. The offer of severance benefits contained in this Agreement will expire on the date stated on page 2 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4. **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

4

**ATMEL PLAN/BERMAN000228**

**Data Sheet by Age**
4/6/2016

**EXHIBIT B**

Job Titles of Individuals Not Selected from the Decisional Unit for this Reduction in Force and Not Offered Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

5

**ATMEL PLAN/BERMAN000229**

**EXHIBIT C**

Job Titles of Individuals Selected from the Decisional Unit for this Reduction in Force and Offered
Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
|-------|-----|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**ATMEL PLAN/BERMAN000230**

## EXHIBIT A-3

**ATMEL PLAN/BERMAN000231**

## DECLARATION OF BO KANG

I, Bo Kang, declare as follows:

In 2015, I was employed by Atmel as a Senior Applications Manager. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan documents that I received in July 2015 is attached hereto as Exhibit A. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

During 2015, I learned that Atmel had entered into an agreement with a company called Dialog pursuant to which Dialog would acquire Atmel. In approximately December 2015, I heard that Dialog might not be the buyer and that Microchip might be the potential purchaser. Around this time period, I had several conversations with my manager, Steve Pancoast (the Vice President of Software, Tools and Applications) about the ongoing validity of the severance. Pancoast communicated to me his understanding and belief that the severance remained in place.

In approximately early February 2016, I read the Frequently Asked Questions ("FAQ's") that had been published for Atmel employees regarding the potential Microchip acquisition of Atmel. A copy of the FAQ's is attached as Exhibit B. The FAQ's appeared to confirm that Microchip would be honoring the Severance Plan if it acquired Atmel, consistent with what Pancoast had expressed to me.

In early March 2016, I spoke with Pancoast about my possible future if Microchip acquired Atmel, and how my position might not be safe. Pancoast discussed with me that both of us would have some financial protection for a transition period because of the severance package, as assured by the FAQ's.

In early April 2016, I was on a pre-arranged vacation overseas, and my paid time off was scheduled to last through April 11, 2016. I returned to work at Atmel on April 12, 2016 and learned that many employees had received a letter on April 8, 2016 terminating them and offering six weeks of severance. Because I had been on vacation, I did not receive such a letter. However, when I returned to the office on April 12, 2016, I was informed by Human Resources that my employment was being terminated effective April 12, 2016. I then received a letter which was dated April 11, 2016. That letter indicated that Microchip would pay me 50% of the severance benefits due under the Severance Plan. A copy of the April 11, 2016 letter which I received is attached hereto as Exhibit C.

In all of my discussions with other Atmel employees prior to April 2016, there was no doubt in anyone's mind that the Severance Plan was valid and intact for the upcoming Microchip acquisition, based on assurances they had received from Atmel management. I and other employees were shocked when the Severance Plan was not honored by Microchip after our termination in April 2016.

1

ATMEL PLAN/BERMAN000232

I relied on receiving severance benefits under the Severance Plan in making the decision to saty at Atmel through the time of the Microchip acquisition, and I would have left and looked for another job outside Atmel long before April 2016 if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration

was executed on May _18_, 2016 at _____Pleasanton_____, _California_____.

_Bo Kang_

**ATMEL PLAN/BERMAN000233**

EXHIBIT A to A-3

ATMEL PLAN/BERMAN000234



July 9, 2015

Bo Kang
Re: Severance Guarantee

Dear Bo,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- Cash Severance: 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- Target Incentive: If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- COBRA Benefits: Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Bo, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Steven Pancoast
Steven Pancoast

*STRICTLY CONFIDENTIAL*

### ADDENDUM TO
### U.S. SEVERANCE GUARANTEE PROGRAM LETTER
### July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

    A.    A Change of Control actually occurs; and
    B.    Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000236**

Payments: All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

Additional Matters. Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000237

EXHIBIT B to A-3

**ATMEL PLAN/BERMAN000238**

**Subject:** Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger

**Date:** Wednesday, February 3, 2016 at 5:57:34 PM Pacific Standard Time

**From:** Human Resources

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our intranet, **Atmel Connect**, at http://connect.atmel.com/index.html and are focused on answering questions related to compensation and benefits.

As we have additional information, we will provide further updates and FAQs.

Warm regards,

Suzy
Suzanne Zoumaras | Senior Vice President, Global Human Resources
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com | www.atmel.com

**ATMEL PLAN/BERMAN000239**



## FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
## Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

**RSUs & PRSUs.** At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

**Stock Options.** All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

ATMEL PLAN/BERMAN000240



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder

Purchase Rights under the Employee Stock Purchase Plan (ESPP). Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

### How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010841/t1600178_8k.htm

### When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

### Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

### Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

ATMEL PLAN/BERMAN000241

# Atmel

## Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-4 (the "Registration Statement") containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the "Proxy Statement/Prospectus"). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the "Investors" section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

## Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investors/home.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the "Investors" section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

## Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

ATMEL PLAN/BERMAN000242

# Atmel

or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of these opportunities, the potential success to be derived from strategic partnerships, the potential impact of capacity constraints, the effect of financial performance on share price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects, (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip, (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip, (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial project ions; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

**ATMEL PLAN/BERMAN000243**



only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

***

ATMEL PLAN/BERMAN000244

EXHIBIT C to A-3

ATMEL PLAN/BERMAN000245

| TO: | Bo Kang |
|---|---|
| DATE: | April 11, 2015 |
| FROM: | Atmel Corporation |
| RE: | Severance Agreement and Release |

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip, Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

### Company Commitments to You

- In consideration for entering into this Agreement, Atmel will pay you a lump sum total of (i) $32,000.00 representing, a lump sum cash payment in cash equal to 0.20 times your Base Pay, and (ii) $3,024.66 representing, a lump sum payment in cash equal to 50% of your 2015 Bonus, prorated to the date of your Involuntary Termination.

- In addition, if you timely elect to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to two (2) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence, you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- The benefits described in the two bullets above are the "Severance Benefits."

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

  - The Company will not contest any claim for unemployment benefits that you may file.

## Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads *"a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."*

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

## General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 27, 2016 to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until the next administratively practicable payroll after the eighth calendar day after you delivered this signed unrevoked Agreement to Geri Shaw. If you decide to accept this offer and you deliver a signed Agreement to Geri Shaw, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Geri Shaw within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 45 days to consider it, and that you are signing it knowingly and voluntarily.

2

**ATMEL PLAN/BERMAN000247**

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time that you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____          _____
Date                                                         Bo Kang



_____          _____
Date                                                         Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

3

ATMEL PLAN/BERMAN000248

**EXHIBIT A**

**DECISIONAL UNIT INFORMATION**

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel:

1.    **Decisional Unit.** The decisional unit for this reduction in force is MCU Apps Engineering Group

2.    **Eligibility.** All persons included in the MCU Apps Engineering Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.    **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to Geri Shaw at Atmel. The offer of Severance Benefits contained in this Agreement will expire on the date stated on page 3 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.    **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

4

**ATMEL PLAN/BERMAN000249**

**EXHIBIT B**

Job Titles of Individuals Not Selected from the Decisional Unit for this Reduction In Force and Not Offered Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**ATMEL PLAN/BERMAN000250**

**EXHIBIT B -Atmel MCU Apps - (4/6/16)**

| Title | Age(s) |
|---|---|
| Sr. Applications / Systems Engineer | 32 |
| Senior Applications Engineer | 32 |
| Staff Applications Engineer | 38 |
| Manager, Systems Applications | 49 |
| Sr. Applications Manager | 50 |
| Sr. RF Applications Engineer | 57 |
| Staff Applications Engineer | 61 |
| Sr. Applications Engineer | 65 |

**Data Sheet by Age**
**4/6/2016**

**EXHIBIT C**

Job Titles of Individuals Selected from the Decisional Unit for this Reduction in Force and Offered
Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
|-------|-----|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**ATMEL PLAN/BERMAN000252**

**EXHIBIT C - Atmel MCU Apps (4/6/16)**

| Job Title | Age(s) |
|---|---|
| Senior Manager, Applications Engineering | 50 |

ATMEL PLAN/BERMAN000253

EXHIBIT A-4

ATMEL PLAN/BERMAN000254

## DECLARATION OF THONG VAN VU

I, Thong Van Vu, declare as follows:

In 2015, I was employed by Atmel as a Digital Marketing and Online Acquisition Manager. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan documents that I received in July 2015 is attached hereto as Exhibit A. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

During 2015, I learned that Atmel had entered into an agreement with a company called Dialog pursuant to which Dialog would acquire Atmel. In approximately late December 2015 or early January 2016, I heard that Dialog might not be the buyer and that another potential purchaser had emerged. In early January 2016, I heard that it was Microchip that was the new emerging buyer. During this time period, I was assured by various Atmel employees (including Sanders Arts, the Vice President of Marketing) that the Severance Plan was in place and that I should not go look for another job outside Atmel, since if I wound up losing my job through the acquisition that I was protected by the Severance Plan and so would have time available to find another job, with my severance payout acting as a financial bridge.

In February 2016, after it had become clear that Microchip was the entity that was going to purchase Atmel, I was assured by Shantanu Dhavale (Director) that the Severance Plan was in place and that I should not go look for a job outside Atmel (as I was inclined to do). Mr. Dhavale assured me that if I wound up losing my job through the Microchip acquisition, that I and the other team members would still be protected by the Severance Plan and so would have time available to find another job. We also discussed that the Severance Plan would offer a bridge to our next transition and allow us to find out more about the integration plans from the merger with Microchip. Mr. Dhavale encouraged me to believe that, because of the severance package, I would have time to find another job and that I should stay at Atmel and see what was going to happen with the company.

In February 2016, I read a memo entitled Frequently Asked Questions ("FAQ's") that had been published for Atmel employees regarding the potential Microchip acquisition of Atmel. A copy of the FAQ's is attached as Exhibit B. As I read the FAQ's, they confirmed that Microchip would be honoring the Severance Plan if it acquired Atmel.

In March 2016, I was assured by Laura Roselli (Director) that I should not look for another job outside Atmel (as I was inclined to do), and assured me that if I wound up losing my job through the Microchip acquisition that I would be protected by the Severance Plan. Ms. Roselli encouraged me to believe that, because of the financial security of the severance package, combined with my unique digital marketing role, I should stay at Atmel and see whether I would be part of the team following the merger.

1

ATMEL PLAN/BERMAN000255

On approximately April 6, 2016, I and many other Atmel employees received a letter informing us that we were being terminated effective immediately. These letters indicated that Microchip would only pay 4 weeks of salary as severance. A copy of the April 6, 2016 termination letter I received is attached hereto as Exhibit C. On that same day, I had a discussion with Ravi Bali (a Director of Human Resources). Bali expressed that he was shocked that Microchip was not honoring the Severance Plan. Bali told me that it was a complete surprise to the Atmel Finance team, Investor Relations team and Human Resources team that Microchip was not paying the severance.

On approximately April 11, 2016, I and the other Atmel employees who were terminated received a new letter, which indicated that Microchip would pay us 50% of the severance benefits due under the Severance Plan. A copy of the April 11, 2016 letter I received is attached hereto as Exhibit D.

I relied on the Severance Plan and the assurances I had received from numerous Atmel managers in deciding to stay with Atmel through the Microchip acquisition. I would have left Atmel and found another job long before the Microchip acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan. In fact, I and many other employees considered Microchip an undesirable purchaser for Atmel, and I was very concerned about the future of Atmel and my own job security when I learned that Microchip was attempting to acquire Atmel.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 18, 2016 at _San Jose_, _California_.

Thong Van Vu

2

**ATMEL PLAN/BERMAN000256**

EXHIBIT A to A-4

ATMEL PLAN/BERMAN000257



Thong Van Vu
Re: Severance Guarantee

Dear Thong Van,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- Cash Severance: 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- Target incentive: if you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- COBRA Benefits: Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Thong Van, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

Attachment

Sander Arts
Sander Arts

## ADDENDUM TO
## U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A.   A Change of Control actually occurs; and
B.   Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

ATMEL PLAN/BERMAN000259

Payments: All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

Additional Matters. Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000260

EXHIBIT B to A-4

ATMEL PLAN/BERMAN000261

**Subject:** Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger

**Date:** Wednesday, February 3, 2016 at 5:57:34 PM Pacific Standard Time

**From:** Human Resources

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our Intranet, **Atmel Connect**, at http://connect.atmel.com/index.html and are focused on answering questions related to compensation and benefits.

As we have additional information, we will provide further updates and FAQs.

Warm regards,

Suzy
Suzanne Zoumaras | Senior Vice President, Global Human Resources
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com | www.atmel.com

ATMEL PLAN/BERMAN000262



## FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
## Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

**RSUs & PRSUs.** At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

**Stock Options.** All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

**ATMEL PLAN/BERMAN000263**



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

Purchase Rights under the Employee Stock Purchase Plan (ESPP)  Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010841/1160017B_8k.htm

When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

ATMEL PLAN/BERMAN000264



## Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel in connection with the proposed merger. Microchip will file with the U.S. Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-4 (the "Registration Statement") containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the "Proxy Statement/Prospectus"). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the "Investors" section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

## Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the "Investors" section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

## Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company. Microchip's

ATMEL PLAN/BERMAN000265

# Atmel

or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential success to be derived from strategic partnerships, the potential impact of capacity constraints, the effect of financial performance on share price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip; (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000266



only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

***

ATMEL PLAN/BERMAN000267

**EXHIBIT C to A-4**

ATMEL PLAN/BERMAN000268

TO:    Thong Van Vu

DATE:   April 6, 2016

FROM:  Atmel, LLC.

RE:     Severance Agreement and Release

In connection with the termination of your employment from Atmel, LLC. effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Atmel, LLC., and its affiliates, parent corporation and subsidiaries (collectively the "Company"), on the terms stated below.

## Atmel, LLC Commitments to You

- In consideration for entering into this Agreement, Atmel, LLC. will pay you a lump sum total of $11,365.38 ("Severance"), which is approximately equal to 4 weeks of your current base pay.

- The Severance will be paid to you in one lump sum within 30 business days after the Effective Date of this Agreement, less all legally-required taxes and withholdings, including any advanced PTO pay.

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel, LLC. Human Resources department, Atmel, LLC. shall use its best efforts to provide only your last position and dates of employment.

## Your Commitments to the Company

- You agree to release the Company and its current and former officers, directors, employees, shareholders, affiliates, benefit plans, administrators, insurers, trustees, divisions, and subsidiaries, and predecessor and successor corporations and assigns (including, but not limited to, Atmel, LLC.) (collectively, the "Releasees") and promise never to assert any and all actions,

ATMEL PLAN/BERMAN000269

causes of action, grievances, obligations, damages, losses and claims of every kind based on any act, omission, event up to the date you sign this Agreement, including, but not limited to, any claims relating to or arising out of your employment and/or termination of your employment with Atmel, LLC. In particular, you release the Releasees from liability for all claims of any nature that you ever had or may have at this time, whether you know about them or not. This release specifically includes, but is not limited to, any claims under federal or state law, such as Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act, as well as any contract claim or other claim under statutory or common law, to the fullest extent the law permits a release of claims. You agree that the waiver and release of claims in this paragraph is on behalf of yourself and your heirs, administrators, representatives, executors, successors and assigns, and all such persons are bound by this waiver and release. You agree that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement. This release does not release claims that cannot be released as a matter of law, including, but not limited to, your right to file a charge with or participate in a charge by the Equal Employment Opportunity Commission, or any other local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, against the Company (with the understanding that any such filing or participation does not give you the right to recover any monetary damages against the Company and your release of claims herein bars you from recovering such monetary relief from the Company). This release does not extend to any right you may have to unemployment compensation benefits or workers' compensation benefits. You acknowledge that you have made no assignment or transfer of any claim or other matter waived or released by this Agreement.

- You agree that this release constitutes a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads:

  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

- You acknowledge that you are waiving and releasing rights you may have under ADEA, and that this waiver and release is knowing and voluntary. You and the Company agree that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Effective Date of this Agreement. You acknowledge that the consideration given for this waiver and release is in addition to anything of value to which you were already entitled. You acknowledge further that you have been advised by this writing that: (a) you should consult with an attorney prior to executing this Agreement; (b) you have forty-five (45) days within which to consider this Agreement; (c) as set forth in Exhibits A, B and C herein, you have been advised in writing by the Company of the class, unit, or group of individuals covered by the reduction in force, the eligibility factors for the reduction in force, and the job titles and ages of all individuals who were and were not selected; (d) you have seven (7) days following the execution of this Agreement to revoke this Agreement; (e) this Agreement shall not be effective until after

2

the revocation period has expired; and (f) nothing in this Agreement prevents or precludes you from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law. You and the Atmel, LLC. agree that changes, whether material or immaterial, do not restart the running of the 45-day period.

• This Agreement will become effective and irrevocable on the eighth (8th) day after both parties execute it (the "Effective Date"). In the event you sign this Agreement and returns it to the Company in less than the forty-five (45) day period identified above, you hereby acknowledge that you have voluntarily chosen to waive the full time period allotted for considering this Agreement. You acknowledge and understand that revocation must be accomplished by a written notification to Geri Shaw, Human Resources, Atmel, LLC., that is received prior to the Effective Date.

• To the extent Employee is in the possession of any Atmel property, including personal computers (PCs), laptops, fax machines scanners, copiers cellular phones, Atmel credit cards, and any Atmel documents, correspondence and related corporate materials on all media, Employee will return all property to Atmel on or before the Termination Date. In addition, computers must be returned with all Company data intact.

• You acknowledge and represent that, other than the consideration set forth in this Agreement, the Company has paid or provided all salary, wages, bonuses, accrued vacation/paid time off, premiums, leaves, housing allowances, relocation costs, interest, severance, outplacement costs, fees, reimbursable expenses, commissions, stock, stock options, vesting, and any and all other benefits and compensation due to you.

## General Understandings and Acknowledgements

• You hereby reaffirm and agree to observe and abide by the terms of the [Confidential Information and Invention Assignment] (the "Proprietary Information Agreement") between you and Atmel, LLC., specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information. You represent that you have returned all documents and other items provided to you by the Company, developed or obtained by you in connection with your employment with the Company, or otherwise belonging to the Company.

• This Agreement and the Proprietary Information Agreement states your and the Company's complete understandings regarding the subject matter of this Agreement and your rights and the Company's obligations relating in any way to, or arising out of, your employment with Atmel, LLC. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

• You have until 5:00 p.m. on May 23, 2016 to consider whether you want to accept the offer Atmel, LLC is making in this Agreement, although you do not need to wait until that time to

3

accept this offer and obtain the Severance. To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in this bullet point. As noted above, you will not receive the Severance until after you deliver this signed Agreement to Geri Shaw and the seven (7) day revocation period ends and you have not revoked this Agreement.

- By signing this Agreement, you will be acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given a reasonable period of time to consider it, and that you are signing it knowingly and voluntarily.

In WITNESS WHEROF, the parties have executed this Agreement on the respective dates set forth below.

_____

Date

Thong Van Vu

_____

Date

Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

4

ATMEL PLAN/BERMAN000272

## EXHIBIT A

## DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1.    **Decisional Unit.** The decisional unit for this reduction in force is Marcom Group

2.    **Eligibility.** All persons included in the Marcom Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.    **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to the Company. The offer of severance benefits contained in this Agreement will expire on the date stated on page 3 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.    **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

5

**Data Sheet by Age**
4/6/2016

## EXHIBIT B

Job Titles of Individuals <u>Not Selected</u> from the Decisional Unit for this Reduction in Force and Not Offered Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

6

ATMEL PLAN/BERMAN000274

## EXHIBIT C

Job Titles of Individuals Selected from the Decisional Unit for this Reduction in Force and Offered Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**EXHIBIT D to A-4**

ATMEL PLAN/BERMAN000276

| TO: | Thong Van Vu |
| --- | --- |
| DATE: | April 11, 2016 |
| FROM: | Atmel Corporation |
| RE: | Severance Agreement and Release |

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip, Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

### Company Commitments to You

- In consideration for entering into this Agreement, Atmel,, LLC. will pay you a lump sum total of (i) $29,550.00 representing, a lump sum cash payment in cash equal to 0.20 times the your Base Pay, and (ii) $1,446.58 representing, a lump sum payment in cash equal to 50% of your 2015 Bonus, prorated to the date of the your Involuntary Termination.

- In addition, if you timely elect to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to two (2) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence, you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- The benefits described in the two bullets above are the "Severance Benefits."

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

- The Company will not contest any claim for unemployment benefits that you may file.

**ATMEL PLAN/BERMAN000277**

## Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you may have or may have at the time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws. It expressly includes any claims under the Age Discrimination in Employment act. This release also excludes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads "a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

- In agreeing to this release, you are not giving up your rights to enforce any terms of this Agreement or to provide information to, or file a charge with, any government agency. However, if agreeing to this release, you are agreeing that you will not attempt any remedy, or the reinstatement of your employment, for any claim you have released.

### General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your agreements and the Company's obligations relating in any way to or arising out of your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an authorized officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of this Agreement.

- You have until 5:00 p.m. on May 27, 2016 to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept the offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Gen Shaw in Human Resources by the date and time stated in the previous bullet point. As noted below, you are not eligible for the Severance Benefits until the next administratively practicable payroll after your decision to accept this offer after you delivered the signed unrevoked Agreement to Gen Shaw. If you decide to accept this offer and you deliver a signed Agreement to Gen Shaw, you have seven 7 calendar days to change your mind and revoke the Agreement. To revoke this Agreement, you sign and date a written statement of revocation to Gen Shaw within seven 7 calendar days after the date you signed the Agreement. The signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 45 days to consider it, and that you are signing it freely and voluntarily.

2

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time that you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____                    _____
Date                                        Thong Van Vu


_____                    _____
Date                                        Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____ _____

ATMEL PLAN/BERMAN000279

**EXHIBIT A**

**DECISIONAL UNIT INFORMATION**

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1.  **Decisional Unit.** The decisional unit for this reduction in force is Marcom Group

2.  **Eligibility.** All persons included in the Marcom Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.  **How Long to Decide.** You will have up to forty-five [45] days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to Geri Shaw at Atmel. The offer of severance benefits contained in this Agreement will expire on the date stated on page 2 of the Agreement. Please note that once you have signed this Agreement, you will have seven [7] days to revoke your signature and acceptance of the terms of this Agreement.

4.  **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

4

**ATMEL PLAN/BERMAN000280**

EXHIBIT A-5

ATMEL PLAN/BERMAN000281

## DECLARATION OF DONNA VIERA-CASTILLO

I, Donna Viera-Castillo, declare as follows:

In 2015, I was employed by Atmel as an Event Marketing Manager. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). I cannot locate the actual Severance Plan document that I received in July 2015. However, attached hereto as Exhibit A is a copy of the Severance Plan document that Bo Kang received in July 2015, and the Severance Plan document I received in July 2015 was identical to Exhibit A, except that my name was on the letter rather than Mr. Kang's. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

During 2015, I learned that Atmel had entered into an agreement with a company called Dialog pursuant to which Dialog would acquire Atmel. In the last half of January 2016, I learned that Dialog seemed to be on the way out as a purchaser, and that Microchip Technology looked like it would be the new purchaser. My boss, Sanders Arts (Vice President of Corporate Marketing), assured me and others that we were still covered by the Severance Plan and would get severance benefits, and that we should stay focused on our jobs and not worry about the potential acquisition by Microchip.

In approximately late January 2016, I learned about a January 14, 2016 letter that was sent by Atmel to director-level employees. That January 14, 2016 letter specifically confirmed that the Severance Plan was still intact and that the severance benefits under the Severance Plan would be paid if Microchip completed the acquisition and terminated Atmel employees. A copy of the January 14, 2016 letter is attached as Exhibit B.

In early February 2016, I read the Frequently Asked Questions ("FAQ's") that had been published for Atmel employees regarding the potential Microchip acquisition of Atmel. A copy of the FAQ's is attached as Exhibit C. Reading the FAQ's confirmed again to me that Microchip would be honoring the Severance Plan if it acquired Atmel. At staff meetings during this time period, it was noted multiple times that employees who were terminated by Microchip would be receiving the severance benefits of the Severance Plan.

During the time period between Microchip signing its agreement with Atmel in January 2016 and the closing of the acquisition in early April 2016, I had a conversation with Steve Laub (Atmel's Chief Executive Officer) about the Severance Plan. During this conversation, Laub told me that the Severance Plan was still in effect. Bob Martin, another Atmel employee, was present during that conversation.

On approximately April 6, 2016, I and many other Atmel employees received a letter informing us that we were being terminated effective immediately. These letters indicated that Microchip would only pay 6 weeks of salary as severance. A copy of the April 6, 2016 termination letter I received is attached hereto as Exhibit D.

On approximately April 11, 2016, I and the other Atmel employees who were terminated received a new letter, which indicated that Microchip would pay us 50% of the severance benefits due under the Severance Plan. A copy of the April 11, 2016 letter I received is attached hereto as Exhibit E.

1

After the April 6th termination of me and other Atmel employees, Sanders Arts expressed to me his shock that Microchip did not pay the severance benefits due under Severance Plan.

Between April 6 and April 11, 2016, I had lunch with Steve Laub and discussed Microchip's refusal to pay the severance benefits due under the Severance Plan. Laub told me that the July 2015 Severance Plan was in effect; that he was surprised that Microchip was not honoring the Severance Plan; and that Microchip knew about the Severance Plan.

I relied on receiving severance benefits under the Severance Plan in making the decision to stay at Atmel through the time of the Microchip acquisition. I certainly would have left Atmel and found another job long before Microchip's April 2016 acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 18, 2016 at _____ San Jose _____, California.

Donna Viera-Castillo

EXHIBIT A to A-5

ATMEL PLAN/BERMAN000284



STRICTLY PERSONAL AND CONFIDENTIAL

July 9, 2015

Bo Kang
Re: Severance Guarantee

Dear Bo,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- Cash Severance: 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- Target Incentive: If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- COBRA Benefits: Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Bo, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Steven Pancoast
Steven Pancoast

STRICTLY CONFIDENTIAL

## ADDENDUM TO
## U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A. A Change of Control actually occurs; and
B. Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

ATMEL PLAN/BERMAN000286

Payments: All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

Additional Matters. Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000287

EXHIBIT B to A-5

ATMEL PLAN/BERMAN000288

Atmel

STRICTLY PERSONAL AND CONFIDENTIAL

January 14, 2016

Dear

We recognize that there continues to be significant speculation regarding the acquisition of the company and understand that this can be distracting and unsettling. As a result, we believe it is important to remind you of the benefits for which you may be eligible in the event that your employment is involuntarily terminated without Cause in connection with a Change of Control of the company, including an acquisition by Dialog or Microchip.

In July 2015, we provided you a letter (the "July Severance Benefits Letter") describing the U.S. Severance Guarantee Benefits for which you are eligible. This U.S Severance Guarantee Program continues to remain in place. In addition, in September 2015, we informed you that the company's Compensation Committee approved acceleration of unvested non-performance restricted stock units ("RSUs") for our U.S. based Director-level employees under certain conditions. Under that program you will be eligible for 100% acceleration of your unvested RSUs if there is a Change of Control and your employment is involuntarily terminated without Cause during the period beginning three (3) months prior to the Change of Control and ending twelve (12) months following the Change of Control.

The benefits under the U.S. Severance Guarantee Program and the U.S Director-level equity acceleration programs are subject to the terms and conditions of each as approved by the company's Compensation Committee. To receive these benefits you will be required to sign a form of separation and release agreement reasonably acceptable to the company (or its successor). Capitalized terms that are not defined in this letter shall have the meanings set forth in the July Severance Benefits Letter.

Nothing in this letter or the July Severance Benefits Letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the company (or its successor) of the benefits provided by this letter and the July Severance Benefits Letter. You shall remain an at-will employee for all purposes, meaning that you or the company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Andy, we hope these benefits provide reassurance and reflect our appreciation for your contributions to Atmel. And, thank you for your continued focus during these unusual times.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

**EXHIBIT C to A-5**

ATMEL PLAN/BERMAN000290

Friday, April 8, 2016 at 12:19:18 PM Pacific Daylight Time

**Subject:** Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger

**Date:** Wednesday, February 3, 2016 at 5:57:34 PM Pacific Standard Time

**From:** Human Resources

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our intranet, **Atmel Connect**, at http://connect.atmel.com/index.html and are focused on answering questions related to compensation and benefits.

As we have additional information, we will provide further updates and FAQs.

Warm regards,

Suzy
**Suzanne Zoumaras** | Senior Vice President, Global Human Resources
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com | www.atmel.com

**ATMEL PLAN/BERMAN000291**



## FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
## Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

**RSUs & PRSUs.** At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

**Stock Options.** All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

**ATMEL PLAN/BERMAN000292**



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

Purchase Rights under the Employee Stock Purchase Plan (ESPP) Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010843/t1600178_8k.htm

When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

ATMEL PLAN/BERMAN000293



## Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-4 (the "Registration Statement") containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the "Proxy Statement/Prospectus"). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the "Investors" section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

## Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the "Investors" section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

## Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel. Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

ATMEL PLAN/BERMAN000294

# Atmel

or Atmel's plans, objectives, expectations and intentions. and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential success to be achieved through strategic partnerships, the potential impact of capacity constraints, the effect of universal price moves on share price, the impact of government expectations and beliefs of the management of M crochip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip; (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000295



only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

ATMEL PLAN/BERMAN000296

EXHIBIT D to A-5

ATMEL PLAN/BERMAN000297

TO: Donna Castillo

DATE: April 6, 2016

FROM: Atmel, LLC.

RE: Severance Agreement and Release

In connection with the termination of your employment from Atmel, LLC. effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Atmel, LLC., and its affiliates, parent corporation and subsidiaries (collectively the "Company"), on the terms stated below.

## Atmel, LLC Commitments to You

- In consideration for entering into this Agreement, Atmel, LLC. will pay you a lump sum total of $16,961.54 ("Severance"), which is approximately equal to 6 weeks of your current base pay.

- The Severance will be paid to you in one lump sum within 30 business days after the Effective Date of this Agreement, less all legally-required taxes and withholdings, including any advanced PTO pay.

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel, LLC. Human Resources department, Atmel, LLC. shall use its best efforts to provide only your last position and dates of employment.

## Your Commitments to the Company

- You agree to release the Company and its current and former officers, directors, employees, shareholders, affiliates, benefit plans, administrators, insurers, trustees, divisions, and subsidiaries, and predecessor and successor corporations and assigns (including, but not limited to, Atmel, LLC.) (collectively, the "Releasees") and promise never to assert any and all actions,

ATMEL PLAN/BERMAN000298

causes of action. grievances, obligations. damages. losses and claims of every kind based on any act, omission, event up to the date you sign this Agreement, including, but not limited to, any claims relating to or arising out of your employment and/or termination of your employment with Atmel, LLC. In particular, you release the Releasees from liability for all claims of any nature that you ever had or may have at this time, whether you know about them or not. This release specifically includes, but is not limited to, any claims under federal or state law, such as Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act, as well as any contract claim or other claim under statutory or common law, to the fullest extent the law permits a release of claims. You agree that the waiver and release of claims in this paragraph is on behalf of yourself and your heirs, administrators, representatives, executors, successors and assigns, and all such persons are bound by this waiver and release. You agree that the release set forth in this section shall be and remain in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement. This release does not release claims that cannot be released as a matter of law, including, but not limited to, your right to file a charge with or participate in a charge by the Equal Employment Opportunity Commission, or any other local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, against the Company (with the understanding that any such filing or participation does not give you the right to recover any monetary damages against the Company and your release of claims herein bars you from recovering such monetary relief from the Company). This release does not extend to any right you may have to unemployment compensation benefits or workers' compensation benefits. You acknowledge that you have made no assignment or transfer of any claim or other matter waived or released by this Agreement.

• You agree that this release constitutes a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

• You acknowledge that you are waiving and releasing rights you may have under ADEA, and that this waiver and release is knowing and voluntary. You and the Company agree that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Effective Date of this Agreement. You acknowledge that the consideration given for this waiver and release is in addition to anything of value to which you were already entitled. You acknowledge further that you have been advised by this writing that: (a) you should consult with an attorney prior to executing this Agreement; (b) you have forty-five (45) days within which to consider this Agreement; (c) as set forth in Exhibits A, B and C herein, you have been advised in writing by the Company of the class, unit, or group of individuals covered by the reduction in force, the eligibility factors for the reduction in force, and the job titles and ages of all individuals who were and were not selected; (d) you have seven (7) days following the execution of this Agreement to revoke this Agreement; (e) this Agreement shall not be effective until after

2

ATMEL PLAN/BERMAN000299

the revocation period has expired; and (f) nothing in this Agreement prevents or precludes you from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law. You and the Atmel, LLC, agree that changes, whether material or immaterial, do not restart the running of the 45-day period.

- This Agreement will become effective and irrevocable on the eighth (8th) day after both parties execute it (the "Effective Date"). In the event you sign this Agreement and returns it to the Company in less than the forty-five (45) day period identified above, you hereby acknowledge that you have voluntarily chosen to waive the full time period allotted for considering this Agreement. You acknowledge and understand that revocation must be accomplished by a written notification to Geri Shaw, Human Resources, Atmel, LLC., that is received prior to the Effective Date.

- To the extent Employee is in the possession of any Atmel property, including personal computers (PCs), laptops, fax machines scanners, copiers cellular phones, Atmel credit cards, and any Atmel documents, correspondence and related corporate materials on all media, Employee will return all property to Atmel on or before the Termination Date. In addition, computers must be returned with all Company data intact.

- You acknowledge and represent that, other than the consideration set forth in this Agreement, the Company has paid or provided all salary, wages, bonuses, accrued vacation/paid time off, premiums, leaves, housing allowances, relocation costs, interest, severance, outplacement costs, fees, reimbursable expenses, commissions, stock, stock options, vesting, and any and all other benefits and compensation due to you

## General Understandings and Acknowledgements

- You hereby reaffirm and agree to observe and abide by the terms of the [Confidential Information and Invention Assignment] (the "Proprietary Information Agreement") between you and Atmel, LLC., specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information. You represent that you have returned all documents and other items provided to you by the Company, developed or obtained by you in connection with your employment with the Company, or otherwise belonging to the Company.

- This Agreement and the Proprietary Information Agreement states your and the Company's complete understandings regarding the subject matter of this Agreement and your rights and the Company's obligations relating in any way to, or arising out of, your employment with Atmel, LLC. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 23, 2016 to consider whether you want to accept the offer Atmel, LLC is making in this Agreement, although you do not need to wait until that time to

5

ATMEL PLAN/BERMAN000300

accept this offer and obtain the Severance. To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in this bullet point. As noted above, you will not receive the Severance until) after you deliver this signed Agreement to Geri Shaw and the seven (7) day revocation period ends and you have not revoked this Agreement.

- By signing this Agreement, you will be acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given a reasonable period of time to consider it, and that you are signing it knowingly and voluntarily.

In WITNESS WHEROF, the parties have executed this Agreement on the respective dates set forth below

_____          _____
Date                                      Donna Castillo


_____          _____
Date                                      Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

4

**ATMEL PLAN/BERMAN000301**

## EXHIBIT A

## DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1.    **Decisional Unit.** The decisional unit for this reduction in force is Marcom Group

2.    **Eligibility.** All persons included in the Marcom Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.    **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to the Company. The offer of severance benefits contained in this Agreement will expire on the date stated on page 3 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.    **Selection Information.**    Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

5

**Data Sheet by Age**
4/6/2016

## EXHIBIT B

Job Titles of Individuals **Not Selected** from the Decisional Unit for this Reduction in Force and Not Offered Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

6

**ATMEL PLAN/BERMAN000303**

**Data Sheet by Age**
4/6/2016

## EXHIBIT C

Job Titles of Individuals Selected from the Decisional Unit for this Reduction in Force and
Offered Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
| --- | --- |
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**ATMEL PLAN/BERMAN000304**

EXHIBIT E to A-5

ATMEL PLAN/BERMAN000305

| TO: | Donna Castillo |
| --- | --- |
| DATE: | April 11, 2016 |
| FROM: | Atmel Corporation |
| RE: | Severance Agreement and Release |

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip. Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

## Company Commitments to You

- In consideration for entering into this Agreement, Atmel will pay you a lump sum total of (i) $29,400.00 representing, a lump sum cash payment in cash equal to 0.20 times the your Base Pay, and (ii) $1,972.60 representing, a lump sum payment in cash equal to 50% of the your 2015 Bonus, prorated to the date of the your Involuntary Termination.

- In addition, if you timely elects to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to two (2) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence, you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- The benefits described in the two bullets above are the "Severance Benefits."

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

- The Company will not contest any claim for unemployment benefits that you may file.

**ATMEL PLAN/BERMAN000306**

| TO: | Donna Castillo |
| DATE: | April 11, 2016 |
| FROM: | Atmel Corporation |
| RE: | Severance Agreement and Release |

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip, Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

## Company Commitments to You

- In consideration for entering into this Agreement, Atmel will pay you a lump sum total of (i) $29,400.00 representing, a lump sum cash payment in cash equal to 0.20 times the your Base Pay, and (ii) $1,972.60 representing, a lump sum payment in cash equal to 50% of the your 2015 Bonus, prorated to the date of the your involuntary Termination.

- In addition, if you timely elects to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to two (2) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence, you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- The benefits described in the two bullets above are the "Severance Benefits."

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

- The Company will not contest any claim for unemployment benefits that you may file.

**ATMEL PLAN/BERMAN000307**

## Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads *"a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."*

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

-

## General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 27, 2016 to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until the next administratively practicable payroll after the eighth calendar day after you delivered this signed unrevoked Agreement to Geri Shaw. If you decide to accept this offer and you deliver a signed Agreement to Geri Shaw, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Geri Shaw within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 45 days to consider it, and that you are signing it knowingly and voluntarily.

2

ATMEL PLAN/BERMAN000308

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time that you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____
Date

_____
Donna Castillo

_____
Date

_____
Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

3

ATMEL PLAN/BERMAN000309

**EXHIBIT A-6**

ATMEL PLAN/BERMAN000310

# DECLARATION OF KHASHAYAR MIRFAKHRAEI

I, Khashayar Mirfakhraei, declare as follows:

In 2015, I was employed by Atmel as a Senior Staff DSP Architect. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan documents that I received in July 2015 is attached hereto as Exhibit A. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

During 2015, I learned that Atmel had entered into an agreement with a company called Dialog pursuant to which Dialog would acquire Atmel. In approximately December 2015 or January 2016, after I learned that Dialog might not increase its offer and that Microchip Technology ("Microchip") might become the acquirer, the Vice President of MCU Engineering (Rafi Fried) was asked by the R & D engineers in his reporting structure about the ongoing validity of the severance package. Dr. Fried subsequently held a meeting with these engineers at Atmel's San Jose headquarters. I was told by several engineers who attended this meeting that, at the meeting, Dr. Fried told the engineers that he had specifically spoken with Atmel Human Resources about this severance issue and assured them that their severance package was still valid with Microchip as the purchaser.

In February 2016, I read a memo entitled Frequently Asked Questions ("FAQ's") that had been published for Atmel employees regarding the potential Microchip acquisition of Atmel. A copy of the FAQ's is attached as Exhibit B. The FAQ's seemed to confirm that Microchip would be honoring the Severance Plan if it acquired Atmel. In early February 2016, after the FAQ's came out, I asked my direct supervisor Gaute Myklebuste (Vice President of Research and Development) about the Severance Plan staying intact under the new acquiring entity (Microchip). Dr. Myklebuste referred me to the FAQ's published by Atmel Human Resources, implying that the Severance Plan would remain intact.

All of the Atmel employees I am familiar with in San Jose believed and understood that the Severance Plan remained intact despite Microchip replacing Dialog as the purchaser of Atmel, and all of the employees I am familiar with had uniformly received such assurances from their superiors.

On approximately April 6, 2016, I and many other Atmel employees received a letter informing us that we were being terminated effective immediately. These letters indicated that Microchip would only pay 5 weeks of salary as severance. A copy of the April 6, 2016 termination letter I received is attached hereto as Exhibit C.

On approximately April 11, 2016, I and the other Atmel employees who were terminated received a new letter, which indicated that Microchip would pay us 50% of the severance benefits due under the Severance Plan. A copy of the April 11, 2016 letter I received is attached hereto as Exhibit D.

1

ATMEL PLAN/BERMAN000311

I relied on the Severance Plan and the assurances I had received from Atmel managers in deciding to stay employed with Atmel through the Microchip acquisition. I would have left Atmel and found another job well before the Microchip acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 18, 2016 at Los Altos, California.

Khashayar Mirfakhraei

2

EXHIBIT A to A-6

ATMEL PLAN/BERMAN000313



STRICTLY PERSONAL AND CONFIDENTIAL

July 9, 2015

Khashayar Mirfakhraei
Re: Severance Guarantee

Dear Khashayar,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target incentive:** If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- COBRA Benefits: Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Khashayar, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

Attachment

Gauta Myldebust
Gauta Myldebust

STRICTLY CONFIDENTIAL

## ADDENDUM TO
## U.S. SEVERANCE GUARANTEE PROGRAM LETTER
### July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

    A.   A Change of Control actually occurs; and
    B.   Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

ATMEL PLAN/BERMAN000315

Payments: All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

Additional Matters. Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000316

EXHIBIT B to A-6

ATMEL PLAN/BERMAN000317

**Subject:** Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger

**Date:**   Wednesday, February 3, 2016 at 5:57:34 PM Pacific Standard Time

**From:**   Human Resources

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our Intranet, **Atmel Connect,** at http://connect.atmel.com/index.html and are focused on answering questions related to compensation and benefits.

As we have additional information, we will provide further updates and FAQs.

Warm regards,

Suzy
Suzanne Zoumaras | Senior Vice President, Global Human Resources
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com | www.atmel.com

ATMEL PLAN/BERMAN000318



## FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
## Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

**RSUs & PRSUs.** At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

**Stock Options.** All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

Confidential *** Not for Distribution

ATMEL PLAN/BERMAN000319



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

**Purchase Rights under the Employee Stock Purchase Plan (ESPP).** Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

## How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010841/t1600178_8k.htm

## When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

## Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

## Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

ATMEL PLAN/BERMAN000320



***

## Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-4 (the "*Registration Statement*") containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the "*Proxy Statement/Prospectus*"). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the "*Investors*" section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

## Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 9, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the "*Investors*" section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

## Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

**ATMEL PLAN/BERMAN000321**

# Atmel

or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential to be derived from strategic partnerships, the potential impact of capacity constraints, the effect of financial performance on share price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip, (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights, (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products, (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts, and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000322



only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

***

ATMEL PLAN/BERMAN000323

EXHIBIT C to A-6

ATMEL PLAN/BERMAN000324

TO: Khashayar Mirfakhraei

DATE: April 6, 2016

FROM: Atmel, LLC.

RE: Severance Agreement and Release

---

In connection with the termination of your employment from Atmel, LLC. effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Atmel, LLC., and its affiliates, parent corporation and subsidiaries (collectively the "Company"), on the terms stated below.

## Atmel, LLC Commitments to You

- In consideration for entering into this Agreement, Atmel, LLC. will pay you a lump sum total of $17,358.37 ("Severance"), which is approximately equal to 5 weeks of your current base pay.

- The Severance will be paid to you in one lump sum within 30 business days after the Effective Date of this Agreement, less all legally-required taxes and withholdings, including any advanced PTO pay.

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel, LLC. Human Resources department, Atmel, LLC. shall use its best efforts to provide only your last position and dates of employment.

## Your Commitments to the Company

- You agree to release the Company and its current and former officers, directors, employees, shareholders, affiliates, benefit plans, administrators, insurers, trustees, divisions, and subsidiaries, and predecessor and successor corporations and assigns (including, but not limited to, Atmel, LLC.) (collectively, the "Releasees") and promise never to assert any and all actions,

ATMEL PLAN/BERMAN000325

causes of action, grievances, obligations, damages, losses and claims of every kind based on any act, omission, event up to the date you sign this Agreement, including, but not limited to, any claims relating to or arising out of your employment and/or termination of your employment with Atmel, LLC. In particular, you release the Releasees from liability for all claims of any nature that you ever had or may have at this time, whether you know about them or not. This release specifically includes, but is not limited to, any claims under federal or state law, such as Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act, as well as any contract claim or other claim under statutory or common law, to the fullest extent the law permits a release of claims. You agree that the waiver and release of claims in this paragraph is on behalf of yourself and your heirs, administrators, representatives, executors, successors and assigns, and all such persons are bound by this waiver and release. You agree that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement. This release does not release claims that cannot be released as a matter of law, including, but not limited to, your right to file a charge with or participate in a charge by the Equal Employment Opportunity Commission, or any other local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, against the Company (with the understanding that any such filing or participation does not give you the right to recover any monetary damages against the Company and your release of claims herein bars you from recovering such monetary relief from the Company). This release does not extend to any right you may have to unemployment compensation benefits or workers' compensation benefits. You acknowledge that you have made no assignment or transfer of any claim or other matter waived or released by this Agreement.

- You agree that this release constitutes a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

- You acknowledge that you are waiving and releasing rights you may have under ADEA, and that this waiver and release is knowing and voluntary. You and the Company agree that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Effective Date of this Agreement. You acknowledge that the consideration given for this waiver and release is in addition to anything of value to which you were already entitled. You acknowledge further that you have been advised by this writing that: (a) you should consult with an attorney prior to executing this Agreement; (b) you have forty-five (45) days within which to consider this Agreement; (c) as set forth in Exhibits A, B and C herein, you have been advised in writing by the Company of the class, unit, or group of individuals covered by the reduction in force, the eligibility factors for the reduction in force, and the job titles and ages of all individuals who were and were not selected; (d) you have seven (7) days following the execution of this Agreement to revoke this Agreement; (e) this Agreement shall not be effective until after

2

ATMEL PLAN/BERMAN000326

the revocation period has expired; and (f) nothing in this Agreement prevents or precludes you from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law. You and the Atmel, LLC. agree that changes, whether material or immaterial, do not restart the running of the 45-day period.

- This Agreement will become effective and irrevocable on the eighth (8th) day after both parties execute it (the "Effective Date"). In the event you sign this Agreement and returns it to the Company in less than the forty-five (45) day period identified above, you hereby acknowledge that you have voluntarily chosen to waive the full time period allotted for considering this Agreement. You acknowledge and understand that revocation must be accomplished by a written notification to Geri Shaw, Human Resources, Atmel, LLC., that is received prior to the Effective Date.

- To the extent Employee is in the possession of any Atmel property, including personal computers (PCs), laptops, fax machines scanners, copiers cellular phones, Atmel credit cards, and any Atmel documents, correspondence and related corporate materials on all media, Employee will return all property to Atmel on or before the Termination Date. In addition, computers must be returned with all Company data intact.

- You acknowledge and represent that, other than the consideration set forth in this Agreement, the Company has paid or provided all salary, wages, bonuses, accrued vacation/paid time off, premiums, leaves, housing allowances, relocation costs, interest, severance, outplacement costs, fees, reimbursable expenses, commissions, stock, stock options, vesting, and any and all other benefits and compensation due to you.

## General Understandings and Acknowledgements

- You hereby reaffirm and agree to observe and abide by the terms of the [Confidential Information and Invention Assignment] (the "Proprietary Information Agreement") between you and Atmel, LLC., specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information. You represent that you have returned all documents and other items provided to you by the Company, developed or obtained by you in connection with your employment with the Company, or otherwise belonging to the Company.

- This Agreement and the Proprietary Information Agreement states your and the Company's complete understandings regarding the subject matter of this Agreement and your rights and the Company's obligations relating in any way to, or arising out of, your employment with Atmel, LLC. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 23, 2016 to consider whether you want to accept the offer Atmel, LLC is making in this Agreement, although you do not need to wait until that time to

3

ATMEL PLAN/BERMAN000327

accept this offer and obtain the Severance. To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in this bullet point. As noted above, you will not receive the Severance until after you deliver this signed Agreement to Geri Shaw and the seven (7) day revocation period ends and you have not revoked this Agreement.

- By signing this Agreement, you will be acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given a reasonable period of time to consider it, and that you are signing it knowingly and voluntarily.

In WITNESS WHEROF, the parties have executed this Agreement on the respective dates set forth below.

_____       _____
Date                                    Khashayar Mirfakhraei


_____       _____
Date                                    Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

4

ATMEL PLAN/BERMAN000328

## EXHIBIT A

## DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1.   **Decisional Unit.** The decisional unit for this reduction in force is CTO Organization

2.   **Eligibility.** All persons included in the CTO Organization are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.   **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to the Company. The offer of severance benefits contained in this Agreement will expire on the date stated on page 3 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.   **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

5

**ATMEL PLAN/BERMAN000329**

**Data Sheet by Age**
4/6/2016

**EXHIBIT B**

Job Titles of Individuals <u>Not Selected</u> from the Decisional Unit for this Reduction in Force and Not Offered Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

6

ATMEL PLAN/BERMAN000330

**Data Sheet by Age**
4/6/2016

**EXHIBIT C**

Job Titles of Individuals Selected from the Decisional Unit for this Reduction in Force and Offered Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**ATMEL PLAN/BERMAN000331**

EXHIBIT D to A-6

ATMEL PLAN/BERMAN000332

| TO: | Khashayar Mirfakhraei |
|---|---|
| DATE: | April 11, 2016 |
| FROM: | Atmel Corporation |
| RE: | Severance Agreement and Release |

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip, Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

## Company Commitments to You

- In consideration for entering into this Agreement, Atmel will pay you a lump sum total of (i) $36,105.40 representing, a lump sum cash payment in cash equal to 0.20 times the your Base Pay, and (ii) $2,564.38 representing, a lump sum payment in cash equal to 50% of the your 2015 Bonus, prorated to the date of the your Involuntary Termination.

- In addition, if you timely elect to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to two (2) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- The benefits described in the two bullets above are the "Severance Benefits."

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

- The Company will not contest any claim for unemployment benefits that you may file.

**ATMEL PLAN/BERMAN000333**

## Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination In Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads *"a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."*

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

-

## General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 27, 2016 to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until the next administratively practicable payroll after the eighth calendar day after you delivered this signed unrevoked Agreement to Geri Shaw. If you decide to accept this offer and you deliver a signed Agreement to Geri Shaw, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Geri Shaw within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 45 days to consider it, and that you are signing it knowingly and voluntarily.

2

ATMEL PLAN/BERMAN000334

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time that you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____

**Date**

_____

Khashayar Mirfakhraei

_____

**Date**

_____

Company Witness/Title

Internal use:

Date received: _____

7-day revocation period ends: _____

3

ATMEL PLAN/BERMAN000335

## EXHIBIT A

### DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1. **Decisional Unit.** The decisional unit for this reduction in force is CTO Organization

2. **Eligibility.** All persons included in the CTO Organization are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3. **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to Geri Shaw at Atmel. The offer of severance benefits contained in this Agreement will expire on the date stated on page 2 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4. **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

4

**ATMEL PLAN/BERMAN000336**

**Data Sheet by Age**
4/6/2016

**EXHIBIT B**

Job Titles of Individuals <u>Not Selected</u> from the Decisional Unit for this Reduction in Force and Not Offered Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

5

ATMEL PLAN/BERMAN000337

**Data Sheet by Age**
4/6/2016

**EXHIBIT C**

Job Titles of Individuals Selected from the Decisional Unit for this Reduction in Force and Offered
Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
|-------|-----|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

ATMEL PLAN/BERMAN000338

EXHIBIT A-7

ATMEL PLAN/BERMAN000339

## DECLARATION OF GIRISH RAMESH

I, Girish Ramesh, declare as follows:

In 2015, I was employed by Atmel as a Senior Marketing Manager. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). Attached hereto as Exhibit A is a copy of the Severance Plan document that I received in July 2015. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

In approximately September 2015, I learned that Atmel had entered into an agreement with a company called Dialog Semiconductor ("Dialog") pursuant to which Dialog would acquire Atmel. In approximately December 2015, I heard that Atmel had received another acquisition offer from a different company. There was speculation among employees at Atmel that the "other" company looking to acquire Atmel was Microchip Technology, Inc. ("Microchip"). In approximately the last half of December 2015, I made an appointment to speak with Suzy Zoumaras, Atmel's Senior Vice President of Human Resources, in order to ask her for confirmation that the Severance Plan would be valid and in effect even if a company other than Dialog wound up acquiring Atmel. During our meeting, Ms. Zoumaras assured me that the Severance Plan had been triggered when Atmel had entered into the agreement with Dialog, and that the Severance Plan was valid and in effect regardless of which company wound up acquiring Atmel. Ms. Zoumaras also indicated that I did not need to worry about looking for other employment outside of Atmel, since I would be protected with severance payments under the Severance Plan if a company acquired Atmel and I was terminated as a result. Ms. Zoumaras also encouraged me to disseminate this message about the Severance Plan to other Atmel employees who might have similar concerns or questions.

In early February 2016, I read the Frequently Asked Questions ("FAQ's") that had been published for Atmel employees regarding the potential Microchip acquisition of Atmel. A copy of the FAQ's is attached as Exhibit B. Reading the FAQ's confirmed again to me that Microchip would be honoring the Severance Plan if it acquired Atmel.

On multiple occasions between approximately January 2016 and March 2016, I had discussions with my immediate manager, Tushar Dhayagude (Atmel's Director of Marketing for the MCU Business Unit) about the issue of severance. Mr. Dhayagude told me multiple times that if Microchip acquired Atmel and then terminated my employment, that I would have a financial cushion because of the severance pay I would receive under the Severance Plan. Mr. Dhayagude also told me that he had been in meetings with Steve Laub (the Chief Executive Officer of Atmel) after Microchip had become the likely acquirer of Atmel, in which Mr. Laub gave assurances that the Atmel employees would receive their severance payments under the Severance Plan if they were terminated following an acquisition. Many other employees at Atmel told me that they also had been assured by their managers that the Severance Plan was valid and in effect and that Microchip would need to pay this severance if it terminated Atmel employees following the acquisition.

1

**ATMEL PLAN/BERMAN000340**

On approximately April 4, 2016, the acquisition between Atmel and Microchip closed. On approximately April 6, 2016, I learned that some Atmel employees received a letter informing them that they were being terminated effective immediately. I was told that these termination letters indicated that Microchip would only pay a small number of weeks of salary as severance. Approximately one week later, I learned that many Atmel employees who had been terminated had subsequently received a new letter, which indicated that Microchip would pay them only 50% of the severance benefits due under the Severance Plan.

On approximately April 13, 2016, I received a letter from Atmel which proposed a "new" severance agreement for me. A copy of this April 13, 2016 letter is attached as Exhibit C. Under this "new" severance proposal, I would only receive 50% of the severance benefits which were due to me under the Severance Plan if I were subsequently terminated by Microchip. I refused to sign this April 13, 2016 letter proposal.

On approximately May 20, 2016, I was informed that I was being terminated effective immediately. A copy of the "Notice To Employee As To Change In Relationship" that I received on May 201, 2016, informing me that I was being laid off as of May 20, 2016, is attached hereto as Exhibit D. I was terminated without "cause". However, Microchip has failed and refused to pay me any of the severance benefits due to me under the Severance Plan.

I relied on receiving severance benefits under the Severance Plan in making the decision to stay at Atmel through the time of the Microchip acquisition. I certainly would have left Atmel and found another job long before Microchip's April 2016 acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 10 2016 at __CAMPBELL__ , __CA__

Girish Ramesh

2

ATMEL PLAN/BERMAN000341

EXHIBIT A to A-7

ATMEL PLAN/BERMAN000342



July 9, 2015

Girish Ramesh
Re: Severance Guarantee

Dear Girish,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- **COBRA Benefits:** Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Girish, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Tushar Dhayagude
Patrick Sullivan

**STRICTLY CONFIDENTIAL**

## ADDENDUM TO
## U.S. SEVERANCE GUARANTEE PROGRAM LETTER
### July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A.   A Change of Control actually occurs; and
B.   Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000344**

Payments: All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

Additional Matters. Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000345

**EXHIBIT B to A-7**

ATMEL PLAN/BERMAN000346

**Subject:** Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger

**Date:** Wednesday, February 3, 2016 at 5:57:34 PM Pacific Standard Time

**From:** Human Resources

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our intranet, **Atmel Connect**, at http://connect.atmel.com/index.html and are focused on answering questions related to compensation and benefits.

As we have additional information, we will provide further updates and FAQs.

Warm regards,

Suzy
**Suzanne Zoumaras** | Senior Vice President, Global Human Resources
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com | www.atmel.com

**ATMEL PLAN/BERMAN000347**



## FREQUENTLY ASKED QUESTIONS
### Microchip Transaction:
### Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

**RSUs & PRSUs.** At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

**Stock Options.** All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

**ATMEL PLAN/BERMAN000348**



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

Purchase Rights under the Employee Stock Purchase Plan (ESPP). Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

## How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $3.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010843/t1600178_8k.htm

## When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

## Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

## Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

ATMEL PLAN/BERMAN000349



°°°

### Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-4 (the "Registration Statement") containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the "Proxy Statement/Prospectus"). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the "Investors" section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

### Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015; and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the "Investors" section of Atmel's website at www.atmel.com. Additional Information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

### Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as their future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company. Microchip's

**ATMEL PLAN/BERMAN000350**

# Atmel

or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential success to be derived from strategic partnerships, the potential impact of capacity constraints, the effect of financial performance on share price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip; (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (22) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (25) business interruptions; natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000351



only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

***

ATMEL PLAN/BERMAN000352

**EXHIBIT C to A-7**

ATMEL PLAN/BERMAN000353

April 13, 2016

Girish Ramesh

Re: Severance Benefits

Dear Girish,

I am pleased to offer you a severance agreement on the terms and conditions set forth below.

As you know, Atmel Corporation (the "Company") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). The Company and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by the Company, and in part to provide you with the security of certain benefits in the event your relationship is terminated involuntarily without Cause (as defined in Appendix A) by the Company, Microchip or any U.S. subsidiary or affiliate of the Company or Microchip (the "Microchip Group"), and other than due to your death or disability, on or prior to April 4, 2017 ("Qualifying Termination").

These benefits (collectively, the "Severance Benefits") are:

- **Cash Severance:** A lump sum payment equal to 20% of your annual base salary, less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");
- **Target Incentive:** A lump sum payment equal to 50% of the annual performance bonus (MIP) that you received from the Company for 2015, then annualized, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date[1]; and
- **COBRA Benefits:** Two months of COBRA benefits paid for by Microchip.

Your receipt of the Severance Benefits will be subject to you signing and not revoking a release of any and all claims, in a form prescribed by Microchip and substantially the same as that attached at Appendix B (the "Release"). Upon the Release becoming effective, the Cash Severance and Target Incentive will be payable in a lump sum without interest as soon as administratively practicable, and all other amounts will be payable in accordance with the payment schedule applicable to each payment or benefit.

Nothing in this agreement is intended to, or shall, contradict, modify or alter the terms of your at-will employment. You shall remain an at-will employee of the Company and the Microchip Group for all purposes, meaning that you, the Company or the member of the Microchip Group employing you may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice. Moreover, the at-will status of your relationship cannot be changed except in a written document, signed by Microchip's Chief Executive Officer and you, and which expressly modifies your at will status. This agreement constitutes the complete, final, and exclusive embodiment of the entire agreement between you and the

---

[1] For example, if your performance bonus for working the entire year of 2015 was $10,000, less applicable withholdings, and you are employed for a total of 180 days after January 1, 2016, then you will be eligible for a Target Incentive of (($10,000 x .5) x (180/365))= $2,465.75, less applicable withholdings. However, if you were hired by the Company sometime after January 1, 2015, then your 2015 bonus number will be annualized accordingly. For example, if you were hired April 1, 2015 and received a performance bonus for 2015 of $7,500, and you are employed for a total of 180 days after January 1, 2016, then you will be eligible for a Target Incentive of (($7,500 x 365/275) x .5) x (180/365)) = $2,454.55.

1

**ATMEL PLAN/BERMAN000354**

Microchip Group with regard to its subject matter and supersedes any other actual or perceived promises, warranties, or representations with regard to its subject matter made by the Company or any other member of the Microchip Group, including, for the avoidance of doubt, any programs, policies, or agreements with respect to severance or equity acceleration benefits made prior to April 4, 2016.

In the event that a portion of the Microchip Group is sold to an unrelated party and your employment is transferred to that party, Microchip and the Company will ensure that the new employer assumes responsibility for this agreement.

If a Qualifying Termination does not occur on or prior to April 4, 2017, this agreement will expire and you will not be eligible to receive the Severance Benefits described here.

To accept this offer, counter-sign in the space provided below and return it to your HR business partner no later than April 20, 2016.

Thank you for your continued contributions to our success.

Sincerely,

*Lauren a. Car*

Lauren Carr
Vice President, Global Human Resources

AGREED AND ACKNOWLEDGED:

MICROCHIP TECHNOLOGY INC.

_____
Signature (Girish Ramesh)

_____
HR Business Partner

_____
Date

_____
Date

2

**ATMEL PLAN/BERMAN000355**

## APPENDIX A

### ADDITIONAL TERMS TO SEVERANCE AGREEMENT

Unless otherwise defined below, capitalized terms used herein will have the meanings set forth in the agreement.

1. **Cause.** "Cause" is defined as (i) your willful and continued failure to perform the duties and responsibilities of your position after there has been delivered to you a written demand for performance from Microchip's Vice President, Worldwide Human Resources which describes the basis for her belief that you have not substantially performed your duties and you have not corrected such failure within 30 days of such written demand; (ii) any act of dishonesty by you in connection with your responsibilities as an employee of the Company with the intention or reasonable expectation that such action may result in your substantial personal enrichment; (iii) your conviction of, or plea of nolo contendere to, a felony that Microchip's Vice President, Worldwide Human Resources reasonably believes has had or will have a material detrimental effect on the reputation or business or any member of the Microchip Group; (iv) a breach of any fiduciary duty owed to the Company or the Microchip Group by you that has a material detrimental effect on the reputation or business of any member of the Microchip Group; (v) you being found liable in any Securities and Exchange Commission or other civil or criminal securities law action or entering any cease and desist order with respect to such action (regardless of whether or not you admit or deny liability); (vi) you (A) obstructing or impeding; (B) endeavoring to obstruct, impede or improperly influence, or (C) failing to materially cooperate with, any investigation authorized by the Board or any governmental or self-regulatory authority (an "Investigation"); however, your waiver of attorney-client privilege relating to communications with your own attorney in connection with an Investigation will not constitute "Cause"; or (vii) your disqualification or bar by any governmental or self-regulatory authority from serving in the capacity contemplated by your position or your loss of any governmental or self-regulatory license that is reasonably necessary for you to perform your responsibilities to the Company or any member of the Microchip Group, if (A) the disqualification, bar or loss continues for more than 30 days, and (B) during that period the Company or any member of the Microchip Group uses its good faith efforts to cause the disqualification or bar to be lifted or the license replaced, it being understood that while any disqualification, bar or loss continues during your employment, you will serve in the capacity contemplated by your position to whatever extent legally permissible and, if your service in the capacity contemplated by your position is not permissible, you will be placed on leave (which will be paid to the extent legally permissible).

**ATMEL PLAN/BERMAN000356**

TO:     [NAME]

FROM:   Microchip Technology Incorporated

DATE:    [XXXX]

RE:      Employment Separation, Severance and Release ("Agreement")

---

As you know, the Company[2] has decided to end your employment without cause (as defined in the Severance Agreement that you signed in April 2016). Under the terms of the Severance Agreement, you are entitled to the Severance Benefits listed below provided you sign, return and do not revoke this Agreement.

### The Company's Commitments to You

- The Company will give you:

  - **Cash Severance:** A lump sum payment equal to 20% of your annual base salary, less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");
  - **Target Incentive:** A lump sum payment equal to 50% of the annual performance bonus (MIP) that you received from the Company for 2015, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date; and
  - **COBRA Benefits:** Two months of COBRA benefits paid for by Microchip.

- The Company will not contest any claim for unemployment benefits that you may file.

### Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads *"a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."*

---

[2] In this document, unless otherwise noted, "Company" means Microchip Technology Incorporated, Atmel Corporation and any of their affiliated entities.

1

**ATMEL PLAN/BERMAN000357**

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

### General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on XXXXX (XX days after your Separation Date), to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Lauren Carr in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until seven (7) business days after you deliver it to Lauren Carr. If you decide to accept this offer and you deliver a signed Agreement to Lauren Carr, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Lauren Carr within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 21 days [or 45 days if you are not the only employee separated from the Company at the same time] to consider it, and that you are signing it knowingly and voluntarily.

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____          _____

Date                                      [XXXX EMPLOYEE NAME]

2

EXHIBIT D to A-7

ATMEL PLAN/BERMAN000359



### NOTICE TO EMPLOYEE AS TO CHANGE IN RELATIONSHIP
(Issued pursuant to provisions of Section 1089
of the California Unemployment Insurance Code)

Employee Name: Girish Ramesh

Social Security Number: last 4 digits 0008

You were ☑ laid off / ☐ discharged on 05/20/2016

OR

You resigned your employment voluntarily with an effective date of

_____

**ATMEL CORPORATION**

BY: _____
Signature

Jayme Valdoz
Printed Name

### NOTICE ACKNOWLEDGMENT

I received a copy of this notice.

Signed: _____

Date: _____

Rev 10 October 2015

EXHIBIT A-8

**ATMEL PLAN/BERMAN000361**

# DECLARATION OF PATRICK HANLEY

I, Patrick Hanley, declare as follows:

In August 2010, I was hired by Atmel Corporation as a Product Marketing Manager. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "US Severance Guarantee Benefit Program", along with an addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). Attached as Exhibit A is a copy of the Severance Plan documents I received on approximately July 9, 2015. This Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated (without cause).

In approximately September 2015, I learned that Atmel had entered into an agreement with Dialog Semiconductor ("Dialog") under which Dialog would acquire Atmel. I believed this would be a very beneficial move for me, as Dialog was a perfect partner for my primary project, and I instantly engaged with them. In approximately December 2015, I learned that Atmel had received another acquisition offer from a different company. Despite this, my relationship with Dialog continued, as we jointly traveled and presented our plans to a variety of Original Equipment Manufacturers (OEMs) and Liquid Crystal Manufacturers (LCMs). Our message was very positively received. During the December 2015/January 2016 time frame, since it was uncertain whether Dialog or some other company might be the eventual purchaser of Atmel, I had several conversations with my manager Brian Daly (who was the Vice President of the maXTouch BU) regarding the Atmel Severance Plan. Mr. Daly assured me multiple times that the severance commitment set forth in the Severance Plan would be honored whether it was Dialog or some other acquiring company.

In the first half of January 2016, I learned that the other acquisition bid was from Microchip Corporation ("Microchip"). Dialog had the chance to counter Microchip's offer, but chose not to. I was informed by Dialog that if Atmel accepted the Microchip offer, the partnership between Dialog and Atmel for my current project would be over. I again went to Mr. Daly and asked for assurances that the severance payments under the Severance Plan would be made even if it turned out to be Microchip (or another company) that acquired Atmel rather than Dialog. Mr. Daly reassured me that our severance was covered under the Severance Plan no matter who the acquirer was.

In early February 2016 I read through the Frequently Asked Questions ("FAQs") that had been published for Atmel employees regarding the Microchip acquisition Atmel. A copy of the FAQs is attached as Exhibit B. Reading through the FAQs reaffirmed to me that Microchip would be honoring the Severance Plan if it acquired Atmel. Given these reassurances by Mr. Daly and the FAQ's, I decided to remain employed at Atmel rather than immediately try to find employment elsewhere. That is, I decided that I could afford to wait out the uncertainty over Microchip's acquisition and my potential future, since I would be receiving a significant severance payment if I wound up being terminated by Microchip and needed to look for another job.

On April 4, 2016, the deal closed between Microchip and Atmel. On approximately April 5 and 6, 2016, Microchip communicated to Atmel employees that Microchip had purportedly been "unaware" of the severance packages that had been promised to Atmel employees. Microchip indicated to the

1

**ATMEL PLAN/BERMAN000362**

Atmel employees that they would offer Atmel employees severance packages that were 50% of what they had previously received from Atmel.

On approximately April 13, 2016, I received a letter from Microchip offering me 50% of the severance benefits due to me under the Severance Plan if I were to be terminated in the future. I understood that Microchip sent similar severance offer letters to other Atmel employees in April 2016. A copy of the April 13, 2016 letter I received from Microchip is attached hereto as Exhibit C. I rejected this "new offer" of a 50% severance payout from Microchip.

On June 10th, 2016, my employment was terminated by Microchip without cause. A copy of the June 10, 2016 termination notice that I received is attached hereto as Exhibit D. Microchip indicated to me that, because I had rejected Microchip's April 13, 2016 "new offer", Microchip would not pay me any severance.

I relied on the Severance Plan and the assurances I had received from my manager and from the FAQs in deciding to stay employed with Atmel through the Microchip acquisition period. I would have looked for a job outside of Atmel well before the Microchip acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 27, 2016 in _San Francisco_____, _CA_____

_Patrick Hanley_ (signature)

Patrick Hanley

2

## CONFIRMATION OF ATTORNEY REPRESENTATION.

I, Patrick Hanley, hereby confirm that the law firms of McGuinn, Hillsman & Palefsky and Altshuler Berzon LLP are authorized to represent me in connection with my claim for benefits against Atmel Corporation/Microchip Technology, Inc. I also hereby confirm that McGuinn, Hillsman & Palefsky and Altshuler Berzon LLP are authorized to obtain documents on my behalf, including obtaining documents from Atmel Corporation/Microchip Technology, Inc. I also request that future correspondence and communications concerning my claim for benefits be directed by Atmel Corporation/Microchip Technology, Inc. to the law firms of McGuinn, Hillsman & Palefsky and Altshuler Berzon LLP.

Dated: June 22, 2016

_____
Patrick Hanley

ATMEL PLAN/BERMAN000364

EXHIBIT A to A-8

ATMEL PLAN/BERMAN000365



July 9, 2015

Patrick Hanley
Re: Severance Guarantee

Dear Patrick,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- Cash Severance: 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- Target Incentive: If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- COBRA Benefits: Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Patrick, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Binay Bajaj
Binay Bajaj

## ADDENDUM TO
## U.S. SEVERANCE GUARANTEE PROGRAM LETTER
### July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

    A.    A Change of Control actually occurs; and

    B.    Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

ATMEL PLAN/BERMAN000367

EXHIBIT B to A-8

ATMEL PLAN/BERMAN000368

**Subject:** Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger

**Date:** Wednesday, February 3, 2016 at 5:57:34 PM Pacific Standard Time

**From:** Human Resources

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our intranet, **Atmel Connect**, at http://connect.atmel.com/index.html and **are focused on answering questions related to compensation and benefits.**

As we have additional information, we will provide further updates and FAQs.

Warm regards,

Suzy
**Suzanne Zoumaras | Senior Vice President, Global Human Resources**
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com | www.atmel.com

**ATMEL PLAN/BERMAN000369**



## FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
## Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

RSUs & PRSUs. At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

Stock Options. All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

**ATMEL PLAN/BERMAN000370**



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

Purchase Rights under the Employee Stock Purchase Plan (ESPP). Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

## How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010841/t1600178_8k.htm

## When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

## Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

## Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

ATMEL PLAN/BERMAN000371

# Atmel

### Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-4 (the "Registration Statement") containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the "Proxy Statement/Prospectus"). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the "Investors" section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

### Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the "Investors" section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

### Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

ATMEL PLAN/BERMAN000372

# Atmel

or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential success to be derived from strategic partnership, the potential impact of capacity constraints; the impact of financial performance on share price, the impact of governmental exposure rand impact of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip, (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities including in connection with the proposed merger or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products, (15) risks related to Microchip's ability to successfully implement its acquisitions strategy, (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials, (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets, (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts, and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000373



only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

\*\*\*

ATMEL PLAN/BERMAN000374

EXHIBIT C to A-8

**ATMEL PLAN/BERMAN000375**

April 13, 2016

Patrick Hanley

Re: Severance Benefits

Dear Patrick,

I am pleased to offer you a severance agreement on the terms and conditions set forth below.

As you know, Atmel Corporation (the "Company") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). The Company and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by the Company, and in part to provide you with the security of certain benefits in the event your relationship is terminated involuntarily without Cause (as defined in Appendix A) by the Company, Microchip or any U.S. subsidiary or affiliate of the Company or Microchip (the "Microchip Group"), and other than due to your death or disability, on or prior to April 4, 2017 ("Qualifying Termination").

These benefits (collectively, the "Severance Benefits") are:

- **Cash Severance:** A lump sum payment equal to 20% of your annual base salary, less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");
- **Target Incentive:** A lump sum payment equal to 50% of the annual performance bonus (MIP) that you received from the Company for 2015, then annualized, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date[1]; and
- **COBRA Benefits:** Two months of COBRA benefits paid for by Microchip.

Your receipt of the Severance Benefits will be subject to you signing and not revoking a release of any and all claims, in a form prescribed by Microchip and substantially the same as that attached at Appendix B (the "Release"). Upon the Release becoming effective, the Cash Severance and Target Incentive will be payable in a lump sum without interest as soon as administratively practicable, and all other amounts will be payable in accordance with the payment schedule applicable to each payment or benefit.

Nothing in this agreement is intended to, or shall, contradict, modify or alter the terms of your at-will employment. You shall remain an at-will employee of the Company and the Microchip Group for all purposes, meaning that you, the Company or the member of the Microchip Group employing you may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice. Moreover, the at-will status of your relationship cannot be changed except in a written document, signed by Microchip's Chief Executive Officer and you, and which expressly modifies your at will status. This agreement constitutes the complete, final, and exclusive embodiment of the entire agreement between you and the

---

[1] For example, if your performance bonus for working the entire year of 2015 was $10,000, less applicable withholdings, and you are employed for a total of 180 days after January 1, 2016, then you will be eligible for a Target Incentive of (($10,000 x .5) x (180/365))= $2,465.75, less applicable withholdings. However, if you were hired by the Company sometime after January 1, 2015, then your 2015 bonus number will be annualized accordingly. For example, if you were hired April 1, 2015 and received a performance bonus for 2015 of $7,500, and you are employed for a total of 180 days after January 1, 2016, then you will be eligible for a Target Incentive of (($7,500 x 365/275) x .5) x (180/365)) = $2,454.55.

1

**ATMEL PLAN/BERMAN000376**

Microchip Group with regard to its subject matter and supersedes any other actual or perceived promises, warranties, or representations with regard to its subject matter made by the Company or any other member of the Microchip Group, including, for the avoidance of doubt, any programs, policies, or agreements with respect to severance or equity acceleration benefits made prior to April 4, 2016.

In the event that a portion of the Microchip Group is sold to an unrelated party and your employment is transferred to that party, Microchip and the Company will ensure that the new employer assumes responsibility for this agreement.

If a Qualifying Termination does not occur on or prior to April 4, 2017, this agreement will expire and you will not be eligible to receive the Severance Benefits described here.

To accept this offer, counter-sign in the space provided below and return it to your HR business partner no later than April 20, 2016.

Thank you for your continued contributions to our success.

Sincerely,

Lauren a. Car

Lauren Carr
Vice President, Global Human Resources

AGREED AND ACKNOWLEDGED:                          MICROCHIP TECHNOLOGY INC.

_____                   _____
Signature (Patrick Hanley)                         HR Business Partner

_____                   _____
Date                                               Date

2

**ATMEL PLAN/BERMAN000377**

## APPENDIX A

### ADDITIONAL TERMS TO SEVERANCE AGREEMENT

Unless otherwise defined below, capitalized terms used herein will have the meanings set forth in the agreement.

1. <u>Cause.</u> "Cause" is defined as (i) your willful and continued failure to perform the duties and responsibilities of your position after there has been delivered to you a written demand for performance from Microchip's Vice President, Worldwide Human Resources which describes the basis for her belief that you have not substantially performed your duties and you have not corrected such failure within 30 days of such written demand; (ii) any act of dishonesty by you in connection with your responsibilities as an employee of the Company with the intention or reasonable expectation that such action may result in your substantial personal enrichment; (iii) your conviction of, or plea of nolo contendere to, a felony that Microchip's Vice President, Worldwide Human Resources reasonably believes has had or will have a material detrimental effect on the reputation or business or any member of the Microchip Group; (iv) a breach of any fiduciary duty owed to the Company or the Microchip Group by you that has a material detrimental effect on the reputation or business of any member of the Microchip Group; (v) you being found liable in any Securities and Exchange Commission or other civil or criminal securities law action or entering any cease and desist order with respect to such action (regardless of whether or not you admit or deny liability); (vi) you (A) obstructing or impeding; (B) endeavoring to obstruct, impede or improperly influence, or (C) failing to materially cooperate with, any investigation authorized by the Board or any governmental or self-regulatory authority (an "Investigation"); however, your waiver of attorney-client privilege relating to communications with your own attorney in connection with an Investigation will not constitute "Cause"; or (vii) your disqualification or bar by any governmental or self-regulatory authority from serving in the capacity contemplated by your position or your loss of any governmental or self-regulatory license that is reasonably necessary for you to perform your responsibilities to the Company or any member of the Microchip Group, if (A) the disqualification, bar or loss continues for more than 30 days, and (B) during that period the Company or any member of the Microchip Group uses its good faith efforts to cause the disqualification or bar to be lifted or the license replaced, it being understood that while any disqualification, bar or loss continues during your employment, you will serve in the capacity contemplated by your position to whatever extent legally permissible and, if your service in the capacity contemplated by your position is not permissible, you will be placed on leave (which will be paid to the extent legally permissible).

1

**ATMEL PLAN/BERMAN000378**

**APPENDIX B**

TO:      [NAME]

FROM:    Microchip Technology Incorporated

DATE:    [XXXX]

RE:      Employment Separation, Severance and Release ("Agreement")

As you know, the Company[2] has decided to end your employment without cause (as defined in the Severance Agreement that you signed in April 2016). Under the terms of the Severance Agreement, you are entitled to the Severance Benefits listed below provided you sign, return and do not revoke this Agreement.

### The Company's Commitments to You

- The Company will give you:

  - **Cash Severance:** A lump sum payment equal to 20% of your annual base salary, less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");

  - **Target Incentive:** A lump sum payment equal to 50% of the annual performance bonus (MIP) that you received from the Company for 2015, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date; and

  - **COBRA Benefits:** Two months of COBRA benefits paid for by Microchip.

- The Company will not contest any claim for unemployment benefits that you may file.

### Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads *"a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."*

---

[2] In this document, unless otherwise noted, "Company" means Microchip Technology Incorporated, Atmel Corporation and any of their affiliated entities.

1

**ATMEL PLAN/BERMAN000379**

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

### General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on XXXXX (XX days after your Separation Date), to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Lauren Carr in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until seven (7) business days after you deliver it to Lauren Carr. If you decide to accept this offer and you deliver a signed Agreement to Lauren Carr, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Lauren Carr within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 21 days [or 45 days if you are not the only employee separated from the Company at the same time] to consider it, and that you are signing it knowingly and voluntarily.

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.


_____              _____
Date                                     [XXXX EMPLOYEE NAME]

2

## EXHIBIT D to A-8

**ATMEL PLAN/BERMAN000381**

 

## NOTICE TO EMPLOYEE AS TO CHANGE IN RELATIONSHIP
(Issued pursuant to provisions of Section 1089
of the California Unemployment Insurance Code)

Employee Name: Patrick J Hanley

Social Security Number: last 4 digits--1779

You were ☑ laid off / ☐ discharged on June 10, 2016

**OR**

You resigned your employment voluntarily with an effective date of

_____

### ATMEL CORPORATION

BY: _____
Signature

Rani Rajan
Printed Name

### NOTICE ACKNOWLEDGMENT

I received a copy of this notice.

Signed: _____

Date: _____

Rev 10 October 2015

ATMEL PLAN/BERMAN000382

EXHIBIT A-9

ATMEL PLAN/BERMAN000383

### DECLARATION OF ILANA SHTERNSHAIN

I, Ilana Shternshain, declare as follows:

In 2015, I was employed by Atmel as a Staff Design Engineer. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). Attached hereto as **Exhibit A** is a copy of the Severance Plan document that I received in July 2015. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated. Under the terms of the Severance Plan, my severance benefits included cash payments representing 40% of my base salary, a pro-rated amount of my annual bonus target and four months of COBRA insurance to be paid by the company.

In approximately September 2015, I learned that Atmel had entered into an agreement with a company called Dialog Semiconductor ("Dialog") pursuant to which Dialog would acquire Atmel. In approximately December 2015, I heard that Atmel had received another acquisition offer from a different company. There was speculation among employees at Atmel that the "other" company looking to acquire Atmel was Microchip Technology, Inc. ("Microchip").

In approximately the last half of December 2015, at an MCU design team meeting attended by Rafael Fried (the MCU design team director) and Suzy Zoumaras (Atmel's Senior Vice President of Human Resources), our team received confirmation that the Severance Plan would be valid and in effect even if a company other than Dialog wound up acquiring Atmel. During this design team meeting, Ms. Zoumaras assured the team that the Severance Plan had been triggered when Atmel had entered into the agreement with Dialog in September 2015, and that the Severance Plan was valid and in effect regardless of which company wound up acquiring Atmel. Ms. Zoumaras and Mr. Fried also indicated that I did not need to worry about looking for other employment outside of Atmel, since I would be protected with severance payments under the Severance Plan if a company acquired Atmel and I was terminated as a result. Ms. Zoumaras and Mr. Fried also encouraged us to disseminate this message about the Severance Plan to other Atmel employees who might have similar concerns or questions.

In early February 2016, I read the Frequently Asked Questions ("FAQ's") that had been published for Atmel employees regarding the potential Microchip acquisition of Atmel. A copy of the FAQ's is attached as **Exhibit B**. Reading the FAQ's confirmed again to me that Microchip would be honoring the Severance Plan if it acquired Atmel.

1

**ATMEL PLAN/BERMAN000384**

During multiple MCU design team meetings which I attended between approximately January 2016 and March 2016, Mr. Fried told the team multiple times that if Microchip acquired Atmel and then terminated our employment, we would have a financial cushion because of the severance pay we would receive under the Severance Plan. At these MCU design team meetings, Mr. Fried also told the team that he had been meetings with Steve Laub (the Chief Executive Officer of Atmel) after Microchip had become the likely acquirer of Atmel, and that Mr. Laub had given assurances at those meetings that the Atmel employees would receive their severance payments under the Severance Plan if they were terminated following an acquisition by Microchip. Many other Atmel employees told me that they had also been assured by their managers that the Severance Plan was valid and in effect, and that Microchip would need to pay this severance if it terminated Atmel employees following the acquisition.

On approximately April 4, 2016, the acquisition between Atmel and Microchip closed. On approximately April 6, 2016, I learned that some Atmel employees had received letters informing them that they were being terminated effective immediately. I was told that these termination letters indicated that Microchip would only pay a small number of weeks of salary as severance. Approximately one week later, I learned that many Atmel employees who had been terminated had subsequently received a new letter, which indicated that Microchip would pay them only 50% of the severance benefits due under the Severance Plan. I was not terminated in April 2016 and so remained as an employee of Atmel/Microchip.

On approximately April 7, 2016, Microchip's Chief Executive Officer (Steve Sanghi) called an all hands meeting at Atmel's San Jose office. At this meeting, which I attended, Mr. Sanghi told employees that he considered the Severance Plan offered by Atmel to be invalid, and that he was going to offer a "new" severance plan which would pay 50% of the benefits provided by the Atmel Severance Plan. Mr. Sanghi told the employees that if they were not satisfied with this, they would have to go to court against him.

On approximately April 8, 2016, Mr. Fried held a design team meeting in which he told employees that he had been assured by upper level Atmel executives that the Severance Plan was valid.

On approximately April 13, 2016, I received a letter from Atmel which proposed a "new" severance agreement for me. A copy of this April 13, 2016 letter is attached as Exhibit C. Under this "new" severance proposal, I would only receive 50% of the severance benefits which were due to me under the Severance Plan if I were subsequently terminated by Microchip without cause. I refused to sign this April 13, 2016 letter proposal.

2

**ATMEL PLAN/BERMAN000385**

On July 12, 2016, I was informed that I was being terminated effective immediately. I was terminated without "cause" effective July 12, 2016. On July 12, 2016, I received a Severance Agreement from Microchip which offered to pay me only 50% of the severance benefits due to me under the Severance Plan. A copy of the July 12, 2016 Severance Agreement which I received from Microchip is attached hereto as Exhibit D. Under the terms of the July 12, 2016 Severance Agreement, I would have to sign a release of all claims against Atmel and Microchip in order to receive these 50% severance benefits. I refused to sign this July 12, 2016 Severance Agreement and Release.

I relied on receiving severance benefits under the Severance Plan in making the decision to stay at Atmel through the time of the Microchip acquisition. I would have left Atmel and found another job long before Microchip's April 2016 acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on September 21, 2016 at _____ San Jose _____, California.

Ilana Shterushain

3

EXHIBIT A to A-9

ATMEL PLAN/BERMAN000387



July 9, 2015

Ilana Shternshain
Re: Severance Guarantee

Dear Ilana,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- **COBRA Benefits:** Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Ilana, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Benjamin Froemming
Rafael Fried

### ADDENDUM TO
### U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A.   A Change of Control actually occurs; and

B.   Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

ATMEL PLAN/BERMAN000389

**Payments:** All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

**Additional Matters.** Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000390

EXHIBIT B to A-9

ATMEL PLAN/BERMAN000391



# FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
## Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

<u>RSUs & PRSUs.</u> At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

<u>Stock Options.</u> All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

**ATMEL PLAN/BERMAN000392**



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

Purchase Rights under the Employee Stock Purchase Plan (ESPP). Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

### How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010841/t1600178_8k.htm

### When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

### Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

### Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

ATMEL PLAN/BERMAN000393



***

### Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-4 (the "*Registration Statement*") containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the "*Proxy Statement/Prospectus*"). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the "*Investors*" section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

### Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the "*Investors*" section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

### Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

ATMEL PLAN/BERMAN000394

# Atmel

or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential success to be derived from strategic partnerships, the potential impact of capacity constraints, the effect of financial performance on share price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip; (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000395



only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

***

Confidential *** Not for Distribution

ATMEL PLAN/BERMAN000396

**EXHIBIT C to A-9**

April 13, 2016

Ilana Shternshain

Re: Severance Benefits

Dear Ilana,

I am pleased to offer you a severance agreement on the terms and conditions set forth below.

As you know, Atmel Corporation (the "Company") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). The Company and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by the Company, and in part to provide you with the security of certain benefits in the event your relationship is terminated involuntarily without Cause (as defined in Appendix A) by the Company, Microchip or any U.S. subsidiary or affiliate of the Company or Microchip (the "Microchip Group"), and other than due to your death or disability, on or prior to April 4, 2017 ("Qualifying Termination").

These benefits (collectively, the "Severance Benefits") are:

- **Cash Severance:** A lump sum payment equal to 20% of your annual base salary, less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");
- **Target Incentive:** A lump sum payment equal to 50% of the annual performance bonus (MIP) that you received from the Company for 2015, then annualized, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date[1]; and
- **COBRA Benefits:** Two months of COBRA benefits paid for by Microchip.

Your receipt of the Severance Benefits will be subject to you signing and not revoking a release of any and all claims, in a form prescribed by Microchip and substantially the same as that attached at Appendix B (the "Release"). Upon the Release becoming effective, the Cash Severance and Target Incentive will be payable in a lump sum without interest as soon as administratively practicable, and all other amounts will be payable in accordance with the payment schedule applicable to each payment or benefit.

Nothing in this agreement is intended to, or shall, contradict, modify or alter the terms of your at-will employment. You shall remain an at-will employee of the Company and the Microchip Group for all purposes, meaning that you, the Company or the member of the Microchip Group employing you may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice. Moreover, the at-will status of your relationship cannot be changed except in a written document, signed by Microchip's Chief Executive Officer and you, and which expressly modifies your at will status. This agreement constitutes the complete, final, and exclusive embodiment of the entire agreement between you and the

---

[1] For example, if your performance bonus for working the entire year of 2015 was $10,000, less applicable withholdings, and you are employed for a total of 180 days after January 1, 2016, then you will be eligible for a Target Incentive of (($10,000 x .5) x (180/365))= $2,465.75, less applicable withholdings. However, if you were hired by the Company sometime after January 1, 2015, then your 2015 bonus number will be annualized accordingly. For example, if you were hired April 1, 2015 and received a performance bonus for 2015 of $7,500, and you are employed for a total of 180 days after January 1, 2016, then you will be eligible for a Target Incentive of ((($7,500 x 365/275) x .5) x (180/365)) = $2,454.55.

1

**ATMEL PLAN/BERMAN000398**

Microchip Group with regard to its subject matter and supersedes any other actual or perceived promises, warranties, or representations with regard to its subject matter made by the Company or any other member of the Microchip Group, including, for the avoidance of doubt, any programs, policies, or agreements with respect to severance or equity acceleration benefits made prior to April 4, 2016.

In the event that a portion of the Microchip Group is sold to an unrelated party and your employment is transferred to that party, Microchip and the Company will ensure that the new employer assumes responsibility for this agreement.

If a Qualifying Termination does not occur on or prior to April 4, 2017, this agreement will expire and you will not be eligible to receive the Severance Benefits described here.

To accept this offer, counter-sign in the space provided below and return it to your HR business partner no later than April 20, 2016.

Thank you for your continued contributions to our success.

Sincerely,

*Lauren a. Carr*

Lauren Carr
Vice President, Global Human Resources

AGREED AND ACKNOWLEDGED:                         MICROCHIP TECHNOLOGY INC.

_____                 _____
Signature (Ilana Shternshain)                    HR Business Partner

_____                 _____
Date                                             Date

2

**ATMEL PLAN/BERMAN000399**

### ADDITIONAL TERMS TO SEVERANCE AGREEMENT

Unless otherwise defined below, capitalized terms used herein will have the meanings set forth in the agreement.

1. **Cause.** "Cause" is defined as (i) your willful and continued failure to perform the duties and responsibilities of your position after there has been delivered to you a written demand for performance from Microchip's Vice President, Worldwide Human Resources which describes the basis for her belief that you have not substantially performed your duties and you have not corrected such failure within 30 days of such written demand; (ii) any act of dishonesty by you in connection with your responsibilities as an employee of the Company with the intention or reasonable expectation that such action may result in your substantial personal enrichment; (iii) your conviction of, or plea of nolo contendere to, a felony that Microchip's Vice President, Worldwide Human Resources reasonably believes has had or will have a material detrimental effect on the reputation or business or any member of the Microchip Group; (iv) a breach of any fiduciary duty owed to the Company or the Microchip Group by you that has a material detrimental effect on the reputation or business of any member of the Microchip Group; (v) you being found liable in any Securities and Exchange Commission or other civil or criminal securities law action or entering any cease and desist order with respect to such action (regardless of whether or not you admit or deny liability); (vi) you (A) obstructing or impeding; (B) endeavoring to obstruct, impede or improperly influence, or (C) failing to materially cooperate with, any investigation authorized by the Board or any governmental or self-regulatory authority (an "Investigation"); however, your waiver of attorney-client privilege relating to communications with your own attorney in connection with an Investigation will not constitute "Cause"; or (vii) your disqualification or bar by any governmental or self-regulatory authority from serving in the capacity contemplated by your position or your loss of any governmental or self-regulatory license that is reasonably necessary for you to perform your responsibilities to the Company or any member of the Microchip Group, if (A) the disqualification, bar or loss continues for more than 30 days, and (B) during that period the Company or any member of the Microchip Group uses its good faith efforts to cause the disqualification or bar to be lifted or the license replaced, it being understood that while any disqualification, bar or loss continues during your employment, you will serve in the capacity contemplated by your position to whatever extent legally permissible and, if your service in the capacity contemplated by your position is not permissible, you will be placed on leave (which will be paid to the extent legally permissible).

1

**ATMEL PLAN/BERMAN000400**

## APPENDIX B

TO:        [NAME]

FROM:      Microchip Technology Incorporated

DATE:      [XXXX]

RE:        Employment Separation, Severance and Release ("Agreement")

As you know, the Company[2] has decided to end your employment without cause (as defined in the Severance Agreement that you signed in April 2016). Under the terms of the Severance Agreement, you are entitled to the Severance Benefits listed below provided you sign, return and do not revoke this Agreement.

### The Company's Commitments to You

- The Company will give you:

    o **Cash Severance:** A lump sum payment equal to 20% of your annual base salary, less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");
    o **Target Incentive:** A lump sum payment equal to 50% of the annual performance bonus (MIP) that you received from the Company for 2015, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date; and
    o **COBRA Benefits:** Two months of COBRA benefits paid for by Microchip.

- The Company will not contest any claim for unemployment benefits that you may file.

### Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads "*a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.*"

---

[2] In this document, unless otherwise noted, "Company" means Microchip Technology Incorporated, Atmel Corporation and any of their affiliated entities.

1

**ATMEL PLAN/BERMAN000401**

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

### General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on XXXXX (XX days after your Separation Date), to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Lauren Carr in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until seven (7) business days after you deliver it to Lauren Carr. If you decide to accept this offer and you deliver a signed Agreement to Lauren Carr, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Lauren Carr within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 21 days [or 45 days if you are not the only employee separated from the Company at the same time] to consider it, and that you are signing it knowingly and voluntarily.

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____       _____

**Date**                                              **[XXXX EMPLOYEE NAME]**

2

**EXHIBIT D to A-9**

ATMEL PLAN/BERMAN000403



**MICROCHIP**

<u>APPENDIX B</u>

| | |
|---|---|
| TO: | Ilana Shternshain |
| FROM: | Microchip Technology Incorporated |
| DATE: | July 12, 2016 |
| RE: | Employment Separation, Severance and Release ("Agreement") |

As you know, the Company[1] has decided to end your employment without cause (as defined in the Severance Agreement that you signed in April 2016). Under the terms of the Severance Agreement, you are entitled to the Severance Benefits listed below provided you sign, return and do not revoke this Agreement.

The Company's Commitments to You

- The Company will give you:

  - o Cash Severance: A lump sum payment equal to 20% of your annual base salary ($26,000.00), less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");
  - o Incentive Bonus: A lump sum payment equal to 50% of the annual performance bonus (MIP) ($1,709.85) that you received from the Company for 2015, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date; and
  - o COBRA Benefits: Two months of COBRA benefits paid for by Microchip.

- The Company will not contest any claim for unemployment benefits that you may file.

Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under

---

[1] In this document, unless otherwise noted, "Company" means Microchip Technology Incorporated, Atmel Corporation and any of their affiliated entities.

1

**ATMEL PLAN/BERMAN000404**

federal, state or local statutes, regulations or common law, including disputed claims that you were not paid wages or benefits due to you under the Atmel Severance plan.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads "*a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.*"

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

### General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on August 26, 2016 (45 days after your Separation Date), to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Lauren Carr in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until seven (7) business days after you deliver it to Lauren Carr. If you decide to accept this offer and you deliver a signed Agreement to Lauren Carr, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Lauren Carr within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 45 days to consider it, and that you are signing it knowingly and voluntarily.

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time you have been given to consider it.

ONCE BOTH PARTIES SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

| | |
|---|---|
| Date | Ilana Shternshain |
| Date Received | Company Representative |

2

**ATMEL PLAN/BERMAN000405**

## EXHIBIT A

### DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Microchip:

1.   **Decisional Unit.** The decisional unit for this reduction in force is MCU Engineering

2.   **Eligibility.** All persons included in the MCU Engineering are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.   **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to the Company. The offer of severance benefits contained in this Agreement will expire on the date stated on page 2 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.   **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

ATMEL PLAN/BERMAN000406

EXHIBIT B -Atmel - MCU Engineering (7/12/16)
Group Not Selected
Title                                          Age(s)

ATMEL PLAN/BERMAN000407

**EXHIBIT C - Atmel -MCU Engineering (07-12-16)**
**Group Selected**

| Job Title | Age(s) |
|---|---|
| Analog Design Engineer | 25 |
| Analog Design Engineer | 25 |
| Senior Analog Design Engineer | 35 |
| Staff Software Development Engineer | 35 |
| Senior Analog Design Engineer | 37 |
| Sr. Design Engineer | 38 |
| Sr. Project Manager | 38 |
| Sr. Design Engineer | 43 |
| Staff Design Engineer | 44 |
| Staff Development Engineer | 45 |
| Staff Design Engineer | 46 |
| Sr. Staff Analog Design Engineer | 47 |
| Senior Analog Layout Engineer | 50 |
| Sr. Digital Design Engineer | 53 |
| Staff Design Engineer | 55 |
| Senior Layout Engineer | 56 |
| Sr. Digital Design Engineer | 57 |
| Staff Analog Design Engineer | 59 |

ATMEL PLAN/BERMAN000408

EXHIBIT A-10

ATMEL PLAN/BERMAN000409

## DECLARATION OF PETER SCHUMAN

I, Peter Schuman, declare as follows:

In 2015, I was employed by Atmel as a Senior Director of Investor Relations. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan I received in July 2015 is attached as **Exhibit A.** The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated without cause. Under the terms of the Severance Plan, my severance benefits included cash payments representing 50% of my base salary, a pro-rated amount of my annual bonus target, and six months of COBRA insurance to be paid for by the company.

In early September 2015, Steve Laub ("Laub"), Atmel's Chief Executive Officer, held a meeting with Atmel employees who were at the Director level or above. I was such an employee and I attended the meeting. At this meeting, Mr. Laub informed us that Atmel's Board of Directors had approved an additional severance benefit for those employees at the Director level or above. Mr. Laub explained that, in the event that Atmel was acquired and such employees were subsequently terminated without cause, they would be entitled to accelerated vesting of any unvested equity awards they held, such as Restricted Stock Units ("RSUs"), in addition to the cash payments previously set forth in the Severance Plan.

In September 2015, I learned that Atmel had entered into an agreement with a company called Dialog Semiconductor ("Dialog"), pursuant to which Dialog would acquire Atmel. In December 2015, I heard that Dialog might not be the buyer, since another potential purchaser had emerged and had made an offer which might be superior to Dialog's. In January 2016, I learned that Microchip Technology, Inc. ("Microchip") was the new potential buyer.

On approximately January 13, 2016, I attended a meeting which Mr. Laub held with Atmel employees who were at the Director level or above. After explaining that Microchip had made a superior offer to purchase Atmel, and that Atmel was going to give Dialog four days in which to make a counter-offer, Mr. Laub reiterated that all of the severance benefits previously presented to the Atmel employees would remain in effect, regardless of whether the ultimate purchaser was Microchip or Dialog.

On approximately January 14, 2016, I received a letter from Suzanne Zoumaras, Atmel's Senior Vice President of Global Human Resources ("the January 14, 2016 Letter"). A copy of the January 14, 2016 Letter that I received from Ms. Zoumaras is attached as **Exhibit B.** In that letter, Ms. Zoumaras stated that I would be eligible for the severance benefits provided in the July 2015 Severance Plan if I were to be involuntarily terminated following a change in control, regardless of whether the acquisition of Atmel was done by Dialog or Microchip. The January 14, 2016 Letter also emphasized that the Severance Plan continued to remain in place. The January 14, 2016 Letter also specifically referenced the September 2015 communication which had informed the Atmel employees at the Director level or above that they would be entitled to accelerated vesting of their unvested RSUs in the event of a

1

**ATMEL PLAN/BERMAN000410**

termination following a change of control. The January 14, 2016 Letter emphasized that this accelerated vesting benefit also remained in place.

After Dialog failed to increase its purchase offer in January 2016, I learned on approximately January 20, 2016 that Microchip had entered into an agreement with Atmel pursuant to which Microchip would acquire Atmel.

On approximately February 3, 2016, Ms. Zoumaras sent an e-mail to Atmel employees entitled "Compensation Benefits Relating to the Microchip Merger", which had links to a series of Frequently Asked Questions ("FAQs") that had been published for Atmel employees regarding the potential Microchip acquisition. A copy of the FAQs is attached as Exhibit C. I read the FAQs shortly after receiving Ms. Zoumaras' e-mail, and the FAQs seemed to clearly confirm that Microchip would be honoring the Severance Plan if it acquired Atmel. Shortly after reading the FAQs, I asked Mr. Laub's Executive Assistant, Cynthia Martsolf, whether the FAQs had been approved by Microchip. Ms. Martsolf stated that they had, and that she herself had sent the FAQs to Steve Sanghi (Microchip's Chief Executive Officer) for approval prior to the FAQs being posted on Atmel's intranet site and that Mr. Sanghi had approved them. Ms. Zoumaras also subsequently confirmed to me that Mr. Sanghi and Microchip had reviewed and approved the FAQs prior to their being posted for Atmel employees. The FAQs remained on the Atmel intranet site and available for review by Atmel employees through at least the date I was terminated (April 6, 2016).

On the morning of February 29, 2016, three senior members of Microchip's finance team visited Atmel's corporate headquarters in San Jose, California, in order to discuss the upcoming acquisition/merger between Atmel and Microchip. These three Microchip individuals were Eric Bjornholt (Microchip's Chief Financial Officer), Nawaz Sharif (Microchip's Vice President of European Finance) and Phil Kagel (Microchip's Director of Finance). At approximately 10:30 a.m., these three Microchip executives met with the senior members of Atmel's Finance team (Director level and above) in the "training room", which was the large meeting room on the ground floor of Atmel's headquarters. There were approximately 12 to 15 Atmel employees at this meeting, including me. During this meeting, which included a question and answer session regarding the upcoming merger between Atmel and Microchip, one of the Atmel employees asked for confirmation that Microchip would be honoring the severance agreements and programs which the Atmel employees had received the previous year. In response, Mr. Bjornholt assured the Atmel employees that, if Microchip acquired Atmel and then terminated Atmel employees, Microchip would honor the severance agreements which the Atmel employees had received.

Later on that same morning of February 29, 2016, Mr. Bjornholt, Mr. Sharif and Mr. Kagel held a second meeting with a larger group of Atmel finance employees in the same "training room" at Atmel's headquarters in San Jose. This meeting was attended by all (or almost all) members of the San Jose Atmel finance team, including me. There were approximately 50 to 60 Atmel employees in attendance at this meeting. During this second meeting, which again focused on the upcoming merger between Microchip and Atmel, Mr. Bjornholt again reiterated to the Atmel employees that Microchip would honor the Atmel severance agreements and programs that the Atmel employees had received, if Microchip terminated Atmel employees following the acquisition by Microchip.

2

ATMEL PLAN/BERMAN000411

During February and March 2016, both my immediate supervisor Steve Skaggs (who was a Senior Vice President and the Chief Financial Officer of Atmel) and Ms. Zoumaras assured me multiple times that if I were terminated following the acquisition by Microchip, that I would receive the severance benefits provided in the July 2015 Severance Plan and would receive the accelerated RSU vesting, and that there was nothing to worry about. To reassure me further, they also referred me to the Proxy Statement which Atmel and Microchip had filed in February 2016 by with the Securities and Exchange Commission ("Proxy Statement"). The Proxy Statement contained language specifically confirming that Microchip had agreed to honor any severance contracts of the Atmel employees which had been disclosed to Microchip.

On approximately April 4, 2016, Microchip's acquisition of Atmel closed. On April 6, I was informed by Mr. Bjornholt (Microchip's Chief Financial Officer) and a Microchip Human Resources executive that I was being terminated, effective that day. They also told me that Microchip was going to take the position that I and other Atmel employees were not entitled to any severance benefits under the Severance Plan and so we would not receive any of the cash benefits of the Severance Plan (including the paid healthcare benefits). I objected to this, but was told that Microchip would only allow the acceleration of my unvested RSUs, but that Microchip would not pay out any of the cash benefits.

On April 6, 2016, I learned that other Director level Atmel employees were also being terminated, and that these employees were also being told by Microchip that they would not be paid any of the cash benefits under the Severance Plan, but instead would only receive accelerated vesting of their RSUs.

On April 6, 2016, Microchip gave me a document titled "Severance Agreement and General Release" ("the April 6 Agreement"). A copy of the April 6 Agreement is attached as Exhibit D. Under the terms of this document, I was required to sign a release of all claims against Atmel and Microchip in order to receive the accelerated vesting of my RSUs, but I would not receive any of the cash severance benefits provided by the Severance Plan (including the paid healthcare benefits). I continued to object to Microchip about Microchip's refusal to honor the Severance Plan. I did not sign the April 6 Agreement.

On April 11, 2016, I received another "Severance Agreement and Release" ("the April 11 Agreement"). An executed copy of the April 11 Agreement is attached as Exhibit E. The April 11 Agreement provided that, if I signed it, I would receive accelerated vesting of my RSUs and would receive 50% of the cash severance benefits to which I was entitled under the Severance Plan. I continued to object to Microchip about Microchip's refusal to honor the Severance Plan, and objected to Microchip's effort to force me to give up 50% of my cash severance benefits (including my paid healthcare benefits) by threatening to refuse to accelerate the vesting of my RSUs and by threatening to not pay me any of the cash severance benefits which were due to me. Although I continued to object to Microchip's refusal to honor the Severance Plan, Microchip told me multiple times that if I did not sign the April 11, 2016 Severance Agreement and Release, I would receive no cash severance benefits and I would also not be permitted to vest in my RSUs. I felt that Microchip's conduct was outrageous but I felt compelled to sign the April 11, 2016 Severance Agreement and Release in order to receive some portion of the money I was due and to receive the RSUs I was due.

3

ATMEL PLAN/BERMAN000412

I relied on the Severance Plan and the assurances I had received from Atmel management and the assurances contained in the documents described above which had been prepared by Atmel and Microchip (the January 14, 2016 Letter, the FAQs, the Proxy Statement) in deciding to stay employed with Atmel through the Microchip acquisition. I might have left Atmel and found another job well before the Microchip acquisition if I had known that Microchip was not going to pay me the full severance benefits provided under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on August 3, 2016 at Burlingame , California .

Peter Schuman

4

EXHIBIT A to A-10

ATMEL PLAN/BERMAN000414



July 9, 2015

Peter Schuman
Re: Severance Guarantee

Dear Peter,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 50% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** A prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- **COBRA Benefits:** Six (6) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Peter, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Stephen Skaggs
Stephen Skaggs

**STRICTLY CONFIDENTIAL**

**ADDENDUM TO**
**U.S. SEVERANCE GUARANTEE PROGRAM LETTER**
**July 9, 2015**

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

    A.  A Change of Control actually occurs; and

    B.  Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000416**

**Payments:** All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

**Additional Matters.** Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000417

EXHIBIT B to A-10

ATMEL PLAN/BERMAN000418



January 14, 2016

Peter Schuman

Dear Peter,

We recognize that there continues to be significant speculation regarding the acquisition of the company and understand that this can be distracting and unsettling. As a result, we believe it is important to remind you of the benefits for which you may be eligible in the event that your employment is involuntarily terminated without Cause in connection with a Change of Control of the company, including an acquisition by Dialog or Microchip.

In July 2015, we provided you a letter (the "July Severance Benefits Letter") describing the U.S. Severance Guarantee Benefits for which you are eligible. This U.S. Severance Guarantee Program continues to remain in place. In addition, in September 2015, we informed you that the company's Compensation Committee approved acceleration of unvested non-performance restricted stock units ("RSUs") for our U.S. based Director-level employees under certain conditions. Under that program you will be eligible for 100% acceleration of your unvested RSUs if there is a Change of Control and your employment is involuntarily terminated without Cause during the period beginning three (3) months prior to the Change of Control and ending twelve (12) months following the Change of Control.

The benefits under the U.S. Severance Guarantee Program and the U.S Director-level equity acceleration programs are subject to the terms and conditions of each as approved by the company's Compensation Committee. To receive these benefits you will be required to sign a form of separation and release agreement reasonably acceptable to the company (or its successor). Capitalized terms that are not defined in this letter shall have the meanings set forth in the July Severance Benefits Letter.

Nothing in this letter or the July Severance Benefits Letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the company (or its successor) of the benefits provided by this letter and the July Severance Benefits Letter. You shall remain an at-will employee for all purposes, meaning that you or the company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Peter, we hope these benefits provide reassurance and reflect our appreciation for your contributions to Atmel. And, thank you for your continued focus during these unusual times.

Sincerely,

Suzanne C. Zoumaras
Suzanne Zoumaras
Senior Vice President, Global Human Resources

EXHIBIT C to A-10

ATMEL PLAN/BERMAN000420

**Subject:** Frequently Asked Questions Regarding Compensation & Benefits Relating to the Microchip Merger

**Date:** Wednesday, February 3, 2016 at 5:57:34 PM Pacific Standard Time

**From:** Human Resources

Dear Atmel Employees,

I am pleased to announce that today we posted our first set of Frequently Asked Questions (FAQs) related to the Atmel/Microchip merger. The FAQs are available on our intranet, **Atmel Connect**, at http://connect.atmel.com/index.html and are focused on answering questions related to compensation and benefits.

As we have additional information, we will provide further updates and FAQs.

Warm regards,

Suzy
**Suzanne Zoumaras** | Senior Vice President, Global Human Resources
O: 408.487.2604 | M: 858.354.4877
suzy.zoumaras@atmel.com | www.atmel.com

**ATMEL PLAN/BERMAN000421**



## FREQUENTLY ASKED QUESTIONS
### Microchip Transaction:
### Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

RSUs & PRSUs. At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards for Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

Stock Options. All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

**ATMEL PLAN/BERMAN000422**



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

Purchase Rights under the Employee Stock Purchase Plan (ESPP). Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

#### How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010841/t1600178_8k.htm

#### When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

#### Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

#### Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

ATMEL PLAN/BERMAN000423



### Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-4 (the "Registration Statement") containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the "Proxy Statement/Prospectus"). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the "Investors" section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

### Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the "Investors" section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

### Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

ATMEL PLAN/BERMAN000424



or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential success to be derived from strategic partnerships, the potential impact of capacity constraints, the effect of financial performance on share price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip; (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000425



only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

***

ATMEL PLAN/BERMAN000426

EXHIBIT D to A-10

ATMEL PLAN/BERMAN000427

SEVERANCE AGREEMENT AND GENERAL RELEASE (the "Agreement") between Peter Schuman ("Employee") and Atmel LLC. (the "Company" or "Atmel")

Whereas Atmel is terminating the employment of Peter Schuman without cause effective as of April 6, 2016

NOW, therefore for good and adequate consideration, receipt of which is hereby acknowledged, Employee and the Company agree as follows:

1.  **Termination Date.** Employee's last date of employment with the Company shall be April 6, 2016 (the "Termination Date").

2.  **General Benefits.** Upon the Termination Date, Employee will be entitled to the following general benefits:

    a.  All salary and wages earned but unpaid through the Termination Date, less applicable tax withholding, to be paid on the Termination Date or through the date of receipt if later.

    b.  All accrued and unused PTO time, less applicable tax withholding, to be paid on the Termination Date or through the date of receipt if later.

    c.  Employee may elect the continuation of health coverage under the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA") after the Termination Date, which will be deemed the date of the "qualifying event" under COBRA, if Employee or any spouse or dependents are currently receiving health benefits from the Company.

    d.  All group term life insurance, long-term disability, short-term disability, and other welfare benefits terminate in accordance with the provisions of these plans. Employee may be entitled to individual conversion privileges under the various policies. The Company will provide information to Employee regarding all individual conversion rights.

    e.  Employee will be entitled to, but shall not be obligated to take, a distribution of all benefits under the Atmel Corporation 401(k) Plan (the "Section 401(k) Plan"), in accordance with the provisions of the Section 401(k) Plan. The severance benefit will not be treated as "Compensation" for purposes of Employee Salary Reduction Contributions to the Section 401(k) Plan, or for purposes of any Atmel Matching Contributions.

**ATMEL PLAN/BERMAN000428**

3 **Severance Benefit.** Employee will be entitled to the following severance benefits if Employee signs and return this Agreement between the date this Agreement is executed by the Company and the expiration of the period for review and consideration of this Agreement, and Employee does not revoke his signature within the seven (7) day revocation period as described in Section 14 of this Agreement:

a. In accordance with the Atmel Corporation Severance Guarantee Benefits (the "Severance Plan"), the Covered Employee shall be entitled to (i) each outstanding equity award, including without limitation, restricted stock unit and restricted stock award, held by Employee shall automatically become vested and, if applicable, exercisable and any forfeiture restrictions or rights of repurchase thereon shall immediately lapse.

No severance benefit will be paid until eight (8) days after receipt of an executed copy of this Agreement by Atmel. Atmel shall deduct from all payments made to Employee all applicable federal, state or local taxes required by law to be withheld from such payments. In addition, any advanced PTO pay will also be subject to deduction. All severance benefits are conditioned upon execution of this Agreement, in accordance with the terms of the Severance Plan.

4 **Adequate Consideration.** Employee agrees that the severance benefit identified in Section 3 is adequate and sufficient consideration for Employee's execution of this Agreement.

5 **Return of Property.** To the extent Employee is in the possession of any Atmel property, including personal computers ("PCs"), fax machines, scanners, copiers, cellular phones, Atmel credit cards, and any Atmel documents, correspondence and related corporate materials on all media, Employee will return all property to Atmel on or before the Termination Date. In addition, computers must be returned with all Company data intact.

6 **Expense Accounts and Reports.** Employee will be allowed to submit any final expense reports with receipts and accountings to Atmel within thirty (30) days after the Termination Date, and will receive all necessary reimbursements from Atmel, subject to, and in accordance with, the applicable expense reimbursement policies of Atmel.

7 **Board/Committee Resignation.** Employee agrees to resign, as of the Termination Date and to the extent applicable, all positions and titles with the Company, including as a member of the Board (and any committee thereof) and all positions and titles, including service as a member of the Board of Directors (and any committee thereof), of any of the Company's affiliates.

8 **General Release.** In exchange for the severance benefits made available under this Agreement, Employee hereby releases, remises and acquits Atmel and all of its affiliates, and

2

ATMEL PLAN/BERMAN000429

their respective current and former officers, directors, shareholders, members, partners, agents, employees, consultants, independent contractors, attorneys, advisers, successors and assigns (collectively, the "Releasees"), jointly and severally, from any and all claims, known or unknown, which Employee or his heirs, successors or assigns have or may have against any of the Releasees arising on or prior to the date of this Agreement and any and all liability which any of the Releasees may have to Employee, whether denominated claims, demands, causes of action, obligations, damages or liabilities arising from any and all bases, however, denominated, including but not limited to, Federal Worker Adjustment Retraining Notification Act, the Fair Labor Standards Act, the National Labor Relations Act, the Employee Retirement Income Security Act of 1974, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act of 1990, the Family and Medical Leave Act of 1993, Title VII of the United States Civil Rights Act of 1964, 42 U.S.C. § 1981, the Genetic Information Non Discrimination Act of 2009 ("GINA"), the Lilly Ledbetter Fair Pay Act, the Older Workers Benefit Protection Act, and any other federal, state or local law and any workers' compensation or disability claims under any such laws or claims under any contract.

This release relates to any and all claims arising from and/or during Employee's employment relationship with Atmel and its affiliates or as a result of the termination of such relationship. Notwithstanding any provision of this Agreement, this release is not intended to interfere with Employee's right to file a charge with the Equal Employment Opportunity Atmel Commission (the "EEOC") in connection with any claim Employee believes he may have against or its affiliates. However, by executing this Agreement, Employee hereby waives the right to recover damages of any kind or any other form of recovery or relief in any proceeding Employee may bring before the EEOC or any state human rights commission or in any proceeding brought by the EEOC or any state human rights commission on Employee's behalf.

Employee understands and acknowledges that he/she is waiving and releasing any rights he/she may have under the Age Discrimination in Employment Act of 1967 ("ADEA"), and that this waiver and release is knowing and voluntary. Employee understands and agrees that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Effective Date of this Agreement. Employee understands and acknowledges that the consideration given for this waiver and release is in addition to anything of value to which Employee was already entitled. Employee further understands and acknowledges that he/she has been advised by this writing that: (a) he/she should consult with an attorney prior to executing this Agreement; (b) he/she has forty-five (45) days within which to consider this Agreement; (c) as set forth in Exhibits A, B, and C herein, he/she has been advised in writing by the Company of the class, unit, or group of individuals covered by the reduction in force, the eligibility factors for the reduction in force, and the job titles and ages of all individuals who were and were not selected; (d) he/she has seven (7) days following his/her execution of this Agreement to revoke this Agreement; (e) this Agreement shall not be effective until after the revocation period has expired; and (f) nothing in this Agreement prevents or precludes Employee from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for

3

ATMEL PLAN/BERMAN000430

doing so, unless specifically authorized by federal law. In the event Employee signs this Agreement and returns it to the Company in less than the forty-five (45) day period identified above, Employee hereby acknowledges that he/she has freely and voluntarily chosen to waive the time period allotted for considering this Agreement.

This release is for any relief, no matter how denominated, including, but not limited to, injunctive relief, wages, back pay, front pay, compensatory damages, punitive damages or attorneys' fees.

This release shall not apply to any obligation of Atmel or its affiliates pursuant to this Agreement, any rights in the nature of indemnification which Employee may have with respect to claims against him relating to or arising out of his employment with Atmel and its affiliates (including Microchip Technology Incorporated, Microchip Technology Management Co., and their affiliates), future rights with respect to Employee's outstanding Atmel equity awards, or any vested benefit to which he is entitled under any tax qualified or other pension plan of Atmel or its affiliates (including without limitation Atmel's 401(k) plan), COBRA continuation coverage benefits or any other similar benefits required to be provided by statute.

9.  **California Civil Code Section 1542.**

California Civil Code Section 1542. Employee acknowledges that he has been advised to consult with legal counsel and is familiar with the provisions of California Civil Code Section 1542, a statute that otherwise prohibits the release of unknown claims, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Employee, being aware of said code section, agrees to expressly waive any rights he may have thereunder, as well as under any other statute or common law principles of similar effect.

10. **No Future Lawsuits.** Employee agrees that he will not file, or permit to be filed in his name or on Employee's behalf, any lawsuit or administrative claim against any of the persons or entities released in this Agreement based upon any act or event which occurred before the effective date of this Agreement.

11. **Non-Admission of Liability.** The use of this Agreement by Atmel does not signify any wrongdoing by Atmel or any affiliates or related companies, all of which is expressly denied.

4

12.  **Period for Review and Consideration of Agreement.** Employee acknowledges that, by his free and voluntary act of signing below, he agrees to all of the terms of this Agreement and intends to be legally bound thereby. Employee understands that he may consider whether to agree to the terms contained herein for a period of forty-five (45) days after the date hereof. However, the severance benefits provided herein will be delayed until this Agreement becomes effective, enforceable and irrevocable in accordance with the terms hereof.

13.  **Encouragement to Consult Attorney.** Employee should consult with an attorney concerning the terms of this Agreement.

14.  **Right to Revoke Agreement.** This Agreement will become effective, enforceable and irrevocable on the eighth (8th) day after the date on which it is executed by Employee (the "Effective Date"). During the seven-day period prior to the Effective Date, Employee may revoke his agreement to accept the terms hereof by indicating in writing to Geri Shaw, Sr. Benefits Manager, Human Resources at Atmel his intention to revoke. If Employee exercises his right to revoke hereunder, he shall forfeit his right to receive any of the benefits provided for herein, and to the extent such payments have already been made, he hereby agrees that he will immediately reimburse Atmel for the amounts of such payment.

15.  **Trade Secrets, Confidential and/or Proprietary Information.** Employee will regard and preserve as confidential the following information: (i) all trade secrets and/or other proprietary and/or confidential information belonging to Atmel or any affiliate; and (ii) all trade secrets and/or other proprietary and/or confidential information belonging to a third party which have been confidentially disclosed to Atmel or any affiliate, which trade secrets and/or other proprietary and/or confidential information described in (i) and (ii) above (collectively, "Confidential Information") have been disclosed to Employee by reason of his employment with Atmel. Employee will not, without written authority from Atmel to do so, use for his own benefit or purposes, or the benefit of purpose of any person or entity other than Atmel, nor disclose to others, any Confidential Information. This provision will not apply to Employee's general expertise and know-how that Employee learned prior to employment with Atmel, nor to Confidential Information that has been voluntarily disclosed to the public by Atmel, or otherwise entered the public domain through lawful means. Confidential Information will include, but not be limited to, all nonpublic information relating to Atmel's or any of its affiliates' (i) business, research, development and marketing plans, strategies and forecasts; (ii) business; (iii) products (whether existing, in development, or being contemplated); (iv) customers' identities, usages, and requirements; (v) reports; (vi) specifications; (vii) designs, software and other technology; (viii) research and development programs; (ix) terms of contracts; and (x) any employee information.

16.  **Non-Solicitation of Employees.** During the course of Employee's employment with Atmel, Employee came into contact and became familiar with the Company's employees, their knowledge, skills, abilities, salaries, commissions, draws, benefits, and other matters with

5

**ATMEL PLAN/BERMAN000432**

respect to such employees, all of which information is not generally known to the public, but has been developed, acquired or compiled by the Company at its great effort and expense. Employee understands that any solicitation, luring away or hiring of such employees of the Company shall be highly detrimental to the business of Atmel and may cause serious loss of business and great and irreparable harm. Consequently, Employee covenants and agrees that for a period of one (1) year after the Termination Date, Employee shall not, directly or indirectly, whether on behalf of Employee or others, solicit, lure or hire away any employees of Atmel or any subsidiary or assist or aid in any such activity.

17. **Reasonableness of Non-Compete and Non-Solicitation Provisions.** Employee acknowledges that the scope of the non-solicitation of client, if applicable, and non-solicitation of employees provisions are reasonable. In the event that any aspect of the applicable provisions is deemed to be unreasonable by a court, Employee will submit to any reduction(s) as the court will deem reasonable. In the event Employee violates these provisions, then the time limitations will be extended for a period of time equal to the pendency of such proceedings, including appeals.

18. **Protected Activity Not Prohibited.** Employee understands that nothing in this Agreement shall in any way limit or prohibit Employee from engaging for a lawful purpose in any Protected Activity. For purposes of the Agreement, "Protected Activity" shall mean filing a charge or complaint, or otherwise communicating, cooperating, or participating with, any state, federal, or other governmental agency, including the Securities and Exchange Commission, the Equal Employment Opportunity Commission, and the National Labor Relations Board. Notwithstanding any restrictions set forth in this Agreement, Employee understands that he is not required to obtain authorization from the Company prior to disclosing information to, or communicating with, such agencies, nor is Employee obligated to advise the Company as to any such disclosures or communications. Notwithstanding in making any such disclosures or communications, Employee agrees to take all reasonable precautions to prevent any unauthorized use or disclosure of any information that may constitute Company confidential information under the Confidentiality Agreement to any parties other than the relevant government agencies. Employee further understands that "Protected Activity" does not include the disclosure of any Company attorney-client privileged communications, and that any such disclosure without the Company's written consent shall constitute a material breach of this Agreement.

19. **Confidentiality of Terms.** Employee and Atmel agree that the fact and terms of this Agreement are confidential, including without limitation all prior discussions, and will not be disclosed to any person without the written consent of Atmel, except to Employee's legal and tax advisors and Employee's spouse, or to the extent required by law; provided however, that Employee shall be responsible for breaches of confidentiality by any such person with whom Employee shares the fact or terms of this Agreement. However, Employee agrees and acknowledges that this Agreement may be introduced as evidence by Atmel in the event Employee commences any legal, administrative, judicial or arbitration proceeding against Atmel.

6

**ATMEL PLAN/BERMAN000433**

20. **Non-Defamation.** Employee agrees that Employee will not, directly or indirectly, in public or private, deprecate, impugn or otherwise make any remarks that would tend to or be construed to tend to defame Atmel or its reputation, nor will Employee assist any other person, firm or company in engaging in such activities.

21. **Consequences of Employee Violation of Promises.** If Employee breaks any of his promises contained within this Agreement and/or files any lawsuit based on legal claims that Employee has released, Employee will pay for all costs incurred by Atmel, any affiliated or related companies, or the directors or employees of any affiliated or related companies, including reasonable attorney's fees to enforce any provisions or to defend against any claim by Employee. Employee also agrees that if Employee acts in violation of this Agreement, Employee will remit to Atmel any and all monies paid to Employee under this Agreement, with the exception of $100.00 which Employee may retain under such circumstances, which shall serve as consideration for his execution of this Agreement, which shall otherwise remain in full force and effect. The terms of this paragraph shall not apply to a challenge to the knowing and voluntary nature of a waiver of claims under the Age Discrimination in Employment Act of 1967 and Employee shall not be penalized for exercising that right.

22. **Sarbanes-Oxley Act of 2002.** Atmel and Employee agrees that this termination is occurring for the reasons cited above and is not related to any lawful actions taken by Employee under the provisions of Section 806 of 18 U.S.C. § 1514A.

23. **Entire Agreement.** This document constitutes the entire Agreement between Employee and Atmel. Atmel has made no promises to Employee other than those in this Agreement. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matters, except to the extent the Employee has greater obligations under any Patent and Trade Secrets Agreement or "Employee" Agreement between Employee and Atmel.

24. **Severability Clause.** If any one or more provisions contained in this Agreement will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provision of this Agreement, but this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

25. **Reference.** Reference inquiries from prospective employers will be handled by only verifying Employee's dates of employment and last position held with Atmel.

26. **Binding Agreement.** The provisions of this Agreement will be binding upon Employee, and Atmel and their successors, assigns, heirs, executors and beneficiaries.

27. **California Law.** Employee and Atmel agree that this Agreement and any interpretation thereof will be governed by the substantive laws of the State of California without regard to its conflict of laws, except as preempted by ERISA.

7

28.  **Captions.** The captions used in this Agreement are designed for convenience of reference only and are not to be resorted to for the purpose of interpreting any provision of this Agreement.

29.  **Taxes.** Employee acknowledges that he is responsible for the payment of all taxes in connection with any payments and benefits he will be receiving pursuant to this Agreement, and has not relied on the Company for any tax advice in connection with his obligations in this regard.

THE EMPLOYEE ACKNOWLEDGES THAT THE EMPLOYEE HAS READ THIS AGREEMENT, UNDERSTANDS IT AND IS VOLUNTARILY ENTERING INTO IT.

_____            _____
Dated                              **Peter Schuman**

                                   Atmel, LLC
_____
Dated                              By:_____
                                   Its:

For internal use:

45 day period for consideration ends, and offer of severance benefits expires:  May 23, 2016

Date signed: _____

7-day period for revocation ends:_____

8

**ATMEL PLAN/BERMAN000435**

# EXHIBIT A

## DECISIONAL UNIT INFORMATION

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by the Atmel, LLC:

1. **Decisional Unit.** The decisional unit for this reduction in force is Finance & Admn Group.

2. **Eligibility.** All persons included in the Finance & Admn Group and above are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3. **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to the Company. The offer of severance benefits contained in this Agreement will expire on the date stated on page 8 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4. **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

9

**Data Sheet by Age**

4/6/2016

**EXHIBIT B**

Job Titles of Individuals <u>Not Selected</u> from the Decisional Unit for this Reduction in Force and Not Offered Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

ATMEL PLAN/BERMAN000437

**Data Sheet by Age**

4/6/2016

**EXHIBIT C**

Job Titles of Individuals Selected from the Decisional Unit for this Reduction in Force and
Offered Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
|---|---|
| Will be mailed to home address | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

11

**ATMEL PLAN/BERMAN000438**

EXHIBIT E to A-10

ATMEL PLAN/BERMAN000439

As you know, Atmel Corporation ("Atmel") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). Atmel and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by Atmel. In connection with the termination of your employment from Atmel effective April 6, 2016 (the "Termination Date"), we are offering you a severance package on the terms set forth in this document. This offer is voluntary and whether you accept it is entirely up to you. If you decide to accept this offer by signing at the end of this document, you will be entering into a legally-binding contract (the "Agreement") with Microchip, Atmel, and their affiliates, and subsidiaries (collectively the "Company"), on the terms stated below.

## Company Commitments to You

- In consideration for entering into this Agreement, Atmel will pay you a lump sum total of (i) $53,045.00 representing, a lump sum cash payment in cash equal to 0.25 times the your Base Pay, and (ii) $5,917.81 representing, a lump sum payment in cash equal to 50% of the your 2015 Bonus, prorated to the date of the your Involuntary Termination (iii) each outstanding equity award, including without limitation, restricted stock unit and restricted stock award, held by you shall automatically become vested and, if applicable, exercisable and any forfeiture restrictions or rights of repurchase thereon shall immediately lapse.

- In addition, if you timely elect to continue health coverage pursuant to COBRA, the Company shall directly pay, the premium costs for you and your covered dependents, for up to three (3) months following the Separation Date, subject to compliance with COBRA. After the Company ceases to pay premiums pursuant to the preceding sentence, you may, if eligible, continue healthcare coverage at your expense in accordance with the provisions of COBRA.

- The benefits described in the two bullets above are the "Severance Benefits."

- Regardless of whether you sign this Agreement, you will be paid all earned but unpaid salary and accrued but unused vacation through the Termination Date. You will receive information regarding your rights to health insurance continuation under COBRA. Nothing in this Agreement will impair any COBRA rights you have or your rights to vested benefits under the terms of Company benefit plans.

- Provided that you direct any inquiries by potential future employers to Atmel Human Resources department, Atmel shall use its best efforts to provide only your last position and dates of employment.

- The Company will not contest any claim for unemployment benefits that you may file.

## Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads *"a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."*

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

## General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on May 27, 2016 to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Geri Shaw in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until the next administratively practicable payroll after the eighth calendar day after you delivered this signed unrevoked Agreement to Geri Shaw. If you decide to accept this offer and you deliver a signed Agreement to Geri Shaw, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Geri Shaw within seven (7) calendar days after you gave her the Agreement with your signature.

2

**ATMEL PLAN/BERMAN000441**

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 45 days to consider it, and that you are signing it knowingly and voluntarily.

- If you sign and return this document in less than the time that you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

4/21/16
4/19/16

Date

Peter Schuman

4/21/16

Date

Company Witness/Title

Internal use:

Date received: 4/21/16

7-day revocation period ends: 4/28/16

3

ATMEL PLAN/BERMAN000442

**DECISIONAL UNIT INFORMATION**

The following information is provided under federal law to assist you in making a decision whether to sign this Agreement and accept the severance benefits offered by Atmel, LLC:

1.  **Decisional Unit.** The decisional unit for this reduction in force is Finance Group

2.  **Eligibility.** All persons included in the Finance Group are eligible for the program. All persons who are being terminated in the reduction in force are selected for the program.

3.  **How Long to Decide.** You will have up to forty-five (45) days from the receipt of this Agreement in which to decide whether to sign this Agreement and return it to Geri Shaw at Atmel. The offer of severance benefits contained in this Agreement will expire on the date stated on page 2 of the Agreement. Please note that once you have signed this Agreement, you will have seven (7) days to revoke your signature and acceptance of the terms of this Agreement.

4.  **Selection Information.** Federal law provides certain information be given to you concerning individuals who were eligible and selected for the reduction in force and individuals who were eligible but not selected for the reduction in force. This information can be found in Exhibits B and C, which follow this Exhibit A.

4

**ATMEL PLAN/BERMAN000443**

**Data Sheet by Age**
4/6/2016

**EXHIBIT B**

Job Titles of Individuals _Not Selected_ from the Decisional Unit for this Reduction in Force and Not Offered
Severance Benefits

| Job Title(s) | Age(s) |
|---|---|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

5

ATMEL PLAN/BERMAN000444

**Data Sheet by Age**
4/6/2016

**EXHIBIT C**

Job Titles of Individuals Selected from the Decisional Unit for this Reduction in Force and Offered
Severance Benefits for Signing this Separation Agreement and Release

| Title | Age |
|---|---|
| attached | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**ATMEL PLAN/BERMAN000445**

**EXHIBIT A-11**

ATMEL PLAN/BERMAN000446

## DECLARATION OF MANDY SCHWARZ

I, Mandy Schwarz, declare as follows:

In 2015, I was employed by Atmel Corporation (hereinafter "Atmel" or "Company") as a Sales Operation Senior Manager. In July 2015, I and other U.S. Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan I received in July 2015 is attached as Exhibit A. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated without cause. Under the terms of the Severance Plan, my severance benefits included cash payments representing 40% of my base salary, a pro-rated amount of my annual bonus target, and four months of COBRA insurance to be paid for by the Company.

In September 2015, I learned that Atmel had entered into a merger agreement with a company called Dialog Semiconductor ("Dialog"), pursuant to which Dialog would acquire Atmel. In December 2015, I heard that Dialog might not be the buyer, since another potential purchaser had emerged and had made an offer that might be superior to Dialog's.

In January 2016, I learned that Microchip Technology, Inc. ("Microchip") was the new potential buyer and had made an offer that was superior to Dialog's. After Dialog failed to increase its purchase offer in January 2016, I learned on approximately January 19, 2016 that Microchip had entered into an agreement with Atmel pursuant to which Microchip would acquire Atmel.

On approximately February 3, 2016, Suzanne Zoumaras (Atmel's Senior Vice President of Human Resources) sent an e-mail to Atmel employees entitled "Compensation Benefits Relating to the Microchip Merger", which had links to a series of Frequently Asked Questions ("FAQs") that had been published for Atmel employees regarding the potential Microchip acquisition. A copy of the FAQs is attached as Exhibit B. I read the FAQs in early February 2016. The FAQs stated that Microchip had agreed to honor the Severance Plan if it acquired Atmel, and so I believed that Microchip would pay the severance benefits set forth in the Severance Plan if it terminated Atmel employees without cause after the merger closed.

Between January 2016 and March 2016, I had multiple discussions with several members of Atmel management regarding the issue of Microchip honoring the Severance Plan and paying the severance benefits set forth in the Severance Plan. During this time period, I had discussions with Kiran Ramakrishnan (who was my immediate supervisor), Yang Chiah Yee (Mr. Ramakrishnan's immediate supervisor) and Ravi Bali (who was in Atmel's Human Resources department). All three of these individuals assured me that, even if Dialog was not to be the acquiring company, whichever company acquired Atmel (including Microchip) would have to pay the severance benefits set forth in the Severance Plan if it terminated Atmel employees following the merger. They told me that the severance payment would not be a problem and that I should not worry about this issue.

1

**ATMEL PLAN/BERMAN000447**

On April 4, 2016, Microchip's acquisition of Atmel closed. On approximately April 5, 2016, I learned that many Atmel employees had been terminated and that Microchip was now stating that Atmel employees were not entitled to the benefits set forth in the Severance Plan and that Microchip would not pay those severance benefits.

On approximately April 6, 2016, Steve Sanghi, the Chairman and Chief Executive Officer of Microchip held a general meeting with Atmel employees. During this meeting, Sanghi informed Atmel employees that they were not entitled to any benefits under the Severance Plan; that he had no knowledge of the July 2015 Severance Plan prior to the merger; that the July 2015 Severance Plan had "expired" in November 2015; that even though Atmel executives had assured Atmel employees in mid-January 2016 that whichever company acquired Atmel (including Microchip) would have to pay the severance benefits under the Severance Plan, Microchip had not entered into its merger agreement with Atmel until January 19, 2016, which was after this assurance by Atmel executives, and so Microchip did not have to honor the Severance Plan; and that Microchip was not obligated to honor the Severance Plan and would not do so. Sanghi eventually said that Microchip was nevertheless willing to offer terminated Atmel employees 50% of the benefits provided by the Severance Plan if Atmel employees signed an agreement accepting this 50% proposal, and if they later signed a release of claims. Sanghi said that employees who refused to sign this new severance agreement would receive no severance whatsoever.

On approximately April 13, 2016, I received a letter "severance agreement" from Microchip ("the April 13 Agreement") which offered to pay me 50% of the Severance Plan benefits if I signed the April 13 Agreement and was subsequently terminated, provided that I also signed a release of claims following my termination. A copy of the April 13 Agreement is attached hereto as Exhibit C. I refused to sign the April 13 Agreement.

On June 28, 2016, my employment was terminated by Microchip without cause. I received no severance benefits from Microchip.

I relied on the Severance Plan, and on the assurances I had received from Atmel management and from the FAQs about my entitlement to severance benefits under the Severance Plan even if Microchip became the acquiring company, in deciding to stay employed with Atmel through the Microchip acquisition period. I would have looked for a job outside of Atmel well before the Microchip acquisition had I known that Microchip was not going to honor the Severance Plan benefits.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on October 5, 2016 at ____San Jose____, ____CA____.

_Mandy Schwarz_
Mandy Schwarz

2

EXHIBIT A to A-11

ATMEL PLAN/BERMAN000449

 

July 9, 2015

Re: Severance Guarantee

'lee       .,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- **COBRA Benefits:** Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

John, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Allou Hassam
Allou Hassam

**ATMEL PLAN/BERMAN000450**

## ADDENDUM TO
## U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A.  A Change of Control actually occurs; and
B.  Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000451**

**Payments:** All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

**Additional Matters.** Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

**ATMEL PLAN/BERMAN000452**

EXHIBIT B to A-11

ATMEL PLAN/BERMAN000453



## FREQUENTLY ASKED QUESTIONS
## Microchip Transaction:
## Effect on Compensation and Benefits for U.S. Employees

**What happens to my employment and compensatory arrangements with Atmel after the closing?**

Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to the closing of the transaction.

**How will my compensation and benefits be affected after the transaction closes?**

Microchip has agreed not to reduce your base salary or base wages through December 31, 2016. In addition, Microchip has promised that your aggregate compensation and benefits package for 2016 will be comparable in value to the aggregate value of your pre-closing compensation and benefits package, excluding the value attributed to any pension plans or employee stock purchase plans.

**Will I participate in the same Atmel benefit plans following the transaction?**

We anticipate that sometime following the closing of the transaction Atmel's benefits will be transitioned onto Microchip's benefit plans. The timing of this transition is yet to be determined. Upon the transition to the Microchip benefits plans, you will be immediately eligible to participate in all Microchip plans subject to the eligibility requirements of the Microchip plans. We will work with Microchip to provide you information about the Microchip plans in the near term.

**Will I receive service credit for purposes of Microchip's benefits plans?**

Microchip has agreed to provide you with the same service credit that Atmel recognizes for you as of the closing (as if you had provided such services to Microchip), for purposes of eligibility, vesting, and level of benefits in Microchip plans that are comparable to Atmel plans (e.g., health insurance plans, paid time off).

**What will happen to my Atmel equity awards after the transaction closes?**

RSUs & PRSUs. At the closing of the transaction, Microchip will assume each continuing employee's then-outstanding and unvested awards of restricted stock units (RSUs) and performance-based restricted stock units (PRSUs), and convert those awards into awards of Microchip common stock with an equivalent value as determined under the definitive agreement. The converted awards will retain the same material terms (e.g., vesting, including any rights you may have to accelerated vesting under the terms of your award, your employment agreement or Atmel's stock plan) as your Atmel award. In addition, at the closing of the transaction, any vested awards of RSUs and PRSUs (including any portion that vests on the closing of the transaction) for which shares have not yet been issued, will be settled in shares, subject to applicable withholding taxes, and converted into the right to receive the merger consideration for those shares after the closing just like any other Atmel stockholder.

Stock Options. All unvested Atmel stock options that you hold will accelerate and become vested and exercisable in full immediately prior to the closing, subject to your continued service through the closing. We will provide more information to you as we get closer to the closing date on how you may exercise your stock options that are eligible for this accelerated vesting in connection with the closing.

ATMEL PLAN/BERMAN000454



If you do not exercise your stock options prior to the closing, Atmel will automatically "net exercise" your stock options, which means that the exercise price and applicable withholding taxes will be paid by withholding the appropriate amount of shares otherwise issuable to you on the exercise of your stock options. You will receive merger consideration for the shares you are issued for your options after the closing just like any other Atmel stockholder.

Purchase Rights under the Employee Stock Purchase Plan (ESPP). Atmel expects to continue the ESPP until just before closing. For any offering period under the ESPP that would otherwise be in effect at the closing of the transaction, Atmel will shorten the offering period so that purchases will be made on the 10th business day prior to such closing. All shares of Atmel stock purchased on that purchase date will not be released until the closing and will be treated like all other outstanding shares at the closing. The ESPP will terminate immediately prior to the closing.

### How much will I receive for my shares of Atmel stock?

Microchip has agreed to pay, for each share of Atmel common stock, a combination of $7.00 in cash, plus a fraction of a share of Microchip common stock having a value of approximately $1.15; provided however that Microchip will make a cash payment in lieu of issuing a fractional share of its common stock. For more information, please see our filing on Form 8-K from January 19, 2016 at:

http://www.sec.gov/Archives/edgar/data/872448/000157104916010841/t1600178_8k.htm

### When is the transaction expected to close?

We expect the transaction to close during the second calendar quarter of 2016, subject to customary closing conditions, regulatory approvals and Atmel stockholder approval. Until then, Atmel and Microchip will continue to operate as independent companies.

### Will there be salary adjustments in 2016?

Atmel agreed not to increase salary for any employees before July 1, 2016. We expect Microchip to review compensation arrangements, including salary levels, during the integration process.

### Who should I contact if I have questions about the transaction?

If you have any questions, please contact Atmel's HR department.

ATMEL PLAN/BERMAN000455



***

### Additional Information

This communication may be deemed to be solicitation material in respect of the proposed merger involving Microchip and Atmel. In connection with the proposed merger, Microchip will file with the U.S. Securities and Exchange Commission (the "SEC") a Registration Statement on Form S-4 (the *"Registration Statement"*) containing a prospectus with respect to the Microchip common stock to be issued in the proposed merger and a proxy statement of Atmel in connection with the proposed merger (the *"Proxy Statement/Prospectus"*). Each of Microchip and Atmel intends to file other documents with the SEC regarding the proposed merger. The definitive Proxy Statement/Prospectus will be mailed to stockholders of Atmel and will contain important information about the proposed merger and related matters. The final Proxy Statement/Prospectus will describe the terms and conditions of the way in which the proposed merger will be implemented, including details of how to vote on the adoption of the proposed merger agreement. Any response to the proposed merger should be made only on the basis of the information in the Proxy Statement/Prospectus.

Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and Registration Statement, and any other documents filed by Atmel and Microchip with the SEC in connection with the proposed merger at the SEC's website at www.sec.gov. Securityholders of Atmel may obtain, free of charge, copies of the Proxy Statement/Prospectus and any other documents filed by Atmel with the SEC in connection with the proposed merger in the *"Investors"* section of Atmel's website at www.atmel.com.

BEFORE MAKING AN INVESTMENT OR VOTING DECISION, WE URGE SECURITYHOLDERS OF ATMEL TO READ CAREFULLY THE PROXY STATEMENT/PROSPECTUS AND REGISTRATION STATEMENT (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS THAT MICROCHIP OR ATMEL WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER.

This communication does not constitute an offer to buy or exchange, or the solicitation of an offer to sell or exchange, any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, sale or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. This communication is not a substitute for any prospectus, proxy statement or any other document that Atmel or Microchip may file with the SEC in connection with the proposed merger.

### Participants in the Solicitation

Atmel, Microchip and their respective directors and executive officers may be deemed to be participants in the solicitation of proxies from Atmel's stockholders in connection with the adoption of the merger agreement in connection with the proposed merger and may have direct or indirect interests in the proposed merger. Information about Microchip's directors and executive officers is set forth in Microchip's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on July 10, 2015, and its Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from Microchip's website at www.microchip.com/investorshome.aspx. Information about Atmel's directors and executive officers and their respective interests in Atmel by security holdings or otherwise is set forth in Atmel's Proxy Statement on Schedule 14A for its 2015 Annual Meeting of Stockholders, which was filed with the SEC on April 3, 2015. These documents are available free of charge at the SEC's website at www.sec.gov and from the *"Investors"* section of Atmel's website at www.atmel.com. Additional information regarding the interests of participants in the solicitation of proxies in connection with the proposed merger will be included in the Proxy Statement/Prospectus and the Registration Statement that Microchip will file with the SEC.

### Cautionary Statements Related to Forward-Looking Statements

This communication contains, or may contain, "forward-looking statements" in relation to Atmel and Microchip, as well as other future events and their potential effects on Atmel, Microchip and the combined company that are subject to risks and uncertainties. Generally, the words "will," "may," "should," "continue," "believes," "targets," "plans," "expects," "estimates," "aims," "intends," "anticipates" or similar expressions or negatives thereof identify forward-looking statements. Forward-looking statements include statements relating to (1) the benefits of the merger, including future financial and operating results of the combined company, Microchip's

ATMEL PLAN/BERMAN000456



or Atmel's plans, objectives, expectations and intentions, and the expected timing of completion of the transaction; (2) expected developments in product portfolio, expected revenues, expected operating costs savings, expected future cash generation, expected future design wins and increase in market share, expected incorporation of products in those of customers, adoption of new technologies, the expectation of volume shipments of products, opportunities in the semiconductor industry and the ability to take advantage of those opportunities, the potential success to be derived from strategic partnerships, the potential impact of capacity constraints, the effect of financial performance on share price, the impact of government expectations and beliefs of the management of Microchip and Atmel; (3) the expansion and growth of Microchip's or Atmel's operations; (4) the expected cost, revenue, technology and other synergies of the proposed merger, the expected impact of the proposed merger on customers and end-users, the combined company's future capital expenditures, expenses, revenues, earnings, economic performance, financial condition, losses and future prospects; (5) business and management strategies and the expansion and growth of the combined company's operations; and (6) the anticipated timings of the Atmel stockholders' meeting and completion of the proposed merger.

These forward-looking statements are based upon the current beliefs and expectations of the management of Atmel and involve risks and uncertainties that could cause actual results to differ materially from those expressed in the forward-looking statements. Many of these risks and uncertainties relate to factors that are beyond Atmel's ability to control or estimate precisely. Those factors include (1) the outcome of any legal proceedings that could be instituted against Atmel or its directors related to the discussions with Microchip, the merger agreements with Dialog or Microchip or any unsolicited proposal; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement with Microchip; (3) the ability to obtain governmental and regulatory approvals of the proposed merger between Atmel and Microchip; (4) the possibility that the proposed merger between Atmel and Microchip does not close when expected or at all, or that the parties, in order to achieve governmental and regulatory approvals, may be required to modify aspects of the proposed merger or to accept conditions that could adversely affect the combined company or the expected benefits of the proposed merger; (5) the possibility that other competing offers or acquisition proposals will be made; (6) the ability to realize the expected synergies or savings from the proposed merger in the amounts or in the timeframe anticipated; (7) the potential harm to customer, supplier, employee and other relationships caused by the announcement or closing of the proposed merger; (8) the ability to integrate Atmel's businesses into that of Microchip in a timely and cost-efficient manner; (9) the combined company's ability to develop and market products containing the respective technologies of Atmel and Microchip in a timely and cost-effective manner; (10) the combined company's ability to protect intellectual property rights; (11) litigation (including intellectual property litigation in which the combined company may be involved or in which customers of the combined company may be involved, especially in the mobile device sector), and the possible unfavorable results of legal proceedings; (12) dependence on key personnel; (13) the inability to realize the anticipated benefits of acquisitions and restructuring activities, including in connection with the proposed merger, or other initiatives in a timely manner or at all; (14) the development of the markets for Atmel's and Microchip's products; (15) risks related to Microchip's ability to successfully implement its acquisitions strategy; (16) uncertainty as to the future profitability of businesses acquired by Microchip, and delays in the realization of, or the failure to realize, any accretion from any other acquisition transactions by Microchip; (17) the inherent uncertainty associated with financial projections; (18) disruptions in the availability of raw materials; (19) compliance with U.S. and international laws and regulations by the combined company and its distributors; (20) the market price and volatility of Microchip common stock (if the merger is completed); (21) the cyclical nature of the semiconductor industry; (22) an economic downturn in the semiconductor and telecommunications markets; (23) consolidation occurring within the semiconductor industry; (24) general global macroeconomic and geo-political conditions; (25) financial market conditions; (26) business interruptions, natural disasters or terrorist acts; and (27) other risks and uncertainties, including those detailed from time to time in Microchip's and Atmel's periodic reports and other filings with the SEC or other regulatory authorities, including Atmel's Annual Report on Form 10-K for the fiscal year ended December 31, 2014 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere) and Microchip's Annual Report on Form 10-K for the fiscal year ended March 31, 2015, which was filed with the SEC on May 27, 2015 and amended on June 8, 2015 and Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 (whether under the caption Risk Factors or Forward Looking Statements or elsewhere).

Neither Atmel nor Microchip can give any assurance that such forward-looking statements will prove to be correct. The reader is cautioned not to place undue reliance on these forward-looking statements, which speak

ATMEL PLAN/BERMAN000457



only as of the date of this announcement. Neither Atmel nor Microchip nor any other person undertakes any obligation to update or revise publicly any of the forward-looking statements set out herein, whether as a result of new information, future events or otherwise, except to the extent legally required.

***

**ATMEL PLAN/BERMAN000458**

EXHIBIT C to A-11

ATMEL PLAN/BERMAN000459

April 13, 2016

Mandy Schwarz

Re: Severance Benefits

Dear Mandy,

I am pleased to offer you a severance agreement on the terms and conditions set forth below.

As you know, Atmel Corporation (the "Company") recently became a subsidiary of Microchip Technology Incorporated ("Microchip") (the "Merger"). The Company and Microchip are making this offer, in part to resolve any current disagreement or misunderstanding regarding severance benefits previously offered by the Company, and in part to provide you with the security of certain benefits in the event your relationship is terminated involuntarily without Cause (as defined in Appendix A) by the Company, Microchip or any U.S. subsidiary or affiliate of the Company or Microchip (the "Microchip Group"), and other than due to your death or disability, on or prior to April 4, 2017 ("Qualifying Termination").

These benefits (collectively, the "Severance Benefits") are:

- **Cash Severance:** A lump sum payment equal to 20% of your annual base salary, less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");
- **Target Incentive:** A lump sum payment equal to 50% of the annual performance bonus (MIP) that you received from the Company for 2015, then annualized, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date[1]; and
- **COBRA Benefits:** Two months of COBRA benefits paid for by Microchip.

Your receipt of the Severance Benefits will be subject to you signing and not revoking a release of any and all claims, in a form prescribed by Microchip and substantially the same as that attached at Appendix B (the "Release"). Upon the Release becoming effective, the Cash Severance and Target Incentive will be payable in a lump sum without interest as soon as administratively practicable, and all other amounts will be payable in accordance with the payment schedule applicable to each payment or benefit.

Nothing in this agreement is intended to, or shall, contradict, modify or alter the terms of your at-will employment. You shall remain an at-will employee of the Company and the Microchip Group for all purposes, meaning that you, the Company or the member of the Microchip Group employing you may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice. Moreover, the at-will status of your relationship cannot be changed except in a written document, signed by Microchip's Chief Executive Officer and you, and which expressly modifies your at will status. This agreement constitutes the complete, final, and exclusive embodiment of the entire agreement between you and the

---

[1] For example, if your performance bonus for working the entire year of 2015 was $10,000, less applicable withholdings, and you are employed for a total of 180 days after January 1, 2016, then you will be eligible for a Target Incentive of (($10,000 x .5) x (180/365))= $2,465.75, less applicable withholdings. However, if you were hired by the Company sometime after January 1, 2015, then your 2015 bonus number will be annualized accordingly. For example, if you were hired April 1, 2015 and received a performance bonus for 2015 of $7,500, and you are employed for a total of 180 days after January 1, 2016, then you will be eligible for a Target Incentive of ((($7,500 x 365/275) x .5) x (180/365)) = $2,454.55.

1

Microchip Group with regard to its subject matter and supersedes any other actual or perceived promises, warranties, or representations with regard to its subject matter made by the Company or any other member of the Microchip Group, including, for the avoidance of doubt, any programs, policies, or agreements with respect to severance or equity acceleration benefits made prior to April 4, 2016.

In the event that a portion of the Microchip Group is sold to an unrelated party and your employment is transferred to that party, Microchip and the Company will ensure that the new employer assumes responsibility for this agreement.

If a Qualifying Termination does not occur on or prior to April 4, 2017, this agreement will expire and you will not be eligible to receive the Severance Benefits described here.

To accept this offer, counter-sign in the space provided below and return it to your HR business partner no later than April 20, 2016.

Thank you for your continued contributions to our success.

Sincerely,

*Lauren a. Car*

Lauren Carr
Vice President, Global Human Resources

AGREED AND ACKNOWLEDGED:                          MICROCHIP TECHNOLOGY INC.

_____                  _____
Signature (Mandy Schwarz)                         HR Business Partner

_____                  _____
Date                                              Date

2

### ADDITIONAL TERMS TO SEVERANCE AGREEMENT

Unless otherwise defined below, capitalized terms used herein will have the meanings set forth in the agreement.

1. Cause. "Cause" is defined as (i) your willful and continued failure to perform the duties and responsibilities of your position after there has been delivered to you a written demand for performance from Microchip's Vice President, Worldwide Human Resources which describes the basis for her belief that you have not substantially performed your duties and you have not corrected such failure within 30 days of such written demand; (ii) any act of dishonesty by you in connection with your responsibilities as an employee of the Company with the intention or reasonable expectation that such action may result in your substantial personal enrichment; (iii) your conviction of, or plea of nolo contendere to, a felony that Microchip's Vice President, Worldwide Human Resources reasonably believes has had or will have a material detrimental effect on the reputation or business or any member of the Microchip Group; (iv) a breach of any fiduciary duty owed to the Company or the Microchip Group by you that has a material detrimental effect on the reputation or business of any member of the Microchip Group; (v) you being found liable in any Securities and Exchange Commission or other civil or criminal securities law action or entering any cease and desist order with respect to such action (regardless of whether or not you admit or deny liability); (vi) you (A) obstructing or impeding; (B) endeavoring to obstruct, impede or improperly influence, or (C) failing to materially cooperate with, any investigation authorized by the Board or any governmental or self-regulatory authority (an "Investigation"); however, your waiver of attorney-client privilege relating to communications with your own attorney in connection with an Investigation will not constitute "Cause"; or (vii) your disqualification or bar by any governmental or self-regulatory authority from serving in the capacity contemplated by your position or your loss of any governmental or self-regulatory license that is reasonably necessary for you to perform your responsibilities to the Company or any member of the Microchip Group, if (A) the disqualification, bar or loss continues for more than 30 days, and (B) during that period the Company or any member of the Microchip Group uses its good faith efforts to cause the disqualification or bar to be lifted or the license replaced, it being understood that while any disqualification, bar or loss continues during your employment, you will serve in the capacity contemplated by your position to whatever extent legally permissible and, if your service in the capacity contemplated by your position is not permissible, you will be placed on leave (which will be paid to the extent legally permissible).

1

**ATMEL PLAN/BERMAN000462**

| TO: | [NAME] |
|---|---|
| FROM: | Microchip Technology Incorporated |
| DATE: | [XXXX] |
| RE: | Employment Separation, Severance and Release ("Agreement") |

As you know, the Company[2] has decided to end your employment without cause (as defined in the Severance Agreement that you signed in April 2016). Under the terms of the Severance Agreement, you are entitled to the Severance Benefits listed below provided you sign, return and do not revoke this Agreement.

## The Company's Commitments to You

- The Company will give you:

  o **Cash Severance:** A lump sum payment equal to 20% of your annual base salary, less applicable withholdings, based on your base rate of pay in effect immediately prior to the date your employment is terminated (the "Separation Date");

  o **Target Incentive:** A lump sum payment equal to 50% of the annual performance bonus (MIP) that you received from the Company for 2015, less applicable withholdings, prorated based on the number of days between January 1, 2016 and your Separation Date; and

  o **COBRA Benefits:** Two months of COBRA benefits paid for by Microchip.

- The Company will not contest any claim for unemployment benefits that you may file.

## Your Commitments to the Company

- You agree to release the Company, its subsidiaries and affiliates, and its and their officers, agents and employees from any liability relating to or arising out of your employment with any of them. This includes a release of any liability for claims of any kind that you ever had or may have at this time, whether you know about them or not. This release is as broad as the law allows and includes a release of claims under federal and state laws, such as anti-discrimination, harassment and retaliation laws and expressly includes any claims under the Age Discrimination in Employment Act. This release also includes a release of any tort and contract claims, and any other claims that could be asserted under federal, state or local statutes, regulations or common law.

- You agree that this release of claims is a waiver of all rights under Section 1542 of the Civil Code of the State of California, which reads *"a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."*

---

[2] In this document, unless otherwise noted, "Company" means Microchip Technology Incorporated, Atmel Corporation and any of their affiliated entities.

1

**ATMEL PLAN/BERMAN000463**

- In agreeing to this release, you are not giving up your rights to enforce any term of this Agreement or to provide information to, or file a charge with, any government agency. However, in agreeing to this release, you are agreeing that you will not accept any money, or the reinstatement of your employment, for any claim you have released.

### General Understandings and Acknowledgements

- This Agreement states your and the Company's complete understandings regarding your rights and the Company's obligations relating in any way to, or arising out of, your employment with the Company. No future modification of this Agreement will be valid unless it is written and signed by an executive officer of the Company and you. If any provision in this Agreement is deemed unenforceable, it will be considered severable and will not affect the enforceability of the rest of the Agreement.

- You have until 5:00 p.m. on XXXXX (XX days after your Separation Date), to consider whether you want to accept the Severance Benefits by signing this Agreement, although you do not need to wait until that time to accept this offer and obtain the Severance Benefits.

- To accept this offer, you must sign this Agreement and deliver a signed copy of it to Lauren Carr in Human Resources by the date and time stated in the previous bullet point. As noted below, you will not receive the Severance Benefits until seven (7) business days after you deliver it to Lauren Carr. If you decide to accept this offer and you deliver a signed Agreement to Lauren Carr, you have seven (7) calendar days to change your mind and revoke the Agreement. To revoke this Agreement after signing it, you must deliver a written notice of revocation to Lauren Carr within seven (7) calendar days after you gave her the Agreement with your signature.

- By signing this Agreement, you are acknowledging that you have read it carefully, that it is written in language that you understand, that you have been advised to consult with an attorney, that you have been given 21 days [or 45 days if you are not the only employee separated from the Company at the same time] to consider it, and that you are signing it knowingly and voluntarily.

- If you sign and return this document in less than the time you have been given to consider it, you are voluntarily agreeing to waive the remaining portion of the time you have been given to consider it.

ONCE YOU SIGN BELOW, THIS DOCUMENT WILL BECOME A LEGALLY ENFORCEABLE CONTRACT.

_____          _____

Date                                              [XXXX EMPLOYEE NAME]

2

**ATMEL PLAN/BERMAN000464**



**MICROCHIP**

November 29, 2016

**This document contains important information that you should retain for your records.** This document serves as notice of an adverse benefit determination. We have declined to provide benefits, in whole or in part, for the claim(s) described below. If you think this determination was made in error, you have the right to appeal (see below for information about your appeal rights).

Dear Ms. Berman:

This letter is in response to your May 20, 2016 claim for benefits under the Atmel U.S. Severance Guarantee Benefit Program (the "Atmel Severance Plan"). The Plan Administrator has denied your claim.

**Reason for Denial:**

You are not eligible for benefits under the Atmel Severance Plan.

**Explanation of Basis for Determination:**

As set forth in the Section entitled "Benefits Conditions" of the Addendum to U.S. Severance Guarantee Program Letter of the Atmel Severance Plan (the "Plan Addendum"), you were only eligible for benefits if:

(1)   Atmel entered into an agreement qualifying as an "Initial Triggering Event" (discussed below) that would result in a "Change of Control" (discussed further below) on or after July 1, 2015, but before November 1, 2015;

(2)   The agreement qualifying as an "Initial Triggering Event" ultimately resulted in a "Change of Control"; and

(3)   You were terminated within 18 months of the execution date of the agreement qualifying as an "Initial Triggering Event" and resulting in a "Change of Control."

The agreement with respect to Dialog Semiconductor PLC referenced in your letter did not result in a "Change in Control." Thus, you are not eligible for benefits under the

**ATMEL PLAN/BERMAN000465**

Atmel Severance Plan with respect to the agreement with respect to Dialog
Semiconductor PLC.

As set forth in the Section entitled "Initial Triggering Event," the Atmel Severance Plan
automatically expired on November 1, 2015, with respect to any "Definitive Agreement"
that did not qualify as "Initial Triggering Event" under the Atmel Severance Plan. Thus,
all agreements entered into on or after November 1, 2015, cannot qualify as an "Initial
Triggering Event."

Notes:

*The term "Change in Control" is defined in the Plan Addendum. It generally means a
transaction or series of transactions whereby persons or entities that did not prior to such
transaction or transactions control a company, its assets, or its board does so after such
transaction or transactions.*

*The term "Definitive Agreement" is defined in the Plan Addendum. It generally means an
agreement that provides for obligations that are material to and enforceable against the
registrant, or rights that are material to a company and enforceable by a company against
one or more other parties to the agreement, in each case whether or not subject to
conditions.*

Sincerely,

*Carly Petrovic*

Carly Petrovic
Plan Administrator

CC: Mr. Cliff Palefsky



**Important Information about Your Appeal Rights:**

**How do I contact the Plan Administrator?** You can contact the Plan Administrator at 21015 SE Stark St., Gresham, OR 97030 or carly.petrovic@microchip.com.

**What if I need help understanding this denial?** Contact the Plan Administrator if you need assistance understanding this notice or our decision to deny your claim for benefits.

**What if I don't agree with this decision?** You have a right to appeal the denial of your claim for benefits.

**How do I file an appeal?** Contact the Plan Administrator in writing.

**When can I file an appeal?** You have 60 days following your receipt of this notice to file an appeal.

**Who may file an appeal?** You or someone you name to act for you (your authorized representative) may file an appeal.

**Can I provide additional information about my claim?** Yes, you may supply additional information. To do so, contact the Plan Administrator in writing. All comments, documents, records, and other information you submit will be considered.

**Can I request copies of information relevant to my claim?** Yes, you may request copies (free of charge). You can request copies of this information by contacting the Plan Administrator in writing.

**What happens next?** If you appeal, we will review our decision and provide you with a written determination.

**When will the appeal review be concluded?** We will provide you with a written determination regarding your appeal within 60 days after we receive your appeal request unless special circumstances require an extension of up to 60 days to process your claim.

**ATMEL PLAN/BERMAN000467**

**What happens if my appeal is denied?** You have the right to file a civil claim under Section 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). In order to file such an action, however, you must first complete the Plan's claims process (including the appeal described above).

**ATMEL PLAN/BERMAN000468**

JOHN A. McGUINN
JOHN R. HILLSMAN
CLIFF PALEFSKY
DEREK B. JACOBSON
KEITH A. EHRMAN
ABRAHAM FEINSTEIN-HILLSMAN
SCOTT M. STILLMAN
JEANNETTE A. VACCARO

LAW OFFICES OF
# McGUINN, HILLSMAN & PALEFSKY
A PROFESSIONAL CORPORATION
535 PACIFIC AVENUE
SAN FRANCISCO, CALIFORNIA 94133
TELEPHONE (415) 421-9292

FAX (415)403-0202

December 22, 2016

## VIA FEDERAL EXPRESS

Ms. Carly Petrovic
Plan Administrator for
   Atmel Corporation's U.S. Severance Guarantee Benefit Program
c/o Microchip Technology Corporation
2355 West Chandler Blvd.
Chandler, AZ 85224-6199

Ms. Carly Petrovic
Plan Administrator for
   Atmel Corporation's U.S. Severance Guarantee Benefit Program
c/o Microchip Technology Corporation
21015 SE Stark St.
Gresham, OR 97030

   **Re:** *ERISA Demand For Administrative Record and Demand for Documents on behalf of Peter Schuman, William Coplin, Robin Berman, Bo Kang, Khashayar Mirfakhraei, Thang Van Vu, Donna Viera-Castillo, Girish Ramesh, Patrick Hanley, Ilana Shternshain and Mandy Schwarz*

Dear Plan Administrator:

   As you know, this office represents Peter Schuman, William Coplin, Robin Berman, Bo Kang, Khashayar Mirfakhraei, Thang Van Vu, Donna Viera-Castillo, Girish Ramesh, Patrick Hanley, Ilana Shternshain and Mandy Schwarz (collectively referred to as our "Clients") in connection with their claims for severance benefits under ERISA.

   You have recently sent letters to our firm and to our Clients, in which you denied the claim of every one of our Clients. We are writing: 1) to demand that you immediately provide us with a complete copy of the administrative record on which you based your denial of our Clients' claims, and 2) to reiterate our Clients' prior demand for documents, i.e., the request for documents that was included in each of our Clients' original demand letters.

**ATMEL PLAN/BERMAN000469**

Well over thirty days ago, each of our Clients submitted a demand letter in which he or she requested that, if the Plan Administrator was not going to pay the benefits demanded, that the Plan Administrator produce certain documents which were highly relevant to his or her claim for benefits. The Clients' letters were worded in virtually identical fashion with respect to the document demand and all of the Clients set forth the same 23 document categories (other than substituting the name of the specific individual Client where appropriate). As an example, I will quote from the most recent demand letter (dated October 5, 2016), which was sent to the Plan Administrator by Mandy Schwarz:

"[I]f Microchip will *not* pay Ms. Schwarz all of her Severance Plan benefits, we are writing to obtain copies of documents pursuant to Employee Retirement Income Security Act of 1974, §§ 3(16)(A), 502(c). For purposes of this document demand, the following definitions apply:

a) The term "Severance Plan" refers to the Atmel "U.S. Severance Guarantee Program" as set forth in a July 9, 2015 letter delivered to Atmel its employees, together with the July 9, 2015 "Addendum to U.S. Severance Guarantee Program Letter". An example of this July 9, 2015 letter and Addendum are attached as Exhibit A to the accompanying Declaration of Mandy Schwarz (Exhibit A-1 to this demand letter).

b) The term "Atmel" refers to Atmel Corporation and to any of its any of its subsidiaries, parents, divisions or affiliates, and to any of Atmel's employees, officers, directors, representatives, agents, attorneys or others acting on behalf of Atmel.

c) The term "Microchip" refers to Microchip Technology Corporation and to any of its any of its subsidiaries, parents, divisions or affiliates, and to any of Microchip's employees, officers, directors, representatives, agents, attorneys or others acting on behalf of Microchip.

d) The term "Document" means and includes any type of written, recorded, electronic, graphic or photographic matter of any kind or character, however produced or reproduced. **The term "Document" includes any electronic communications such as "e-mails."** When an "e-mail" is a responsive document, you are requested to provide a hard-copy printout of any such e-mail.

e) The term "Communication" means the transmittal of information, whether orally or in writing, including electronic communications such as e-mail.

## DOCUMENTS TO BE PROVIDED

Please provide us with copies of:

1. Documents governing the operation the Severance Plan for the years 2015 and 2016.

2. The annual report for the Severance Plan for the years 2015 and 2016.

3. The summary plan description for the Severance Plan.

4. The Severance Plan's annual Financial Report for the years 2015 and 2016.

5. All documents related to the authorization of any person or committee to administer the Severance Plan for the years 2015 and 2016.

6. The Rules and Procedures established by the Plan Administrator for the years 2015 and 2016.

7. A complete copy of the Severance Plan's claim file pertaining to Mandy Schwarz.

8. A complete copy of all other documentation (whether maintained in hard copy or computer medium) pertaining to or referring to Mandy Schwarz's severance benefit claim, whether or not it is deemed to be part of the "claim file".

9. A copy of all internal rules, guidelines, protocols, or other similar criteria which were relied upon to make any decision related Mandy Schwarz's severance benefit benefits.

10. Each document which was submitted, considered, or generated in the course of making all decisions related to Mandy Schwarz's severance benefits, without regard to whether they were relied upon in the decision, including but not limited to the claim manual(s).

11. All documents which constitute a statement of policy or guidance with respect to claim determinations for severance benefit claimants.

12. All documents which reflect any legal opinions obtained related to the subject of whether Mandy Schwarz (or any other Atmel employee) is entitled to severance benefits under the Severance Plan.

**ATMEL PLAN/BERMAN000471**

13. All documents which demonstrate that the Severance Plan's processes and safeguards designed to ensure and to verify that severance benefit claims determinations are made in accordance with the terms of the Severance Plan, and that those terms have been applied consistently with respect to similarly situated claimants.

14. All communications between Atmel and Microchip created between July 1, 2015 and the present which discuss, relate or refer to the Severance Plan.

15. All communications between Atmel and Microchip created between July 1, 2015 and the present which discuss, relate or refer to any potential obligations or liabilities which Microchip may be required to assume or pay for in connection with a potential merger/acquisition between Atmel and Microchip. This includes, but is not limited to, any potential obligations or liabilities with respect to payments to employees who were (or might be) terminated following a merger/acquisition.

16. All communications between Atmel and Microchip created between July 1, 2015 and the present which discuss, relate or refer to the subject of any severance payments or severance benefits which Microchip might be required to assume or pay for in connection with a merger/acquisition between Atmel and Microchip.

17. All documents which were electronically placed by Atmel after January 1, 2015 in a "data room" created for review or use in connection with any potential merger/acquisition involving Atmel, provided that they discuss, relate or refer to the subject of severance or the Severance Plan. This includes any documents placed in a data room by Atmel for possible consideration or review by Microchip, in connection with a potential merger/acquisition between Atmel and Microchip, which discuss, relate or refer to severance or the Severance Plan.

18. All documents which were provided by Atmel to Microchip, or which were shown by Atmel to Microchip, in connection with a potential merger/acquisition between Atmel and Microchip, provided that they discuss, relate or refer to the subject of severance or the Severance Plan.

19. All minutes of any Atmel Board of Director meetings between July 1, 2015 and the present, to the extent that such minutes discuss, relate or refer to a potential merger/acquisition involving Atmel and Microchip, or to the subject of severance.

20. All minutes of any Microchip Board of Director meetings between July 1, 2015 and the present, to the extent that such minutes discuss, relate or refer to a potential merger/acquisition involving Atmel and Microchip, or any liabilities or

> obligations that may arise from such a merger/acquisition, or to the subject of
> severance in connection with Atmel employees.

21. All documents created by Microchip (whether for internal use only or
communicated or shown to any outside entities) which discuss, relate or refer to
the subject of potential severance payments for Atmel employees which
Microchip might be obligated to assume or pay for in connection with a merger
between Atmel and Microchip. This includes, but is not limited to, any forecasts,
estimates, analyses or summaries of how much in severance payments might
potentially be due to Atmel employees who were (or might be) terminated
following a merger.

22. All documents created by Atmel (whether for internal use only or communicated
or shown to any outside entities) which discuss, relate or refer to the subject of
potential severance payments for Atmel employees which Microchip might be
obligated to assume or pay for in connection with a merger between Atmel and
Microchip. This includes, but is not limited to, any forecasts, estimates, analyses
or summaries of how much in severance payments might potentially be due to
Atmel employees who were (or might be) terminated following a merger.

23. All documents created by Atmel in connection with the drafting or creation of the
Severance Plan. This includes, but is not limited to, any documents which
discuss, relate or refer to Atmel's intention or purpose in creating the language of
the Severance Plan.

Please provide us with the requested documents within 30 days of receipt of this
letter. If any documents specified above are withheld, a list of each document being
withheld together with a complete explanation of the basis upon which each document is
being withheld." (Quoting October 5, 2016 letter of Mandy Schwarz to Plan
Administrator).

To the extent that the Plan Administrator responded at all to our Clients' demands for
documents, the Plan Administrator's written response was identical each time (other than
substituting the name of the Client and the date of that Client's demand letter). As an example,
the Plan Administrator responded to Ms. Schwarz' October 5, 2016 demand for documents on
October 18, 2016, in relevant part as follows:

> "Your letter of October 5, 2016, requests that, in the event that the Plan
> Administrator denies your client's claim for benefits, the Plan Administrator
> provides you with an extensive list of documents. As noted above, the Plan has
> yet to make a determination with respect to this claim. Nonetheless, we are
> providing you with the following Responsive Items:

(1)  A letter regarding "Severance Guarantee" dated July 9, 2015;
(2)  A second letter regarding "Severance Guarantee" dated July 9, 2015;
(3)  A third letter regarding "Severance Guarantee" dated July 9, 2015;
(4)  A letter entitled "ADDENDUM TO U.S. SEVERANCE GUARANTEE PROGRAM LETTER" dated July 9, 2015;
(5)  A second letter entitled "ADDENDUM TO U.S. SEVERANCE GUARANTEE PROGRAM LETTER" dated July 9, 2015; and
(6)  A presentation slide entitled "US Severance Guarantee Program Summary".

These documents are responsive to a request under ERISA Section 104(b). Please note that in response to your request for the "annual report for the Severance Plan for the years 2015 and 2016," that neither annual report is currently due. Additionally, in response to your request for the ·Severance Plan's annual Financial Report for the years 2015 and 2016," the Severance Plan is not funded and as such, does not require financial reports.

Should you require further information while the Plan Administrator reviews your client's claim for benefits, please let us know and we will diligently work to respond to your requests. However, we note that many of the document demands set forth in your letter are inappropriate in the context of an ERISA benefit claim. Furthermore, they are enormously broad and burdensome and raise issues related to interests associated with their production, accessibility, and relevance to your client's claim for benefits.

For example, your request No. 19 seeks "[a]11 minutes of any Atmel Board of Director meetings between July 1, 2015 and the present, to the extent such minutes discuss, relate or refer to a potential merger/acquisition involving Atmel and Microchip" while your request No. 20 seeks "[a]ll minutes of any Microchip Board of Director meetings between July 1, 2015 and the present, to the extent that such minutes discuss, relate or refer to a potential merger/acquisition involving Atmel and Microchip." Providing you with all Atmel or Microchip board minutes containing any mention of a merger or acquisition involving Microchip and Atmel would require providing you with documents that are completely irrelevant to your client's claim for benefits and beyond the scope of what is required under ERISA. Thus, we construe your requests to demand only materials relevant to your client's claim for benefits under the Severance Plan.

We believe that you will find that the documents we are providing fulfill your requests. The Plan Administrator will timely inform you of its determination of your client's initial claim for benefits under the Severance Plan. Please let me

**ATMEL PLAN/BERMAN000474**

know if I can provide any further information at this time." (Quoting October 18, 2016 letter from Carly Petrovic to Mandy Schwarz).

Unfortunately, the documents that the Plan Administrator provided in response to our Clients' demand letters did *not* fulfill our requests. We also disagree with your contention that the document demands were "inappropriate in the context of an ERISA benefit claim." The Plan Administrator has access to all of the requested documents. The requested documents, including but not limited to Board minutes and other documents which specifically discuss or refer to the Severance Plan or to potential severance payments or obligations pursuant to the Severance Plan, including communications between Atmel and Microchip concerning the Severance Plan or potential severance payments or obligations in connection with a merger/acquisition or how the Severance Plan should be interpreted, are highly relevant to our Clients' claims. As such, the document demands are appropriate in an ERISA benefit claim, and it is an abuse of discretion if the Plan Administrator did not seek to obtain and consider all of the requested documents. This is especially true now based upon the recent denials that were issued. Indeed, one of the reasons the Plan Administrator purportedly did not previously provide responsive documents was that the claims had not yet been decided; that is obviously no longer the case.

Accordingly, we not only demand a complete copy of the administrative record on which the denial of our Clients' claims was based, but we also reiterate our Clients' prior document demands as set forth in their original claim letters.

Please do not hesitate to contact me if you have any questions.

Very truly yours,

Keith Ehrman

cc:     Michael Rubin, Esq. (via email)
        Kim van Herk, Esq. (via email)
        Mark Kisicki, Esq. (via email)

**ATMEL PLAN/BERMAN000475**

JOHN A. McGUINN
JOHN R. HILLSMAN
CLIFF PALEFSKY
DEREK B. JACOBSON
KEITH A. EHRMAN
ABRAHAM FEINSTEIN-HILLSMAN
SCOTT M. STILLMAN
JEANNETTE A. VACCARO

LAW OFFICES OF

# McGUINN, HILLSMAN & PALEFSKY

A PROFESSIONAL CORPORATION

535 PACIFIC AVENUE

SAN FRANCISCO, CALIFORNIA 94133

TELEPHONE (415) 421-9292

FAX (415) 403-0202

June 9, 2016

## VIA HAND DELIVERY (Atmel Corporation)
## and FEDERAL EXPRESS (Microchip Technology Corporation)

Plan Administrator for
    Atmel Corporation's U.S. Severance Guarantee Benefit Program
c/o Atmel Corporation
1600 Technology Drive
San Jose, CA 95110

Plan Administrator for
    Atmel Corporation's U.S. Severance Guarantee Benefit Program
c/o Microchip Technology Corporation
2355 West Chandler Blvd.
Chandler, AZ 85224-6199

      Re:    *Robin Berman v. Atmel Corporation/Microchip Technology Incorporated*

Dear Plan Administrator:

    This office represents Robin Berman. On May 20, 2016, we served you with a letter demanding that Atmel Corporation ("Atmel") and/or Microchip Technology, Inc. ("Microchip") pay Ms. Berman the full severance benefits to which she is entitled pursuant to the Severance Plan which was provided to Ms. Berman and other Atmel employees in 2015. In our May 20, 2016 letter, we provided you with explanations for why Ms. Berman was owed this severance, and also provided various declarations and documentary evidence in support of Ms. Berman's claim for benefits.

    Enclosed with this letter is yet another piece of supporting evidence which should be considered by you as part of Ms. Berman's claim for benefits. Specifically, we are attaching a Declaration of Peter Schuman, dated June 7, 2016. Mr. Schuman was the Senior Director of Investor Relations at Atmel. As set forth in Mr. Schuman's Declaration, senior finance executives of Microchip (including Microchip's Chief Financial Officer) held two meetings with Atmel's Finance Department employees at Atmel's headquarters on February 29, 2016 to discuss the upcoming acquisition. During these meetings, Microchip's Chief Financial Officer specifically assured the Atmel employees that Microchip would honor the severance agreements which the Atmel employees had received, in the event that those employees were terminated following a Microchip acquisition.

**ATMEL PLAN/BERMAN000476**

We are also enclosing a formal "Confirmation of Attorney Representation" signed by Ms. Berman, in which Ms. Berman has confirmed in writing that the law firms of McGuinn, Hillsman & Palefsky and Altshuler Berzon LLP are authorized to represent her in connection with her claims against Atmel/Microchip, and that those law firms are further authorized to obtain documents on her behalf.

Finally, we have had no response from you regarding the demand for documents which we made in our May 20, 2016 letter pursuant to ERISA. Thus, we again demand that you provide us with copies of the requested documents on or before June 22, 2016.

If you wish to discuss any of these matters, feel free to call Cliff Palefsky or me.

Very truly yours,

Keith Ehrman

Enclosures

cc: Michael Rubin, Esq. (via e-mail w/Enclosures)
    Kim Van Herk, Esq. (via e-mail w/Enclosures)

## DECLARATION OF PETER SCHUMAN

I, Peter Schuman, declare as follows:

In 2015, I was employed by Atmel Corp. ("Atmel") as a Senior Director of Investor Relations. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan I received in July 2015 is attached as Exhibit A. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

In September 2015, I learned that Atmel had entered into an agreement with a company called Dialog Semiconductor ("Dialog") pursuant to which Dialog would acquire Atmel. In December 2015, I heard that Dialog might not be the buyer and that another potential purchaser had emerged. In January 2016, I learned that Microchip Technology, Inc. ("Microchip") was the new potential buyer and that Microchip had made a purchase offer superior to Dialog's. On approximately January 14, 2016, I received a letter from Suzanne Zoumaras, Atmel's Senior Vice President of Global Human Resources. A copy of the January 14, 2016 letter I received from Ms. Zoumaras is attached as Exhibit B. In that letter, Ms. Zoumaras stated that I would be eligible for the severance benefits provided in the July 2015 Severance Plan if I were to be involuntarily terminated following a change in control, regardless of whether the acquisition of Atmel was done by Dialog or Microchip. The January 14, 2016 letter also emphasized that the Severance Plan continued to remain in place.

After Dialog failed to increase its purchase offer, I learned in the last half of January 2016 that Microchip had entered into an agreement with Atmel pursuant to which Microchip would acquire Atmel.

On the morning of February 29, 2016, three senior members of Microchip's finance team visited Atmel's corporate headquarters in San Jose, California, in order to discuss the upcoming acquisition/merger between Atmel and Microchip. These three Microchip individuals were Eric Bjornholt (Microchip's Chief Financial Officer), Nawaz Sharif (Microchip's Vice President of European Finance) and Phil Kagel (Microchip's Director of Finance). At approximately 10:30 a.m., these three Microchip executives met with the senior members of Atmel's Finance team (Director level and above) in the "training room", which was the large meeting room on the ground floor of Atmel's headquarters. There were approximately 12 to 15 Atmel employees at this meeting, including me. During this meeting, which included a question and answer session regarding the upcoming merger between Atmel and Microchip, one of the Atmel employees asked for confirmation that Microchip would be honoring the severance agreements and programs which the Atmel employees had received the previous year. In response, Mr. Bjornholt assured the Atmel employees that, if Microchip acquired Atmel and then terminated Atmel employees, that Microchip would honor the severance agreements which the Atmel employees had received.

1

**ATMEL PLAN/BERMAN000478**

Later on that same morning of February 29, 2016, Mr. Bjornholt, Mr. Sharif and Mr. Kagel held a second meeting with a larger group of Atmel finance employees in the same "training room" at Atmel's headquarters in San Jose. This meeting was attended by all (or almost all) members of the San Jose Atmel finance team, including me. There were approximately 40 to 60 Atmel employees in attendance at this meeting. During this second meeting, which again focused on the upcoming merger between Microchip and Atmel, Mr. Bjornholt again reiterated to the Atmel employees that Microchip would honor the Atmel severance agreements and programs that the Atmel employees had received, if Microchip terminated Atmel employees following the acquisition by Microchip.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June _7_, 2016 at ____Burlingame, California_____,
_____.

Peter Schuman

2

**ATMEL PLAN/BERMAN000479**

**EXHIBIT A**

ATMEL PLAN/BERMAN000480



July 9, 2015

Peter Schuman
Re: Severance Guarantee

Dear Peter,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 50% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** A prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- **COBRA Benefits:** Six (6) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Peter, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,

Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*

Stephen Skaggs
Stephen Skaggs

ADDENDUM TO
U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A.   A Change of Control actually occurs; and
B.   Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000482**

**Payments:** All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

**Additional Matters.** Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

**ATMEL PLAN/BERMAN000483**

EXHIBIT B

ATMEL PLAN/BERMAN000484



January 14, 2016

Peter Schuman

Dear Peter,

We recognize that there continues to be significant speculation regarding the acquisition of the company and understand that this can be distracting and unsettling. As a result, we believe it is important to remind you of the benefits for which you may be eligible in the event that your employment is involuntarily terminated without Cause in connection with a Change of Control of the company, including an acquisition by Dialog or Microchip.

In July 2015, we provided you a letter (the "July Severance Benefits Letter") describing the U.S. Severance Guarantee Benefits for which you are eligible. This U.S. Severance Guarantee Program continues to remain in place. In addition, in September 2015, we informed you that the company's Compensation Committee approved acceleration of unvested non-performance restricted stock units ("RSUs") for our U.S. based Director-level employees under certain conditions. Under that program you will be eligible for 100% acceleration of your unvested RSUs if there is a Change of Control and your employment is involuntarily terminated without Cause during the period beginning three (3) months prior to the Change of Control and ending twelve (12) months following the Change of Control.

The benefits under the U.S. Severance Guarantee Program and the U.S Director-level equity acceleration programs are subject to the terms and conditions of each as approved by the company's Compensation Committee. To receive these benefits you will be required to sign a form of separation and release agreement reasonably acceptable to the company (or its successor). Capitalized terms that are not defined in this letter shall have the meanings set forth in the July Severance Benefits Letter.

Nothing in this letter or the July Severance Benefits Letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the company (or its successor) of the benefits provided by this letter and the July Severance Benefits Letter. You shall remain an at-will employee for all purposes, meaning that you or the company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Peter, we hope these benefits provide reassurance and reflect our appreciation for your contributions to Atmel. And, thank you for your continued focus during these unusual times.

Sincerely,

Suzanne C. Zoumaras
Suzanne Zoumaras
Senior Vice President, Global Human Resources

Confirmation of Attorney
Representation

ATMEL PLAN/BERMAN000486

**CONFIRMATION OF ATTORNEY REPRESENTATION**

I, Robin Berman, hereby confirm that the law firms of McGuinn, Hillsman & Palefsky and Altshuler Berzon LLP are authorized to represent me in connection with my claim for benefits against Atmel Corporation/Microchip Technology, Inc. I also hereby confirm that McGuinn, Hillsman & Palefsky and Altshuler Berzon LLP are authorized to obtain documents on my behalf, including obtaining documents from Atmel Corporation/Microchip Technology, Inc. I also request that future correspondence and communications concerning my claim for benefits be directed by Atmel Corporation/Microchip Technology, Inc. to the law firms of McGuinn, Hillsman & Palefsky and Altshuler Berzon LLP.

Dated: June 8, 2016

Robin Berman

**ATMEL PLAN/BERMAN000487**

LAW OFFICES OF

# McGUINN, HILLSMAN & PALEFSKY

A PROFESSIONAL CORPORATION

535 PACIFIC AVENUE

SAN FRANCISCO, CALIFORNIA 94133

TELEPHONE (415) 421-9292

JOHN A. McGUINN
JOHN R. HILLSMAN
CLIFF PALEFSKY
DEREK B. JACOBSON
KEITH A. EHRMAN
ABRAHAM FEINSTEIN-HILLSMAN
SCOTT M. STILLMAN
JEANNETTE A. VACCARO

FAX (415)403-0202

May 20, 2016

Plan Administrator for
    Atmel Corporation's U.S. Severance Guarantee Benefit Program
c/o Atmel Corporation
1600 Technology Drive
San Jose, CA 95110

Plan Administrator for
    Atmel Corporation's U.S. Severance Guarantee Benefit Program
c/o Microchip Technology Corporation
2355 West Chandler Blvd.
Chandler, AZ 85224-6199

VIA HAND DELIVERY (Atmel Corporation)
and FEDERAL EXPRESS (Microchip Technology Corporation)

Re:     *Robin Berman v. Atmel Corporation/Microchip Technology Incorporated*

Dear Plan Administrator:

This office represents Robin Berman. On July 9, 2015, Atmel Corporation ("Atmel") delivered to Ms. Berman and other employees a letter setting forth its "U.S. Severance Guarantee Benefit Program," along with an Addendum to the letter providing additional details (hereafter collectively "Severance Plan"). Examples of these July 9, 2015 documents are attached as part of Exhibits A-1 through A-5 (Declarations of Robin Berman, Bo Kang, Thong Van Vu, Donna Viera-Castillo and Khashayar Mirfakhraei). The Severance Plan constitutes an ERISA plan created by Atmel for the benefit of its employees.

The terms of the Severance Plan were clearly spelled out: if an "Initial Triggering Event" occurred prior to November 1, 2015, the Severance Plan would remain in effect for 18 months following that triggering event. An Initial Triggering Event occurred if Atmel entered into a definitive agreement (before November 1, 2015) "that will result in a Change of Control of the Company." If a change of control of Atmel occurred and an employee was terminated without "cause" within 18 months of the Initial Triggering Event, the employee would become entitled to benefits under the Severance Plan.

**ATMEL PLAN/BERMAN000488**

On September 19, 2015, an Initial Triggering Event occurred when Atmel entered into a definitive agreement with Dialog Semiconductor PLC ("Dialog"), pursuant to which Dialog would acquire Atmel for stock and cash worth approximately $4.6 billion. Not only did Dialog and Atmel enter into a formal "Agreement and Plan of Merger" ("Merger Agreement"), but the Merger Agreement was announced publicly in press releases; the Merger Agreement was the subject of a Form 8-K filing with the Securities and Exchange Commission in September 2015; and the Merger Agreement was the subject of a Form 425 filing with the SEC in September 2015. Excerpts from these documents are attached hereto as Exhibits B, C and D. The Merger Agreement with Dialog constituted a "definitive agreement that will result in a change of control of [Atmel]" within the meaning of the Severance Plan. Therefore, an Initial Triggering Event within the meaning of the Severance Plan occurred prior to November 1, 2015, thereby extending the Severance Plan for 18 months.

Several months after Atmel entered into its Merger Agreement with Dialog (but before the transaction had closed), Microchip Technology Corporation ("Microchip") approached Atmel and made a more lucrative purchase offer. When Dialog declined to increase its offer, Atmel elected to back out of its Merger Agreement with Dialog. Atmel then entered into a new merger agreement with Microchip on January 19, 2016, pursuant to which Microchip would purchase Atmel. See, Exhibit E.

Beginning in approximately January 2016, the Atmel employees were repeatedly informed by Atmel management--both orally and in writing--that their entitlement to severance benefits under the Severance Plan remained intact and was unaffected by the fact that Microchip might be replacing Dialog as the acquiring company. See Exhibits A-1 through A-5. For example, in a January 14, 2016 letter to numerous Atmel employees, Atmel senior management stated:

> "We recognize that there continues to be significant speculation regarding the acquisition of the company and understand that this can be distracting and unsettling. As a result, we believe it is important to remind you of the benefits for which you may be eligible in the event that your employment is involuntarily terminated without Cause in connection with a Change of Control of the company, including an acquisition by Dialog or Microchip. In July 2015, we provided you a letter (the "July Severance Benefits Letter") describing the U.S. Severance Guarantee Benefits for which you are eligible. The U.S. Severance Guarantee Program continues to be in place....To receive these benefits you will be required to sign a form of separation and release agreement...Nothing in this letter or the July Severance Benefits Letter is intended to...modify...the terms of your at-will

employment, other than the provision by the company (or its
successor) of the benefits provided by this letter and the July
Severance Benefits Letter. "

An example of this January 14, 2016 letter is attached hereto as Exhibit F. See also Exhibit A-4
(Declaration of Viera-Castillo).

Atmel employees were also informed that Microchip was aware of the Severance Plan
and its obligation under the Severance Plan to pay the benefits provided therein in the event
Atmel employees were terminated following an acquisition by Microchip. See Exhibit A-1
(Declaration of Berman). For example, on approximately February 3, 2016, Atmel management
published for its employees a "Frequently Asked Questions" memorandum regarding the
Microchip transaction. That FAQ began with the question, **"What happens to my employment
and compensatory arrangements with Atmel after the closing?"** The FAQ that answers that
question stated: "Microchip has agreed to honor each of your employment and compensatory
contracts (including retention awards and employment, employment continuation, severance,
incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect
prior to the closing of the transaction." See Exhibit G attached hereto. Microchip not only
reviewed the FAQs before they were made available to Atmel employees, but Microchip
participated in drafting the language of the FAQs. See Exhibit A-1 (Declaration of Berman).
Similarly, the Proxy Statement filed with the SEC in February 2016, which contained the Merger
Agreement between Atmel and Microchip, specifically stated: "Microchip has agreed, as of the
Effective Time, to honor and perform all employment or compensatory contracts between Atmel
or any of its subsidiaries, on the one hand, and any Atmel employees, on the other (including all
retention awards and employment, employment compensation, severance, incentive, change in
control and termination contracts disclosed to Microchip and the assumed Atmel equity
awards)." See Exhibit H attached hereto. In sum, the Atmel employees were assured both orally
and in writing that they would receive the benefits of the Severance Plan in connection with the
Microchip acquisition, and that Microchip understood that the Atmel employees were entitled to,
and were expecting to receive, these benefits.

As intended by Atmel senior management, the Atmel employees relied on these repeated
assurances and remained at Atmel from July 2015 through the Microchip acquisition in April
2016. See Exhibit A-1 through A-5. If these assurances had not been given to Atmel employees,
those employees would have looked for other jobs and left Atmel long before Microchip's
acquisition of Atmel. *Id.*

In the months prior to the April 4, 2016 merger closing, as the negotiations between
Atmel and Microchip continued, and as Atmel discussed with and communicated to Microchip
the various severance obligations that would be owed to Atmel employees if Microchip
terminated their employment following a merger, and as Atmel provided relevant company

documents to Microchip showing Microchip's potential obligations and liabilities, Microchip was fully aware of the potential severance payments which would be due to Atmel employees following an acquisition by Microchip. Microchip was also aware that Atmel—*as the drafter and creator of the Severance Plan*—believed that the Severance Plan was intact and that Microchip was legally obligated to pay Atmel employees the severance benefits set forth in the Severance Plan if Microchip terminated Atmel employees following a Microchip acquisition. Microchip was also aware that Atmel had communicated this position to Atmel employees.

On April 4, 2016, Microchip's acquisition of Atmel closed and Atmel became a wholly owned subsidiary of Microchip. This merger transaction constituted a "change of control" within the meaning of the Severance Plan. On April 6, 2016, Ms. Berman's employment was involuntarily terminated without "cause." See Exhibit A-1. Since all three conditions under the Atmel Severance Plan had now occurred--the Initial Triggering Event prior to November 1, 2015; a change of control; and a termination without cause--Ms. Berman is entitled to the benefits provided by the Severance Plan. Thus, Ms. Berman is entitled to 40% of her base salary, a prorated portion of 100% of her annual incentive bonus, and four months of paid COBRA benefits.

However, on April 6, 2016, Ms. Berman and other Atmel employees received a letter from Microchip which indicated that Microchip would only pay either 5 or 6 weeks of salary as severance. See, Exhibits A-1 through A-5. On April 11, 2016, Ms. Berman and other Atmel employees were sent another letter from Microchip which indicated that Microchip would only pay her 50% of the severance benefits due to her under the Severance Plan. See Exhibits A-1 through A-5.

Prior to Microchip sending this April 11, 2016, letter to Ms. Berman and other Atmel employees, Microchip's Chief Executive Officer gave an interview to an electronics industry publication in which he acknowledged that Microchip was aware that Atmel had represented in writing to its employees in January 2016 that the Atmel employees would be eligible for the severance benefits contained in the Severance Plan in connection with an acquisition by Microchip, and that the Severance Plan remained in place, and that this had been confirmed again to the Atmel employees in the February 2016 FAQ's regarding the potential Microchip transaction. See Exhibit I. Thus, despite knowing prior to April 11, 2016 that these representations and assurances had been made by Atmel to its employees, Microchip nevertheless tried to force Ms. Berman and other employees to accept only 50% of the severance benefits due to them under the Severance Plan.

By this letter, we are demanding that Microchip honor its obligations and pay Ms. Berman 100% of the severance benefits due to her under the Severance Plan, i.e., 40% of her base salary, a pro-rated portion of 100% of her annual incentive bonus, and four months of paid COBRA benefits. As contemplated by the Severance Plan, Ms. Berman is prepared to sign an

**ATMEL PLAN/BERMAN000491**

appropriate separation and release agreement upon confirmation that Microchip intends to pay Ms. Berman her *full* severance benefits.

In light of Microchip's April 11, 2016 communication, we demand that Microchip inform us in writing no later than 5:00 p.m. on <u>Monday June 6, 2016</u> whether or not Microchip will pay Ms. Berman all of her Severance Plan benefits. If Microchip's stated position in response to this demand is that Microchip will *not* pay Ms. Berman all of her Severance Plan benefits, Microchip must provide us with an explanation for its position and any documents supporting this position.

Furthermore, if Microchip will *not* pay Ms. Berman all of her Severance Plan benefits, we are writing to obtain copies of documents pursuant to Employee Retirement Income Security Act of 1974, §§ 3(16)(A), 502(c). For purposes of this document demand, the following definitions apply:

a)  The term "Severance Plan" refers to the Atmel "U.S. Severance Guarantee Program" as set forth in a July 9, 2015 letter delivered to Atmel its employees, together with the July 9, 2015 "Addendum to U.S. Severance Guarantee Program Letter". An example of this July 9, 2015 letter and Addendum are attached as Exhibit A to the accompanying Declaration of Robin Berman (Exhibit A-1 to this demand letter).

b)  The term "Atmel" refers to Atmel Corporation and to any of its any of its subsidiaries, parents, divisions or affiliates, and to any of Atmel's employees, officers, directors, representatives, agents, attorneys or others acting on behalf of Atmel.

c)  The term "Microchip" refers to Microchip Technology Corporation and to any of its any of its subsidiaries, parents, divisions or affiliates, and to any of Microchip's employees, officers, directors, representatives, agents, attorneys or others acting on behalf of Microchip.

d)  The term "Document" means and includes any type of written, recorded, electronic, graphic or photographic matter of any kind or character, however produced or reproduced. **The term "Document" includes any electronic communications such as "e-mails."** <u>When an "e-mail" is a responsive document, you are requested to provide a hard-copy printout of any such e-mail.</u>

e)  The term "Communication" means the transmittal of information, whether orally or in writing, including electronic communications such as e-mail.

## DOCUMENTS TO BE PROVIDED

Please provide us with copies of:

1. Documents governing the operation the Severance Plan for the years 2015 and 2016.

2. The annual report for the Severance Plan for the years 2015 and 2016.

3. The summary plan description for the Severance Plan.

4. The Severance Plan's annual Financial Report for the years 2015 and 2016.

5. All documents related to the authorization of any person or committee to administer the Severance Plan for the years 2015 and 2016.

6. The Rules and Procedures established by the Plan Administrator for the years 2015 and 2016.

7. A complete copy of the Severance Plan's claim file pertaining to Robin Berman.

8. A complete copy of all other documentation (whether maintained in hard copy or computer medium) pertaining to or referring to Robin Berman's severance benefit claim, whether or not it is deemed to be part of the "claim file".

9. A copy of all internal rules, guidelines, protocols, or other similar criteria which were relied upon to make any decision related Robin Berman's severance benefit benefits.

10. Each document which was submitted, considered, or generated in the course of making all decisions related to Robin Berman's severance benefits, without regard to whether they were relied upon in the decision, including but not limited to the claim manual(s).

11. All documents which constitute a statement of policy or guidance with respect to claim determinations for severance benefit claimants.

12. All documents which reflect any legal opinions obtained related to the subject of whether Robin Berman (or any other Atmel employee) is entitled to severance benefits under the Severance Plan.

13. All documents which demonstrate that the Severance Plan's processes and safeguards designed to ensure and to verify that severance benefit claims determinations are made in accordance with the terms of the Severance Plan, and that those terms have been applied consistently with respect to similarly situated claimants.

14. All communications between Atmel and Microchip created between July 1, 2015 and the present which discuss, relate or refer to the Severance Plan.

15. All communications between Atmel and Microchip created between July 1, 2015 and the present which discuss, relate or refer to any potential obligations or liabilities which Microchip may be required to assume or pay for in connection with a potential merger/acquisition between Atmel and Microchip. This includes, but is not limited to, any potential obligations or liabilities with respect to payments to employees who were (or might be) terminated following a merger/acquisition.

16. All communications between Atmel and Microchip created between July 1, 2015 and the present which discuss, relate or refer to the subject of any severance payments or severance benefits which Microchip might be required to assume or pay for in connection with a merger/acquisition between Atmel and Microchip.

17. All documents which were electronically placed by Atmel after January 1, 2015 in a "data room" created for review or use in connection with any potential merger/acquisition involving Atmel, provided that they discuss, relate or refer to the subject of severance or the Severance Plan. This includes any documents placed in a data room by Atmel for possible consideration or review by Microchip, in connection with a potential merger/acquisition between Atmel and Microchip, which discuss, relate or refer to severance or the Severance Plan.

18. All documents which were provided by Atmel to Microchip, or which were shown by Atmel to Microchip, in connection with a potential merger/acquisition between Atmel and Microchip, provided that they discuss, relate or refer to the subject of severance or the Severance Plan.

19. All minutes of any Atmel Board of Director meetings between July 1, 2015 and the present, to the extent that such minutes discuss, relate or refer to Microchip; or to a potential merger/acquisition involving Atmel and Microchip; or to the subject of severance.

20. All minutes of any Microchip Board of Director meetings between July 1, 2015 and the present, to the extent that such minutes discuss, relate or refer to Atmel; or to a potential merger/acquisition involving Atmel and Microchip; or to the subject of severance in connection with Atmel employees.

21. All documents created by Microchip (whether for internal use only or communicated or shown to any outside entities) which discuss, relate or refer to the subject of potential severance payments for Atmel employees which Microchip might be obligated to assume or pay for in connection with a merger between Atmel and Microchip. This includes, but is not limited to, any forecasts, estimates, analyses or summaries of how much in severance payments might potentially be due to Atmel employees who were (or might be) terminated following a merger.

22. All documents created by Atmel (whether for internal use only or communicated or shown to any outside entities) which discuss, relate or refer to the subject of potential severance payments for Atmel employees which Microchip might be obligated to assume or pay for in connection with a merger between Atmel and Microchip. This includes, but is not limited to, any forecasts, estimates, analyses or summaries of how much in severance payments might potentially be due to Atmel employees who were (or might be) terminated following a merger.

23. All documents created by Atmel in connection with the drafting or creation of the Severance Plan. This includes, but is not limited to, any documents which discuss, relate or refer to Atmel's intention or purpose in creating the language of the Severance Plan.

If any documents specified above are withheld, a list of each document being withheld together with a complete explanation of the basis upon which each document is being withheld.

Very truly yours,

Cliff Palefsky

Enclosures

cc: Michael Rubin, Esq. (w/Enclosures)

**ATMEL PLAN/BERMAN000495**



Writer's Direct Line: (503) 669-5544
Writer's Direct Facsimile: (503) 669-6055

August 15, 2016

**This document contains important information that you should retain for your records.**

Dear Ms. Berman:

This letter is in reference to your claim for benefits under the Atmel U.S. Severance Guarantee Benefit Program.

Given the integration of the two companies, the Plan Administrator is in the process of obtaining all appropriate documentation relating to your claim and has determined that circumstances require an extension of time to process your claim.

Please note that if your claim for benefits is wholly or partially denied, the Plan Administrator will notify you no later than 180 days after we received your written claim.

If you have any questions, please contact the Plan Administrator at 21015 SE Stark St., Gresham, OR 97030 or carly.petrovic@microchip.com.

Sincerely,

*Carly Petrovic*

Carly Petrovic
Plan Administrator

**Microchip Technology**
21015 SE Stark St. · Gresham, Oregon 97030
Phone (503) 669-5500 · Fax (503) 669-6160

ATMEL PLAN/BERMAN000496

LAW OFFICES OF

JOHN A. McGUINN
JOHN R. HILLSMAN
CLIFF PALEFSKY
DEREK B. JACOBSON
KEITH A. EHRMAN
ABRAHAM FEINSTEIN-HILLSMAN
SCOTT M. STILLMAN
JEANNETTE A. VACCARO

# McGUINN, HILLSMAN & PALEFSKY

A PROFESSIONAL CORPORATION
535 PACIFIC AVENUE
SAN FRANCISCO, CALIFORNIA 94133
TELEPHONE (415) 421-9292

FAX (415) 403-0202

June 9, 2016

**VIA HAND DELIVERY (Atmel Corporation)**
**and FEDERAL EXPRESS (Microchip Technology Corporation)**

Plan Administrator for
    Atmel Corporation's U.S. Severance Guarantee Benefit Program
c/o Atmel Corporation
1600 Technology Drive
San Jose, CA 95110

Plan Administrator for
    Atmel Corporation's U.S. Severance Guarantee Benefit Program
c/o Microchip Technology Corporation
2355 West Chandler Blvd.
Chandler, AZ 85224-6199

      Re:    *Robin Berman v. Atmel Corporation/Microchip Technology Incorporated*

Dear Plan Administrator:

    This office represents Robin Berman. On May 20, 2016, we served you with a letter demanding that Atmel Corporation ("Atmel") and/or Microchip Technology, Inc. ("Microchip") pay Ms. Berman the full severance benefits to which she is entitled pursuant to the Severance Plan which was provided to Ms. Berman and other Atmel employees in 2015. In our May 20, 2016 letter, we provided you with explanations for why Ms. Berman was owed this severance, and also provided various declarations and documentary evidence in support of Ms. Berman's claim for benefits.

    Enclosed with this letter is yet another piece of supporting evidence which should be considered by you as part of Ms. Berman's claim for benefits. Specifically, we are attaching a Declaration of Peter Schuman, dated June 7, 2016. Mr. Schuman was the Senior Director of Investor Relations at Atmel. As set forth in Mr. Schuman's Declaration, senior finance executives of Microchip (including Microchip's Chief Financial Officer) held two meetings with Atmel's Finance Department employees at Atmel's headquarters on February 29, 2016 to discuss the upcoming acquisition. During these meetings, Microchip's Chief Financial Officer specifically assured the Atmel employees that Microchip would honor the severance agreements which the Atmel employees had received, in the event that those employees were terminated following a Microchip acquisition.

**ATMEL PLAN/BERMAN000497**

We are also enclosing a formal "Confirmation of Attorney Representation" signed by Ms. Berman, in which Ms. Berman has confirmed in writing that the law firms of McGuinn, Hillsman & Palefsky and Altshuler Berzon LLP are authorized to represent her in connection with her claims against Atmel/Microchip, and that those law firms are further authorized to obtain documents on her behalf.

Finally, we have had no response from you regarding the demand for documents which we made in our May 20, 2016 letter pursuant to ERISA. Thus, we again demand that you provide us with copies of the requested documents on or before June 22, 2016.

If you wish to discuss any of these matters, feel free to call Cliff Palefsky or me.

Very truly yours,

Keith Ehrman

Enclosures

cc: Michael Rubin, Esq. (via e-mail w/Enclosures)
    Kim Van Herk, Esq. (via e-mail w/Enclosures)

**ATMEL PLAN/BERMAN000498**

Confirmation of Attorney
Representation

**ATMEL PLAN/BERMAN000499**

## CONFIRMATION OF ATTORNEY REPRESENTATION

    I, Robin Berman, hereby confirm that the law firms of McGuinn, Hillsman & Palefsky and

Altshuler Berzon LLP are authorized to represent me in connection with my claim for benefits against

Atmel Corporation/Microchip Technology, Inc.  I also hereby confirm that McGuinn, Hillsman & Palefsky

and Altshuler Berzon LLP are authorized to obtain documents on my behalf, including obtaining

documents from Atmel Corporation/Microchip Technology, Inc.  I also request that future

correspondence and communications concerning my claim for benefits be directed by Atmel

Corporation/Microchip Technology, Inc. to the law firms of McGuinn, Hillsman & Palefsky and Altshuler

Berzon LLP.


Dated:  June 8, 2016

_____

Robin Berman

EXHIBIT A-1

ATMEL PLAN/BERMAN000501

## DECLARATION OF ROBIN BERMAN

I, Robin Berman, declare as follows:

In 2015, I was employed by Atmel as a Creative Director. In July 2015, I and other Atmel employees received a letter setting forth Atmel's "U.S. Severance Guarantee Benefit Program", along with an Addendum to the letter providing additional details about the severance program (hereafter collectively "Severance Plan"). A copy of the Severance Plan documents that I received in July 2015 is attached hereto as Exhibit A. The Severance Plan provided for certain severance benefits if Atmel was acquired and I was subsequently terminated.

In September 2015, I learned that Atmel had entered into an agreement with a company called Dialog Semiconductor pursuant to which Dialog would acquire Atmel. In December 2015, I heard that another company had made an offer to purchase Atmel and that a decision would be made in January. The rumor among employees was that the new company was Microchip. I and many other employees thought this would be bad for Atmel and for the future of many Atmel employees.

In mid-January 2016, I learned that Microchip had made a superior offer to that of Dialog. My superior, Sander Arts (the Vice President of Corporate Marketing), assured me and other employees that we should not look elsewhere for a job outside of Atmel, since the Severance Plan was in place and so we had financial protection in the event that Microchip terminated us.

On approximately January 20, 2016, Steve Laub (the Chief Executive Officer of Atmel) held an informal all hands meeting. During this meeting, Laub discussed the Microchip offer, and indicated to the employees that the Severance Plan was still in place.

In February 2016, I discussed with Sander Arts the fact that I and others had not started looking for new jobs in light of the Severance Plan. Arts again assured me that the Severance Plan was intact and so I would have financial protection for many months if Microchip terminated me. I had an almost identical discussion with Arts again in March 2016.

On approximately April 6, 2016, I and many other Atmel employees received a letter informing us that we were being terminated effective immediately. These letters indicated that Microchip would only pay 5 weeks of salary as severance. A copy of the April 6, 2016 termination letter I received is attached hereto as Exhibit B. As I was being escorted out of the lobby on April 6th, I had a discussion with Ravi Bali (a Manager of Human Resources). Bali made it clear that he was shocked that Microchip was not honoring the Severance Plan, and he also indicated that it was a complete surprise to the remaining Atmel Human Resources team that Microchip was not paying the severance.

On approximately April 11, 2016, I and the other Atmel employees who were terminated received a new letter, which indicated that Microchip would pay us 50% of the severance benefits due under the Severance Plan. A copy of the April 11, 2016 letter I received is attached hereto as Exhibit C.

Based on my discussions with other Atmel employees prior to the closing of the acquisition in April 2016, it was my understanding that Atmel had made Microchip aware of the existence of the Severance Plan prior to April 2016, and that Atmel had also made Microchip aware of the fact that Atmel believed that the Severance Plan was still in place following Microchip's agreement to purchase

1

**ATMEL PLAN/BERMAN000502**

Atmel in January 2016 and that the Severance Plan would require Microchip to pay severance benefits if Microchip acquired Atmel and then terminated Atmel employees. Based on my discussions with other Atmel employees prior to the closing of the acquisition in April 2016, Microchip had knowledge of, and had been involved in the drafting of, the language of the February 2016 "Frequently Asked Questions" that were published for Atmel employees to address questions regarding the Microchip acquisition.

On approximately May 11, 2016, I had a conversation with Sander Arts, in which Arts confirmed that prior to the Microchip acquisition, he had conveyed to his whole team that the Severance Plan was intact even with Microchip becoming the purchaser. Arts also confirmed that, prior to the April acquisition by Microchip, Laub had told all of his direct reports (including Arts) that the Severance Plan was still intact.

I relied on the Severance Plan and the assurances I had received from Atmel managers in deciding to stay with Atmel through the Microchip acquisition. I would have left Atmel and found another job long before the Microchip acquisition if I had known that Microchip was not going to pay me the severance benefits under the Severance Plan.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on May 18, 2016 at Palo Alto, California.

_Robin S. Berman_

_____

Robin Berman

2

ATMEL PLAN/BERMAN000503



EXHIBIT A to A-1

**ATMEL PLAN/BERMAN000504**



July 9, 2015

Robin Berman
Re: Severance Guarantee

Dear Robin,

Our employees are the lifeblood of our company and we value and appreciate all you do for Atmel. We recognize that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling. To support our employees and to keep everyone focused on our continued success, we are pleased to share with you the terms of a recently approved U.S. Severance Guarantee Benefit program that is intended to ease concerns among our employees. Under this program, you will have the opportunity to receive benefits as described below if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control. These benefits (collectively, the "Severance Guarantee Benefits") include:

- **Cash Severance:** 40% of base salary (based on your base rate of pay in effect on the date the Change of Control transaction closes); and
- **Target Incentive:** If you are eligible, a prorated annual MIP or SIP, whichever you are eligible for at the time of termination; the proration will be based a determination of your MIP or SIP at the time of termination, as determined by the Company; and
- **COBRA Benefits:** Four (4) months' of COBRA benefits paid for by the Company

All Severance Guarantee Benefits are subject to the terms and conditions in the Addendum attached to this letter. To receive any benefits, you will be required to sign a form of separation and release agreement reasonably acceptable to the Company (or its successor) if a transaction occurs (the "Release").

Nothing in this letter is intended to, or shall, contradict, modify or alter the terms of your at-will employment, other than the provision by the Company (or its successor) of the Severance Guarantee Benefits provided by this letter. You shall remain an at-will employee for all purposes, meaning that you or the Company (or its successor) may terminate your employment at any time for any reason or for no reason, with or without Cause, and with or without notice.

Robin, we are pleased to be able to provide you with these Severance Guarantee Benefits and hope they convey our recognition and appreciation of your contributions to Atmel. Thank you for your continued contributions to our success.

Sincerely,


Suzanne Zoumaras
Senior Vice President, Global Human Resources

*Attachment*




Sander Arts
Robin Berman

**ATMEL PLAN/BERMAN000505**

ADDENDUM TO
U.S. SEVERANCE GUARANTEE PROGRAM LETTER
July 9, 2015

**Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.

**Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.

**Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.

**Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

A.  A Change of Control actually occurs; and
B.  Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.

For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

**Severance Guarantee Benefits:** If the Benefits Conditions described above have been satisfied, and you are entitled to Severance Guarantee Benefits under the U.S. Severance Guarantee Program, you will receive the benefits as described in the Severance Guarantee letter provided to you dated July 9, 2015.

**Terminations Not Subject to Program:** If your employment is terminated at any time before or after an Initial Triggering Event has occurred as a result of your voluntary resignation, death, disability or termination for Cause, you will not be eligible to receive any Severance Guarantee Benefits. As discussed above, the U.S. Severance Guarantee Program is a "double trigger" plan, meaning that no benefits are available under this Program unless there is both a Change of Control that occurs and your employment is terminated without Cause.

**Release of Claims (the "Release"):** Receipt of any Severance Guarantee Benefits will be subject to your executing a separation and release agreement in a form reasonably acceptable to the Company or its successor (the "Release"). If you do not timely provide the Release, you will forfeit the right to any Severance Guarantee Benefits. If any portion of the Severance Guarantee Benefits is scheduled to be paid prior to the date the Release is effective, that portion will, instead, accrue and be paid as soon as administratively practicable following the Release effective date.

**Coordination of Benefits:** If you are or become eligible for statutory severance benefits, such as but not limited to WARN notice pay, you will receive the greater of those statutory benefits or the Severance Guarantee Benefits, but not both (and without duplication).

**ATMEL PLAN/BERMAN000506**

**Payments:** All Severance Guarantee Benefit payments will be made as soon as administratively practicable as determined by the Company, but in no case more than ninety (90) days following the date of termination, and will be subject to all applicable tax withholdings and other payroll deductions. The Severance Guarantee Benefit payments are intended to be exempt from application of Section 409A of the Code, and any ambiguities herein shall be interpreted accordingly.

**Additional Matters.** Any successor to the Company will assume the obligations under the Program. For all purposes under the Program, the term "Company" will include any successor to the Company's business and/or assets which becomes bound by the terms of the Program by operation of law, or otherwise. The Company will withhold from any severance benefits all federal, state, local and other taxes required to be withheld therefrom and any other required payroll deductions. The Program will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith. The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Company's Board of Directors. The provisions of the Program will be construed, administered and enforced in accordance with the internal substantive laws of the State of California (with the exception of its conflict of laws provisions).

ATMEL PLAN/BERMAN000507