OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C., SBN 00504800
Mark G. Kisicki (CA SBN 150057)
mark.kisicki@ogletreedeakins.com
Elizabeth M. Soveranez (AZ SBN 024009) admitted *pro hac vice*
elizabeth.soveranez@ogletreedeakins.com
2415 E. Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: 602.778.3700
Fax: 602.778.3750

Mark Schmidtke (IN SBN 1733-45) admitted *pro hac vice*
mark.schmidtke@ogletreedeakins.com
56 S. Washington Street, Suite 302
Valparaiso, IN 46383
Telephone: 219.242.8668
Fax: 219.242.8669

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBIN BERMAN, BO KANG, KHASHAYAR MIRFAKHRAEI, THANG VAN VU, DONNA VIERA-CASTILLO, GIRISH RAMESH, PATRICK HANLEY, ILANA SHTERNSHAIN and MANDY SCHWARZ,<br><br>Plaintiff,<br><br>v.<br><br>MICROCHIP TECHNOLOGY INCORPORATED, a corporation; ATMEL CORPORATION, a corporation; and ATMEL CORPORATION U.S. SEVERANCE GUARANTEE BENEFIT PROGRAM, an employee benefit plan,<br><br>Defendants. | No. 4:17-CV-01864-HSG<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: October 7, 2021<br>Time: 2:00 p.m.<br>Courtroom: 2, Floor 4<br>Judge: Honorable Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 2

I.      BACKGROUND FACTS ............................................................................................ 3

        A.     The Atmel Plan ................................................................................................. 2

        B.     Procedural History ......................................................................................... 10

II.     LEGAL ARGUMENT ............................................................................................... 12

        A.     The Benefits Claims and Appeals Determinations Must be Reviewed
               and Upheld under a Deferential Arbitrary and Capricious Standard ................... 13

               1.     The Plan Administrator's Claims and Appeals Determinations Are
                      Entitled to Deference under an Arbitrary and Capricious Standard ......... 13

                      a.     The Plan Conferred Discretion on the Plan Administrator .......... 13

                      b.     Petrovic Had Authority to Decide the Claims Appeal ................. 15

                      c.     There Was No Pre-Merger Binding Interpretation by a
                             Fiduciary that Limited the Plan Administrator's Discretion ........ 16

               2.     The Administrator Denied Plaintiffs' Claims based on a Reasonable
                      Interpretation of the Plan .......................................................................... 18

               3.     The Plan Administrator's Decision was Not Influenced by a
                      Conflict of Interest .................................................................................... 19

        B.     Under a De Novo Review, Disputed Facts Preclude Summary Judgment ........... 23

III.    CONCLUSION .......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abatie v. Alta Health & Life Ins. Co.*,
  458 F.3d 955 (2006) ...............................................................................................13, 14, 20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ......................................................................................................12, 13

*Anderson v. Unum Life Ins. Co. of Am.*,
  414 F. Supp. 2d 1079 (M.D. Ala. 2018).............................................................................16

*Berman et. al v. Microchip et. al*,
  No. 19-17339 (9th Cir. April 24, 2020)..............................................................................12

*Bernstein v. Travelers Ins. Co.*,
  2006 WL 2567875 (N.D. Cal. Sept. 5, 2006)......................................................................13

*Bogue v. Ampex Corp.*,
  976 F.2d 1319 (9th Cir. 1992) ............................................................................................13

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................................12

*Conkright v. Frommert*,
  559 U.S. 506 (2010) ............................................................................................................18

*Curtiss-Wright Corp. v. Schoonejongen*,
  514 U.S. 73 (1995) ..............................................................................................................17

*Day v. AT&T Disability Plan*,
  698 F.3d 1091 (9th Cir. 2012) ............................................................................................13

*Dunner v. Univ. of S. Cal. Long Term Disability Plan*,
  770 F. Supp. 2d 1054 (C.D. Cal. 2011)..............................................................................22

*Firestone Tire and Rubber Co. v. Bruch*,
  489 U.S. 101 (1989) ......................................................................................................13, 14

*Graham v. Hartford Life & Acc. Ins. Co.*,
  No. 03-CV-0144-CVE-TLW, 2009 WL 702813 (N.D. Okla. Mar. 13, 2009)............................14

*Jacobson v. U.S. Dep't of Homeland Sec.*,
  882 F.3d 878 (9th Cir. 2018) ..............................................................................................12

*Kearney v. Standard Ins. Co.*,
  175 F.3d 1084 (9th Cir. 1999) (en banc) ............................................................................16

ii

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 4:17-CV-01864-HSG

*Martinez v. Beverly Hills Hotel*,
    695 F. Supp. 2d 1085 (C.D. Cal. 2010) ........................................................20

*McDaniel v. Chevron Corp.*,
    203 F.3d 1099 (9th Cir. 2000) ........................................................12, 14

*Metro. Life Ins. Co. v. Glenn*,
    554 U.S. 105 (2008) ........................................................19, 20

*Moyle v. Liberty Mut. Ret. Ben. Plan*,
    823 F.3d 948 (9th Cir. 2016) ........................................................14, 18, 21

*Pengilly v. Guardian Life Ins. Co. of Am.*,
    81 F. Supp. 2d 1010 (N.D. Cal. 2000) ........................................................19

*Sandy v. Reliance Standard Life Ins. Co.*,
    222 F.3d 1202 (9th Cir. 2000) ........................................................14

*Stephan v. Unum Life Ins. Co. of Am.*,
    697 F.3d 917 (9th Cir. 2012) ........................................................14, 20

*Tapley v. Locals 302 & 612 of the Int'l Union of Operating Eng'rs Ret. Plan*,
    728 F.3d 1134 (9th Cir. 2013) ........................................................13

**Statutes**

29 C.F.R. §2509.75-8 ........................................................16

29 U.S.C. §1002(16)(A) ........................................................15

29 U.S.C. §1002(21)(A) ........................................................16

29 U.S.C. § 1102(b)(2) ........................................................16

29 U.S.C. § 1105(c)(1) ........................................................16

29 U.S.C. §1132(a)(1)(b) ........................................................11

Employee Retirement Income Security Act of 1974 ("ERISA") ............................................ *passim*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

As the Court opined early in this case, "notwithstanding Plaintiffs' assertion that the provisions of the Atmel Plan are unambiguous, [] reasonable minds could disagree" as to whether the definitive agreement the Plan required to be signed by November 15, 2015 had to be one that *will* result in a change in control (CIC), or merely one that *might*. The Ninth Circuit agreed the Plan was ambiguous on this point, concluding that both sides proffered reasonable interpretations. The plan administrator denied Plaintiffs' benefits claims based on one of those reasonable interpretations. Because the plan administrator exercised her discretion by applying a reasonable interpretation of the Atmel Plan, her decisions are entitled to deference. While Plaintiffs present evidence to try to explain why they had a different reasonable interpretation of the plan, that evidence is irrelevant under a deferential standard of review, and it cannot be used to overturn the administrator's reasonable interpretation. ERISA imposes a significant burden on participants seeking to avoid deferential review, and the evidence and arguments Plaintiffs present of the administrator's purported conflict of interest and technical mistakes fail to satisfy that burden. Accordingly, the Court should deny Plaintiffs' motion, defer to the administrator's decisions and grant Defendants' cross-motion on Plaintiffs' benefits claims under ERISA §502(a)(1)(B).

If a *de novo* standard were appropriate, Defendants have presented substantial evidence showing disputed material facts, precluding summary judgment. Plaintiffs urge the Court to disregard Defendants' evidence, arguing that review should be limited to the administrative record. However, that would require the Court to also disregard the Ninth Circuit's decision which concluded that, because the plan is ambiguous, Defendants were entitled to conduct the discovery that Plaintiffs now seek to exclude. The Court also would have to disregard Plaintiffs' numerous representations to the Court that such evidence *is* relevant and Defendants had to produce it in discovery. Plaintiffs' newfound commitment to the administrative record is a transparent attempt to preclude the Court from considering Defendants' substantial evidence that devastates the narrative that Plaintiffs have spun since filing the complaint. That narrative, rooted in their 33-page complaint based on patently false statements, twisted truths, and misleading facts in an attempt to suggest Defendants were being "dishonorable" [*See* Dkt. 131, at 20:12-22.]

Defendants finally have the opportunity to provide the evidence that gives the Court a full perspective, and which proves that Plaintiffs' narrative is a misguided work of fiction. A primary example of Plaintiffs' false narrative is the cornerstone of their argument that Atmel had interpreted the Atmel Plan as applying to the Microchip acquisition – and that interpretation was therefore binding on the plan administrator after the acquisition. Plaintiffs base that argument on a January 14, 2016 letter they represented was sent "to employees," but failed to inform the Court that it wasn't sent to or even seen by any of the Plaintiffs. Understandably, Plaintiffs want the Court to disregard Defendants' evidence that shows the letter was only sent to Director-level employees, and while it noted that the Atmel Plan was still in effect (which was true as the Dialog definitive agreement was still in effect), it was intended *merely* to communicate to directors about an equity acceleration program previously adopted, but not communicated in writing. Defendants' evidence proves the letter was not an exercise of Atmel's fiduciary authority to interpret the Atmel Plan.

Indeed, if Atmel had exercised its fiduciary authority to interpret the Atmel Plan as applying to the Microchip acquisition, that interpretation would have applied to all plan beneficiaries and necessarily would have been shared with them – and with Microchip. Neither happened. Rather than sharing the supposed "interpretation" with all plan beneficiaries, Defendants' evidence shows that the Director-level Equity Letter was marked "personal and confidential" to ensure it was not discussed or disclosed to other employees, and explains why Plaintiffs never saw it.

The extra-record evidence Plaintiffs vigorously pursued in discovery – only now to argue is irrelevant – also shows that *immediately* after signing the definitive agreement with Microchip on January 19, 2016, Atmel's CEO, Steve Laub, held a meeting with all Atmel employees and informed them that the Atmel Plan was no longer a guarantee with the Microchip merger. Employees understandably concluded the Plan did not apply to Microchip, and Atmel never had any official communication to them that said otherwise. While Plaintiffs contend that Atmel's then-VP of Global Human Resources, Suzy Zoumaras, instructed her HR team to tell anyone who asked that they were protected under the Atmel Plan, that claim is belied by employees' repeated communications with HR representatives in which no such response was given.

Plaintiffs also claim they received assurances from their supervisors and managers that the

Atmel Plan remained in effect, or that they were protected in a Microchip acquisition. But none of those statements were made by a person to whom the Company had given written fiduciary authority to interpret the Atmel Plan, and that is what the Plan expressly required. Plaintiffs also ignore the fact that other managers and supervisors told their employees that the Plan did not apply to the Microchip acquisition, and that it was "not worth the paper it was written on." After the Court reviews all the evidence, it will be clear that Defendants are entitled to summary judgment because the plan administrator's decisions are entitled to deference because they were based on a reasonable interpretation of the Atmel Plan. In the event the Court concludes *de novo* review is appropriate, then disputed material facts require the matter to proceed to trial.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      <u>BACKGROUND FACTS</u>**

**A.      <u>The Atmel Plan</u>**

The terms of the July 1, 2015 U.S. Severance Guarantee Benefit Program (the "Atmel Plan" or "Plan") provide that benefits would become available only if "the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, *that will result* in a Change of Control of the Company." [Dkt. 157, at 1029 (emphasis added)].[1] The Atmel Plan required the Company's Board of Directors and/or the Compensation Committee to approve any "Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program." [*Id.* at 1030.] The Plan also unambiguously granted discretion to the "Company" to administer and interpret the Plan:

> The [Plan] will be administered and interpreted by the Company. Any decision made or other action taken by the Company prior to a Change in Control with respect to the Program, and any interpretation by the Company prior to a Change in Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and will be given the maximum possible deference allowed by law. Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any terms or conditions of the Program, or any related document that (i) does not affect the benefits payable under the Program *shall <u>not</u> be subject to review unless found to be arbitrary and capricious* or (ii) does affect the benefits payable under the Program *shall <u>not</u> be subject to review*

---

[1] While Plaintiffs claim the Atmel Plan was adopted "to encourage Atmel employees to continue working despite uncertainties about the company's future" [Dkt. 145, at 3], the July 9, 2015 cover letter that accompanied the two-page Atmel Plan only states that the severance benefits were "[t]o support our employees and to keep everyone focused on our continued success," [Dkt. 157, at 1031].

*unless found to be unreasonable and not to have been made in good faith.*

[*Id.* (emphases added)].

Atmel entered into a definitive agreement with Dialog Semiconductor ("Dialog") on September 19, 2015. [Dkt. 1, at ¶ 27.] After November 1, 2015, Microchip engaged in merger discussions with Atmel.

On December 18, 2015, during a period when Dialog had an opportunity to increase its bid, an Atmel VP, Mike Fogerty, sent an email to the VP of Global HR, Suzy Zoumaras, and Atmel's CEO, Steve Laub, copying Atmel's Sr. VP and Chief Legal Officer, Scott Wornow. Fogerty stated he had received "a number of questions" about the Initial Triggering Event language requiring "a Definitive Agreement before November 1, 2015 that will result in a Change of Control of the Company" in terms of whether "the potential second suitor, who's [sic] bid came in after this date, would nullify the protection." [Declaration of Elizabeth M. Soverazez, attached as Exhibit 1, at Ex. A.] Wornow responded that "we need to recheck the precise working to see if it requires clarification in new resolutions for a Microchip deal (we will probably do so anyway just to make sure)." [*Id.*]

Wornow directed two senior in-house attorneys to obtain and review the Plan, and evaluate whether it needed to be clarified if it were to apply to a potential Microchip merger. Atmel's Senior Corporate and M&A Counsel, Greg Kerber, circulated the Plan with an email stating that it "is vague on Mike's questions and should probably be reconfirmed." [Ex. 1, at Ex. B.] Atmel's VP and Associate General Counsel, Steven Ruskin, also sent an email stating "We should clarify this." [Ex. 1, at Ex. C.] Wornow responded, "Probably covered, but not worth the angst. We should also ensure all Plans and Programs do not have any unintended glitches." [*Id.*] Atmel's outside benefits counsel, Wendy Davis, replied: "If we end up walking down the road with M rather than D, and if it won't stir up too much trouble with the board or comp cmte, we might ask them to adopt a clarifying resolution that the cash/COBRA severance benefit program is still in effect and the M deal triggers it. I share your concern about the other party reading the program more aggressively as required the same party to be the Initial Triggering Event and the ultimate CIC event." [*Id.*] Wornow responded: "We should dot all the "I"s when we get to it in a subtle way and not revisit the entirety of the matter on all the programs or accelerations issues." [*Id.*]

On January 7, 2016, while Dialog's definitive agreement was still in place, Zoumaras sent Wornow and Ruskin an email, with the subject (she identified) as, "US Director Equity Letter Template - for your review". Zoumaras's email attached a draft letter and stated that she, Laub and Atmel's then-CFO, Steve Skaggs, had concluded that "we should get out to our US Directors a formal communications regarding their eligibility for equity acceleration under the plan that was approved and verbally communicated in August/Sept." [Ex. 1, at Ex. D.] In response, Wornow expressed concern about they "are having major issues with M on these types of issues and I would be very uncomfortable uploading any 'Plan,' new or old, at this point into the data room" and "I do not want Microchip to have the impression we are adding to our plans or introducing new employees, which we said we would not do." [*Id.*] Zoumaras responded that they simply "wanted to provide a letter to the US Directors confirming their eligibility for equity acceleration because we only communicated this verbally (in Sept)" and they agreed to send Director-level employees a "casual letter" confirming the equity acceleration as outlined in a PowerPoint slide already uploaded to the data room. [*Id.*]

In contemporaneous internal communications, Wornow stated that Microchip was "ok with clarifying the termination date for certain severance benefits plans, but want[ed] to be specific about the Plans" and listed the following plan titles provided by outside counsel: 1) Atmel Corporation Designated Vice President Change of Control and Severance Plan; 2) Atmel Corporation Non-U.S. Vice President Change of Control and Severance Plan; and 3) Atmel Corporation U.S. Director Change of Control and Severance Plan. [Ex. 1, at Ex. E.] Kerber responded:

> I'm not quite following, but the plan titles Jones Day provided don't look right to me.
>
> Below are the plan titles I'm aware of (I'm attaching the relevant documents from the data room for back-up):
>
> 1. Amended and Restated Senior Executive Change of Control and Severance Plan
>
> 2. Designated Vice President Change of Control and Severance Plan
>
> 3. U.S. Severance Guarantee Benefit Program
>
> 4. Designated US-Based Director Equity Acceleration Plan (name of the plan appendix to the U.S. director equity plan letter I understand Suzy was working on with Steve)
>
> We might now be calling 3 and 4 the "U.S. Director Change of Control and Severance Plan", but technically *these programs were announced at different times.*

[*Id.* (emphasis added).]

On January 14, 2016, Zoumaras sent the Director-level Equity Letter only to Director-level employees. While that letter stated that the Atmel Plan "continues to remain in place" [Dkt. 157, at 421], that was true at that time: the Dialog definitive agreement was in effect so the Atmel Plan, likewise, was in effect. [Dkt. 1, at ¶¶ 33, 35.] That letter to Directors also recognized that the Atmel Plan benefits (as well as the Director-level equity acceleration benefits) "are subject to the terms and conditions of each as approved by the company's Compensation Committee." [Dkt. 157, at 421.] The letter was not distributed to anyone other than director-level employees, and it was labeled "Personal and Confidential" so it is understandable that no Plaintiff ever saw it (or received it).

A few days after the Director-level Equity Letter was distributed to that small group of employees, Dialog declined to increase the price it would offer. So Atmel terminated its definitive agreement with Dialog, and entered into a new definitive agreement with Microchip on January 19, 2016 – months after the November 1, 2015 deadline. [Dkt. 1, at ¶ 35.]

The following day, Laub conducted an all-employee meeting with Atmel employees, some participating both in person and others remotely from around the world. [Declaration of Jim Lutinski, attached as Exhibit 2, at ¶ 6.] When asked whether the severance program would still apply now that Microchip was going to acquire the company, Laub responded by stating it was no longer guaranteed. Declaration of Dan Harfert, attached as Exhibit 3, at ¶¶ 8-10.] Employees were surprised by Laub's statement, which they expressed in conversations immediately after the meeting, and which continued for the next few weeks. [Ex. 2, at ¶ 13; Ex. 3, at ¶ 10.] In one of those group conversations, an employee said that he had gone back and carefully read the Atmel Plan after Laub's statement, and saw the issue was that Microchip definitive agreement did not constitute an "initial triggering event." [Ex. 3, at ¶ 10.] Another employee responded: "that's the problem – it's the dates." [*Id.*]

Given Laub's statement and the concerns employees had been expressing to their managers and each other as a result of Laub's statement, some managers attempted to get clarification from HR and their managers about Laub's comments. A manager at one of Atmel's largest U.S. locations wrote to HR and Senior HR, pointing out that he and the "majority" of other employees ("at least here in CSO") "took that comment to mean that now that this is no longer a Dialog deal, that previous

guarantee no longer applies. If this is not the correct interpretation, I strongly recommend communicating this!" [Ex. 3, at ¶ 11; Declaration of Wade Guinn, attached as Exhibit 4, at ¶ 21.] Other employees and managers in various Atmel locations expressed similar concerns to their HR reps and managers. Some made those requests repeatedly. [Ex. 1, at Ex. U.] But no one in HR or management responded to correct what Laub had said or to say that the Plan applied to the Microchip acquisition. [Ex. 3, at ¶¶ 11-12.] After the all-employee meeting with Laub, and without further communication from Atmel about the Plan, employee productivity plummeted, presumably because they knew the Atmel Plan was no longer a guarantee. [*Id.* at ¶¶ 13-14.]

Following Laub's announcement in the all-hands meeting, another manager, Wade Guinn, received an email from HR asking him to provide a copy of the Atmel Plan to an employee who had not previously received it. [Ex. 4, at Ex. 1.] Guinn had already concluded that, based on the Atmel Plan's terms the Plan would not apply to Microchip's acquisition because its definitive agreement with Atmel was not signed by the November 2015 deadline. [*Id.* at ¶¶ 8-10.] Consequently, Guinn responded to the HR representative, copying his own manager, Scott Hensley, and another, more senior HR representative, asking, "Are we not changing the effective dates . . . [including] November 2015." [*Id.* at Ex. 1.] On February 2, 2016, Guinn sent another email letter to the same recipients, asking if they had an update, and also asking, "Are we all going to receive updated CoC letters to reflect the new dates?" [*Id.*] Hensley quickly replied to all recipients but addressed his comments to the senior HR representative, advising that during a staff meeting his boss had conducted the prior week, "someone from HR" stated that new letters were coming, but that his boss had since advised that no such letters would be coming, and asking why not – and that HR should communicate with the employees to share that explanation. [*Id.*]

Guinn immediately responded to all three recipients, but addressed his email to the senior HR representative, stating "If revisions are not made the previous CoC letter is not valid given that it terminated in Nov 15, correct??" Guinn also echoed Hensley's concerns, stating that "I feel an explanation as to the mechanics that make the original document valid need to be clearly detailed to the field." [*Id.*] The senior HR responded that same day. Although his response was two weeks after the Microchip-Atmel definitive agreement, the senior HR rep did not state that the Atmel Plan did

apply, or explain how the Atmel Plan could apply despite the November 2015 definitive agreement deadline. Rather, he responded: "Trying to get answers & clarification." [*Id.* at ¶ 16 and Ex. 1.] The following day, February 3, 2016, Atmel distributed the FAQs about the Microchip acquisition to all employees. [*Id.* at ¶ 17.] Because Guinn had not received any confirmation that the Plan did apply, he sent another email to the group, but adding his manager's boss, VP Mike Fogerty, asking the senior HR representative if he had any clarification. He also pointed out that, "the FAQ that were sent yesterday did not answer the question regarding the dates. Please let me know as I know many are concerned." [*Id.* at ¶ 18 and Ex. 1.]

Guinn did not receive any further response to the emails from HR, his manager or his VP (Fogerty). No Atmel representative ever told Guinn that his interpretation of the Atmel Plan was incorrect or that the Atmel Plan would apply to the Microchip merger. [*Id.* at ¶ 19.] Guinn stopped inquiring about it, concluded that Atmel shared his interpretation that the Plan did not apply to Microchip, and told his subordinates that they should not expect to receive benefits under the Atmel Plan because it "wasn't worth the paper it was written on." [*Id.* at ¶ 20.]

Although Guinn's manager, Hensley, provided no further information about the Atmel Plan, he did share that Atmel provided him and other director-level employees a letter about severance benefits to which they, but not lower-level managers and employees, would be entitled regardless of who acquired Atmel. Hensley did not share any further information and, given their daily communications over the last several years, he recognized that Hensley was uncomfortable sharing any further information with him. [*Id.* at ¶ 10.]

Despite knowing what Laub had said, and that many Atmel employees did not believe the Atmel Plan applied to the Microchip acquisition, Atmel never issued any official verbal or written communication to all employees to confirm that the Atmel Plan still applied.  And the only representation Microchip made to Atmel employees before the merger was the specific statement in the FAQs, that: "Microchip has agreed that after the transaction closes, it will honor each employment or compensatory contract (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) entered into between you and Atmel, or its subsidiaries that are in effect immediately prior to the closing of the transaction." [Dkt.

155, at 388 (emphasis added).]

Atmel had started drafting that single set of FAQs [Ex. 1, at Exs. G, and on January 20, 2016 its outside counsel provided a revised draft that included the following as one FAQ answer: "Microchip has agreed that after the transaction closes, it will honor each employment or compensatory contract (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) entered into between you and Atmel, or its subsidiaries *that are in effect immediately prior to the closing of the transaction*." [Ex. 1, at Ex. H (emphasis added).]

That same day, Zoumaras sent an email to Laub and Wornow stating she planned to draft a communication to "all US employees confirming that the Severance Guarantee remains effective and that as part of the Microchip merger agreement, compensation benefits (in aggregate) will be guaranteed through 12/31." [*Id.* at Ex. I.] On January 22, 2016, Zoumaras circulated to those executives her draft communication in the form of a Q&A, which she intended to deliver to all U.S. employees once finalized. The Q&A included a statement that "Microchip has agreed to honor each employment or compensatory contract (including retention awards severance, *including the US Severance Guarantee Benefits*, incentives and change of control agreements) you have with Atmel, or its subsidiaries, after the transaction closes." [*Id.* at Ex. J (emphasis added).] Wornow responded that they were already preparing a list of FAQs with outside counsel's assistance and directed Zoumaras to use those draft FAQs for any further communications to employees. [*Id.* at Ex. K.] Zoumaras' draft Q&A communication was never sent to any Atmel employees.

Instead, Zoumaras attempted to add a specific statement in the FAQs that "Microchip has agreed to honor each of your employment or compensatory contracts (including retention awards, *US Severance Guarantee Benefits*, incidents and change of control agreements) with Atmel …. [*Id.* at Ex. L (emphasis added).] Wornow responded: "THIS ANSWER SHOULD TRACK LANGAUGE [sic] IN THE AGREEMENT." [*Id.* at Ex. M.] Accordingly, Atmel revised the draft FAQs to again state that "Microchip has agreed to honor each of your employment and compensatory contracts (including retention awards and employment, employment continuation, severance, incentive and change in control agreements) with Atmel, or its subsidiaries, that are in effect immediately prior to

1   the closing of the transaction" and provided that draft to Microchip. [*Id.* at Ex. N.] Microchip did not

2   revise the FAQ or answer about severance.  [*Id.* at Ex. O.] The final FAQs of February 3, 2016 did

3   not identify the Atmel Plan or define which severance benefits "are in effect immediately prior to

4   the closing of the transaction." [Dkt. 155, at 387-88.]

5          The merger between Atmel and Microchip closed on April 4, 2016. [Dkt. 1, at ¶ 4.] After

6   Plaintiffs started demanding benefits under the Atmel Plan, Steve Sanghi, Microchip's CEO and now

7   an Atmel Board member, presented a resolution to the Atmel Board on June 20, 2021. The primary

8   purpose of the resolution was to designate Carly Petrovic, Human Resource Manager for Microchip,

9   as plan administrator of the Atmel Plan, and to delegate to Petrovic all of Atmel's authority and

10  responsibility over the Plan, including full discretionary authority to interpret the terms of the Plan,

11  as well as all other authority previously vested in Atmel. [Declaration of Steve Sanghi, attached as

12  Exhibit 5, at ¶ 3.] The Atmel Board unanimously adopted the resolution without modification and

13  executed it. [Ex. 1, at Ex. Q.]

14         The plan administrator later denied Plaintiffs' claims under the Atmel Plan, stating that the

15  Dialog agreement did not result in a change of control and any agreements entered into after the

16  November 1, 2015 deadline could not qualify as an "Initial Triggering Event" under the Atmel Plan.

17  [Dkt. 1, at ¶ 67.] Plaintiffs appealed the denials of benefits, which the plan administrator confirmed

18  for the same reasons. [Dkt. 1, at ¶ 69.]

19         **B.**     **Procedural History**

20         Defendants filed a Motion to Dismiss arguing, in part, that Plaintiffs had not alleged that the

21  Atmel Plan was ambiguous.[2] [Dkt. 9, at 6, 17.] While that motion was pending, the parties did not

22  engage in discovery beyond exchanging initial disclosures. In its order granting that motion in part

23  and denying it in part, the Court stated that, "notwithstanding Plaintiffs' assertion that the provisions

24  of the Atmel Plan are unambiguous, [] reasonable parties could disagree as to whether the Plan

25  required the Initial Triggering Event and the Change of Control to involve the same merger partner."

26  [Dkt. 35, at 23.]

27  _____

28  [2] While Defendants recognize that a party may plead inconsistent theories in the alternative under
    ERISA (even though the party is still barred from ultimately recovering under both theories), a party
    must still comply with Rule 8's pleading requirements to pursue a specific claim or theory.

Following the Court's ruling on Defendants' Motion to Dismiss, Plaintiffs served discovery, which ultimately led to a discovery hearing before the magistrate judge. Plaintiffs argued:

> Plaintiffs' second cause of action is a straightforward ERISA claim under 29 U.S.C. §1132(a)(1)(b) for the recovery of benefits due under an ERISA severance plan. Nothing in this statute limits the beneficiaries' recovery to those circumstances where the plan's language is "plain". ***Indeed, entitlement to recovery under this provision of ERISA frequently requires construction of the plan based on established principles of contract interpretation***. . . . Another basis for prevailing under §1132(a)(1)(b) is that, even if the Court were to find the Plan language "***ambiguous***," the Plan Administrator should have construed the Plan language to require the payment of those benefits, given the Plan's purposes and the circumstances of its drafting, the parties' pre-merger positions and statements and conduct, Atmel's unequivocal pre-merger interpretation of the Plan language, and other relevant indicia of the parties' intent. . . .
>
> Judge Gilliam stated in his Order that the Court might find the Plan language ambiguous, in which case ***the Court would need to apply the applicable principles of contract construction to determine whether Plaintiffs are entitled to Plan benefits***. Order at 23 (Berman), at 22 (Schuman). Yet Microchip insists that Plaintiffs may not obtain any ***discovery pertaining to the criteria for contract construction, such as the pre-merger statements and conduct of the parties, and communications, advice, actions, or knowledge by Atmel and Microchip regarding the Plan's meaning or employees' potential entitlement to Plan benefits***. . . .
>
> ***Evidence about how Atmel interpreted the Plan before the April 4, 2016 Merger (including its communications to its employees and to Microchip) is also relevant*** because the Plan expressly states that any interpretation or decision made by Atmel as to the Plan's language and meaning prior to a merger is binding and conclusive…. But Plaintiffs do not possess all documents created by Atmel that show how Atmel interpreted the Plan, only whatever documents Atmel happened to share with them during their employment. . . .

[Dkt. 43, at 4-6 (emphases added).]

The magistrate judge determined that, because "the applicable standard of review has not yet been resolved by the presiding court, Plaintiffs are entitled to discovery at this time on the alleged ambiguity in the relevant plan terms." [Dkt. 53, at 2 ("Discovery Order").] Although Plaintiffs did *not* allege ambiguity of any plan terms, Defendants engaged in extensive e-discovery efforts to comply with the Discovery Order and respond to Plaintiffs' discovery requests, as well as serving discovery requests related to the additional areas of discovery permitted under the Discovery Order and requesting dates to depose Plaintiffs.[3] Just a few weeks later, Plaintiffs filed a premature motion

---

[3] While Plaintiffs gratuitously claim that Defendants have taken more discovery than "could possibly affect this motion," including deposing the Plaintiffs and "many others" as if to suggest Defendants engaged in overbroad discovery [Dkt. 14 at 25], Defendants *only* noticed the Plaintiffs' depositions – it was the Plaintiffs who noticed all of the other depositions as identified above.

1   for partial summary judgment while Defendants' discovery requests were still pending. After filing

2   their motion, Plaintiffs also noticed several depositions. On March 22, 2019, the Court issued its

3   order granting Plaintiffs' motion and denying Defendants' Rule 56(d) Motion. [*Id.* at 13.]

4          Defendants appealed the Court's order on several grounds, including Plaintiffs' benefits and

5   breach of fiduciary duty claims and Defendants' Rule 56(d) motion. Brief of Defendants-Appellants,

6   *Berman et. al v. Microchip et. al*, No. 19-17339 (9th Cir. April 24, 2020). Contrary to what they

7   argued to the magistrate judge during the discovery dispute, Plaintiffs responded in the Ninth Circuit

8   that, even if the Atmel Plan were ambiguous, "Microchip had no right in this ERISA action to pursue

9   discovery outside the administrative record to defend its Plan Administrator's denial-of-benefits

10  decisions." Ans. Brief of Plaintiffs-Appellees at 7 (9th Cir. July 27, 2020).

11         The Ninth Circuit ultimately held that "the relevant language in the Atmel Plan is ambiguous.

12  Specifically, the phrase 'that will result' is ambiguous because it does not "exclud[e] all alternative

13  readings as unreasonable," *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000), and

14  the ambiguity is not eliminated by reading the phrase in the context of the Plan as a whole. As the

15  district court stated in its order resolving the defendants' motion to dismiss, 'reasonable parties could

16  disagree as to whether the [Atmel] Plan required the Initial Triggering Event and the Change of

17  Control to involve the same merger partner.'" [Dkt. 133, at 2.] The Ninth Circuit further held that,

18  "[b]ecause the language of the Atmel Plan is ambiguous, the district court abused its discretion in

19  denying defendants' motion for discovery under Rule 56(d) of the Federal Rules of Civil Procedure.

20  *See Jacobson v. U.S. Dep't of Homeland Sec.*, 882 F.3d 878, 883–84 (9th Cir. 2018)." [*Id.*] Plaintiffs

21  filed a petition for panel rehearing, arguing again that judicial review was limited to the plan language

22  and Petition for Panel Rehearing of Plaintiffs-Appellees (9th Cir. March 16, 2021). Just one week

23  later, the Ninth Circuit panel voted unanimously to deny Plaintiffs' Petition. [Dkt. 134.]

24  **II.   LEGAL ARGUMENT**

25         A party moving for summary judgment must show there are no genuine, triable issues of

26  material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v.

27  Catrett*, 477 U.S. 317, 327 (1986). A dispute about a material fact is genuine "if the evidence is such

28  that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

12

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 4:17-CV-01864-HSG

1    *Inc.*, 477 U.S. 242, 248 (1986). All inferences drawn from the facts must be viewed in the light most

2    favorable to the nonmoving party, *Bernstein v. Travelers Ins. Co.*, 2006 WL 2567875, *2 (N.D. Cal.

3    Sept. 5, 2006) (internal citation omitted).

4          Additionally, an alleged conflict of interest in an ERISA case cannot be disposed of on

5    summary judgment if it requires "something akin to a credibility determination" in light of the

6    "particulars of a conflict of interest, along with all the other facts and circumstances, to determine

7    whether an abuse of discretion has occurred." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955,

8    969 (2006). Rather, a bench trial "would ensure the full bias inquiry necessary to determine what

9    weight to give the conflict." *Anderson*, 477 U.S. at 249-50 (internal citation and quotations omitted).

10       **A.**    **The Benefits Claims and Appeals Determinations Must be Reviewed and Upheld under a Deferential Arbitrary and Capricious Standard.**

11

12           **1.**    **The Plan Administrator's Claims and Appeals Determinations Are Entitled to Deference under an Arbitrary and Capricious Standard.**

13               **a.**    *The Plan Conferred Discretion on the Plan Administrator.*

14   "Under the deferential abuse of discretion standard of review, the plan administrator's

15   interpretation of the plan will not be disturbed if reasonable." *Day v. AT&T Disability Plan*, 698 F.3d

16   1091, 1096 (9th Cir. 2012) (internal quotation marks omitted); *Firestone Tire and Rubber Co. v.*

17   *Bruch*, 489 U.S. 101, 111 (1989) (same); *Tapley v. Locals 302 & 612 of the Int'l Union of Operating*

18   *Eng'rs Ret. Plan*, 728 F.3d 1134, 1139-1140 (9th Cir. 2013) (plan language interpretation is entitled

19   to a high level of deference and will not be disturbed unless it is not grounded on any reasonable

20   basis and it conflicts with other plan language).

21         Discretion means "the power or right to decide or act according to one's own judgment."

22   *Abatie,* 458 F.3d at 965. Therefore, "when a plan includes even one important discretionary element,

23   and the power to apply that element is unambiguously retained by its administrator," a court "may

24   not second-guess the exercise of that discretion." *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1325 (9th

25   Cir. 1992) (granting authority to evaluate and determine facts invoked "a judgmental function" that

26   was "sufficient evidence of a grant of discretionary authority"). Under these circumstances, a court

27   may "reverse the exercise of such discretion only when it has been abused." *Id.*

28         The Atmel Plan provided that, following "a Change of Control, any decision made or other

action taken by the Company, and any interpretation by the Company of any terms or conditions of the Program, or any related document that (i) does not affect the benefits payable under the Program *shall __not__ be subject to review unless found to be arbitrary and capricious* or (ii) does affect the benefits payable under the Program *shall __not__ be subject to review unless found to be unreasonable and not to have been made in good faith*." [Dkt. 59, at 19 (emphases added).] That language incorporates virtually verbatim the arbitrary and capricious review standard applied by the United States Supreme Court and the Ninth Circuit to ERISA plan interpretations. *See, e.g.*, *Firestone*, 489 U.S. at 111 ("A trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable."); *Moyle v. Liberty Mut. Ret. Ben. Pla*n, 823 F.3d 948, 957-58 (9th Cir. 2016) (no abuse of discretion when denial of benefits is based upon a "reasonable interpretation" of the plan's terms and made in "good faith:); *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (noting a "plan administrator's decision will not be disturbed if reasonable") (internal citation and quotation omitted); *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1113 (9th Cir. 2000) (even when construing ambiguous plan terms, a "plan administrator's decision to deny benefits must be upheld under the abuse of discretion standard if it is based upon a reasonable interpretation of the plan's terms and if it was made in good faith").

While Plaintiffs contend that, because the Atmel Plan used different wording to convey discretion pre-merger, that somehow renders the Atmel Plan ambiguous and dilutes the plan administrator's post-merger authority [Dkt. 145, at 14-16], that argument fails. As this Court has long recognized, "there are no 'magic' words that conjure up discretion on the part of the plan administrator." *Abatie*, 458 F.3d at 963 (citing *Sandy v. Reliance Standard Life Ins. Co.*, 222 F.3d 1202, 1207 (9th Cir. 2000)). Nor are there different levels of discretionary review. Further, Plaintiffs proffer no authority mandating that multiple discretionary grants within a single plan document must use identical language. *See, e.g.*, *Graham v. Hartford Life & Acc. Ins. Co.*, No. 03-CV-0144-CVE-TLW, 2009 WL 702813, at *1 (N.D. Okla. Mar. 13, 2009) (noting "[t]he Hartford reserves the right to determine if your proof of loss is satisfactory" under the plan and also "has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy"), *aff'd*, 589 F.3d 1345 (10th Cir. 2009). Rather, as noted above, the

post-merger interpretation language incorporates virtually verbatim the arbitrary and capricious review standard that grants a plan administrator deferential authority.

### b. *Petrovic Had Authority to Decide the Claims Appeals.*

Prior to the Atmel-Microchip merger, Atmel was the plan administrator. ERISA defines the plan administrator as "the person specifically so designated by the terms of the instrument under which the plan is operated [or], if an administrator is not so designated, the plan sponsor." 29 U.S.C. §1002(16)(A). The "plan sponsor" is "the employer in the case of an employee benefit plan established or maintained by a single employer." Id. at §1002(16)(B). The Atmel Plan did not specifically designate the plan administrator so Atmel was both plan sponsor and administrator.

The Plan authorized the Company to delegate its authority to "one or more officers of the Company." Specifically, the Plan stated as follows:

> The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Board of Directors.

[Atmel Plan] There is no evidence that Atmel delegated its authority as plan administrator to any officer of the Company prior to the merger, in writing or otherwise.

It was only after the merger that the Company exercised its authority to delegate plan administrator responsibilities. By board resolution dated June 20, 2016, the Atmel board expressly designated Carly Petrovic as "the Plan Administrator of the Atmel Severance Plan." [Ex. 1, at Ex. P.] This was the one and only time the Company utilized its Plan-granted discretion to appoint Petrovic to exercise the Company's plan administrator authority. In doing so, it was the intent of the Company to delegate the full extent of the Company's authority under the Atmel Plan, including the discretionary authority to interpret the terms of the Atmel Plan. [Ex. 5, at ¶ 3.]

The Company's delegation of discretionary authority to Petrovic as plan administrator is consistent with the overall authority of an ERISA plan administrator. The U.S. Department of Labor has recognized that plan administrators have a unique position with respect to an ERISA plan. Plan administrators are one of only two possible positions that are, by their very title, deemed fiduciary

positions with inherent discretionary authority to control overall administration of the benefit plan:

> Q: Does a person automatically become a fiduciary with respect to a plan by reason of holding certain positions in the administration of such plan?

> A: Some offices or positions of an employee benefit plan by their very nature require persons to who hold them to perform one or more of the functions described in [29 U.S.C. §1002(21)(A)] of the Act. For example, a plan administrator or trustee of a plan must, by the very nature of his position, have 'discretionary authority or discretionary responsibility in the administration' of the plan within the meaning of section [1002(21)(A)(iii)] of the Act. Person who hold such positions will therefore be fiduciaries.

29 C.F.R. §2509.75-8 (FAQ D-3). Moreover, the same regulations provide that every benefit plan must have a plan administrator, even if it also has other fiduciaries with overlapping authority:

> Q: How many fiduciaries must an employee benefit plan have?

> A: There is no required number of fiduciaries that a plan must have. Each plan must, of course, have at least one named fiduciary who serves as the plan administrator and, if plan assets are held in trust, the plan must have at least one trustee.

*Id.* at FAQ FR-12. In other words, the plan administrator is the person or entity with overall authority for operating and administering the benefit plan. Petrovic was expressly delegated that authority.

> ### c. There Was No Pre-Merger Binding Interpretation by a Fiduciary that Limited the Plan Administrator's Discretion.

Plaintiffs have failed to provide any evidence of a binding, pre-merger interpretation by a plan fiduciary with discretionary authority. *See, e.g.*, *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999) (en banc), *cert. denied*, 528 U.S. 964 (1999) (party asserting deferential review has the burden to show that it applies); *accord Anderson v. Unum Life Ins. Co. of Am.*, 414 F. Supp. 2d 1079, 1096 (M.D. Ala. 2018) ("An authorized party is one who has received a proper delegation of powers"). For fiduciary responsibility to be delegated, the plan must "describe any procedure under the plan for allocation of responsibilities for the operation and administration of the plan (including any procedure described in [29 U.S.C. § 1105(c)(1)]." 29 U.S.C. § 1102(b)(2). Section 1105(c)(1) states that the "instrument under which the plan is maintained may expressly provide for procedures . . . for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities . . . under the plan."

The Atmel Plan did include a provision permitting the Company to "in its sole discretion and

1    on such terms and conditions as it may provide, delegate *in writing* to one or more officers of the

2    Company all or any portion of its authority or responsibility with respect to [the Plan]." [Dkt. 157,

3    at 1030 (emphasis added.] While Plaintiffs claim the January 14, 2016 Director-level Equity Letter

4    and random alleged verbal statements by executives constituted binding pre-merger statements [Dkt.

5    145, at 5], they fail to proffer any evidence of a written delegation of authority to these individuals,

6    discretionary or otherwise, to interpret the Atmel Plan. In contrast, the Atmel Board of Directors did

7    later expressly comply with the Atmel Plan's delegation procedures by adopting the June 20, 2016

8    resolution appointing Petrovic as the plan administrator.

9          Nor have Plaintiffs alleged that these individuals were acting on behalf of the "Company" as

10   the term is used in the Atmel Plan. Determining whether particular individuals were authorized to

11   act on behalf of the Company is a "fact-intensive inquiry, under applicable corporate law principles,"

12   for which the Plaintiffs have no evidence. *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 84-

13   85 (1995). Plaintiffs provide no authority for their position that various alleged statements made

14   outside the context of a formal benefit claim – and in various contexts to various people at various

15   times – rise to the level of an official discretionary exercise of plan interpretive authority.

16         The Director-level Equity Letter on which Plaintiffs primarily rely does not even say what

17   Plaintiffs want it to say. The letter did not apply to any of the Plaintiffs. It was a confidential letter

18   aimed at confirming the separate, Director-level equity acceleration program, and was sent to only a

19   few, high-level employees to remind them of the benefits that they "*may* be eligible for." [Dkt. 157,

20   at 421.] While that letter stated that the Atmel Plan "continues to remain in place," that was true at

21   that point in time: the Dialog definitive agreement was the only one in place. If Dialog had increased

22   its offer, the Atmel Plan would have applied to a change of control resulting from Dialog's September

23   19, 2015 definitive agreement. Furthermore, the letter recognized that the Atmel Plan benefits (and

24   the Director-level equity acceleration benefits) "are subject to the terms and conditions of each as

25   approved by the company's Compensation Committee." [Dkt. 157, at 1030.] The Atmel Plan

26   required the approval of the Company's Board of Directors and/or the Compensation Committee for

27   any "Program amendment or termination or any other action that could reasonably be expected to

28   increase significantly the cost of the Program" [Dkt. 59, at 19], which Plaintiffs do not contend ever

17

1    happened.

2          Notwithstanding the fact that these executives lacked authority to bind the Atmel Plan, a

3    plan administrator has freedom to revise its interpretation and to correct a prior plan interpretation,

4    even if the prior interpretation is deemed unreasonable. *See Conkright v. Frommert*, 559 U.S. 506,

5    509 (2010). In *Conkright*, the administrator applied an interpretation of a pension plan that was later

6    determined to be unreasonable. The administrator then applied a different interpretation of the same

7    plan language that was also challenged. The district and appellate courts both ruled that the

8    fiduciary's revised interpretation was no longer entitled to deference, the fiduciary having lost its

9    discretionary authority once it made the incorrect interpretation. The Supreme Court reversed,

10   holding that the "one strike and you're out" approach did not apply and that the fiduciary was also

11   entitled to deference with respect to its revised interpretation. *Id.* at 512.

12         Similarly, here, Plaintiffs claim that the plan administrator applied a different interpretation

13   than they contend was applied pre-merger. Under *Conkright*, a plan administrator has the authority,

14   if not the duty, to apply what she views as the correct interpretation of the Atmel Plan. This was

15   especially true when the alleged pre-merger statements were contrary to what the administrator

16   determined was the plain and unambiguous language of the Atmel Plan and there is no evidence that

17   the alleged interpretations were made by plan fiduciaries who had the requisite authority to make

18   such interpretations. Moreover, information produced in discovery and discussed above shows that

19   there were significant statements by Atmel executives (all the way up to CEO Laub) that the Atmel

20   Plan would not apply to the Microchip merger. So under Plaintiffs' theory, to whose pre-merger

21   interpretation is the Court supposed to defer? The interpretation that the Atmel Plan applied to the

22   Microchip merger or the interpretation that it did not apply? At a minimum, this creates a disputed

23   issue of material fact, destroying the basis for Plaintiffs' Motion.

24              **2.    The Administrator Denied Plaintiffs' Claims based on a Reasonable**
                        **Interpretation of the Plan.**
25

26         In reviewing the administrator's determination, the court does not determine "whose

27   interpretation of the plan documents is most persuasive," but whether the administrator's

28   interpretation "is unreasonable." *Moyle*, 826 F.3d at 959 (it was "not unreasonable" to exclude certain

service time from benefits accrual); *Pengilly v. Guardian Life Ins. Co. of Am.*, 81 F. Supp. 2d 1010, 1020 (N.D. Cal. 2000) (where both claimant's and administrator's interpretations are both "reasonable," the court will defer to the administrator's interpretation).

The plan administrator determined that the Plan terms required that the definitive agreement entered into prior to November 1, 2015 must be the same definitive agreement that results in a post-November 1, 2015 change of control. As the Ninth Circuit recognized, that is a perfectly rational reading of the Atmel Plan. Accordingly, the administrator's determination that the Atmel Plan's severance benefits did not apply to the Microchip merger must be affirmed.[4]

Plaintiff's argument that the Plan Administrator's interpretation is not consistent with the purpose of the Plan is simply wrong. The purpose of the Plan was to allow benefits for a pre-November 1, 2015 definitive agreement that itself resulted in a change of control, period. The Plan Administrator's interpretation is perfectly consistent with that purpose. While Plaintiffs now claim the pre-merger language was to "prevent[] any successor company from later depriving Atmel's employees of the severance benefits that Atmel intended those employees to receive in exchange for their loyalty" [Dkt. 145, at 4-5], there is no record evidence to support that argument. Even if Plaintiffs are offering an alternative reasonable interpretation that supports their position, under the applicable arbitrary and capricious standard, the Plan Administrator's interpretation must be upheld.

### 3.   The Plan Administrator's Decision was Not Influenced by a Conflict of Interest.

Where a plan administrator has a conflict of interest, a court may take it into account as a factor in determining whether the administrator's decision is arbitrary and capricious. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). Nevertheless, "a deferential standard of review remains appropriate even in the face of a conflict." *Id.* Furthermore, the weight of the conflict as a factor depends on the circumstances. *Glenn,* 554 U.S. at 117 (conflict weight may vary, even to the

---

[4] Contrary to Plaintiffs' current (and new) argument, the Atmel Plan does not say that it applies as long as the terms of the definitive agreement provide that, upon closing, Atmel will experience a Change of Control – indeed, that is adding "an extra-contractual eligibility condition that is nowhere found in the Plan's language." [Dkt. 145, at 26.] Further, there is nothing in the administrative record (or even anything produced in discovery) establishing that the Dialog definitive agreement's terms provided that Atmel "will experience a Change in Control" at closing.

vanishing point); *Abatie*, 458 F.3d at 965. If a court finds a conflict of interest should be given more than minimal weight, the conflict creates an issue of material triable fact requiring discovery and summary judgment is not appropriate. *Stephan*, 697 F.3d at 930 (stating a bench trial "would ensure the full bias inquiry necessary to determine what weight to give the conflict of interest"); *see also Abatie*, 458 F.3d at 969 (recommending a "careful, case-by-case approach" for the court to make the requisite "credibility determination" in light of the "particulars of a conflict of interest, along with all the other facts and circumstances, to determine whether an abuse of discretion has occurred").

Plaintiffs have failed to establish any evidence, much less undisputed evidence, that the plan administrator's decision was affected by a conflict of interest.[5] The mere fact that Petrovic worked in the HR department fails to establish evidence of a personal conflict of interest.[6] To the contrary, Petrovic's undisputed deposition testimony establishes that she: 1) was the HR Manager responsible for Microchip's Gresham, Oregon facility, which was not involved with the merger; 2) had no personal involvement in the Atmel merger and did not have HR responsibility for any Atmel employees after the merger; 3) had no involvement in the April 2016 severance and release agreements or any communications to Atmel employees about whether the Atmel Plan had expired; 4) was just returning from a 3½ month maternity leave when she was appointed as the plan administrator on June 20, 2016; 5) had no knowledge of the Atmel Plan or the dispute about whether it applied to the Microchip merger until she reviewed the benefits claims as the plan administrator; 6) never spoke with Sanghi or anyone else at Microchip about whether Microchip believed the Atmel Plan had expired or how to decide the claims or appeals; and 7) had no personal financial interest in

---

[5] While there is a structural conflict of interest present with all self-funded plans like the Atmel Plan, that is typically not the type of conflict, in and of itself, that would overcome a plan administrator's reasonable interpretation. *See, e.g.*, *Glenn*, 554 U.S. at 117 (noting a structural conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits"); *Martinez v. Beverly Hills Hotel*, 695 F. Supp. 2d 1085, 1102 (C.D. Cal. 2010) ("Here, there is no evidence of malice, self-dealing, or parsimonious claims-granting. Thus, the structural conflict is less significant than it would be if such evidence had been presented.").

[6] While Plaintiffs attempt to rely on their own multi-page declarations concerning purported pre-merger statements made by non-fiduciaries of the Atmel Plan to support this argument, none of their declarations ever mention Petrovic. [Dkt. 145, at 18.]

---

20

the outcome of the decision. [Ex. 1, at Ex. R.] Consistent with this evidence, Sanghi testified that Petrovic was the HR manager at Microchip's plant in Oregon; Atmel had no employees in Oregon; Petrovic was not involved in any Atmel merger diligence activities; and, thus, "[s]he seemed to be the most neutral and qualified person to be appointed." [Ex. 1, at Ex. Q at 102.] Merely holding a certain position with the company, without any personal knowledge of or involvement in the disputed communications about an ERISA benefit, does not constitute a personal conflict of interest. *See Moyle*, 823 F.3d at 957-59 (director of HR who approved the final denial of benefits was also a member of the board involved in drafting plan documents; while beneficiaries claimed plan administrators "were essentially relying on their own communications when deciding to deny [the beneficiaries'] claims," the court held review remained abuse of discretion absent information the director of HR compared the actuarial soundness of the plan for purposes of her review and the beneficiaries could not show she "was motivated by the self-interest of the fiduciary when she denied" the beneficiaries claims.)

Without any supportive authority, Plaintiffs contend that Petrovic committed a "procedural irregularity" by serving as the decision-maker for both their claims and appeals. [Dkt. 145, at 16.] Nothing in ERISA prohibits severance plan administrators from deciding both claims and appeals. To the extent this is Plaintiffs' attempt to argue that the June 2016 board resolution allowed only Sue Flores, and not Petrovic, to decide claim appeals, their argument is disingenuous. Based on the discovery Plaintiffs sought and received, they are well aware that, before Plaintiffs filed their claims for benefits under the Atmel Plan, Flores was actively involved in terminations of Atmel employees and in drafting communications stating that the Atmel Plan did not apply to them. [Ex. 1, at Ex. T.] In fact, Plaintiffs specifically questioned Sanghi about this issue in his deposition. [Ex. 1, at Ex. Q at 104-05.] Had the Plan moved forward and assigned Plaintiffs' appeals to Flores, Plaintiffs would have argued that Flores was biased, she had pre-determined the result of their appeals through her earlier communications about the Atmel Plan, and the appeal decisions were rife with conflict. To avoid this potential conflict, it only made sense for Petrovic to decide the appeals as the only person who was delegated full plan administrator authority under the Atmel Plan.

While Plaintiffs contend that Petrovic failed to adequately "investigate" their claims and

21

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 4:17-CV-01864-HSG

appeals [Dkt. 145, at 18], they fail to specify what she should have investigated and the information purportedly lacking from her analysis. There was no dispute as to when various company agreements, employee terminations, or the merger with Microchip occurred. The lack of factual disputes made Petrovic's job as Plan Administrator solely one of interpreting and applying the Atmel Plan. Plaintiffs do not cite any case law – nor are Defendants aware of any – standing for the proposition that a plan administrator needs to conduct an investigation into plan intent. Furthermore, while Plaintiffs contend that Petrovic delayed while failing to review their evidence or address it in her denials, that is a gross mischaracterization of her deposition testimony. As she explained without contradiction, she still needed the time to review the over two thousand pages of documents submitted in total between the nine claims following her return from maternity leave. [Ex. 1, at Ex. R at 45-46.] The fact that she determined the Atmel Plan required the Change of Control to result from a Definitive Agreement signed by the November 1, 2015 deadline does not mean she did not review their evidence or explain the reasoning behind her denials.

Ultimately, Plaintiffs' allegations of procedural defects amount to nothing more than Plaintiffs disagreeing with the Plan Administrator's determination, which cannot establish a breach of fiduciary duty claim.[7] The fact that Plaintiffs continue to insist the "Atmel Plan as a whole" supports reversal "under either standard of review" [Dkt. 145, at 19], wholly disregards the Ninth Circuit's clear ruling that "the ambiguity is not eliminated by reading the phrase in the context of the plan as a whole" [Dkt. 133, at 2] and only emphasizes their unreasonable willingness to continue pursuing an approach that has already been rejected.

**B.    Under a *De Novo* Review, Disputed Facts Preclude Summary Judgment.**

As courts have noted, "each provision of a plan should be interpreted consistent with the entire document, and only if a plan is ambiguous, should a court 'examine extrinsic evidence to determine the intent of the parties.'" *Dunner v. Univ. of S. Cal. Long Term Disability Plan*, 770 F. Supp. 2d 1054, 1061–62 (C.D. Cal. 2011) (quoting *Gilliam*, 488 F.3d at 1194 (internal citations omitted)). While Plaintiffs now argue discovery outside the administrative record is only appropriate

---

[7] Plaintiffs have already litigated and lost their right to "monetary compensation" for a loss resulting from any alleged breach of fiduciary claim. [Dkt. 112.]

1   when the beneficiary wants to introduce it, [Dkt. 145, at 19 n. 4], that simply is not true. If that were

2   the case, Defendants would have been barred as a matter of law from presenting any evidence outside

3   of the administrative record and the Ninth Circuit would not have ruled that it was error to deny

4   Defendants' Rule 56(d) motion. Even after Plaintiffs reiterated this argument in their petition for

5   panel rehearing, the Ninth Circuit unanimously voted to deny their request a *second* time.

6        Furthermore, Plaintiffs are talking out of both sides of their mouths. It was Plaintiffs who

7   first sought extensive discovery, asserting their position that they were entitled to discovery outside

8   of the administrative record, including: 1) "discovery pertaining to the criteria for contract

9   construction, such as the pre-merger statements and conduct of the parties, and communications,

10  advice, actions, or knowledge by Atmel and Microchip regarding the Plan's meaning or employees'

11  potential entitlement to Plan benefits" because the MTD order indicating "the Court might find the

12  Plan language ambiguous, in which case the Court would need to apply the applicable principles of

13  contract construction to determine whether Plaintiffs are entitled to Plan benefits"; 2) "[e]vidence

14  about how Atmel interpreted the Plan before the April 4, 2016 Merger (including its communications

15  to its employees and to Microchip) is also relevant because the Plan expressly states that any

16  interpretation or decision made by Atmel as to the Plan's language and meaning prior to a merger is

17  binding and conclusive; 3) evidence regarding the "basis for Microchip's construction, including

18  whether Microchip expressed or received opinions and advice (and engaged in conduct) that are

19  contrary to its post-merger interpretation" "because Judge Gilliam concluded that the Plan language

20  might be found 'ambiguous,'"; and 4) "discovery into whether the Plan Administrator's

21  interpretation of the Plan language was 'arbitrary and capricious,' 'unreasonable," an 'abuse of

22  discretion,' or made in 'bad faith.'" [Dkt. 43, at 4-6.]

23       Discovery goes both ways. Plaintiffs cite no holding that only plan beneficiaries and not

24  Defendants are allowed to rely on evidence outside the administrative record to interpret an

25  ambiguous plan under a *de novo* review. Of course, a review of the evidence produced in discovery

26  makes clear why, once Plaintiffs received the discovery they had fought so hard for, they suddenly

27  changed course and argued that the Court is barred from even considering the evidence.

28       For example, once there was a potential second suitor submitting an offer after the November

1, 2015 deadline, employees understandably started asking whether the Atmel Plan would still apply and no one gave them a definitive answer that it did apply. [Ex. 1, at Ex. U; Exs. 2-4.] In-house and external attorneys for Atmel similarly felt the Atmel Plan could be ambiguous and recommended going back to the Atmel Board of Directors and/or the Compensation Committee to amend the Plan [Ex. 1, at Exs. A-C] – which never happened despite the plan requirement that the Company's Board of Directors and/or the Compensation Committee must approve any "Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program." [Dkt. 157, at 1030.] Perhaps even more telling is the fact that *no one* during those discussions between company executives and counsel suggested that they discussed this situation when drafting the Atmel Plan or drafted any language that anticipated and provided for the Atmel Plan to apply in this situation.

Similarly, refuting the argument that the January 14, 2016 Director-level Equity Letter was intended as an interpretation that the Atmel Plan applied to the Microchip merger, internal emails showed that the letter was drafted specifically to formalize in writing what the Director-level employees were told verbally in September 2015 about their separate equity acceleration benefits program. [Ex. 1, at Ex. D-F.] Had the letter been intended as a formal interpretation of the Atmel Plan (even assuming it was made by someone with fiduciary authority to do so, which Plaintiffs fail to even allege let alone establish), it necessarily would have gone to everyone who received the Atmel Plan. Instead, it went to only a few, high-level Director employees and was marked "confidential" [Dkt. 157, at 421]; not surprisingly, none of the Plaintiffs claim they saw the letter. Similarly, had the January 14, 2016 letter been intended as an interpretation of the Atmel Plan, Atmel certainly would have communicated it to *all* employees. Yet, Zoumaras' letter attempting to do that was never finalized or distributed after Wornow directed the draft FAQs must follow the language of the Microchip definitive agreement. [Ex. 1, at Exs. I-M.] And Wornow did not want to put the January 14, 2016 letter (or anything else "new or old") into the data room because "I do not want Microchip to have the impression we are adding to our plans or introducing new employees, which we said we would not do."[8] [*Id.* at Ex. F.]

---

[8] The January 14, 2016 Director-level Equity Letter was not placed in the data room. [*See* Ex. 1, at

24

1        Not surprising, employees continued to question whether the Atmel Plan would apply to the

2   Microchip merger after Atmel disseminated the February 3, 2016 FAQs. [*Id.* at Ex. U; Exs. 2-4.]

3   While Plaintiffs allege they were verbally told that the Atmel Plan would apply, Atmel's CEO told

4   all employees that it was no longer a guarantee, and other managers told employees it did not apply

5   and was "not worth the paper it was written on." [Exs. 2-4.] Tellingly, Atmel did not issue any

6   statement to the larger group of employees saying the Plan applied to the Microchip merger.

7   **III.   <u>CONCLUSION</u>**

8        For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'

9   Partial Motion for Summary Judgment in its entirety.[9] Defendants further request that, based on the

10  applicable deferential review standard, the Court should grant summary judgment to Defendants that

11  Plaintiffs' are not entitled to benefits under the Atmel Plan as a matter of law.

12  DATED: August 23, 2021

13                                         OGLETREE, DEAKINS, NASH, SMOAK &

14                                         STEWART, P.C.

15                                         By: */s/ Mark G. Kisicki*

16                                               Mark G. Kisicki

17                                               Elizabeth M. Soveranez

18                                               2415 East Camelback Road, Suite 800
                                             Phoenix, Arizona 85016

19                                               Mark Schmidtke, admitted *pro hac vice*

20                                               56 S. Washington Street, Suite 302
                                           Valparaiso, IN 46383

21

22                                             *Attorneys for Defendants*

23

24  _____

   Exs. F and S at 33-34.]

25  [9] Plaintiffs argue that there is no reason for the Court to defer deciding their MPSJ pending further
discovery. While Defendants do not understand Plaintiffs' insistence on moving for summary

26  judgment and setting the oral argument before the discovery period even closes – rather than just
using the January 13, 2022 dispositive motion date already set in the scheduling order – Defendants

27  are filing their opposition at this time to demonstrate a good faith effort to resolve the case. However,
responding to Plaintiffs' early motion certainly does not cut off Defendants' entitlement to complete

28  discovery during the period allotted under the scheduling order, especially in regards to Plaintiffs'
other claims not addressed in their current MPSJ.

1

**PROOF OF SERVICE**

2

I, Bernadette Young, declare:

3

I am a citizen of the United States and employed in Maricopa County, Arizona. I am over the

4

age of eighteen years and not a party to this action. My business address is 2415 East Camelback

5

Road, Suite 800, Phoenix, Arizona 85016. On August 23, 2021, I served a copy of:

6

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

7

8

by electronic transmission.

9

I am familiar with the United States District Court, Northern District of California's practice

10

for collecting and processing electronic filings. Under that practice, documents are electronically

11

filed with the court. The court's CM/ECF system will generate a Notice of Electronic Filing (NEF)

12

to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute

13

service of the document. Registration as a CM/ECF user constitutes consent to electronic service

14

through the court's transmission facilities. Under said practice, the following CM/ECF users were

15

served:

16

Michael Rubin                                                    Attorneys for Plaintiffs

17

ALTSHULER BERZON LLP
177 Post Street, Suite 300

18

San Francisco, CA 94108

19

Cliff Palefsky

20

Keith Ehrman
MCGUINN, HILLSMAN & PALEFSKY

21

535 Pacific Avenue
San Francisco, CA 94133

22

23

William B. Reilly
LAW OFFICE OF WILLIAM REILLY

24

86 Molino Avenue
Mill Valley, CA 94941

25

Executed on August 23, 2021, at Phoenix, Arizona.

26

/s/ Bernadette Young

27

48263560.1

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT