UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN BERMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MICROCHIP TECHNOLOGY INCORPORATED, et al.,<br><br>Defendants. | Case No. 17-cv-01864-HSG<br><br>**ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 145, 163 |

Pending before the Court are the parties' cross-motions for summary judgment. Dkt. Nos. 145, 163. The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). For the reasons detailed below, the Court **DENIES** the motions.

## I.   BACKGROUND

### A.   Factual Background

The parties are aware of the facts of this case, and many remain undisputed. Plaintiffs are former employees of Defendant Atmel Corporation.[1] In July 2015, Atmel created the U.S. Severance Guarantee Benefit Program ("Plan" or "Atmel Plan"). *See* Dkt. Nos. 150–158 ("Administrative Record" or "AR") at 4115–19. The cover letter distributed with the Plan said that Atmel recognized there "ha[d] been significant market speculation regarding possible transactions involving the company," and that "such rumors can be distracting and unsettling." *Id.* at 4117. The letter further explained that the Plan was "intended to ease concerns among [] employees" and allow them to "focus[] on [the company's] continued success." *See id.* In

---

[1] Plaintiffs are Robin Berman, Bo Kang, Khashayar Mirfakhrael, Thang Van Vu, Donna Viera-Castillo, Girish Ramesh, Patrick Hanley, Ilana Shternshain, and Mandy Schwarz.

September 2015, Atmel entered into an agreement with Dialog Semiconductor, under which Dialog would acquire Atmel. *See id.* at 2202–48. Before the merger with Dialog closed, Atmel received a competing offer from Defendant Microchip Technology Inc., which it ultimately accepted. *See id.* at 2250–51.

Plaintiffs continued to work at Atmel during this time, but they were terminated without cause in 2016 following the merger with Microchip. *See, e.g.*, *id.* at 210–11, 1969–70, 1992–93, 2019–20, 2048–49, 2077–78, 2099–2100, 2121–23, 2184–85. Microchip informed them that the Plan had expired and that they were not entitled to any benefits under it, and instead offered them a fraction of the severance benefits that would have been owed under the Plan. *See, e.g.*, *id.* at 2184–85. Plaintiffs rejected Microchip's counteroffer, and contend that they were entitled to benefits under the Plan. *See, e.g.*, Dkt. No. 145 at 10–11, 19–25. Nevertheless, Carly Petrovic, Microchip's Human Resources Manager, denied Plaintiffs' claims both in the first instance and on appeal. *See, e.g.*, AR at 165–76, 238–41, 4113–14, BER-001–2. At bottom, the parties dispute the meaning of the Atmel Plan.

The relevant terms of the Plan are as follows:

> **Term of the Severance Guarantee Benefit Program:** The U.S. Severance Guarantee Benefit Program is effective from July 1, 2015 and will terminate on November 1, 2015 unless an Initial Triggering Event (as described below) has occurred prior to November 1, 2015, in which event the U.S. Severance Guarantee Benefit Program will remain in effect for 18 (eighteen) months following that Initial Triggering Event.
>
> **Eligibility:** Eligibility is limited to U.S.-based employees of Atmel Corporation as of the date a Change of Control is consummated.
>
> **Initial Triggering Event:** Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, that will result in a Change of Control of the Company. If a Definitive Agreement is not entered into on or before that date, the U.S. Severance Guarantee Benefit Program described in the letter and this Addendum will automatically expire, unless expressly extended by the Company's Board of Directors.
>
> **Benefits Conditions:** After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if:

2

>
> (A) A Change of Control actually occurs; and
>
> (B) Their employment is terminated without "Cause" by the Company (or its successor) at any time within 18 months of the execution date of the Definitive Agreement.
>
> For purposes of this U.S. Severance Guarantee Benefit Program, the definition of "Change of Control" and "Cause" will be the same as that contained in the Company's Senior Executive Change of Control and Severance Plan.

*Id.* at 4115. The Plan further states that Atmel's successor would "assume the obligations" of the Plan. *Id.* at 4116.

As the Court previously explained, the Plan created three conditions precedent to Plaintiffs' entitlement to severance benefits: (1) an Initial Triggering Event occurred before November 1, 2015; (2) a Change of Control transpired; and (3) Plaintiffs were terminated without cause. *See* Dkt. No. 95 at 10. The key dispute among the parties is whether the first condition was met. Specifically, the parties dispute whether the Definitive Agreement that served as the Initial Triggering Event must be the same definitive agreement that ultimately resulted in the Change of Control. In other words, the key question is whether the Plan requires that the "Change of Control" occur with the same entity that entered into a "Definitive Agreement with Atmel before November 1, 2015." Plaintiffs argue that the plain language of the Plan does not require this. *See* Dkt. No. 145 at 20–25. Plaintiffs explain that the Definitive Agreement with Dialog extended the Plan another eighteen months, during which time there was a Change of Control when Microchip acquired Atmel. *See* Dkt. No. 145 at 20–25. Defendants now urge that the Plan is ambiguous, and that Microchip's plan administrator—Carly Petrovic—applied a reasonable interpretation of the Plan that is entitled to deference. *See* Dkt. No. 163 at 13–22.

### B. Procedural History

In July 2018, Plaintiffs moved for summary judgment on their denial of benefits claim and partial summary judgment on their breach of fiduciary duty claim under ERISA, 29 U.S.C. §§ 1132(a)(1)(B), (a)(3). The Court initially granted Plaintiffs' motion and denied Defendants' Rule 56(d) request for discovery. *See* Dkt. No. 95. On appeal, the Ninth Circuit reversed and remanded, concluding that the pertinent Plan language was "ambiguous," and that discovery was

therefore warranted.  *See* Dkt. No. 133 at 2.  The parties have since conducted discovery and have again moved for summary judgment.  *See* Dkt. Nos. 145, 163.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.* But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).  If a court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment. Fed. R. Civ. P. 56(a).

## III. DISCUSSION

### A. Standard of Review

As before, the parties dispute the relevant standard of review that should apply when reviewing the Plan Administrator's interpretation of the Atmel Plan.

#### i. Discretionary Authority under the Plan

A denial of ERISA benefits "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (*en banc*) ("De novo is the default standard of review.").  However, "if the plan *does* confer discretionary authority as a matter of contractual agreement, then the standard of review shifts to abuse of discretion." *Abatie*, 458 F.3d at 963 (citing *Firestone*, 489 U.S. at 115) (emphasis in original).  Such discretion must be conferred "unambiguously." *Kearney v. Standard Ins. Co.*, 175

4

F.3d 1084, 1090 (9th Cir. 1999). As the Ninth Circuit has cautioned, "[n]either the parties nor the courts should have to divine whether discretion is conferred." *See Sandy v. Reliance Standard Life Ins. Co.*, 222 F.3d 1202, 1207 (9th Cir. 2000); *see also Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1113 (9th Cir. 2001) ("If an insurance company seeking to sell and administer an ERISA plan wants to have discretion in making claims decisions, it should say so."). In any event, "[t]o assess the applicable standard of review, the starting point is the wording of the plan." *Abatie*, 458 F.3d at 962–63.

According to the Plan, "[t]he Program will be administered and interpreted by the Company." *See* AR at 4116. If the Plan language ended here, perhaps this would have amounted to a straightforward grant of discretion such that the abuse of discretion standard would apply. However, the Plan goes on to qualify the authority the Company has to administer and interpret the Plan.

Prior to a change of control, the Company's interpretations were "conclusive and binding on all persons" and entitled to "maximum" deference:

> Any decision made or other action taken by the Company prior to a Change of Control with respect to the Program, and any interpretation by the Company prior to a Change of Control of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law.

*Id.* The parties appear to agree that under this language, the Company had discretion pre-merger, so that any pre-merger actions and Plan interpretations would be subject to the abuse of discretion standard. *See* Dkt. No. 145 at 14–15; *see also* Dkt. No. 163 at 13–14. The Ninth Circuit has found that similar language established an unambiguous grant of discretion. In *McDaniel* v. *Chevron*, for example, the plan provided that the administrator "ha[d] the 'sole discretion to interpret the terms of the Plan' and that those interpretations 'shall be conclusive and binding.'" *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1107 (9th Cir. 2000). The Court reasoned that this was "sufficiently clear to overcome the presumption in favor of de novo review." *Id.*

In contrast, the Plan does not state that the Company's post-merger actions or

5

interpretations are "conclusive" or "binding." Rather, the Plan states:

> Following a Change of Control, any decision made or other action taken by the Company, and any interpretation by the Company of any term or condition of the Program, or any related document that (i) does not affect the benefits payable under the Program shall not be subject to review unless found to be arbitrary and capricious or (ii) does affect the benefits payable under the Program shall not be subject to review unless found to be unreasonable or not to have been made in good faith.

AR at 4116. The structure of the Plan appears to suggest that the drafters were concerned about the Company making changes to benefits post-merger. If the Company's actions taken post-merger do not affect the "benefits payable" under the Plan, then such conduct is not "subject to review unless found to be arbitrary and capricious." *Id.* However, if—as is the case here—the Company's conduct *does* affect the benefits payable under the Plan, such decisions are subject to review if they are "unreasonable" or not "made in good faith." *Id.* The parties dispute the significance of this language, and whether it unambiguously grants discretion to interpret the Plan.

Plaintiffs argue that this tripartite structure "does not unambiguously grant . . . discretion to construe the Plan language post-merger," and de novo review is therefore required. *See* Dkt. No. 145 at 15. Plaintiffs urge that the drafters "knew how to grant discretion" unambiguously because they did so for the Company's pre-merger decisions. *See* Dkt. No. 145 at 15–16. However, under the plain language of the plan, the Company's interpretations are only "conclusive and binding on all persons" and entitled to "maximum" deference if made pre-merger. Plaintiffs argue that the fact that the Plan does not use such clear language for post-merger decisions indicates that the drafters intended de novo review to apply to post-merger decisions that affect participants' benefits. *Id.* at 15.

For their part, Defendants contend that the abuse of discretion standard should apply. Dkt. No. 163 at 13–14. Defendants argue that the Plan's use of the phrase "unreasonable or not to have been made in good faith," AR at 4116, "incorporates virtually verbatim the arbitrary and capricious review standard." Dkt. No. 163 at 14. In *McDaniel*, for example, the Ninth Circuit explained that an administrator's decision "must be upheld under the abuse of discretion standard if it is based upon a *reasonable interpretation* of the plan's terms and if it was made in *good*

6

*faith.*" *McDaniel*, 203 F.3d at 1113 (emphasis added). In short, Defendants argue that the Company had discretionary authority warranting application of the abuse of discretion standard at all times, regardless of whether the Company's actions or interpretations occurred pre- or post-merger. *See* Dkt. No. 163 at 14 ("Plaintiffs proffer no authority mandating that multiple discretionary grants within a single plan document must use identical language").

The parties have not cited any case in which similar language has been addressed in the context of what standard of review should apply. And the Ninth Circuit has made clear that "[t]here are no 'magic' words that conjure up discretion on the part of the plan administrator." *Abatie*, 458 F.3d at 963. This is therefore a fact-specific inquiry. As relevant to the Court's task, however, the Ninth Circuit has clarified that "[o]nly by excluding alternative readings as unreasonable could we conclude that the conferral of discretion is unambiguous." *Kearney*, 175 F.3d at 1090. In order to find that the Plan unambiguously confers discretion, even post-merger, the Court must therefore conclude that Plaintiffs' proposed interpretation is unreasonable. The Court cannot do so.

Defendants do not—and indeed cannot—dispute that the plain language of the Plan draws a distinction between pre-merger and post-merger actions. *See* AR at 4116. The Plan then draws another distinction between post-merger conduct that does and does not affect participants' benefits. *Id.* It is reasonable to assume that if the drafters simply intended to confer discretionary authority on the Company, without regard to whether it was acting pre- or post-merger, there would be no need to reference a Change of Control at all. Nor would the Plan need to describe the applicable review for pre- and post-merger conduct. Instead, the Plan would simply have read:

> Any decision made or other action taken by the Company ~~prior to a Change of Control with respect to the Program~~, and any interpretation by the Company ~~prior to a Change of Control~~ of any term or condition of the Program, or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by law.

*See* AR at 4116 (alterations added). But only the Company's pre-merger actions or interpretations are explicitly "conclusive and binding." A reasonable corollary is that post-merger interpretations

7

are *not* conclusive or binding. And the Plan only provides "maximum possible deference allowed by law" for the Company's pre-merger actions or Plan interpretations. The parties appear to agree that "the maximum possible deference" in this context is abuse of discretion. *See* Dkt. No. 145 at 15–16; Dkt. No. 163 at 14–15. Again, it is reasonable to assume that the Plan drafters were trying to withhold some authority from the post-merger Company, and intended for the de novo standard to apply. This interpretation reflects the Plan language as a whole, and avoids reading out a large portion of the text as mere surplusage. *See Cree v. Waterbury*, 78 F.3d 1400, 1405 (9th Cir. 1996) (when interpreting contracts "a court must give effect to every word or term employed by the parties and reject none as meaningless or surplusage in arriving at the intention of the contracting parties") (quotation omitted).

It is also consistent with the cover letter circulated to employees with the Plan, which stated that Atmel "recognize[d] that recently there has been significant market speculation regarding possible transactions involving the company and understand that such rumors can be distracting and unsettling." *See* AR at 4117. The Plan was therefore touted as a way "[t]o support [] employees and to keep everyone focused on [Atmel's] continued success . . . ." *Id.* The cover letter further states that "you will have the opportunity to receive benefits . . . if your employment is involuntarily terminated without Cause after the occurrence of a Change of Control." *Id.* Contrary to Defendants' suggestion, the possible merger appears to be the primary driver for offering the Plan. The letter and the Plan itself suggest that the drafters intended to provide employees with some comfort—and incentive to stay—in the wake of uncertainty about Atmel's future. But the benefits offered under the Plan would be illusory if the Company after the merger could simply reinterpret the Plan to deny benefits. As this case highlights, the Company simply did not have the same incentive to protect and compensate employees after a Change of Control.

The Court further notes that in the cases cited by the parties, the Ninth Circuit found that a plan confers discretion where the administrator has exclusive and final decision-making authority. For example, the Ninth Circuit found the following language sufficient to confer discretion and require deferential review: "The responsibility for full and final determinations of eligibility for benefits; interpretation of terms; determinations of claims; and appeals of claims denied in whole

8

...

or in part under the [] Policy rests exclusively with [the administrator]." *See Abatie*, 458 F.3d at 962–66; *see also Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673, & n.8 (9th Cir. 2011) (finding plan conferred discretion where plan said administrator "shall have all powers and duties necessary to fulfill its responsibilities, including . . . [t]o interpret the Plan as it, in its sole discretion, determines to be appropriate"); *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1158–59 (9th Cir. 2001) (finding plan conferred discretion where plan gave administrator "full, final, conclusive, and binding power" to interpret policy in making claims determinations); *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 943, & n.1 (9th Cir. 1999), *abrogated in part on other grounds by Abatie*, 484 F.3d 955 (finding plan conferred discretion where it stated "we have full and exclusive authority to . . . interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy" and "any decision we make in the exercise of our authority is conclusive and binding"); *Jones v. Laborers Health & Welfare Trust Fund*, 906 F.2d 480, 481 (9th Cir. 1990) (finding plan conferred discretion where it stated the administrator had the "power . . . to construe the provisions" of the plan and such constructions were "binding").

The Plan language at issue here, however, does not make clear that post-merger the Company had "binding" or "exclusive" discretion to administer or interpret the Plan. Rather, as already noted, the Company's interpretations are only "conclusive and binding on all persons" if made pre-merger. *See* AR at 4116.

The Court need not decide at this stage who has the better interpretation of the Plan. Because the Court cannot rule out Plaintiffs' interpretation as unreasonable, the Court finds that the Plan does not "unambiguously" confer discretion. *See Kearney*, 175 F.3d at 1090. In the face of such ambiguity, the Court applies the de novo standard of review. *See Sandy*, 222 F.3d at 1207 (noting that plan language "should be clear," otherwise "the standard of review will be de novo.").

### ii. Authorization under the Plan

Plaintiffs further argue that even if the Plan granted discretion to the administrator post-merger, de novo review should still apply because Carly Petrovic was not authorized to review Plaintiffs' appeals. *See* Dkt. No. 145 at 16.

9

The Plan authorized the Company to delegate its authority to "one or more officers of the Company." Specifically, the Plan stated as follows:

> The Company may, in its sole discretion and on such terms and conditions as it may provide, delegate in writing to one or more officers of the Company all or any portion of its authority or responsibility with respect to the Program; provided, however, that any Program amendment or termination or any other action that could reasonably be expected to increase significantly the cost of the Program must be approved by the Company's Board of Directors or the Compensation Committee of the Board of Directors.

AR at 4115. In June 2016, after the merger with Microchip, the Board passed a resolution expressly designating Carly Petrovic "as the Plan Administrator of the [Atmel Plan]." *See* AR at 4113. The resolution also expressly designated "Sue Flores, Microchip's Senior Manager, Compensation Benefits" as "the Claims Appeal Administrator of the [Atmel Plan]." *Id.* Ms. Flores—not Ms. Petrovic—was thus authorized to review appeals. Yet Ms. Petrovic alone reviewed and denied Plaintiffs' appeals. *See, e.g., id.* at 165–76, 238–41, 4113–14, BER-001–2. The Ninth Circuit has recognized that "[w]hen an unauthorized body that does not have fiduciary discretion to determine benefits eligibility renders such a decision . . . deferential review is not warranted." *See Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) (quotation omitted); *Shane v. Albertson's Inc.*, 504 F.3d 1166, 1170–71 (9th Cir. 2007) (same).

Despite the language of the Board resolution, Defendants suggest that as plan administrator, Ms. Petrovic still had authority to review and decide claim appeals. *See* Dkt. No. 163 at 15–16; Dkt. No. 166 at 5–6 ("Petrovic's authority as Plan Administrator was much broader, but that does not mean she lacked the narrower authority to decide claim appeals."). Defendants cite 29 U.S.C. § 1133, and point out that it does not prohibit the same person from deciding claims and claim appeals. *See id.* But § 1133 requires that the claim appeal be conducted "by the appropriate named fiduciary." *See* 29 U.S.C. § 1133(b). And here, the Board resolution designated specific authority to someone else for claim appeals. Defendants have not cited any evidence to support their contention that the Company also designated authority to Ms. Petrovic to

10

decide claim appeals. They also do not cite any authority that the Court may ignore limitations imposed by the Company on the administrator's authority.

Instead, Defendants explain why it was sensible in their view for Ms. Petrovic to decide the appeals. *See* Dkt. No. 166 at 6; *see also* Dkt. No. 163 at 21–22. Ms. Flores, they explain, had been involved in terminations. *See* Dkt. No. 163 at 21. They state that Ms. Flores "was actively involved in terminations of Atmel employees and in drafting communications stating that the Atmel Plan did not apply to them." *Id.* Had she decided Plaintiffs' appeals as specified by the Board resolution, Defendants argue that Plaintiffs would have complained that Ms. Flores had a conflict of interest. *Id.* However purportedly well-intentioned Defendants' plans may have been, they have not pointed to any document authorizing Ms. Petrovic to decide claim appeals. Moreover, if Ms. Flores was potentially conflicted, as Defendants claim, the Company could have authorized someone else as appeal administrator, but it didn't. For this additional reason, the Court finds that de novo review is appropriate.

### iii. Conflict of Interest

Lastly, Plaintiffs argue that even if de novo review applies, there are conflicts of interest that would require more exacting scrutiny of the administrator's decisions here. *See* Dkt. No. 145 at 16–18; Dkt. No. 165 at 20–21. The Court agrees.

The Supreme Court "has noted that a conflict of interest in an ERISA case can affect judicial review." *Abatie*, 458 F.3d at 965; *see also Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 384, n. 15 (2002) ("It is a fair question just how deferential the review can be when the judicial eye is peeled for conflict of interest."). The Supreme Court explained that the "conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115 (quotation omitted). This depends on the unique circumstances of each case. A conflict may "prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . ." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). In contrast, a conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ." *Id.* This includes, "for example, [] walling off claims administrators

11

1  from those interested in firm finances, or by imposing management checks that penalize inaccurate
2  decisionmaking irrespective of whom the inaccuracy benefits." *Id.*
3        Here, Plaintiffs identify two conflicts: a structural conflict and a personal conflict. Dkt.
4  No. 145 at 16–18. A structural conflict exists where "the employer [] both funds the plan and
5  evaluates the claims." *Glenn*, 554 U.S. at 112. This is problematic because "every dollar
6  provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in
7  [the employer's] pocket." *See id.* (quotation omitted). The parties appear to agree that this
8  conflict exists here because the Plan was self-funded. *Compare* Dkt. No. 145 at 17, *with* Dkt. No.
9  163 at 20, & n.5. Plaintiffs also argue that Ms. Petrovic had a conflict of interest because she was
10  a director in Microchip's Human Resources Department. *See* Dkt. No. 145 at 17–18.
11        Plaintiffs note that Microchip's HR Department was responsible for post-merger
12  communications informing former Atmel employees that the Plan had expired. *See, e.g.*, AR at
13  1933–38, 2121–23, 2184–85. Lauren Carr, the Vice President of Global Human Resources,
14  signed the letters sent to terminated employees offering them a new severance agreement "in part
15  to resolve any current disagreement or misunderstanding regarding severance benefits previously
16  offered by the Company . . . ." *Id.* at 1933. Plaintiffs have cited evidence that before Ms. Petrovic
17  reviewed Plaintiffs' claims, her supervisor (Ms. Carr) informed Ms. Petrovic that Microchip had
18  already determined that the Plan had expired and that the former Atmel employees would not be
19  entitled to severance benefits under the Plan. *See, e.g.*, Dkt. No. 165-1, Ex. D ("Carr Depo.") at
20  67:17–68:11; Dkt. No. 165-1, Ex. C ("Petrovic Depo.") at 14:4–25, 51:8–54:19. Defendants do
21  not engage with this evidence, except to argue that they selected someone who "had no prior
22  involvement with the Atmel Plan," and "[u]nder Plaintiffs' theory, no employee of Microchip at
23  any level could have administered the benefit claim process." *See* Dkt. No. 166 at 7. But Ms.
24  Petrovic's direct supervisor provided the Company's position, such that Ms. Petrovic was not
25  "walled off" from those involved in the ongoing dispute. And as noted in Section III.A.ii above,
26  Defendants could have authorized someone else to review the claims.
27        The Court therefore agrees with Plaintiffs that even under the abuse of discretion standard,
28  the Court would need to take these conflicts into account when evaluating the administrator's

decisions.

**B.  Scope of Evidence**

Next, the parties disagree about whether—and to what extent—the Court can consider evidence outside the Administrative Record. *Compare* Dkt. No. 145 at 18–19, *with* Dkt. No. 163 at 1, 22–23. Plaintiffs argue that the Court's review "must be based solely on the Administrative Record." *See* Dkt. No. 145 at 18. Plaintiffs appear to believe that, despite the Ninth Circuit's ruling, the Court should simply adopt its prior order and find that the denial of benefits was incorrect under the plain language of the Plan. The Court declines Plaintiffs' invitation to sidestep the Ninth Circuit's mandate in this way.

Additionally, Plaintiffs' own authorities recognize that the Court may consider new evidence outside the administrative record in certain circumstances. In *Abatie*, for example, the Ninth Circuit confirmed that "consideration of new evidence is permitted [] in conjunction with de novo review of a denial of benefits." *Abatie*, 458 F.3d at 969. Moreover, the Ninth Circuit concluded that the language of the Atmel Plan was ambiguous and discovery was warranted. *See* Dkt. No. 133 at 2. The Court therefore reversed the denial of Defendants' Rule 56(d) motion for additional discovery. *See id.* In its opposition and reply brief, Plaintiffs appear to acknowledge this point. *See* Dkt. No. 165 at 8–9. If the Ninth Circuit believed this case could be decided on the administrative record, there would have been no reason to reverse the Court's denial of the Rule 56(d) motion. Consideration of evidence outside the administrative record is clearly necessary to determine the meaning of the Atmel Plan. *See Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) ("When a plan is ambiguous, . . . a court typically will examine extrinsic evidence to determine the intent of the parties.") (quotation omitted). The Court understands that Plaintiffs may dispute the meaning and significance of Defendants' evidence, *see* Dkt. No. 165 at 11–14, but that does not preclude the Court from considering it in the first instance.

**C.  Interpretation of the Atmel Plan**

The Court therefore turns to the meaning of the Atmel Plan. Plaintiffs argue that the Court should grant summary judgment in their favor, regardless of the standard of review that applies. *See* Dkt. No. 145 at 19–23. Defendants, in turn, respond that if de novo review applies, summary

13

1 judgment cannot be granted for either party. *See* Dkt. No. 163 at 22–25. The Court agrees with
2 Defendants that there is at least one genuine dispute of material fact that precludes summary
3 judgment.
4      From the outset of this case, the parties have disputed the meaning of the Atmel Plan. As
5 relevant, under the Plan:

> Benefits under the U.S. Severance Guarantee Benefit Program will become available to eligible employees only if the Company enters into a definitive agreement (a "Definitive Agreement"), on or before November 1, 2015, *that will result in a Change of Control* of the Company.
>
> . . .
>
> After an Initial Triggering Event occurs that makes available to eligible employees the U.S. Severance Guarantee Benefit Program, participants will then be entitled to receive cash payments and COBRA benefits if, but only if . . . [a] Change of Control actually occurs.

13 AR at 4115 (emphasis added). Specifically, the Ninth Circuit concluded that the language
14 highlighted above is ambiguous as to whether the Definitive Agreement that constitutes an Initial
15 Triggering Event must ultimately result in the Change of Control. The Ninth Circuit believed that
16 "reasonable parties could disagree as to whether the [Atmel] Plan required the Initial Triggering
17 Event and the Change of Control to involve the same merger partner." Dkt. No. 133 at 2.
18      The parties have each proffered evidence that they believe helps elucidate what the Plan
19 means. Plaintiffs, for their part, point to deposition testimony from Atmel's CEO, Steve Laub,
20 and Senior Vice President of Human Resources, Suzanne Zoumaras, who helped develop and
21 implement the Atmel Plan. During Mr. Laub's deposition, for example, he testified that his
22 understanding was that the Plan remained in effect and would apply to all Atmel employees who
23 were employed at the time of the Microchip acquisition. *See* Dkt. No. 165-1, Ex. B ("Laub
24 Depo.") at 7:1–14:5, 18:6–21, 24:2–16, 28:11–25, 29:12–16, 32:23–33:14, 34:23–35:13, & Ex. 1.
25 Mr. Laub explained that "[i]t was clear from our perspective that the [P]lan should apply to any
26 potential acquirer." *See id.* at 29:15–16. He further testified that Atmel's executive team had
27 assured employees that they would be covered under the Plan regardless of whether Dialog or
28 Microchip ultimately acquired Atmel. *Id.* at 7:1–14:5, 18:6–21, 24:2–16, 28:11–25.

Ms. Zoumaras similarly testified that at the time she drafted the Plan, she was "particularly sensitive to the potential that there was a superior bid at some point," so "[t]here was language put in the agreement [] specifically to address" this scenario. *See* Dkt. No. 165-1, Ex. A ("Zoumaras Depo.") at 8:18–9:6, 11:18–13:18, 18:5–24:24, 25:1–27:24, 32:16–36:6, 41:4–10, 59:21–60:17, 91:21–92:18, & Exs. 1 & 4. She said that she intentionally "did not want to draft something that would be defined by a single change of control trigger because we knew that that could change." *Id.* at 20:3–11. Ms. Zoumaras confirmed that she drafted the Plan so that any change of control would satisfy the Plan's requirement. *Id.* at 20:14–25.

Ms. Zoumaras later circulated a "Frequently Asked Questions" ("FAQ") document to Atmel employees, entitled "Microchip Transaction: Effect on Compensation and Benefits for U.S. Employees." *See* AR at 422–26. The document stated that Microchip agreed to "honor each of your employment and compensatory contracts (including . . . severance [] agreements) with Atmel . . . that are in effect immediately prior to the closing of the transaction." *See id.* at 422. Ms. Zoumaras also drafted a letter to some employees, confirming the benefits to which they would be entitled if their "employment is involuntarily terminated without Cause in connection with a Change of Control of the company, including an acquisition by Dialog or Microchip." *See, e.g.*, *id.* at 1924. She explicitly stated that the Atmel Plan "remain[s] in place." *Id.*

Defendants point out that once Microchip submitted a competing offer, Atmel employees began asking whether the Atmel Plan would still apply. *See, e.g.*, Dkt. No. 163-1, Ex. U. Some people specifically asked "[a]t what point do the severance letters we received expire?" *See id.* at 9420. Another person asked "is Dialog offer consider[ed] initial triggering event for Microchip acquisition?" *See id.* at 4439. However, it appears that no one provided a definitive response. *See, e.g.*, Dkt. No. 163-1, Ex. U. During a meeting in January 2016, Mr. Laub told employees that the "Atmel Plan was no longer a guarantee with the Microchip merger." *See* Dkt. No. 163-1, Ex. 3 at ¶¶ 7–8. Defendants point out that Atmel's attorneys recognized the ambiguity and recommended that the Board amend the Plan, but the Board never did so. *See id.*, Ex. 1 at Exs. A–C. Defendants also note that Ms. Zoumaras tried to clarify specifically in an initial draft of the FAQ that Microchip would honor the Atmel Plan, but this language was eventually removed. *See*

15

*id.*, Ex. 1 at Exs. I–M. Defendants point out that despite the obvious confusion among employees, Atmel never issued any official response confirming that the Atmel Plan remained valid. *See* Dkt. No. 8–9.

Although not overwhelming, the Court finds that Defendants have offered evidence that could be read to contradict Plaintiffs' interpretation of the Plan. The parties have thus raised at least one genuine dispute of material fact that precludes summary judgment. *See* Fed. R. Civ. P. 56(a).

## IV. CONCLUSION

Accordingly, the Court **DENIES** the motions. The Court further **SETS** a telephonic case management conference on August 25, 2022, at 1:30 p.m. All counsel shall use the following dial-in information to access the call:

Dial-In: 888-808-6929;

Passcode: 6064255

For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines. The Court **DIRECTS** the parties to meet and confer and submit a joint case management statement by August 16, 2022. The parties should be prepared to discuss how to move this case forward efficiently.

**IT IS SO ORDERED.**

Dated: 7/29/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge